SEALED

FILED
2017 APR 12 AM 10: 31
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____

SA17CV 317 FB

1   NIALL P. McCARTHY (California Bar. No. 160175, to be admitted pro hac vice)
nmccarthy@cpmlegal.com
2   JUSTIN T. BERGER (California Bar. No. 250346, to be admitted pro hac vice)
jberger@cpmlegal.com
3   ADAM SHAPIRO (California Bar No. 267429, to be admitted pro hac vice)
ashapiro@cpmlegal.com
4   **COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
5   840 Malcolm Road
Burlingame, CA 94010
6   Telephone: (650) 697-6000
Facsimile: (650) 697-0577
7
WALLACE M. BRYLAK, JR. (Texas Bar No. 03283360)
8   wbrylak@brylaklaw.com
**BRYLAK & ASSOCIATES**
9   15900 La Cantera Pkwy Ste 19245
San Antonio, TX 78256-2468
10   Telephone:  (210) 733-5533
Facsimile: (210) 558-4804
11
*Attorneys for Relators*
12

### IN THE UNITED STATES DISTRICT COURT

13

### WESTERN DISTRICT OF TEXAS

14

| | |
|---|---|
| 15 **UNITED STATES OF AMERICA** *ex rel.* **TIFFANY MONTCRIEFF, ROBERTA MARTINEZ**, and **ALICIA BURNETT**, | CASE NO. _____ |
| 16 | **COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FALSE CLAIMS ACT** |
| 17 Plaintiffs, | |
| 18 v. | |
| 19 **PERIPHERAL VASCULAR ASSOCIATES, P.A.** | **DEMAND FOR JURY TRIAL** |
| 20 Defendant. | |

21

22

23   **[FILED IN CAMERA AND UNDER SEAL**

24   **PURSUANT TO 31 U.S.C. § 3730(b)(2)]**

25

26

27

28

**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE ......................................................................... 1

III.   PARTIES ............................................................................................................ 1

IV.   OVERVIEW OF THE SCHEME ...................................................................... 2

      A.   The United States Medicare System ...................................................... 2

      B.   Ultasound Imaging ................................................................................. 4

      C.   PVA's Illicit Billing Practices ............................................................... 5

V.    EVIDENCE OF THE SCHEME ....................................................................... 7

VI.   CAUSES OF ACTION ...................................................................................... 9

     FIRST CAUSE OF ACTION
     On Behalf of the United States
     Federal False Claims Act, Presenting False Claims
     31 U.S.C. § 3729(a)(1)(A) ............................................................................... 9

     SECOND CAUSE OF ACTION
     On Behalf of the United States
     Federal False Claims Act, Making or Using False Records or Statements
     Material to Payment or Approval of False Claims
     31 U.S.C. § 3729(a)(1)(B) ............................................................................. 10

     THIRD CAUSE OF ACTION
     (In the Alternative)
     On Behalf of the United States
     Federal False Claims Act, Retention of Proceeds to Which Not Entitled
     31 U.S.C. § 3729(a)(1)(G) ............................................................................. 11

VII.  PRAYER FOR RELIEF .................................................................................. 11

VIII. JURY DEMAND .............................................................................................. 13

## I.    INTRODUCTION

1.    Relators Tiffany Montcrieff, Roberta Martinez, and Alicia Burnett (collectively, "Relators") bring this action on behalf of the United States to recover losses sustained by the Medicare Program as a result of the operations of Defendant Peripheral Vascular Associates, P.A. (PVA).  Over the course of at least the last five years, PVA has defrauded the government by systematically charging Medicare for incomplete and unnecessary ultrasound studies.

2.    Specifically, PVA often bills for ultrasounds for which either a final report has not been completed or both a preliminary and final report have not been completed.  In doing so, PVA is effectively billing for services which have not been rendered.

3.    PVA also frequently orders ultrasounds for a patient before that patient has been seen by a doctor and the doctor has determined whether an ultrasound is necessary and what kind should be performed.  As a result, PVA has ordered thousands of unnecessary ultrasounds.

## II.    JURISDICTION AND VENUE

4.    This Court has jurisdiction over the claims raised in this complaint under 28 U.S.C. § 1331 as they arise under Federal law.  This Court also has jurisdiction over this action pursuant to 31 U.S.C. § 3732, which confers jurisdiction for claims brought under the False Claims Act on the District Courts of the United States.

