IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED
FEB 20 2019
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY DEPUTY

| | | |
|---|---|---|
| UNITED STATED OF AMERICA *ex rel.*, TIFFANY MONTCRIEFF, *et al.*, | § | |
| Relators, Plaintiffs, | § | |
| v. | § | Case No. 5:17-CV-00317-XR |
| PERIPHERAL VASCULAR ASSOCIATES, P.A., | § | |
| Defendant. | § | |

**DEFENDANT'S MOTION TO DISMISS**

Peripheral Vascular Associates, P.A. ("PVA" or "Defendant") moves to dismiss with prejudice this deficient *qui tam* civil action under the False Claims Act ("FCA") and the related employment law claims under the FCA, the Texas Medicare Fraud Prevention Act ("TMFPA"), the Family and Medical Leave Act ("FMLA"), and the *Sabine Pilot* Doctrine pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. PVA further moves to dismiss with prejudice the civil action under Rule 9(b) for failure to plead fraud with particularity, and in support shows the Court the following.

## I. INTRODUCTION

1. Relators' First Amended Complaint for Money Damages and Civil Penalties for Violations of the False Claims Act ("Complaint") is devoid of any sufficient facts to support plausible claims under the FCA, the TMFPA, or the FMLA, lacks materiality, advances mutually exclusive claims under the FCA and the *Sabine Pilot* Doctrine, and does not plead fraud with particularity. Relators' fail to satisfy the pleading obligations and burdens necessary to bring their various claims. As a result this case should be dismissed with prejudice. Although Relators Tiffany Montcrieff ("Montcrieff"), Roberta Martinez ("Martinez"), and Alicia Burnett ("Burnett") (collectively,

"Relators") are former employees of PVA, they do not individually or collectively plead the necessary fact or legal theories to move forward with this civil action. This is because, simply put, no fraud occurred and Relators do not even collectively, let alone individually, possess the requisite knowledge of facts that would support a claim of fraud or employment violations. Instead Relators, who worked as sonographers (the technicians who perform vascular ultrasound scans) and registered vascular technologists for PVA, have brought this action to seek draconian remedies under the FCA for what appear to be - at worse - an alleged handful of minor immaterial regulatory and data entry errors. But as the Department of Justice and courts across the country have long held, the FCA is not a mechanism for punishing negligence or garden variety regulatory noncompliance. *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016). That is exactly what is alleged by Relators and thus this entire case should be dismissed with prejudice.

2. Moreover, Relators' Complaint falls far short of the minimal requirements imposed by the FCA, Federal Rules of Civil Procedure, and controlling Supreme Court and Fifth Circuit precedent to survive the pleadings stage. The Complaint fails to plead the who, what, when, where, and how of the supposed schemes and entirely ignores recent Supreme Court precedent that requires specific allegations of materiality of the alleged fraud. Despite filing an amended complaint, Relators utterly fail to plead a single fact supporting their claim that PVA submitted false or fraudulent claims. They also fail to allege fraud with particularity or to state any plausible claim. For these same reasons Martinez's related FCA and TMFPA retaliation claims fail to meet the required pleading standards and should be dismissed. Martinez's FCA retaliation and *Sabine Pilot* claims also are mutually exclusive and, as such, her *Sabine Pilot* claim is should be dismissed with prejudice. Finally, Burnett's FMLA interference and retaliation claims similarly lack specificity,

including any reference to any type of inference with her FMLA rights allegedly committed by PVA and any connection between her alleged use of FMLA leave and the termination of her employment. PVA accordingly requests the Court to dismiss the Complaint with prejudice.

## II. FACTUAL BACKGROUND

### A. PVA

3. PVA is the "largest single specialty vascular surgery group in the state" of Texas. (Compl. at ¶ 10). "PVA offers a range of services to treat and diagnose peripheral vascular disease." (Compl. at ¶ 10). It has twenty locations, each of which "provide a full range of vascular testing services through its vascular ultrasound laboratories." (Compl. at ¶ 10). "PVA also contracts to provide services with various hospitals in Texas." (Compl. at ¶ 10). PVA employs about 40 sonographers across all PVA locations and contracted hospitals, and its staff generates 6,000 to 7,000 ultrasound studies each month." (Compl. at ¶ 27).

4. PVA utilizes a "workflow and clinical data management tool" called MedStreaming. (Compl. at ¶ 28). MedStreaming has several patient status designations that are expected to flow in chronological order as follows:

- "Scheduled" — Patient who has been referred to PVA and scheduled for a consult, but who has not been seen;
- "Acquired" — Patient ultrasound test performed;
- "Ready" — Sonographer has begun preliminary report;
- "QA" — Sonographer's preliminary report is complete and ready for physician review;
- "Final" — Doctor completes review of the sonography images and the preliminary report. (Compl. at ¶ 28).

### B. Relators' Employment

5. Montcrieff was hired as a registered vascular sonographer in March 2016 and was

terminated for misconduct in December 2016.[1] (Compl. at ¶7). Despite claiming to be an original source of information for this *qui tam* action and despite her employment being terminated by PVA, Montcrieff has not alleged any employment-related causes of action. Martinez was hired as a registered vascular technologist in March 2015 and was fired for misconduct in September 2016. (Compl. at ¶8). Unlike Montcrieff, Martinez has asserted several causes of action based on the termination of her employment, including claims that she was terminated in retaliation for engaging in protected activity under the FCA and the TMFPA. (Compl. at ¶¶73-85). Martinez also alleges that she was terminated based on her alleged refusal to engage in illegal conduct in violation of the *Sabine Pilot* Doctrine. (Compl. at ¶¶77-81). Burnett was employed by PVA as a registered vascular technologist from January 2016 to September 2017 when she was laid off as the result of a reduction in force at PVA's Northeast office.[2] (Compl. at ¶¶9, 44). She was approved for intermittent leave under the FMLA on or about July 18, 2017. (Compl. at ¶42). She did not actually use any of her approved FMLA leave, however. Though she has raised employment-related claims, those claims are not based on the FCA or TMFPA. Instead, she implausibly complains PVA interfered with her rights under the FMLA and then terminated her employment in retaliation for her exercise of those rights. (Compl. at ¶¶64-72).