5.    Venue is proper pursuant to 31 U.S.C. § 3732(a), as Defendant transacts business in this district.

## III.    PARTIES

6.    The Plaintiff in this action is the United States of America (United States) by and through Relators Tiffany Montcrieff, Roberta Martinez, and Alicia Burnett.

7.    Relator Tiffany Montcrieff is a registered cardiovascular sonographer.  She worked at PVA from March 2016 through November 2016.  Montrcrieff is an original source of the information contained herein.  Montcrieff voluntarily provided the Government with the information contained herein before bringing this action.

8.    Relator Martinez is a registered vascular technologist.  She was a sonographer at PVA from March 9, 2015 until she was wrongfully terminated on September 2, 2016, after she

1  alerted her supervisors to the fraudulent scheme alleged herein.  Martinez is an original source of

2  the information contained herein.  Martinez voluntarily provided the Government with the

3  information contained herein before bringing this action.

4       9.     Relator Alicia Burnett is a registered vascular technician.  She has been employed

5  by PVA since January 2015.  Burnett voluntarily provided the Government with the information

6  contained herein before bringing this action.

7       10.    Defendant PVA is a Texas corporation which conducts business in Texas.

8  According to PVA's website, it has 20 locations in Texas and has become the largest single

9  specialty vascular surgery groups in the state.  PVA offers a range of services to treat and diagnose

10  peripheral vascular disease.[1]  Each of its clinics provide a full range of vascular testing services

11  through its vascular ultrasound laboratories.  PVA also contracts to provide services with various

12  hospitals in Texas.

13  **IV.    OVERVIEW OF THE SCHEME**

14      **A.    THE UNITED STATES MEDICARE SYSTEM**

15       11.    Medicare is a federally-funded health care program that provides medical insurance

16  coverage to qualified residents of the United States who are aged 65 and older, younger people

17  with permanent or congenital disabilities, or those who meet other special criteria like the End

18  Stage Renal Disease program.  The vast majority of Medicare's costs are paid by United States

19  citizens through their taxes.  Medicare pays for medical expenses, such as doctor visits, hospital

20  stays, and as pertinent to this case, ultrasounds.

21       12.    Title XVII of the Social Security Act establishes the Medicare Program

22  (technically, the "Health Insurance for the Aged and Disabled Program").  See 42 U.S.C. § 1397 *et*

23  *seq.*

24       13.    The United States provides reimbursement for Medicare claims from the Medicare

25  Trust Funds through the Centers for Medicare & Medicaid Services ("CMS"), which is the

26  operating division of the United States Department of Health & Human Services ("HHS").  CMS,

27

28

---

[1] Peripheral vascular disease or peripheral arterial disease is a slow and progressive circulation disorder. It may involve disease in any of the blood vessels outside of the heart and diseases of the lymph vessels - the arteries, veins, or lymphatic vessels. Organs supplied by these vessels such as the brain, heart, and legs, may not receive adequate blood flow for ordinary function.

1   in turn, contracts out to Medicare Administrative Contractors ("MACs"), also known as carriers, to

2   review, approve, and pay Medicare claims received from healthcare providers like PVA.

3       14.   Medicare payments are typically made directly to healthcare providers rather than

4   the patient, as Medicare recipients routinely assign their right to payment to the healthcare

5   provider, such as PVA.  Once a Medicare recipient assigns their right to payment to a provider, the

6   provider then submits its bill directly to Medicare for payment

7       15.   To bill Medicare, a provider must submit an electronic or hard-copy claim form

8   called a CMS-1500 form.  When submitting the form, the provider must certify that the services in

9   question were "medically indicated and necessary for the health of the patient."

10      16.   The CMS-1500 form requires the provider to state, among other things, the

11   procedure(s) for which it is billing Medicare, the provider number, the identity of the patient, and a

12   short narrative explaining the diagnosis and the medical necessity of services that the provider

13   rendered.

14      17.   All healthcare providers, including PVA, must comply with all applicable statutes,

15   regulations, and guidelines in order to be reimbursed by Medicare.  Providers have a duty to have

16   knowledge of the relevant statutes, regulations, and guidelines regarding coverage for Medicare

17   services.