**C. The Alleged Fraudulent Schemes**

6. Relators make unsubstantiated claims in their Complaint that PVA engaged in six alleged fraudulent "schemes" to defraud the government. *See* (Compl.) While not true or accurate, Relators' allege:

*1. Billing for Professional Component Before Doctor Completes Report* ("Scheme 1")

> PVA frequently bills Medicare for both the professional and technical components, even though a patient's status is 'Acquired,' [']Ready,' or 'QA' and the professional

[1] The Complaint misstates Montcrieff's termination date as November 2016. (Compl. at ¶7).
[2] The Complaint misstates Burnett's hire date as January 2015. (Compl. at ¶9).

component is never completed. In these cases, PVA submits a bill to Medicare for its services after a sonographer completes a preliminary report, but before a doctor has seen the report, reviewed the patient's images, or interpreted or provided an independent assessment of the results. In most, if not all of these cases, the professional component is never completed, even though PVA is billing for it. (Compl. at ¶ 29).

2. *Doctors Relied on Preliminary Reports from Sonographers* ("Scheme 2")

[I]n the absence of a final report, doctors would sometimes ask Relators about preliminary ultrasound results or rely on the preliminary report drafted by Relators, without looking at the images themselves. Thus, the medical providers did not provide an independent assessment of the images. Patients are often told to come back to PVA for a new ultrasound every six months, even though a final professional assessment with a final report for a prior ultrasound has not been completed. (Compl. at ¶ 30).

3. *Billing for Services Before Sonographer Completes Report* ("Scheme 3")

PVA bills Medicare for both the technical and professional components before either is completed. In these instances, PVA bills Medicare after an ultrasound has been taken but before the sonographer has even completed a preliminary report. Thus, the bill is submitted while the patient's status remains "Ready" in MedStreaming. Medicare is billed even though there has been absolutely no analysis of the patient's imaging. (Compl. at ¶ 31).

4. *Billing for Imaging that Was Never Completed Due to Technical Errors* ("Scheme 4")

PVA billed for imaging that was never completed due to technical errors. For example, sometimes a doctor would reject a preliminary report and send it back to a technician to fix, but PVA would nonetheless bill for the study. Likewise, PVA would also bill when ultrasound equipment failed and prevented images from uploading onto MedStreaming. (Compl. at ¶ 32).

5. *Billing for Unnecessary Ultrasound* ("Scheme 5")

PVA also has a practice of ordering unnecessary ultrasounds. In these cases, PVA orders an ultrasound after a patient has been referred by a PCP, but before the patient has been evaluated by a PVA doctor. In other words, tests are ordered before the PVA doctor has seen the patient and determined what tests are necessary and appropriate. As a result, these initial ultrasounds are unnecessary and generally provide no useful information. Moreover, PVA doctors are often unaware that these initial ultrasounds have been taken, and thus will not look at them before ordering subsequent ultrasounds. (Compl. at ¶ 33).

PVA performed imaging on a patient before that patient was able to see a doctor at the practice. For example, PVA's records show that imaging was ordered for and conducted on a patient at around 12:30 pm on September 1, 2016, but that patient

did not undergo a physical exam or see a PVA doctor until later in the day. Likewise, imaging of another patient was taken on September 29, 2016, but the patient did not see a doctor until the following day. (Compl. at ¶ 41).

6. *Fraudulent Ultrasound Orders* ("Scheme 6")

Montcrieff personally witnessed a number of fraudulent ultrasound orders that were purportedly filed by her on behalf of a doctor. In fact, Montcrieff did not file these orders and had no knowledge of their existence until she discovered them on MedStreaming. (Compl. at ¶ 34).

## III. ARGUMENTS & AUTHORITIES

7. PVA urges the Court to dismiss the Complaint for at least three separate reasons, all based on the inadequacy of Relators' unsubstantiated fraud and employment claims. First, the Complaint fails the plausibility standard in Rule 12(b)(6), because it lacks sufficient facts to state a plausible claim and is based on incorrect conclusions of law. Second, the Complaint fails because it fails to plead any FCA violations that were material. Third, the Complaint fails because it fails Rule 9(b)'s particularity requirement because it does not plead sufficient details about a fraudulent scheme or identify specific examples of "false claims."

8. As the Department of Justice recently reiterated, when *qui tam* cases are "non-meritorious, abusive, or contrary to the interests of justice, they impose unnecessary costs on the Department, on the judiciary, and on the defendants."[3] The threadbare nature of the Complaint reveals such a case here and therefore warrants dismissal with prejudice.

### A. Plaintiff's First, Second, and Third Counts Should Be Dismissed With Prejudice Because Even Accepting the Allegations as True, Plaintiff's Accusations of Fraud are Not Plausible.

[3] *Deputy Associate Attorney General Stephen Cox Delivers Remarks at the 2019 Advanced Forum on False Claims and Qui Tam Enforcement*, U.S. Department of Justice, Jan. 28, 2019, available at: https://www.justice.gov/opa/speech/deputy-associate-attorney-general-stephen-cox-delivers-remarks-2019-advanced-forum-false. *See also* Memorandum from Michael Granston, Director United States Department of Justice, Commercial Litigation, Civil Fraud Section, to Commercial Litigation Branch, Fraud Section (January 10, 2018).

9. To survive a motion to dismiss under Rule 12(b)(6), a "plaintiff's factual allegations must support a claim to relief that is plausible on its face and rises above mere speculation." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010). "'[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.'" *Bell Atlantic v. Twombly*, 550 U.S. 554, 555 (2007) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp 235-236 (3d ed. 2004)). Rule 12(b)(6) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Id.* at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The requirement of well-pleaded facts means that mere "conclusory statements" and "legal conclusion couched as a factual allegation" can be disregarded. *Id.* This clear, unambiguous law means that alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. When alternative explanations are likely or "obvious," it is not reasonable to infer that the well-pleaded (non-conclusory) behavior was unlawful. *Id.* The meagerness of the details presented by Relators demonstrates their failure to meet this requirement.

10. Relators failed to identify a single claim submitted by PVA that was allegedly false or fraudulent. Relators do not identify a single false claim, much less any specificity of who submitted the claim, when the claim was submitted, why the claim is "false" or how the claim violated a material Medicare requirement. No specifics are even plead, just that certain diagnostic tests were performed. More telling is Relators cannot even identify whether physicians did or did not perform services to warrant submission or a claim or even reimbursement. This is due to the fact not any of the three Relators possess personal knowledge of the alleged fraud.