18      18.   For example, Medicare reimburses only reasonable and necessary medical services

19   furnished to beneficiaries and excludes from payment services that are not reasonable and

20   necessary.  See 42 U.S.C. § 1395y(a)(1)(A); see also 42 C.F.R. § 411.115(k).  Providers must also

21   assure that they provide medical services to Medicare recipients "economically and only when,

22   and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1).

23      19.   Because it is not realistically feasible to review medical documentation before

24   paying each claim, MACs generally make payment under Medicare based on the providers'

25   certification on the Medicare claim form that the services in question were "medically indicated

26   and necessary for the health of the patient."

27

28   / / /

**B.      ULTASOUND IMAGING**

20.      Ultrasound imaging is a non-invasive test that uses sound waves to produce pictures of the inside of the body.  Doppler ultrasound can be used to diagnose peripheral vascular disease.  It can depict blood flow by bouncing high-frequency sound waves off of red blood cells to create images of blood vessels, tissues, and organs.  Faintness or absence of sound may indicate an obstruction of blood flow.  Additionally, Doppler ultrasound can detect abnormal blood flow within a vessel, which can indicate a blockage caused by a blood clot, plaque, or inflammation.

21.      Medicare covers imaging services, including ultrasound and Doppler imaging that are performed or supervised by a physician who is certified by the American Board of Radiology or for whom radiology services account for at least 50 percent of the total amount of charges under Medicare.

22.      Imaging services are billed under Medicare Part B to Medicare Carriers and MACs using acceptable Healthcare Common Procedure Coding System (HCPCS) codes for imaging and other diagnostic services taken primarily from the Current Procedural Terminology (CPT).  CPT Codes correspond to an ICD[1]10 diagnostic code, which classifies a disease or condition.  Imaging services are generally paid based on the lower of the charge or the Medicare Physician Fee Schedule (MPFS) amount.

23.      Generally, imaging services are split into a professional component and a technical component, each separately billable to the local Medicare contractor.  The professional component is performed by the physician, and may include supervision, interpretation, and a written report.  The technical component of a service includes the provision of all equipment, supplies, personnel, and costs related to the performance of the exam.

24.      To claim only the technical component of a service, service providers must append the modifier "TC", to the appropriate CPT code when billing for a service.

25.      Under the relevant regulations, Medicare carriers pay service providers for interpretations of imaging, such as ultrasound procedures, only if there is a written report prepared for inclusion in the patient's medical record maintained by the service provider.  42 C.F.R. §

---

[1] The International Classification of Diseases 10 Codes (ICD 10 Codes) are a set of medical diagnostic codes which describe an injury or disease.

1  415.120, subd. (a).  Additionally, the services must contribute directly to the diagnosis or treatment

2  of an individual beneficiary.  *Ibid*; 42 C.F.R. § 415.102, subd. (a)(2).

3  ## C.    PVA'S ILLICIT BILLING PRACTICES

4          26.      Over the last several years, PVA has engaged in a pattern and practice of

5  fraudulently billing Medicare for sonography reports.  PVA often bills for incomplete reports.

6  These reports are billed before they are interpreted and signed by a credentialed physician or

7  alternatively, before a sonographer even has the opportunity to complete a preliminary report.

8  PVA also frequently orders an ultrasound — and then later bills for that ultrasound — before a

9  doctor has seen the patient and determined whether an ultrasound is necessary or what kind should

10  be performed.

11         27.      PVA employs about 40 sonographers across all PVA locations and contracted

12  hospitals, and its staff generates approximately 6,000 to 7,000 ultrasound studies each month.  A

13  significant number of these reports are incomplete when they are billed.  Moreover, about 75

14  percent to 85 percent of PVA's patients are over the age of 65, and most of these patients are on

15  Medicare.

16         28.      In the appropriate process, a patient's primary care physician (PCP) refers the

17  patient to PVA and the patient is designated as "scheduled" in MedStreaming, PVA's workflow

18  and clinical data management tool.  Next, the patient has an initial appointment with a doctor at

19  PVA, and the doctor orders the appropriate and necessary tests.  The sonographer then performs

20  the tests and, once the images are captured in MedStreaming, the patient's status is designated as