11. Here it appears, despite obvious legal and factual deficiencies, Relators seek to move

forward after the government declined to intervene in this case to obtain some settlement. "[T]he threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching [summary judgment] proceedings." *Id.* at 559. This is exactly the scenario PVA finds itself in. The Federal Rules of Civil Procedure impose a plausibility requirement, "lest a plaintiff with 'a largely groundless claim' be allowed to 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Twombly*, 550 U.S. at 558 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)) (additional internal quotation marks and citations omitted).

12. The Complaint's allegations hinge on the accuracy of the MedStreaming "Status" field. (Compl. at ¶¶ 28–29, 31, 39–41), a wholly irrelevant term for purposes of federal program reimbursement. But as the Complaint itself acknowledges, the "Status" field did not always correctly or accurately reflect a patient's *actual* status. The Complaint identifies 17 patients on whom Relators Martinez performed studies in August 2016. (Compl. at ¶ 40). As alleged, once a test is performed, the patient status in MedStreaming is supposed to change to "Acquired." (Compl. at ¶ 28). Relators also contend the status of 8 of these 17 patients remained as "Scheduled" in MedStreaming, despite that Martinez had already performed the test. (Compl. at ¶ 40). In other words, the allegations show that the "Status" field was demonstrably incorrect for nearly half of these claims. But the Complaint provides no indicia that the Status field for the remaining patients reflected each patient's correct or actual status. This is fatal to the plausibility of Relators' allegations. Relators fail to acknowledge or plead that the "Status" field at times requires manual adjustment by the sonographer and lacks any correlation to whether a physician performed or completed work that warranted federal program reimbursement or whether a claim was appropriately submitted for payment. They instead draw an improper conclusion that because the

"Status" field was inaccurate, the requirements to submit a claim were not met. This is not true and as a result the Complaint cannot survive.

13. This situation is analogous to *Twombly*. In *Twombly*, the Supreme Court held that allegations of parallel pricing alone did not provide a plausible basis for a section 1 conspiracy under the Sherman Act because parallel conduct on its own was not illegal conduct. 550 U.S. at 556–557 ("It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.") Likewise, here, the MedStreaming Status for a handful of claims identified by Relators does not provide a plausible basis that PVA actually submitted claims for incomplete studies as the Complaint's allegations demonstrate the "Status" field in MedStreaming is not reliably accurate nor an indicator of illegality. A data entry system's accuracy or inaccuracy cannot be a basis for FCA liability. Such information does not demonstrate whether an actual reimbursable item or service was performed or whether a claim was properly or improperly submitted to a federal healthcare program. Without more, Relators do not satisfy Rule 12(b)(6)'s plausibility requirement. Relators plead no facts and cite no rule or regulation that would lead to any reasonable inference that PVA submitted false claims. They only offer conclusory assertions. No court is "bound to accept as…true" mere "conclusory statements" and "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. Relators are thus left with nothing to offer to overcome a motion to dismiss on their FCA claims. Relators only provide conclusions and bald assertions without support from any ***factual*** allegations. Relators' FCA claims as a matter of law must be dismissed with prejudice as amending the Complaint would be futile.

**B. Plaintiff's First, Second, and Third Counts Should Be Dismissed With Prejudice Because the Complaint Does Not Plead Materiality.**

14. In conjunction with other defects, the Complaint should separately be dismissed with prejudice because Relators failed to plead any FCA violations that were material. *Escobar*, 136 S. Ct. at 2002. In *Escobar* the Supreme Court found "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Id.* Further, that Court stated:

> The materiality standard is demanding. The False Claims Act is not an all-purpose antifraud statute…or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* at 2003 (internal citation and quotation marks omitted).

15. As held in *Escobar*, a plaintiff must plead with "plausibility and particularity…facts to support allegations of materiality." *Id.* at n.6. A pleading supporting materiality could include, for example, allegations "that the defendant knows that the government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 2003. The insufficiency of Relators' Complaint is apparent when evaluated under *Escobar's* materiality standard. *Id.* Relators failed to plead any statutory, regulatory or contractual requirement violated by PVA. Indeed the only plead facts discuss – by Realtors' own admission - an inaccurate data system. This mere assertion is wholly immaterial and does not satisfy *Escobar*. *Id.* Relators cannot point to any actual or even implied federal program guidance suggesting the alleged facts supposedly caused a false claim to be submitted and paid by the government. Even had Realtors made such an accusation, clear Department of Justice guidance states that that guidance does not have the force and effect of law and should not be a basis for a

civil or criminal liability.[4] Relators' Complaint therefore is an empty shell of unsupported accusations, lacking a single fact that would lend support to allegations of materiality.

16. In addition, though the Complaint was filed more than a year after the Supreme Court's opinion in *Escobar*, it does not comply with the Court's requirement that a plaintiff must plead a plausible and particular basis for materiality. *Escobar*, 136 S. Ct. at 2002. The FCA's materiality requirement is "rigorous" and should be "strit[ly] enforce[ed]" to address "concerns about fair notice and open-ended liability." *Id.* at 2001. In fact, Count I does not mention materiality and Counts 2 and 3 only make conclusory allegations of materiality with no supporting factual allegations. (Compl. at ¶ 57 ("PVA knowingly (as defined in 31 U.S.C. § 3729(b)(1) made, used, or caused to be made or used false records or statements material to false or fraudulent claims") and ¶ 61 ("PVA knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government")). The remainder of the Complaint simply does not allege or explain how the supposed regulatory violations were material to the Government's decision to pay claims as required by *Escobar*. *Escobar*, 136 S. Ct. at 2002. Instead the Complaint actually pleads facts supporting a finding of non-materiality.

17. PVA performs between 6,000 – 7,000 ultrasounds per month. (Compl. at ¶ 27). But at any given time, only a handful (up to 70) had incomplete internal paper work at the time the claim was submitted. (Compl. at ¶37). As explained in *Escobar*, the FCA, and attendant treble damages and mandatory $21,000 penalty per violation, is not intended as "a vehicle for punishing garden-variety breaches of contract or regulatory violations." 136 S. Ct. at 2003. An allegation of "legal falsity"

---

[4] *See the Brand Memo: Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases*, U.S. Department of Justice, Office of the Associate Attorney General, January 25, 2018, available at: https://www.justice.gov/file/1028756/download.

asserts that a defendant knowingly submitted claims for payment that falsely certified compliance with regulatory requirements which were "material to the government's payment decision." *Id.* at 1996. Misrepresentations of regulatory compliance can be express or implied, but "must be material to the other party's course of action." *Id.* at 2001. The FCA's materiality requirement is "rigorous" and should be "strict[ly] enforce[ed]" to address "concerns about fair notice and open-ended liability." *Id.* Even if there was a regulatory requirement that PVA have all paperwork 100% complete before submitting a claim (a requirement that Relators have not identified because it does not exist), failing to comply with this paperwork requirement a small percentage of the time is not sufficiently material to give rise to the FCA's draconian remedies. Relators have failed to plausibly plead materiality under the FCA and *Escobar* for any of alleged schemes. This reason mandates Counts 1–3 must be dismissed with prejudice.