21  "Acquired" in the system.  The status is changed to "Ready" after a sonographer begins a

22  preliminary report, but before that report is finished.  Once the sonographer completes a

23  preliminary report and the information is sent to the physician, the patient's MedStreaming status

24  changes to "QA."  At this point, the technical component can be billed and the doctor is alerted

25  that the study and images are ready for his or her review.  Finally, a doctor reviews the preliminary

26  report, including the images, and interprets the study.  After the doctor's review is complete, the

27  MedStreaming status becomes "Final," and the professional component can be billed.

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT**
DM No. 213583

5

29.     PVA, however, regularly fails to follow this procedure, resulting in improper charges to Medicare.  PVA frequently bills Medicare for both the professional and technical components, even though a patient's status is "Acquired," Ready," or "QA" and the professional component is never completed.  In these cases, PVA submits a bill to Medicare for its services after a sonographer completes a preliminary report, but before a doctor has seen the report, reviewed the patient's images, or interpreted or provided an independent assessment of the results.  In most if not all of these cases, the professional component is never completed, even though PVA is billing for it.  Relators personally witnessed this very situation on a number of occasions during their employment at PVA when they were checking patients' status on MedStreaming.

30.     Moreover, in the absence of a final report, doctors would sometimes ask Relators about preliminary ultrasound results or rely on the preliminary report drafted by Relators, without looking at the images themselves.  Thus, the medical providers did not provide an independent assessment of the images.  Patients are often told to come back to PVA for a new ultrasound every six months, even though a final professional assessment with a final report for a prior ultrasound has not been completed.

31.     In other cases, PVA bills Medicare for both the technical and professional components before either is completed.  In these instances, PVA bills Medicare after an ultrasound has been taken but before the sonographer has even completed a preliminary report.  Thus, the bill is submitted while the patient's status remains "Ready" in MedStreaming.  Medicare is billed even though there has been absolutely no analysis of the patient's imaging.

32.     Relators also witnessed incidents where PVA billed for imaging that was never completed due to technical errors.  For example, sometimes a doctor would reject a preliminary report and send it back to a technician to fix, but PVA would nonetheless bill for the study.  Likewise, PVA would also bill when ultrasound equipment failed and prevented images from uploading onto MedStreaming.

33.     PVA also has a practice of ordering unnecessary ultrasounds.  In these cases, PVA orders an ultrasound after a patient has been referred by a PCP, but before the patient has been evaluated by a PVA doctor.  In other words, tests are ordered before the PVA doctor has seen the

1  patient and determined what tests are necessary and appropriate.  As a result, these initial

2  ultrasounds are unnecessary and generally provide no useful information.  Moreover, PVA doctors

3  are often unaware that these initial ultrasounds have been taken, and thus will not look at them

4  before ordering subsequent ultrasounds.

5      34.    Relator Tiffany Montcrieff personally witnessed a number of fraudulent ultrasound

6  orders that were purportedly filed by her on behalf of a doctor.  In fact, Montcrieff did not file

7  these orders and had no knowledge of their existence until she discovered them on MedStreaming.

8      35.    PVA typically bills $400 to $500 for per ultrasound, although the reimbursement

9  rates of each ultrasound can vary widely.  The technical component is generally priced at about

10  $400, while the professional component generally is capped about $50.

11      36.    On information and belief, this scheme began in or around 2012, when Barbara

12  Burrow was appointed Technical Director for PVA.  Burrow pushed staff to complete more studies

13  to increase PVA's billings and drive up its revenue.  Normally, a sonographer completes an

14  average of roughly eight studies per day.  At PVA, sonographers are expected to average

15  approximately 10 to 20 studies per day.

16      37.    PVA staff have also been instructed to bill within 24 hours of imaging, even though

17  it is often impossible to complete the technical and professional components within this period.  It

18  is common knowledge at PVA that there is a long backlog of reports that need to be finished.

19  Sometimes, up to 70 studies still need finished reports.

20      38.    PVA and its agents, including Burrow, are and have been aware for years of the

21  aforementioned false billing and reporting practices and have knowingly permitted such wrongful

22  practices to continue.