### C. Plaintiff's First, Second, and Third Counts Should Be Dismissed With Prejudice Because The Complaint Fails to Plead Fraud With Particularity

18. Should the Court find the Complaint satisfied the plausibility and materiality standards, Relators have still failed to plead fraud with particularity under Rule 9(b). For over twenty years, the Fifth Circuit has required plaintiffs to meet the heightened pleading standard of Rule 9(b) when alleging fraud under the FCA. *See Grubbs,* 565 F.3d. at 185; *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d. 899, 903 (5th Cir. 1997).

19. Relators' Complaint makes only "sweeping and conclusory" allegations "without a shred of detail or particularity" that PVA "defrauded the government by systematically charging Medicare for incomplete and unnecessary ultrasound studies." *See United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013). "[T]o state a claim under the FCA, a plaintiff must allege: (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the

Government." *Steury*, 625 F.3d at 267 (citing *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009)). "An FCA complaint must [also] meet the heightened pleading standard of Rule 9(b). To allege fraud, 'a party must state with particularity the circumstances constituting fraud.'" *United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x. 622, 625 (5th Cir. 2015) (quoting FED. R. CIV. P. 9(b)). Courts must apply Rule 9(b) "with 'bite' and 'without apology,'" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)), and "require[], at a minimum, that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *Steury*, 625 F.3d at 266 (quoting *United States ex rel. Thompson c. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). The Complaint's lack of specificity does not meet the basic requirements under Rule 9(b) that a relator must detail the who, what, when, where, and how of the alleged fraud. *Id.* at 892. Here, Relators instead only plead superficial and undetailed and unsupported statements about the who, what, when, where, and how of the alleged fraud.

20. In the context of an FCA case, Rule 9(b) also requires pleading, with specificity, details of false claims *actually submitted* to the government. In other words, the presentment of a false claim is the "*sine qua non*" of FCA liability. *Grubbs*, 565 F.3d at 188. This is because the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 364-65 (5th Cir. 2014) (quoting *Longhi*, 575 F.3d at 467). This requirement serves as a critical gatekeeping role and "prevents nuisance suits and the filing of baseless claims as a pretext to gain access to a 'fishing expedition.'" *United States ex rel. Grubbs v. Kanneganti*, 595 F.3d 180, 190 (5th Cir. 2009). Relators fail to meet this standard for each of their alleged schemes and they lack the requisite

knowledge to be able to successfully plead the "who, what, when, where, and how" of the alleged submitted claims. In addition to not describing the specifics surrounding each alleged false claim, Relators do not plead details of any false claims actually submitted to a federal healthcare program as each relator lacks that specific, actual knowledge. Their imprecision and inexactness fails to satisfy the default method of satisfying Rule 9(b) in the FCA context. *Grubbs*, 565 F.3d at 188. This is the case for ***all six*** of Relators' unsubstantiated alleged PVA schemes.

**1. The Complaint Fails to Allege the "Who" of the Fraud.**

21. The Complaint fails to allege with particularity the "who." It is well settled that Rule 9(b) requires a plaintiff who accuses a defendant of violating the FCA to identify the particular employees who engaged in the unlawful conduct. An FCA plaintiff, therefore, must allege "the identity of the person making the misrepresentation and what that person obtained thereby." *Grubbs*, 565 F.3d at 186 (internal quotation marks omitted). Relators fail to identify a single physician that did not complete a report for which PVA submitted a claim anyway. The Complaint simply repeats the same conclusory allegations that "PVA" submitted false claims. In each of the six alleged schemes Relators do not identify a single individual that undertook the allegedly fraudulent activity on behalf of PVA. For example, the Complaint alleges that PVA "frequently orders an ultrasound – and then later bills for that ultrasound – before a doctor has seen the patient and determined whether an ultrasound is necessary or what kind should be performed." (Compl. At ¶26). To comply with Rule 9(b) Relators must state for each claim which doctor, which patient, who at PVA submitted the false claim. Simply repeating the same statement and pointing to a test that was run, but does not allege a claim for reimbursement by a federal program was actually submitted is not sufficient to plead fraud under Rule 9(b).

22. The closest the Complaint comes to satisfying Rule 9(b) is through innuendo that Barbara Burrow somehow engaged in improper conduct by "push[ing] staff to complete more studies to

increase PVA's billings and drive up its revenue." (Compl. at ¶ 36). This insinuation is unsupported, and Relators have failed to plead a single fact that links any PVA employee, let alone Ms. Burrow, to anything improper. Relators do not plead a scintilla of support for the allegation that she has "been aware for years" of "false billing." (Compl. at ¶ 38). PVA should not be left to guess which of its hundreds of employees at its 20 locations over a period of years allegedly engaged in the otherwise unidentified fraudulent conduct. The failure to plead such "fraud with particularity" compels dismissal with prejudice of the Complaint.

**2. The Complaint Fails to Allege the "What" of the Fraud.**

23. The Complaint further fails to allege with particularity the "what." In cases such as this, where the allegation of falsity is predicated on a certification of compliance with a statute or regulation, the plaintiff must "plead with particularity *what* was false about the claims [and] *how* they were false." *Gage*, 623 F. App'x. at 625 (emphasis in original). "To plead the 'what' of a claim in a case such as this…a plaintiff must state with particularity the statute, regulation, or contract provision with which [the] defendant[] ha[s] certified compliance." *Id.* at 626 (citing *Steury*, 625 F.3d at 269). Relators only allege that "PVA frequently bills Medicare for both the professional and technical components, even though a patient's status is "Acquired," "Ready," or "QA" and the professional component is never completed. In these cases PVA submits a bill to Medicare for its services after a sonographer completes a preliminary report, but before a doctor has seen the report, reviewed the patient's images, or interpreted or provided an independent assessment of the results. In most if not all of these cases, the professional component is never completed, even though PVA is billing for it." (Compl. at ¶ 29)[5]. There is nothing further that

---

[5] While not evidence of falsity, PVA's Medicare Administrative Contractor states that there is significantly flexibility for when a provider may submit a claim for completing of a diagnostic interpretation. This means there is no falsity or materiality under *Escobar* as well. *See Billing FAQ*,

supports Relators' assertions that PVA "never" completed the professional component for a federal program patient or that such a claim was even submitted for payment. Relators thus fail to plead with particularity what was actually false about the claims.