23  **V.     EVIDENCE OF THE SCHEME**

24      39.    The following table provides examples of instances in which PVA billed for

25  incomplete sonography studies.  For each instance, the table provides the date the image was taken

26  (date of service), the type of image taken (test type), the CPT code for the patient's condition (CPT

27  Code), the status of the report in MedStreaming after the test was billed to Medicare

28  (MedStreaming Status), the amount paid by Medicare, and the payment date.

| Date of Service | Test Type | CPT Code | MedStreaming Status | Amount Paid by Medicare | Payment Date |
|---|---|---|---|---|---|
| Oct. 18, 2016 | LE Arterial Segmental Pressure | 93922 | Scheduled (as of Nov. 3, 2016) | $65.79 | Nov. 3, 2016 |
| Apr. 13, 2016 | Dialysis Fistula | | Ready (as of Oct. 3, 2016) | $85.32 $53.83 $54.93 | Apr. 29, 2016 Apr. 29, 2016 May 24, 2016 |
| Sep. 11, 2015 | LE Arterial Segmental Pressure | 93922 | Acquired (as of Oct. 5, 2016) | $65.06 $16.85 (Tricare) | Oct. 1, 2015 Oct. 21, 2015 |
| Oct. 18, 2016 | Hemodialysis Access Scan | 93990 | Acquired (as of Nov. 3, 2016) | $54.93 | Nov. 3, 2016 |
| Jan. 20, 2016 | Dialysis Fistula, Hemodialysis Access Scan | 93990 | Acquired (as of Sep. 13, 2016) | $85.32 | Feb. 5, 2016 |
| Feb. 2, 2016 | UE Segmental with Digit | 93990 | Scheduled (as of Oct. 3, 2016) | $119.99 | Mar. 14, 2016 |

40.     The following table provides examples of studies performed by Relator Martinez in August 2016, but which remained incomplete as February 2017.  On information and belief, and based on PVA's billing protocols, PVA billed for these studies days after they were performed by Martinez.

| Date of Service | Test Type | Location of Study | Status as of February 2017 |
|---|---|---|---|
| August 25, 2016 | LE Arterial Duplex Scan | Southwest Practice | Scheduled |
| August 25, 2016 | Stent | Southwest Practice | Scheduled |
| August 25, 2016 | LE Arterial Duplex Scan | Southwest Practice | Scheduled |
| August 25, 2016 | Stent | Southwest Practice | Scheduled |
| August 24, 2016 | LE Arterial Duplex Scan | Downtown Practice | Scheduled |
| August 25, 2016 | Stent | Metro Practice | Scheduled |
| August 25, 2016 | LE Arterial Duplex Scan | Metro Practice | Scheduled |
| August 22, 2016 | Stent | Downtown Practice | Scheduled |

| | | | |
|---|---|---|---|
| August 29, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |
| August 25, 2016 | LE Arterial Segmental Pressure | Southwest Practice | Ready |
| August 25, 2016 | LE Arterial Segmental Pressure | Southwest Practice | Ready |
| August 24, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |
| August 24, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |
| August 23, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |
| August 23, 2016 | Graft Compression | Downtown Practice | Ready |
| August 25, 2016 | LE Arterial Segmental Pressure | Metro Practice | Ready |
| August 22, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |

41.     Relators have also observed a number of instances where PVA performed imaging on a patient before that patient was able to see a doctor at the practice.  For example, PVA's records show that imaging was ordered for and conducted on a patient at around 12:30 pm on September 1, 2016.  But that patient did not undergo a physical exam or see a PVA doctor until later in the day.  Likewise, imaging of another patient was taken on September 29, 2016, but the patient did not see a doctor until the following day.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### On Behalf of the United States

#### Federal False Claims Act, Presenting False Claims

#### 31 U.S.C. § 3729(a)(1)(A)

42.     Plaintiffs incorporate herein by reference and reallege the allegations stated in Paragraphs 26 through 41, inclusive, of this Complaint.

43.    PVA knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

44.    PVA knowingly presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare program for radiology that had not been rendered or were not in fact completed.

45.    The conduct of PVA violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## SECOND CAUSE OF ACTION

### On Behalf of the United States

### Federal False Claims Act, Making or Using False Records or Statements

### Material to Payment or Approval of False Claims

### 31 U.S.C. § 3729(a)(1)(B)

46.    Plaintiffs incorporate herein by reference and reallege the allegations stated in Paragraphs 26 through 41, inclusive, of this Complaint.