24. The Complaint fails to give any detail about a single claim PVA may have submitted to the Government. Relators have not pled an estimate (because they would not have the requisite knowledge) and instead vaguely and summarily alleged that "PVA frequently bills Medicare" without specifying ***which*** claims. *See*, *e.g.*, (Compl. at ¶ 29). Not only could information that PVA bills Medicare come from publicly available data (thus barring this civil action under the public disclosure doctrine, *see* 31 U.S.C. § 3730(e)(4)), this contention is insufficient to overcome Rule 9(b)'s "exacting" pleading requirements. *Grubbs*, 565 F.3d at 190. The Compliant also is littered with conclusory allegations without actually identifying what made PVA's claim submissions false. The Complaint fails to identify *any* specific statute, regulation, or contract provision that requires a doctor to complete his report before submitting a claim for a performed sonography. Relators clearly have no knowledge of which actual claims were submitted to the government or what PVA's requirements were for claim submissions. This does not raise the level of possibility

---

Novitas, available at: https://www.novitassolutions.com/webcenter/ portal/ MedicareJH/ pagebyid?contentId=00005049&_adf.ctrlstate=bi2vrpmwl_4&_afrLoop=417446806784990#!.

The Medicare contractor that process PVA's claims states:

**"[w]hat date of service should I report when completing a diagnostic interpretation on a different date from the actual test?**

We recognize that providers do not always perform the professional component on the same date as the technical component. Many providers prefer to submit a claim with a date of service that reflects the day the professional component was performed, while others prefer to use the day the technical component was performed as the date of service for their professional component. Currently, there is no policy from CMS that requires providers to bill one way or the other. Since there is no specific policy, regulation, or other mandate from CMS on this issue, we will leave it up to the provider to determine which date of service to report for the professional component."

to probability that actual false claims were submitted to a federal healthcare payer, nor does it satisfy the heightened pleading requirements of Rule 9(b). Relators' Complaint should be dismissed with prejudice as no amendment can cure this deficiency.

**3. The Complaint Fails to Allege the "How" of the Fraud.**

25. The Complaint does not allege with particularity the "how." To plead the "how" of the claim, the plaintiff must describe how the defendant failed to comply with the pertinent statute, regulation, or contract provision. *See Gage*, 623 F. App'x. at 627. Instead, the Complaint fails to state a single statute, regulation, or contract provision that PVA has violated. The Complaint fails to provide facts demonstrating that any false claims were submitted or even explain how submitting a claim before the doctor completes the report violates a statute, rule, or regulation. Simply put, Relators' Complaint has failed to state with particularity what PVA did wrong. Between the three Relators, not one has identified a single statute, rule, or regulation that PVA violated. Instead, only generalized conclusory statements are pled. The Complaint provides tables from MedStreaming, PVA's workflow and clinical data management tool, relying on the MedStreaming Status to demonstrate that claims were incomplete or improper and therefore false. (Compl. at ¶¶ 39, 40). MedStreaming status requires manual direction by the sonographers and technicians and is a workflow application meant to assist in patient care, not to assist in the submission of claims. "MedStreaming" is not a condition of payment or claim submission to a federal healthcare program. Relators do not acknowledge that a patient with an imprecise "Status" on MedStreaming would not inhibit the patient from receiving the imaging ordered by their physician. Most importantly, sonographers and technicians – like Relators - that may assist with the early stages of the MedStreaming application do not participate in the submission of claims and would not have knowledge of claim submissions to the government. As such, these allegations do not plausibly allege fraud because, as discussed *supra*, they are predicated on the accuracy of

the MedStreaming "Status," which Relators' own pleaded facts concede is unreliable.

**4. The Complaint Fails to Allege the "When" and "Where" of the Fraud.**

26. The Complaint further fails to identify when or where they believe false claims were submitted to the government. FCA claims that lack specific temporal and geographic allegations are subject to dismissal. *See Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003). Relators do not allege any details regarding when or where PVA submitted any false claims. None of the date ranges provided by Relators relate to temporal allegations that meet the requirements of Rule 9(b). The Complaint only provides general ranges such as: "over the course of at least the last five years"; "frequently"; "over the last several years." (Compl. at ¶¶ 1, 2, 25). *See United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 722-23 (5th Cir. 2008) (rejecting FCA relators' allegations that false claims were submitted "at least once each year" between 1995 and 2001, "on a daily basis," and within various spans of years, as insufficiently particular under Rule 9(b)); *see also Sealed Appellant I v. Sealed Appellee I*, 156 F. App'x 630, 634-34 (5th Cir. 2005) (affirming dismissal of an FCA claim where the complaint failed to "identify a single false claim that was actually submitted to the government" but rather alleged the existence of false claims generally). Relators also do not identify where the supposed wrongdoing occurred. *See Willard*, 336 F.3d at 385 (affirming dismissal of a claim where the plaintiff failed to identify the site of alleged wrongful negotiations). Notably missing is that Relators do not plead at which of the 20 PVA locations did the "scheme" occur. For instance, the Complaint states that Montcrieff "personally witnessed" fraudulent ultrasound orders "purportedly filed by her on behalf of a doctor," yet fails to provide any specifics about when or where this happened. Because Relators failed to identify where or when PVA engaged in wrongful conduct that failure further warrants dismissal of the claims against PVA.