47.    PVA knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

48.    PVA knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by the Medicare program for radiology services that were not rendered or were never completed.

49.    The conduct of PVA violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

/ / /

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT**
DM No. 213583

10

1  **THIRD CAUSE OF ACTION**

2  **(In the Alternative)**

3  **On Behalf of the United States**

4  **Federal False Claims Act, Retention of Proceeds to Which Not Entitled**

5  **31 U.S.C. § 3729(a)(1)(G)**

6    50.    Plaintiffs incorporate herein by reference and reallege the allegations stated in

7  Paragraphs 26 through 41, inclusive, of this Complaint.

8    51.    In the alternative, PVA knowingly made, used, or caused to be made or used, a false

9  record or statement material to an obligation to pay or transmit money or property to the

10  Government, or knowingly concealed or knowingly and improperly avoided or decreased an

11  obligation to pay or transmit money or property to the Government.

12    52.    As discussed above, PVA received far more money from the Medicare programs

13  than it was entitled to.  PVA knew that it had received more money than it was entitled to, and

14  avoided is obligation to return the excess money to the Government.

15    53.    The conduct of PVA violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial

16  factor in causing the United States to sustain damages in an amount according to proof.

17  **VII.    PRAYER FOR RELIEF**

18    WHEREFORE, Plaintiff, by and through the Relators, prays judgment in its

19  favor and against Defendants as follows:

20    1.    That judgment be entered in favor of Plaintiff UNITED STATES OF AMERICA *ex*

21  *rel.* TIFFANY MONTCRIEFF, ROBERTA MARTINEZ, and ALICIA BURNETT, and against

22  Defendant PERIPHERAL VASCULAR ASSOCIATES, P.A., according to proof, as follows:

23    a.    On the First Cause of Action (Presenting False Claims (31 U.S.C. §

24  3729(a)(1)(A))) damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

25    i.    Triple the amount of damages sustained by the Government;

26    ii.    Civil penalties of Ten Thousand Dollars ($10,000.00) for each false

27    claim;

28    iii.    Recovery of costs, attorney's fees, and expenses;

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT**
DM No. 213583

11

iv.     Pre- and post-judgment interest;

v.      Such other and further relief as the Court deems just and proper.

b.      On the Second Cause of Action (False Claims Act; Making or Using False Records or Statements Material to Payment or Approval of False Claims (31 U.S.C. § 3729(a)(1)(B))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

i.      Triple the amount of damages sustained by the Government;

ii.     Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

iii.    Recovery of costs, attorney's fees, and expenses;

iv.     Pre- and post-judgment interest;

v.      Such other and further relief as the Court deems just and proper.

c.      On the Third Cause of Action (Federal False Claims Act, Retention of Proceeds to Which Not Entitled (31 U.S.C. § 3729(a)(1)(G))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

i.      Triple the amount of damages sustained by the Government;

ii.     Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

iii.    Recovery of costs, attorney's fees, and expenses;

iv.     Pre- and post-judgment interest;

v.      Such other and further relief as the Court deems just and proper.

2.      Further, Relators, on their own behalf, request that they receive such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by Plaintiff, plus an amount for their reasonable expenses incurred, plus reasonable attorney's fees and costs of this action. Relators request that their percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

3.      That Relators be awarded all costs of this action, including attorney's fees and expenses; and

4.    That Relators recover such other and further relief as the Court deems just and proper.

Dated: April 11, 2017                        **BRYLAK & ASSOCIATES**

By: _____
       WALLACE M BRYLAK JR.


**COTCHETT, PITRE & McCARTHY LLP**
         NIALL P. McCARTHY
         JUSTIN T. BERGER
         ADAM M. SHAPIRO


*Attorneys for Relators*

## VIII.    JURY DEMAND

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE

Dated: April 11, 2017                        **BRYLAK & ASSOCIATES**

By: _____
       WALLACE M BRYLAK JR.


**COTCHETT, PITRE & McCARTHY LLP**
         NIALL P. McCARTHY
         JUSTIN T. BERGER
         ADAM M. SHAPIRO


*Attorneys for Relators*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**
DM No. 213583

13