### 5. The Complaint Fails to Allege Actual Knowledge of PVA

27. Relators must plead facts supporting the element of scienter. *See Health Choice Alliance, LLC v. Eli Lilly & Co.*, No. 5:17-cv-123, 2018 WL 4026986, at *15 (E.D. Tex. July 25, 2018). This glaring omission is fatal. *Id.* The threadbare allegations in Relators' Complaint fail to allege any actual knowledge on the part of PVA to cause or submit false claims. At most, Relators make allegations that data entry into MedStreaming could leave one to infer that a claim may have been submitted where PVA failed to meet unidentified Medicare statutes or regulations. This is not enough to allow a FCA action to proceed. "'Although Rule 9(b) expressly allows scienter to be 'averred generally', simple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b).'" *Dorsey v. Portfolio Equities,* 540 F.3d 333, 339 (5th 2008) (quoting *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir. 1994)). "'The plaintiff[] must set forth specific facts supporting an inference of fraud.'" *Id.* "The inference may be drawn by alleging facts showing a defendant's motive or 'by identifying circumstances that indicate conscious behavior on the part of the defendant. . . .'" *Health Choice Alliance*, 2018 WL 4026986, at *30 (quoting *Tuchman v. DS Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 2003)). "But the scienter element is not met by allegations of 'mere negligence or even gross negligence.'" *United States ex rel. Long v. GSD&M Idea City LLC,* No. 3:11-cv-1154, 2013 WL 214590 at *7 (N.D. Tex. Jan 18, 2013) (quoting *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008)). Relators have failed to meet the scienter requirement because their Complaint fails to plead with particularity any factually false claim, let alone the conscious behavior of a single PVA employee that demonstrates actual knowledge of submission of a false claim to the government. This lack of specifics warrants dismissal of Relators' Complaint with prejudice.

28. Relators' Complaint fails to meet the Rule 9(b) "Scienter" requirement. The FCA requires that a defendant act with the requisite mental state at the time that allegedly false claims are

submitted. *See Gordon v. Butler*, 105 U.S. 553, 557 (1881). Relators have not plead any facts showing PVA acted with any improper motive or conscious behavior in submitting a false claim.

**6. The Complaint Fails to Allege the Actual Submission of a False Claim**

29. Finally the Fifth Circuit has held that "the linchpin of an FCA claim is a false claim." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008). A plaintiff should "provide details that identify particular false claims for payment that were submitted to the government...[including] the dates of the claims, the contents of the forms or bills submitted, their identification numbers, the amount of money charged to the government, [and] the particular goods or services for which the government was billed." *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.23d 220, 232 (1st Cir. 2004) (quoting *United States ex rel. Clausen v. Lab. Corp of Am.*, 290 F.3d 1301, 1312 n.21 (11th Cir. 2002)). If a plaintiff is unable to identify particular invoices that he believes were fraudulent, the complaint must "include both particular details of a scheme to present fraudulent bills to the Government and allegations making it likely bills were actually submitted." *Grubbs*, 565 F.3d at 191.

30. Relators do not have knowledge of any false claims submitted to the government. Relators fail to meet any of the required elements in their FCA claims against PVA. They have not pled personal knowledge of any doctor who caused or filed a fraudulent order or claim. They failed to identify a specific statute, regulation, or contract violation that was violated by the purportedly fraudulent claims. They do not identify a single claim to the government that was false. They cannot identify when any claims for fraudulent ultrasounds were submitted to the government. They fail to state any facts showing motive or indicating conscious behavior on the part of PVA. In short, repeating and hoping a fact to be true is vastly different than pleading a fact with direct and personal knowledge. None of the three Relators can do so and as a result their FCA claims against PVA under Rule 9(b) should be dismissed with prejudice.

**D. Martinez Fails to Allege Facts to State a Cause of Action for FCA and TMFPA Retaliation.**

31. Martinez alleges that the termination of her employment for misconduct was actually based on retaliation in violation of the TCA and TMFPA. Both statutes prohibit retaliation against employees for engaging in lawful acts "in furtherance of" an action under either statute. *See* 31 U.S.C. § 3730(h); TEX. HUM. RES. CODE § 36.115(a). In considering retaliation claims under these statutes, courts have applied similar standards. *See, e.g., United States ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-cv-604-M, 2012 WL 12886423, at *5 (N.D. Tex. July 23, 2012) (considering a motion to dismiss retaliation claims based on the TCA and the TMFPA); *United States v. City of Dallas, Tex.*, 3:09-cv-1452-O, 2011 WL 4912590 (N.D. Tex. Sept. 27, 2011) report and recommendation adopted sub nom. *Moore v. City of Dallas, Tex.*, 3:09-CV-1452-O, 2011 WL 4907303 (N.D. Tex. Oct. 14, 2011) (evaluating a TMFPA action and FCA retaliation claim using the same evidence and arguments).

32. To state a retaliation claim under the FCA, a plaintiff must show that: (1) she engaged in protected activity; (2) her employer knew about the activity; and (3) her employer retaliated against her because of the protected activity. *Robertson v. Bell Helicopter Textron*, 32 F.3d 948, 951 (5th Cir. 1994); *see also United States ex rel Ligai v. ESCO Tech., Inc.*, 611 F. App'x 219, 220 (5th Cir. 2015) (same). The "in furtherance" language in both provisions requires a "'nexus' between the protected activity and the filing or potential filing of a *qui tam* suit." *Guerrero v. Total Renal Care, Inc.*, EP-11-cv-449-KC, 2012 WL 899228, at *4 (W.D. Tex. Mar. 12, 2012) (citing *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187 (3d Cir. 2001)) .

**1. Martinez fails to allege facts that show she engaged in protected activity.**

33. As the Fifth Circuit has recognized, "internal complaints that 'concern false or fraudulent claims for payment submitted to the government' [are] protected activity under the [FCA]."

However, those complaints must actually "raise concerns about fraud." *Jamison v. Flou Fed. Sol., LLC*, No. 3:16-CV-0441-B, 2017 WL 3215289, at *6 (N.D. Tex. July 28, 2017) (quoting *United States ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 603–04 (S.D. Tex. 2012) (quoting *Patton*, 418 F. App'x at 371–72)). And while the protected activity need not be directly in furtherance of a *qui tam* action, it must include steps "towards the exposure of the false claims, such as investigating or complaining about the fraud." *Vista Hospice Care, Inc.*, 2012 WL 12886423, at *5 (quoting *Guerrero*, 2012 WL 899228, at *4).

34. Martinez alleges that the sonographers at PVA were "being assigned too many patients and were not being given enough time to complete the reports for those patients." (Compl. at ¶48). Further, she alleges that sonographers were "often unable to complete sonography reports before they were billed to Medicare." (Compl. at ¶48). Martinez allegedly "complained" to her supervisors that "she and other sonographers did not have enough time to complete their reports, and that reports were being billed before they were completed." (Compl. at ¶50). Accepting these allegations as true, they do not amount to protected activity under the FCA. None of these reports or complaints have "any suggestion that [Martinez] was attempting to expose illegality or fraud within the meaning of the FCA." *Patton*, 418 F. App'x. at 372. As discussed in depth above, Martinez has no basis to allege that these reports were being submitted to the government, much less that any such activity was actually fraudulent under the FCA.

35. Martinez's allegations amount to nothing more than mere criticism of PVA's methods and cannot support her conclusory assertion of having engaged in protected activity. *See Robertson*, 32 F.3d at 951 (holding that the plaintiff's internal reports did not constitute protected activity in part because the plaintiff "admitted that he never used the terms 'illegal,' 'unlawful,' or '*qui tam* action' in characterizing his concerns"); *Patton*, 418 F. App'x. at 372 ("Mere criticism of [the

defendant's] construction methods, without any suggestion that [the relator] was attempting to expose illegality or fraud within the meaning of the FCA, does not rise to the level of protected activity."); *Ligai*, 611 F. App'x at 221 (finding that a report of substandard practices "did not rise to the level of protected activity under the FCA"); *Bouknight v. Hous. Indep. Sch. Dist.*, No. H–06–1057, 2008 WL 110427, at *4 (S.D. Tex. Jan. 8, 2008) ("A plaintiff must do more than investigate or complain about an employer's improper conduct; a plaintiff must have specifically investigated or complained about the employer making false claims for federal funds."). Because these alleged complaints do not establish that Martinez engaged in protected activity nor even informed her employer of such, her retaliation claims under the FCA and TMFPA must be dismissed with prejudice.

**2. Martinez fails to allege facts showing PVA's knowledge of any alleged protected activity.**

36. Even if Martinez had engaged in protected activity, which she has not, she has failed to plead facts that establish that PVA was on notice that she was complaining of fraud. "The second element of Plaintiff's prima facie case is that the employer must be on notice that the employee is investigating fraud." *Guerrero v. Total Renal Care, Inc.*, 932 F. Supp. 2d 769, 789 (W.D. Tex. 2013). "It is insufficient for the relator to show that the employer knew that the whistleblower had concerns about compliance with the law; she must show that the employer was on notice of the distinct possibility of *qui tam* litigation." *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95, 104 (W.D. Tex. 2010) (citing *Robertson*, 32 F.3d at 952 and *Sealed Appellant I v. Sealed Appellee I*, 156 F. App'x. 630 (5th Cir. 2005)). Thus, without knowledge of the protected act, an employer "could not possess the retaliatory intent necessary to establish a violation" of the anti-retaliation provision of the FCA. *Robertson*, 32 F.3d at 952.

37. There are simply no allegations in the Complaint that establish that PVA has any knowledge of protected activity by Martinez. As noted above, Martinez complained of a lack of time and the alleged submission of incomplete reports. She did not, however, plead any facts that show that she referred to fraudulent claims or any possibility of *qui tam* litigation in raising these alleged complaints. *See Patton*, 418 F. App'x at 372–73 (holding that allegations regarding error in performance of contract were insufficient to support an FCA retaliation claim unless the employee specifically referred to fraudulent claims for payment for those services, putting the employer on notice of potential FCA liability); *Jamison*, 2017 WL 3215289, at *10 (finding that an internal report that did not "allege fraud or other otherwise mention the possibility of litigation" insufficient to adequately allege that the employer had knowledge of protected activity). Without such allegations, Martinez cannot establish that PVA had knowledge of her alleged protected activity and her retaliation claim must be dismissed with prejudice.

**E. Martinez's *Sabine Pilot* Claim and FCA Claim Are Mutually Exclusive.**

38. The Texas Supreme Court has recognized an exception to Texas's employment-at-will doctrine, which protects an employee who is discharged for the sole reason that the employee refused to perform an illegal act. *See White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir. 2003) (citing *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985)). Because this cause of action requires that it be plead as the "sole cause" of the termination of Martinez's employment, it cannot be plead as an alternative theory of recovery. *See Robertson*, 32 F.3d at 952 (holding that a relator who alleges wrongful discharge for refusing to perform an illegal act cannot advance additional claims in the alternative); *Wall*, 2012 WL 12886423, at *7 ("A *qui tam* action and a *Sabine Pilot* claim are mutually exclusive."). Because Martinez has asserted that she was fired for another reason, namely, her report of allegedly fraudulent activity under the FCA, her claim under the *Sabine Pilot* doctrine is precluded. *See Robertson*, 32 F.3d at 952 ("[The plaintiffs'] assertion

that he was fired for another reason—in retaliation for investigating a qui tam action—precludes his common law claim.). As such, Martinez's *Sabine Pilot* claim must be dismissed with prejudice.

39. Even if Martinez's *Sabine Pilot* claim was not precluded, she failed to plead facts that establish the elements of this cause of action. "To establish a *prima facie* case of wrongful termination under *Sabine Pilot*, the plaintiff must prove that: (1) she was required to commit an illegal act which carries criminal penalties; (2) she refused to engage in the illegality; (3) she was discharged; and (4) the sole reason for her discharge was her refusal to commit an unlawful act." *White*, 319 F.3d at 676. As discussed above, Martinez has not alleged any facts supporting her conclusory assertion that PVA's practices were illegal. But even more critically, she fails to plead her alleged refusal to perform this illegal act with the required specificity. Despite a conclusory assertion that she "refused to partake in the fraudulent conduct," she pleads no facts as to the actual conduct that she refused to participate in, as she was not responsible for the submission of claims which would have been the allegedly illegal conduct. (Compl. at ¶83). And there is no assertion that she refused to perform ultrasound studies. Instead, she pleads that she was "discharged because of her efforts to stop PVA from unlawfully billing for incomplete ultrasound studies," not because she actually refused to perform or bill for such studies. (Compl. at ¶51). Without facts showing a refusal to perform an illegal act, Martinez's *Sabine Pilot* claim cannot stand. *See Yeoman v. Blackmon Mooring Steamatic*, No. SA-06-CV-0497-XR, 2006 WL 3514593, at *3 (W.D. Tex. Dec. 5, 2006) (noting that "courts have refused to extend [*Sabine Pilot's*] protection to plaintiffs who did not refuse to perform an illegal act"). As a result, this claim must be dismissed with prejudice.

## F. Burnett Fails to Allege Sufficient Facts to Support Her Claims Under the FMLA.

### 1. Burnett fails to sufficiently allege interference with any right protected by the FMLA.

40. Burnett alleges that "PVA's decision to terminate [her] employment was related to [her] attempt to exercise her FMLA rights" and that the "termination of [her] employment interfered with her rights to take FMLA leave." (Compl. at ¶¶ 66, 67). However, Burnett's allegations are nothing more than legal conclusions that lack any supporting facts. As she has failed to plead any facts regarding any denial of FMLA benefits to which she was entitled to receive, she has failed to sufficiently plead a claim based on FMLA interference.

41. To make a prima facie case of FMLA interference, an employee must show that: "(1) she was an eligible employee; (2) [the employer] was an employer subject to the FMLA's requirements; (3) she was entitled to leave; (4) she gave proper notice of her intention to take FMLA leave; and (5) [the employer] denied her the benefits to which she was entitled under the FMLA." *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013). Here, Burnett fails to provide any factual support for her conclusory statements that PVA committed FMLA interference. To survive a motion to dismiss, a plaintiff must "allege facts demonstrating, *inter alia*, that her leave was interfered with ...." *Gillie v. La. Dept.t of State Civil Serv.*, 559 F. App'x 333, 335 (5th Cir. 2014).

42. In the Complaint, Burnett provides no factual information regarding how PVA interfered with her benefits, when PVA interfered with her benefits, or what actions PVA took that allegedly constituted such interference. More importantly, she never even claims to have used any FMLA leave or to have suffered any hostility towards her application for such leave. Accordingly, Burnett has failed to plead sufficient facts to support her claim of FMLA interference and this claim must be dismissed with prejudice.

**2. Burnett fails to allege facts establishing a causal connection between any use of FMLA leave and the termination of her employment.**

43. Likewise, in her Complaint, Burnett alleges that she "engaged in protected activity by

requesting FMLA leave in mid July 2017." (Compl. at ¶70). Burnett further alleges that PVA took "materially adverse action in September 2017 by terminating [her] employment" and that there was a "causal connection between the protected activity and the adverse action." (Compl. at ¶¶ 71-72). Yet Burnett again fails to allege any facts supporting this legal conclusion. Without such facts, Burnett has failed to sufficiently plead an FMLA retaliation claim.

44. To establish a prima facie case for FMLA retaliation, a plaintiff must show that: "1) [s]he was protected under the FMLA; 2) [s]he suffered an adverse employment action; and 3) [s]he was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because [s]he sought protection under the FMLA." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 790 (5th Cir. 2017) (quoting *Mauder v. Metro. Transit Auth. of Harris Cty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006)). "The third element requires the employee to show 'there is a causal link' between the FMLA-protected activity and the adverse action." *Id.* (quoting *Richardson v. Monitronics Int'l Inc.*, 434 F.3d 327, 332 (5th Cir. 2005)).

45. There is no dispute that Burnett was approved for FMLA leave and that her employment was terminated as part of a reduction in force at PVA's Northeast office, which involved a number of other employees in addition to Burnett. However, Burnett has failed to allege any facts showing that her alleged use of FMLA leave caused her termination. As noted above, Burnett failed to plead any facts that establish any hostility to her use of FMLA leave. She has alleged no facts that PVA denied her any benefits that she was entitled to under the FMLA. As such, Burnett's claim appears to be based on the temporal proximity between her use of FMLA and her termination as part of the reduction in force.

46. To accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie

case, the temporal proximity must be "very close." *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x. 395, 402 (5th Cir. 2012) (concluding that a two-month period between the end of the plaintiff's FMLA leave and his dismissal, while "short, [ ]is not, by itself, enough to show a causal connection based on temporal proximity alone"); *Potts v. United Parcel Serv.*, No. 3:11–cv–2407–L, 2013 WL 4483080, at *14 (N.D. Tex. Aug. 22, 2013) (finding a two month gap insufficient to establish a causal link for a *prima facie* FMLA retaliation claim). Yet, Burnett fails to plead any facts showing a causal link between any alleged use of FMLA leave and her termination. Without additional evidence the nearly two-month gap between PVA's approval of her FMLA leave and Burnett's layoff is insufficient to show a causal connection between these events. Burnett thus fails to allege a *prima facie* case of FMLA retaliation and this claim must be dismissed with prejudice.

**G. Dismissal Should Be With Prejudice.**

47. Leave to amend is not automatic, but rather "is within the sound discretion of the district court." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003) (citation omitted). Relators already were granted an opportunity to amend their pleadings. As set forth above, even with this second chance they have not plead any facts giving rise to their requested relief. There is no reason to believe Relators would have anything more to offer given a third go round. Leave to amend a pleading may be denied where, as here, the party seeking leave has repeatedly failed to cure deficiencies by amendments previously allowed and when amendment would be futile. *See United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (finding that the district court's denial of leave to file a third amended complaint was not an abuse of discretion). Because further amendment would be futile, Relators' claims should be dismissed with prejudice.

WHEREFORE, Defendant Peripheral Vascular Associates P.A. respectfully requests that the Court grant its Motion to Dismiss, dismiss Relators' claims in their entirety and with prejudice, and grant PVA such other and further relief, both at law and in equity, both general and specific, to which PVA may show itself justly entitled.

Respectfully submitted,

By: /s/ *Sean McKenna*
Sean McKenna
State Bar No. 24007652
sean@seanmckennalaw.com
Law Office of Sean McKenna, PLLC
8710 Greenville Avenue, Building D, Suite B
Dallas, Texas 75240
Telephone: 786-973-3762
Facsimile: 1-888-492-2847

Stephen J. Romero
State Bar No. 24046756
stephen.romero@nortonrosefulbright.com
Jeff Wurzburg
State Bar No. 24105140
jeff.wurzburg@nortonrosefulbright.com
300 Convent Street, Suite 2100
San Antonio, Texas 78205-3792
Telephone: 210-224-5575
Facsimile: 210-270-7205

Counsel for Defendant
Peripheral Vascular Associates, P.A.

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of February, 2019, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Justin T. Berger
Adam M. Shapiro
Cotchett Pitre & McCarthy, LLP
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010

Wallace M. Brylak, Jr.
Brylak & Associates
15900 La Cantera Pkwy, Suite 19245
San Antonio, TX 78256

Thomas A. Parnham, Jr.
United States Attorney's Office
816 Congress Avenue, Suite 1000
Austin, Texas 78701
Thomas.Parnham@usdoj.gov

*/s/ Sean McKenna*
Sean McKenna