**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. TIFFANY MONTCRIEFF, ROBERTA MARTINEZ, and ALICIA BURNETT,**<br><br>Plaintiffs,<br><br>vs.<br><br>**PERIPHERAL VASCULAR ASSOCIATES P.A.,**<br><br>Defendant. | Civil Action No. SA-17-CV-00317-XR |

**<u>RELATORS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page No.**


I. INTRODUCTION AND STATEMENT OF THE ISSUES TO BE DECIDED ............... 1

II. SUMMARY OF THE ALLEGATIONS AND PROCEDURAL HISTORY .................... 2

A. Summary of the Allegations .................................................................... 2

1. Billing Practices and Scheme ................................................................ 3
2. Burnett's Wrongful Termination ............................................................ 9
3. Martinez's Wrongful Termination ........................................................... 9

B. Procedural History ................................................................................ 10

III. LEGAL STANDARD ................................................................................ 11

A. The False Claims Act is Construed Broadly ........................................ 11

B. Federal Rules of Civil Procedure 8(a) and 12(b) .................................. 11

C. Rule 9(b) Standard ................................................................................ 12

IV. ARGUMENT ........................................................................................... 13

A. The FAC Adequately Pleads Plausible Claims ...................................... 13

B. The FAC Sufficiently Pleads Materiality ............................................... 15

C. Relators Plead Fraud with the Required Particularity .......................... 16

1. The "Who" Standard of an FCA Claim is Misapplied by Defendant ....... 18
2. The "What" Standard is Properly Met .................................................. 18
3. The "How" Standard is Properly Met .................................................... 19
4. The "When" and "Where" are Properly Pled .......................................... 19
5. The FAC Pleads the Requisite Element of Scienter ............................... 20
6. Actual Submission of False Claims ....................................................... 21

D. Relator Martinez Sufficiently Pleads Retaliation under the FCA and TMFPA ................................................................................................ 21

1. Martinez Engaged in Protected Activity ................................................ 22
2. Martinez Alleges Defendant Had Knowledge of the Protected Activity and Terminated Her Because of It ............................................ 22

E. Martinez's FCA Retaliation and Wrongful Termination In Violation of Public Policy Claims ........................................................................... 22

F. Burnett Alleges Sufficient Facts under the FMLA .............................................. 23

V. CONCLUSION .......................................................................................................... 24

CERTIFICATE OF SERVICE ........................................................................................ 25

# TABLE OF AUTHORITIES

**Page No(s).**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 672, 678 (2009) ... 12, 13, 14

*Automotive Parts Antitrust Litigation*,
2014 WL 840272 (E.D. Mich. 2014) ... 12

*Bell Atlantic v. Twombly*,
550 U.S. 554, 555-56 (2007) ... 11, 13, 14

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333, 339 (5th Cir. 2008) ... 12, 20

*Duffie v. Wichita County*,
990 F. Supp. 2d 695, 706 (N.D. Tex. 2013) ... 13, 14

*Glover v. Hester*,
2011 WL 1467635, at *14 (W.D. La. 2011) ... 23

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
677 F.2d 1045, 1050 (5th Cir. 1982) ... 11

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792, 802 (1973) ... 23

*Melchior v. Apple Homecare Med. Supply, Inc.*,
2018 WL 1876287, at *2 (W.D. Tex. January 8, 2018) ... 21

*Robertson v. Bell Helicopter Textron, Inc.*,
32 F.3d 948, 951 (5th Cir. 1994) ... 21

*Starr v. Baca*,
652 F.3d 1202, 1216 (9th Cir. 2011) ... 12

*Swannie v. Bank of N.Y.*,
2012 WL 2942242, at *1 (N.D. Tex., July 19, 2012) ... 11

*Swanson v. Gen. Serv. Admin.*,
110 F.3d 1180, 1188 (5th Cir. 1997) ... 23

*Thomas v. ITT Educ. Servs., Inc.*,
517 Fed. Appx. 259, 262 (5th Cir. 2013) ... 21

*Tuchman v. DSC Comms. Corp.*,
14 F.3d 1061, 1068 (5th Cir. 1994) .......... 12

*U.S. ex rel. Harman v. Trinity Industries Inc.*,
872 F.3d 645, 661 (5th Cir. 2017) .......... 15

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
2012 WL 12886423, at *5 (N.D. Tex. July 23, 2012) .......... 21

*U.S. ex rel. Bias v. Tangipahoa,*
816 F.3d 315, 324 (5th Cir. 2016) .......... 11

*U.S. ex rel. Dekort v. Integrated Coast Guard Systems*,
705 F. Supp. 2d 519, 544-45 (N.D. Tex. 2010) .......... 12, 17

*U.S. ex rel. Farmer v. City of Houston*,
523 F.3d 333, 339 (5th Cir. 2008) .......... 14

*U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.*,
513 F. Supp. 2d 866, 875 (S.D. Tex. 2007) .......... 14, 15

*U.S. ex rel. Rigsby v. State Farm Fire & Casualty Co.*,
794 F.3d 457, 478 (5th Cir. 2015) .......... 20

*U.S. ex rel. Rigsby v. State Farm Fire Cas. Co.*,
794 F.3d 457, 468 (5th Cir. 2015) .......... 11

*United States ex rel. Compton v. Midwest Specialties, Inc.*,
142 F.3d 296, 302 (6th Cir. 1989) .......... 11

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) .......... 12, 16, 17

*United States v. Dynamics Research Corp.*,
2008 WL 886035, at *8 (D. Mass., March 31, 2008) .......... 11

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
136 S. Ct. 1989 (2016) .......... 15

*Walpool v. Frymaster, L.L.C.*
2017 WL 5505396, at *3 (W.D. La. November 16, 2017) .......... 23

/ / /

/ / /

**Statutes**

31 U.S.C. § 3729(b) .......... 14

42 CFR § 415.102(a)(1) .......... 14, 16, 19

42 CFR § 415.120(a) .......... 14, 15, 19

## I. INTRODUCTION AND STATEMENT OF THE ISSUES TO BE DECIDED

This is a *qui tam* case alleging that the largest single specialty vascular surgery group in the State of Texas, Peripheral Vascular Associates, P.A. (PVA) engaged in schemes to defraud the federal Medicare program by systematically charging Medicare for incomplete and unnecessary ultrasound studies.

Specifically, PVA is alleged in the First Amended Complaint (FAC) to bill for services which have not been rendered. The schemes involve the following: (1) Defendant bills for ultrasounds for which either a final report has not been completed or both a preliminary and final report have not been completed. (2) PVA also frequently orders unnecessary ultrasounds for patients before they have been seen by a physician and before the physician has determined whether an ultrasound should be performed, and further what kind of ultrasound should be performed. (3) After ultrasounds are performed, physicians are often not involved at all in interpreting the studies as required by Medicare.

Relators Roberta Martinez and Alicia Burnett also bring causes of action for retaliation and wrongful termination. Relator Tiffany Montcrieff has not alleged employment claims.

Defendant argues that Relators fail to state a claim under Rule 12(b)(6) and fail to plead fraud with particularity under Rule 9(b). In doing so, Defendant attempts to argue that Relators' allegations amount to "at worse—an alleged handful of minor immaterial regulatory and data entry errors." (PVA Motion to Dismiss (MTD) at 2.) Defendant's arguments are meritless for the following reasons:

- Relators claims are plausible and identify numerous false claims by including detailed facts illustrating fraudulent schemes. Defendant improperly applies a standard of plausibility that is evidence based, and therefore, not appropriate pursuant to a 12(b)(6) motion.
- In arguing Relators do not meet the standard for materiality, Defendant ignores the most fundamental principle of healthcare billing: claims may only be submitted for services that have actually been performed. In a case that violates

that fundamental principle, "materiality" is not an issue. The remainder of Defendant's materiality argument is a conflation with scienter issues.

- Defendant fails to apply the appropriate 5th Circuit standard under Rule 9(b) for pleading the Federal False Claims Act (FCA) claims with particularity, by arguing that Relators must show evidence of the actual false claims submitted, who submitted them specifically to Medicare, and other related facts that are explicitly rejected by the controlling case law.
- Defendant misapplies the case law relating to the FCA and Texas Medicare Fraud Prevention Act (TMFPA) retaliation claims brought on behalf of Relator Martinez. Relator pleads sufficient facts to support the allegation that she engaged in protected activity, complained about specific fraudulent billing to put PVA on notice, and was retaliated against because of such protected activity.
- Defendant improperly characterizes Relator Burnett's Family Medical Leave Act (FMLA) claims by stating that Burnett does not allege any hostility towards her application for such leave, when the FAC clearly describes termination within a short time period after application for FMLA. Furthermore, Defendant fails to apply the proper standard for temporal proximity between knowledge of protected activity and adverse employment action with regard to both FMLA claims being asserted.

Accordingly, Relators respectfully request that the Court deny PVA's motion, in its entirety. In the alternative, Relators respectfully request leave to amend.

## II. SUMMARY OF THE ALLEGATIONS AND PROCEDURAL HISTORY

### A. Summary of the Allegations

Relators Montcrieff, Martinez, and Burnett, former employees of Defendant PVA, filed this case (under seal as required by 31 U.S.C. Section 3730(b)(2)), on April 12, 2017. The FAC was filed on December 21, 2017. The operative FAC asserts claims on behalf of the United States, through Relators Martinez, Montcrieff, and Burnett for violation of the FCA by

presenting false claims, making or using false records or statements material to payment or approval of false claims, and in the alternative, retention of proceeds to which not entitled.

Relator Burnett alleges interference with FMLA rights and retaliation pursuant to the FMLA. Relator Martinez alleges retaliation in violation of the FCA and TMFPA, as well as wrongful termination in violation of public policy.

### 1. Billing Practices and Scheme

With respect to the *qui tam* claims, the FAC alleges that over the last several years, PVA has engaged in a pattern and practice of fraudulently billing Medicare for sonography reports. The schemes include the following practices:

Ultrasound imaging is a non-invasive test that uses sound waves to produce pictures of the inside of the body. Doppler ultrasound can be used to diagnose peripheral vascular disease. It can depict blood flow by bouncing high-frequency sound waves off of red blood cells to create images of blood vessels, tissues, and organs. Faintness or absence of sound may indicate an obstruction of blood flow. Additionally, Doppler ultrasound can detect abnormal blood flow within a vessel, which can indicate a blockage caused by a blood clot, plaque, or inflammation. (FAC ¶ 20.)

Medicare covers imaging services, including ultrasound and Doppler imaging that are performed or supervised by a physician who is certified by the American Board of Radiology or for whom radiology services account for at least 50 percent of the total amount of charges under Medicare. (FAC ¶ 21.)

Imaging services are billed under Medicare Part B to Medicare Carriers and MACs using acceptable Healthcare Common Procedure Coding System (HCPCS) codes for imaging and other diagnostic services taken primarily from the Current Procedural Terminology (CPT). CPT Codes correspond to an ICD[1]10 diagnostic code, which classifies a disease or condition.

---

[1] The International Classification of Diseases 10 Codes (ICD 10 Codes) are a set of medical diagnostic codes which describe an injury or disease.

Imaging services are generally paid based on the lower of the charge or the Medicare Physician Fee Schedule (MPFS) amount. (FAC ¶ 22.)

Generally, imaging services are split into a professional component and a technical component, each separately billable to the local Medicare contractor. The professional component is performed by the physician, and may include supervision, interpretation, and a written report. The technical component of a service includes the provision of all equipment, supplies, personnel, and costs related to the performance of the exam. (FAC ¶ 23.)

To claim only the technical component of a service, service providers must append the modifier "TC", to the appropriate CPT code when billing for a service. Under the relevant regulations, Medicare carriers pay service providers for interpretations of imaging, such as ultrasound procedures, only if there is a written report prepared for inclusion in the patient's medical record maintained by the service provider. 42 C.F.R. § 415.120(a). Additionally, the services must contribute directly to the diagnosis or treatment of an individual beneficiary. 42 C.F.R. § 415.120(a); 42 C.F.R. § 415.102(a)(2). (FAC ¶¶ 24-25.)

PVA often bills for incomplete reports. (FAC ¶ 26.) These reports are billed before they are interpreted and signed by a credentialed physician or alternatively, before a sonographer even has the opportunity to complete a preliminary report. *Id.* PVA also frequently orders an ultrasound — and then later bills for that ultrasound — before a doctor has seen the patient and determined whether an ultrasound is necessary or what type of ultrasound should be performed. *Id.*

PVA employs about 40 sonographers across all PVA locations and contracted hospitals, and its staff generates approximately 6,000 to 7,000 ultrasound studies each month. *Id.* at ¶ 27. Moreover, about 75 percent to 85 percent of PVA's patients are over the age of 65, and most of these patients are on Medicare. *Id.*

In the appropriate ultrasound process, a patient's primary care physician (PCP) refers the patient to PVA and the patient is designated as "Scheduled" in MedStreaming, PVA's workflow and clinical data management tool. (FAC ¶ 28.) Next, the patient has an initial appointment

with a doctor at PVA, and the doctor orders the appropriate and necessary tests after evaluating the patient. *See id.* The sonographer then performs the tests and, once the images are captured in MedStreaming, the patient's status is designated as "Acquired" in the system. *Id.* The status is changed to "Ready" after a sonographer begins a preliminary report, but before that report is finished. *Id.* Once the sonographer completes a preliminary report and the information is sent to the physician, the patient's MedStreaming status changes to "QA." *Id.* At this point, the technical component can be billed to the insurer (Medicare) and the doctor is alerted that the study and images are ready for his or her review. (*See* FAC ¶ ¶ 25, 28.) Finally, a doctor reviews the preliminary report, including the images, and interprets the study. After the doctor's review is complete, the MedStreaming status becomes "Final," and the professional component can be billed. (FAC ¶ 28.)

PVA, however, regularly fails to follow this procedure, resulting in improper charges to Medicare. *Id.* at ¶ 29. PVA frequently bills Medicare for both the professional and technical components, even though a patient's status is "Acquired," "Ready," or "QA" and the professional component is never completed. *Id.* In these cases, PVA submits a bill to Medicare for its services after a sonographer completes a preliminary report, but before a doctor has seen the report, reviewed the patient's images, or interpreted or provided an independent assessment of the results. *Id.* In most if not all of these cases, the professional component is <u>never completed</u>, even though PVA is billing for it. *Id.* Relators personally witnessed this very situation on a number of occasions during their employment at PVA when they were checking patients' status on MedStreaming. *Id.*

Moreover, in the absence of a final report, doctors would sometimes ask Relators about preliminary ultrasound results or rely on the preliminary report drafted by Relators, without looking at the images themselves. (FAC ¶ 30.) Thus, the medical providers did not provide an independent assessment of the images. *Id.* Patients are often told to come back to PVA for a new ultrasound every six months, even though a final professional assessment with a final report for a prior ultrasound has not been completed. *Id.*

In some cases PVA bills Medicare for both the technical and professional components before either is completed. *Id.* at ¶ 31. In these instances, PVA bills Medicare after an ultrasound has been taken but before the sonographer has even completed a preliminary report. *Id.* Thus, the bill is submitted while the patient's status remains "Ready" in MedStreaming. Medicare is billed even though there has been absolutely no analysis of the patient's imaging. *Id.* Relators also witnessed incidents where PVA billed for imaging that was never completed due to technical errors. (FAC ¶ 32.) For example, sometimes a doctor would reject a preliminary report and send it back to a technician to fix, but PVA would nonetheless bill for the study. *Id.* Likewise, PVA would also bill when ultrasound equipment failed and prevented images from uploading onto MedStreaming. *Id.*

PVA also has a practice of ordering unnecessary ultrasounds. In these cases, PVA orders an ultrasound after a patient has been referred by a PCP, but before the patient has been evaluated by a PVA doctor. *Id.* at ¶ 33. In other words, tests are ordered before the PVA doctor has seen the patient and determined what tests are necessary and appropriate. *Id.* As a result, these initial ultrasounds are unnecessary and generally provide no useful information. (FAC ¶ 33.) Moreover, PVA doctors are often unaware that these initial ultrasounds have been taken, and thus will not look at them before ordering subsequent ultrasounds. *Id.*

The FAC alleges that Relator Montcrieff personally witnessed a number of fraudulent ultrasound orders that were purportedly filed by her on behalf of a doctor. *Id.* at ¶ 33. In fact, Montcrieff did not file these orders and had no knowledge of their existence until she discovered them on MedStreaming. *Id.*

The FAC further alleges that the schemes began in or around 2012, when Barbara Burrow was appointed Technical Director for PVA. *Id.* at ¶ 36. Burrow pushed staff to complete more studies to increase PVA's billings and drive up its revenue. (FAC ¶ 36.) Normally, a sonographer completes an average of roughly eight studies per day. At PVA, sonographers are expected to average approximately 10 to 20 studies per day. *Id.* Further, the staff are instructed to bill within 24 hours of imaging, even though it is often impossible to

complete the technical and professional components within this period. *Id.* at ¶37. It is common knowledge at PVA that there is a long backlog of reports that need to be finished. Sometimes, up to 70 studies still need finished reports. *Id.* Relators allege that Burrow and other PVA management have encouraged and/or been aware of the false billing and reporting practices. *Id.* at ¶ 38.

The FAC further provides specific data outlining instances where PVA billed for incomplete sonography studies. The table taken from the FAC, below, summarizes the examples and provides for each instance the date the image was taken (date of service), the type of image taken (test type), the CPT code for the patient's condition (CPT Code), the status of the report in MedStreaming after the test was billed to Medicare (MedStreaming Status), the amount paid by Medicare, and the payment date. (FAC ¶ 39.)

| Date of Service | Test Type | CPT Code | MedStreaming Status | Amount Paid by Medicare | Payment Date |
|---|---|---|---|---|---|
| Apr. 13, 2016 | Dialysis Fistula | | Ready (as of Oct. 3, 2016) | $85.32<br>$53.83<br>$54.93 | Apr. 29, 2016<br>Apr. 29, 2016<br>May 24, 2016 |
| Oct. 18, 2016 | LE Arterial Segmental Pressure | 93922 | Scheduled (as of Nov. 3, 2016) | $65.79 | Nov. 3, 2016 |
| Sep. 11, 2015 | LE Arterial Segmental Pressure | 93922 | Acquired (as of Oct. 5, 2016) | $65.06<br>$16.85 (Tricare) | Oct. 1, 2015<br>Oct. 21, 2015 |
| Oct. 18, 2016 | Hemodialysis Access Scan | 93990 | Acquired (as of Nov. 3, 2016) | $54.93 | Nov. 3, 2016 |
| Jan. 20, 2016 | Dialysis Fistula, Hemodialysis Access Scan | 93990 | Acquired (as of Sep. 13, 2016) | $85.32 | Feb. 5, 2016 |
| Feb. 2, 2016 | UE Segmental with Digit | 93990 | Scheduled (as of Oct. 3, 2016) | $119.99 | Mar. 14, 2016 |

The FAC further pleads facts illustrating studies that remained incomplete. The following table provides such examples of studies performed by Relator Martinez in August

2016, but which remained incomplete as of February 2017. (FAC ¶ 40.) The FAC alleges that based on PVA's billing protocols, PVA billed for the studies outlined below days after they were performed by Martinez. (FAC ¶ 40.)

| Date of Service | Test Type | Location of Study | Status as of February 2017 |
|---|---|---|---|
| August 25, 2016 | LE Arterial Duplex Scan | Southwest Practice | Scheduled |
| August 25, 2016 | Stent | Southwest Practice | Scheduled |
| August 25, 2016 | LE Arterial Duplex Scan | Southwest Practice | Scheduled |
| August 25, 2016 | Stent | Southwest Practice | Scheduled |
| August 24, 2016 | LE Arterial Duplex Scan | Downtown Practice | Scheduled |
| August 25, 2016 | Stent | Metro Practice | Scheduled |
| August 25, 2016 | LE Arterial Duplex Scan | Metro Practice | Scheduled |
| August 22, 2016 | Stent | Downtown Practice | Scheduled |
| August 29, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |
| August 25, 2016 | LE Arterial Segmental Pressure | Southwest Practice | Ready |
| August 25, 2016 | LE Arterial Segmental Pressure | Southwest Practice | Ready |
| August 24, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |
| August 24, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |
| August 23, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |
| August 23, 2016 | Graft Compression | Downtown Practice | Ready |
| August 25, 2016 | LE Arterial Segmental Pressure | Metro Practice | Ready |

| | | | |
|---|---|---|---|
| August 22, 2016 | LE Arterial Segmental Pressure | Downtown Practice | Ready |

Relators also allege having observed a number of instances where PVA performed imaging on a patient before that patient was able to see a doctor at PVA. (FAC ¶ 41.) For example, PVA's records show that imaging was ordered for and conducted for patient "LH" at approximately 12:30 pm on September 1, 2016, but patient "LH" did not undergo a physical exam or see a PVA doctor until later in the day. (FAC ¶ 41.) Further, imaging of another patient, "EL," was taken on September 29, 2016, but patient "EL" did not see a physician until the following day. (FAC ¶ 41.)

The FAC alleges PVA's practices were fraudulent and did not follow appropriate billing practices in seeking reimbursement for unnecessary studies, incomplete studies, and/or for studies which were not reviewed or ordered by physicians. (FAC ¶ ¶ 26-41.)

**2. Burnett's Wrongful Termination**

Burnett alleges that her FMLA request was a factor in PVA's decision to terminate her employment. (FAC ¶ 46.) On July 7, 2017, Burnett requested leave pursuant to the FMLA so that she could care for her ill uncle. *Id.* at ¶ 42. PVA approved an unscheduled and intermittent leave on July 18, 2017. *Id.*

On September 7, 2017, Brian Hembling, PVA's Business Coordinator, and John Gilpin, PVA's CEO, informed Burnett that her employment was being terminated. *Id.* at ¶ 44. They explained that the "Northeast" office, where Burnett worked, was closing. *Id.* Some of the Northeast's office and staff were relocated to another property in downtown San Antonio. *Id.* PVA retained other employees, including sonographers with less seniority and experience than Burnett, who had worked at the Northeast office. (FAC ¶ 45.)

**3. Martinez's Wrongful Termination**

The FAC alleges that Martinez was terminated on September 2, 2016 because of her efforts to stop PVA from unlawfully billing for ultrasound studies. *Id.* at ¶ 47. In or around September 2015, Martinez informed her supervisor, Randi Balch, that sonographers at PVA were

being assigned too many patients and were not given adequate time to complete the reports for those patients. *Id* at ¶ 48. Martinez also told Balch that because sonographers had inadequate time, they were often unable to complete sonography reports before they were billed to Medicare. *Id.* Martinez asked Balch why PVA was billing exams without reports. *Id.* Balch replied that she just did what Barbara Burrow instructed her to do. (FAC at ¶ 48.)

The FAC further alleges that in or around January 2016, Martinez told Marla First, PVA's Nursing Supervisor, that PVA sonographers were not given adequate time to complete their reports. *Id.* at ¶ 49. In or around July or August of 2016, First told Martinez she did not understand why there was such high turnover among sonographers. *Id.* Martinez again stated that the expectations for sonographers were unreasonable. *Id.* She also explained that because of the volume of patients and the lack of time to work on sonography reports, many reports were being billed before they were complete. *Id.* Martinez showed First how to look up these tests in PVA's computer system. *Id.*

Between January and September 2016, Martinez also regularly complained to Barbara Burrow and Marilyn Fagg, Martinez's supervisor at the time, that she and other sonographers did not have enough time to complete their reports, and that reports were being billed before they were completed. (FAC at ¶ 50.) Shortly after these last complaints, Martinez was terminated.

**B. Procedural History**

Relators filed their Complaint on April 12, 2017. On June 15, 2017 the United States obtained its first extension of time to intervene. On December 21, 2017 Relators filed their FAC. On October 16, 2018 the United States received a second extension of time to intervene. On November 26, 2018 the United States filed its Notice to Decline intervention.[2] One day later this Court lifted the seal, and Defendant PVA was served shortly thereafter with the FAC.

---

[2] As repeatedly emphasized by the courts, a declination to intervene should not be construed as a comment by the government on the merits of a claim. *See United States ex rel. Atkins v. Mclnteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) (the United States' "absence from the fray" does not mean that the relator's claims lack merit); *United States ex rel. Chandler v. Cook County*, 277 F.3d 969, 974 n.5 (7th Cir. 2002), *aff'd,* 538 U.S. 119 (2003) ("there is no reason to presume that a decision by the Justice Department not to assume control of the suit is a commentary on its merits. The Justice Department may have myriad reasons for permitting the private suit to go forward including

## III. LEGAL STANDARD

### A. The False Claims Act is Construed Broadly

The courts and Congress have repeatedly mandated that the FCA be interpreted liberally. As stated by the Fifth Circuit, "[b]ecause the FCA is 'remedial,' its provisions are to be construed 'broadly to effectuate its purpose.'" *U.S. ex rel. Bias v. Tangipahoa,* 816 F.3d 315, 324 (5th Cir. 2016) (quoting *U.S. ex rel. Rigsby v. State Farm Fire Cas. Co.*, 794 F.3d 457, 468 (5th Cir. 2015), *petition for cert. filed* (Oct. 21, 2015) (No. 15-513)). Indeed, the Act "has as its core function the promotion of transparency and honesty amongst government contractors." *U.S. v. Dynamics Research Corp.*, 2008 WL 886035, at *8 (D. Mass., March 31, 2008). The goal of the FCA generally is to ensure integrity in government contracting and the statutes embody "the maxim that men must turn square corners when they deal with the Government." *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 (6th Cir. 1989).

### B. Federal Rules of Civil Procedure 8(a) and 12(b)

Rule 12(b)(6) "must be interpreted in conjunction with Rule 8(a), which sets forth the requirements for pleading a claim for relief in federal court." *Swannie v. Bank of N.Y.*, 2012 WL 2942242, at *1 (N.D. Tex., July 19, 2012). Rule 8(a) calls for a short and plain statement of the claim showing that the pleader is entitled to relief. A complaint need only allege "enough facts to state a claim for relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or allege sufficient facts to "raise a right to relief above the speculative level." *Id.* at 555. The Court must accept as true all allegations of material facts alleged in the complaint, and must draw all inferences in the light most favorable to the non-moving party. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir. 1982).

---

limited prosecutorial resources and confidence in the relator's attorney."); *United States ex rel. El-Amin v. George Washington University*, 533 F. Supp. 2d 12, 21-22 (D.D.C. 2008) ("assuming the government looked unfavorably upon each qui tam action in which it did not intervene would seem antithetical to the purpose of the qui tam provision – to encourage private parties to litigate on behalf of the government . . . [and inaction cannot be seen] as evidence of how the government appraised the merits of the relator's case" because, absent "evidence tending to show the actual reason the government elected not to intervene . . . the simple fact that the government did not intervene has no probative value and is not relevant").

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 672, 678 (2009) (quoting *Twombly*, 550 U.S. at 544). "If there are two alternative explanations, one advanced by defendant and the other advanced by Relator, both of which are plausible, Relator's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2101 (2012). Accordingly, a relator "need not rule out all possible innocent explanations." *In re Automotive Parts Antitrust Litigation*, 2014 WL 840272 (E.D. Mich. 2014).

**C. Rule 9(b) Standard**

Rule 9 on its face does not apply to the scienter requirement of the FCA. The second sentence of the Rule relaxes the particularity requirement for conditions of the mind, such as scienter: "Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (analyzing securities fraud cause of action and quoting Fed. R. Civ. Proc. 9(b)). Although fraud claims cannot be merely based upon speculation and conclusory allegations, if the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based upon information and belief. *Id.* (citing *Tuchman v. DSC Comms. Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).

The Fifth Circuit in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) held that in a *qui tam* case a relator need not plead under Rule 9(b) with particular detail the actual contents of a presented bill itself. *Id.* at 190. Rather, "[t]he particular circumstances constituting the fraudulent presentment are often harbored in the scheme." *Id.* The details of a scheme to submit false claims "paired with reliable indicia that lead to a strong inference that claims were actually submitted" are sufficient for stating an FCA claim. *Grubbs*, 565 F.3d at 190; *see also U.S. ex rel. Dekort v. Integrated Coast Guard Systems*, 705 F. Supp. 2d 519, 544-45 (N.D. Tex. 2010).

## IV. ARGUMENT

### A. The FAC Adequately Pleads Plausible Claims

Under Rule 12(b)(6), a pleading must be plausible on its face, contain more than mere suspicion of a legally cognizable right of action, and more than a mere conclusory recitation of legal elements. *See Bell Atlantic v. Twombly*, 550 U.S. 554, 555-56 (2007) (citations omitted). A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw a reasonable inference that the defendant is liable for the misconduct that is alleged. *Duffie v. Wichita County*, 990 F. Supp. 2d 695, 706 (N.D. Tex. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 556).

As stated above, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When there exist well-pleaded factual allegations, the court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Duffie*, 990 F. Supp. 2d at 706.

Although Defendant cites to *Twombly's* plausibility requirement, it fails to apply the standard correctly and instead focuses upon a much higher evidence-based standard. Defendant further inaccurately states that Relators failed to identify even one claim that was allegedly false. (MTD at 7:10.) Indeed, although unnecessary at the pleading stage, Relators, who understand what is considered the appropriate and normal process to order, conduct, review, and bill for sonography studies, have identified <u>specific claims and details</u>, establishing a pattern of fraudulent activity by PVA, nearly meeting the much higher standard for summary judgment.

As detailed above in Section II, A, 1, PVA fails to follow the MedStreaming protocol in completing review and analysis of studies ordered, yet bills Medicare for these studies. In some cases PVA bills Medicare for both the technical and professional components before either is completed. *Id.* at ¶ 31. In these instances, PVA bills Medicare after an ultrasound has been taken but before the sonographer has even completed a preliminary report. *Id.* Thus, the bill is

submitted while the patient's status remains "Ready" in MedStreaming. Medicare is billed even though there has been absolutely no analysis of the patient's imaging. *Id.*

The FAC also sets forth specific data outlining examples of specific patients for which PVA billed for incomplete sonography studies as evidenced by the detailed tables above outlined. (FAC ¶ ¶ 39-41.) Relators allege that often little or no physician oversight, analysis, or interpretation is involved in the PVA process, which is critical for properly submitting claims to Medicare. *See* 42 CFR § 415.120(a) (mandating distinct services must be provided by the physician and that a written report must be prepared in order to obtain payment from a carrier for ultrasound procedures); *see also* 42 CFR § 415.102(a)(1) (requiring that a physician "personally" furnish services to the individual beneficiary); Medicare guidelines, Medicare.gov, providing that "services" under Part B coverage (medical insurance) cover medically necessary services provided by physicians. It is therefore inconceivable how Defendant believes such detailed facts amount to mere conclusory statements.

Defendant further argues that in citing MedStreaming examples, Relators drew improper conclusions because the accuracy of the MedStreaming "status" fields is not relevant to Medicare reimbursement. (MTD at 8:12-9:13.) Defendant further argues that "[a] data entry system's accuracy or inaccuracy cannot be a basis for FCA liability." (MTD at 9:13.)

Defendant, however, ignores that the FAC alleges the MedStreaming data shows a pattern of conduct that is not consistent with mere occasional error or inaccuracy, but rather, at the very least evidences the plausibility there was intent to defraud the Medicare system in order to obtain more reimbursements. *See Duffie v. Wichita County*, 990 F. Supp. 2d 695, 706 (N.D. Tex. 2013) (holding that a claim has facial plausibility when the plaintiff pleads facts that allow the court to draw a reasonable inference that the defendant is liable for the misconduct that is alleged) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 556). It is no defense that the company's own medical record system is so unreliable and error prone that false claims were inevitable. The company is responsible for its own systems, and the FCA only requires that a defendant act "recklessly" to be found liable. *See U.S. ex rel. Farmer v. City of*

*Houston*, 523 F.3d 333, 339 (5th Cir. 2008) (citing 31 U.S.C. § 3729(b)); *see also U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.*, 513 F. Supp. 2d 866, 875 (S.D. Tex. 2007).

**B. The FAC Sufficiently Pleads Materiality**

Defendant's argument relating to materiality is flawed as *Escobar* is inapposite. Further, Defendant mistakenly conflates the element of materiality with scienter.

In *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), the Supreme Court evaluated, unlike the claim Relators assert in this case, an *implied false certification* FCA claim, on a motion to dismiss. In *Escobar,* relators alleged defendant defrauded the Government by submitting reimbursement claims that made representations about the specific services provided, yet failed to disclose violations of regulations regarding licensing to provide those services. *Id.* at 1993. The Court held that in evaluating whether a defendant's false statements are material to obtaining payment, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 1995.

The Fifth Circuit has stated that in *Escobar* the Supreme Court approved the longstanding Fifth Circuit "so-called natural tendency test." *U.S. ex rel. Harman v. Trinity Industries Inc.*, 872 F.3d 645, 661 (5th Cir. 2017). In *Harman*, the Fifth Circuit confirmed that this approach to materiality was advanced by the Circuit years prior to *Escobar,* in *U.S. ex rel. Longhi Lithium Power Technologies*, 575 F.3d 458 (2009). This standard requires "proof only that the defendant's false statements could have influenced the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *Harman*, 872 F.3d at 661 (citing *Longhi*).

Here, there can be no dispute that billing for services that have not been provided meets the materiality standard. Further, Relators meet materiality requirements by alleging that PVA failed to properly order and evaluate sonography studies, and often ordered studies that were wholly unnecessary and/or repeated only for the purposes of higher reimbursement. Clearly, Medicare guidelines require evaluation of the ultrasound studies by the licensed medical

professional billing for the professional component, as well as require the technical component be billed properly, which is premised upon initial medical evaluation. *See* 42 CFR § 415.120(a) (mandating distinct services must be provided by the physician and that a written report must be prepared in order to obtain payment from a carrier for ultrasound procedures); *see also* 42 CFR § 415.102(a)(1) (requiring that a physician "personally" furnish services to the individual beneficiary); Medicare guidelines, Medicare.gov, providing that "services" under Part B coverage (medical insurance) cover medically necessary services provided by physicians.

Indeed, the FAC sets forth facts specifically alleging that claims were filed with Medicare fraudulently in the name of Relators on behalf of physicians who never evaluated the studies, or perhaps the patient's case at all. (FAC at ¶ ¶ 33, 41.) Further as explained above, Relators allege that protocol was broken in order to benefit from extra payments, as pushed by Barbara Burrow and other PVA upper management. (FAC at ¶ ¶ 33-50.)

This is not a case of violation of a technical regulation or certification. Rather, this is a case of fundamental falsity of billing for services not rendered. Moreover, Defendant's materiality argument is misplaced in stating that "the remainder of the Complaint simply does not allege or explain how the supposed regulatory violations were material to the Government's decision to pay claims as required by *Escobar*. . . [i]nstead the Complaint actually pleads facts supporting a finding of non-materiality." (MTD at 11:16.) PVA argues that it made innocent billing errors, not intentional FCA violations. Clearly, if PVA is alleged to have billed for services not completed and/or unnecessary (i.e. the crux of Relators' allegations pled) *this is not an issue of materiality, but rather, one of scienter* (which does not fall under the Rule 9(b) heightened standard or *Escobar's* materiality analysis). As described below in Section 5, scienter is more than adequately pleaded.

**C. Relators Plead Fraud with the Required Particularity**

While Defendant repeatedly cites to the Fifth Circuit decision in *Grubbs*, Defendant fails to quote the most critical portions of *Grubbs,* which provide clear guidance on the standard for pleading fraud pursuant to the FCA.

In *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), the Court reversed the District Court's decision to dismiss relator's FCA claims. Under *Grubbs*, to plead with particularity the fraud for an FCA claim, even if relator "cannot allege the details of an actually submitted false claim, [the claims] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

The Court further distinguished FCA fraud requirements from other types of fraud and held, "a claim under the False Claims Act and a claim under common law and securities fraud are not on the same plane in meeting the requirements of 'stating with particularity' the contents of the fraudulent misrepresentation." *Grubbs* 565 F.3d at 189; *see also U.S. ex rel. Dekort v. Integrated Coast Guard Systems*, 705 F. Supp. 2d 519, 544-45 (N.D. Tex. 2010) (holding that relator's false certification allegations were well-pled).

While a relator must plead the general "who, what, how, when, and where" of fraud, *Grubbs* makes clear that the FCA standard of pleading fraud is not one set "single construction of Rule 9(b) that applies to all contexts. Depending on the claim, a plaintiff may sufficiently state with particularity the circumstances constituting fraud or mistake without including all the details of any single court-articulated standard—it depends on the elements of the claim at hand." *Grubbs*, 565 F.3d at 188 (internal quotations omitted).

Defendant, however, omits these, and other key portions of *Grubbs* which mandate the exact opposite standard urged by Defendant regarding presentment of submitted claims for properly pleading an FCA fraud cause of action. While Defendant argues that Relators fail to plead "actual claims submitted" to the government under *Grubbs* (FAC at 13:20), the very case relied upon by Defendant states that the contents of exact claims, and specificity of such claims *do not* need to be pled in an FCA complaint. Indeed,

> Stating with particularity the circumstances constituting fraud does not necessarily and always mean stating the contents of the bill. The particular circumstances constituting the fraudulent presentment are often harbored in the scheme . . . It is the scheme in which particular circumstances constituting

> fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills.

*Grubbs*, 565 F.3d at 190.

Here, the facts set forth in the FAC, which are summarized in detail above, exceed this standard, as they not only detail the scheme, but also provide specific examples of patient encounters that were falsely and fraudulently billed.

**1. The "Who" Standard of an FCA Claim is Misapplied by Defendant**

Defendant argues that Relators must allege the identify of the person making the misrepresentations. (MTD at 14:21.) However, in citing to *Grubbs*, Defendant fails to clarify that *Grubbs* was distinguishing other Circuit decisions, and noting there is no set formula for pleading the particulars of an FCA claim. *Grubbs*, 565 F.3d at 186. In any event, Relators provide great detail about who directed the scheme at PVA, and plead specific details of under what physicians claims were submitted to Medicare.

The FAC sets forth facts specifically alleging that claims were filed with Medicare fraudulently in the name of Relators on behalf of physicians who never evaluated the studies, or perhaps the patient's case at all. (FAC at ¶ ¶ 33, 41.) Further as portions of the FAC cited above make clear, Relators allege that protocol was broken in order to benefit from extra payments, as pushed by Barbara Burrow and other PVA upper management. (FAC at ¶ ¶ 33-50.)

**2. The "What" Standard is Properly Met**

Similarly, Defendant misapplies the *Grubbs* standard under the "what" standard of fraud in arguing that Relators must submit details of which claims were ultimately submitted. (MTD at 16:24.) *Grubbs* does not require such pleading. In any event, as explained immediately above, Relators have provided detailed examples of what items were submitted, and the scheme behind the submissions.[3]

---

[3] In this section of its MTD, page 15 at footnote 5, Defendant also improperly cites to an online billing provider Q&A which is not referenced anywhere in the FAC. Defendant does not provide any authority to support the ability of a moving party bringing a 12(b)(6) motion to provide citation to data (merely referenced by a website address by Defendant) which has not been pled or mentioned in any manner in a complaint or the supporting documents. Even if reliance on such data is permissible, Defendant again simplifies the MedStreaming database timing issue of submitting billing data to Medicare. Relators provide facts to support an overall scheme—that PVA routinely breaking proper

**3. The "How" Standard is Properly Met**

Contrary to Defendant's assertions, Relators do not allege that PVA simply suffered from imperfect timing and occasional errors. Rather, they allege that in breaking fundamental Medicare principles of billing in how and when to screen patients, how to order the proper sonographies (and evaluate when multiple orders must be made), how to interpret such reports, and ultimately submit claims for Medicare reimbursement, a fraudulent scheme arose for obtaining higher volumes of reimbursement for unnecessary and/or improperly screened or reviewed sonographies.

Furthermore, Relators have alleged a "rule" has been violated—Medicare does not reimburse unnecessary claims and/or claims that are not supervised by a medical professional (for the technical component) and which have not been ordered and interpreted by the licensed physician (professional component). *See* 42 CFR § 415.120(a) (mandating distinct services must be provided by the physician and that a written report must be prepared in order to obtain payment from a carrier for ultrasound procedures); *see also* 42 CFR § 415.102(a)(1) (requiring that a physician "personally" furnish services to the individual beneficiary); Medicare guidelines, Medicare.gov, providing that "services" under Part B coverage (medical insurance) cover medically necessary services provided by physicians. As summarized above, the FAC in fact does properly plead how exactly the fraud was carried out by PVA.

**4. The "When" and "Where" are Properly Pled**

Defendant cites to case law which is inapposite in support of pleading the "when" and "where" relating to an FCA fraud claim. Defendant, for example, argues that FCA claims that lack specific temporal and geographic allegations are subject to dismissal, and cites to *Willard v. Humana Health Plan*, 336 F.3d 375, 385 (5th Cir. 2003) in support of this notion. (MTD at 18:26.) However in *Willard*, the court agreed with the District Court's finding that facts were

protocol results in cases where there is no initial physician review, evaluation, and no later physician interpretation. Additionally, the website referenced is not providing a directive from Medicare, but rather the opinion of a third-party Medicare Administrator.

not pled with sufficient particularity because only "one sentence" was provided in the complaint to provide any details. *Id.* The court in *Willard* went on to state that the complaint did not even meet the Rule 8(a) pleading requirements. *Id.* Moreover, the case, along with the other cases cited by Defendant are pre-*Grubbs*, and apply the incorrect standard for what is sufficient for pleading FCA claims under Rule 9(b).

**5. The FAC Pleads the Requisite Element of Scienter**

The second sentence of Rule 9(b) relaxes the particularity requirement for the conditions of the mind, such as scienter. *Dorsey v. Portfolio Equities*, 540 F.3d 333, 339 (5th Cir. 2008) (analyzing securities fraud claims). If the facts pleaded in the complaint are peculiarly within the opposing party's knowledge, fraud may be based on information and belief. *Id.*

In FCA cases, proof of specific intent is not required, though negligence or gross negligence is insufficient. *U.S. ex rel. Rigsby v. State Farm Fire & Casualty Co.*, 794 F.3d 457, 478 (5th Cir. 2015). Defendant argues that the FAC fails to plead "with particularity any factually false claim, let alone the conscious behavior of a single PVA employee that demonstrates actual knowledge of submission of a false claim to the government." (MTD at 19:27.)

Defendant improperly attaches the more stringent "particularity" requirement to scienter. Moreover, Defendant fails to recognize that Relators cite numerous facts to support the notion that PVA management had knowledge of false claims. Relators set forth facts specifically alleging that claims were filed with Medicare fraudulently in the name of Relators on behalf of physicians who never evaluated the studies, or perhaps the patient's case at all. (FAC at ¶ ¶ 33, 41.) Further, Relators allege that protocol was broken in order to benefit from extra payments, as pushed by Barbara Burrow (who obviously had knowledge as pled) and other PVA upper management. (*See* FAC at ¶ ¶ 33-50.) Relators further allege that the practices continued even after they explicitly raised concerns internally. (*See* FAC at ¶ ¶ 48-50.)

/ / /

/ / /

### 6. Actual Submission of False Claims

As detailed in Section C above, Defendant fails to cite the critical portions of *Grubbs* which provide clear guidance that details of particular bills submitted need not be provided at the pleading stage. *See Grubbs*, 565 F.3d at 190. Relators have exceeded the requirements of *Grubbs* by providing evidence of the details in the mismanaged MedStreaming protocol, as well as specific cases documented and witnessed by Relators involving fraud.

### D. Relator Martinez Sufficiently Pleads Retaliation under the FCA and TMFPA

Courts have applied similar standards in evaluating both the FCA and TMFPA retaliation claims. Both statutes prohibit an employer from retaliating against an employee because of lawful acts, including investigating, initiating, testifying, or assisting in an action filed "in furtherance of an action" under either statute. *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 2012 WL 12886423, at *5 (N.D. Tex. July 23, 2012) (denying defendant's motion to dismiss retaliation claims).

The Relator must show (1) engagement in protected activity, (2) that the employer was on notice about the activity, (3) and that the employer retaliated against the employee because of the protected activity. *Wall* at *5; *Melchior v. Apple Homecare Med. Supply, Inc.*, 2018 WL 1876287, at *2 (W.D. Tex. January 8, 2018). The protected activity does not need to be directly in furtherance of a *qui tam* action, but needs to show that employees complained about concerns relating to possible fraud. *Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948, 951 (5th Cir. 1994); *Melchoir* at *2.

While the *Robertson v. Bell Helicopter* case did not foreclose a retaliation suit in the absence of a *qui tam* action, the standard has relaxed even more so after *Robertson,* since the 2009 expansion of the whistleblower provision by Congress. *Melchior* at *3. Courts have noted that since that expansion, the Fifth Circuit has not yet issued a published opinion interpreting the new language, but in one unpublished opinion*, Thomas v. ITT Educ. Servs., Inc.,* 517 Fed. Appx. 259, 262 (5th Cir. 2013), the Court considered only whether the employee had informed her employer that its actions were illegal or fraudulent. *Melchior* at *3. Unlike the claims for fraud,

these retaliation claims are not subject to a heightened pleading standard. Here, as outlined below, Martinez pleads retaliation sufficiently.

#### 1. Martinez Engaged in Protected Activity

Contrary to Defendant's assertions, Martinez does not merely plead generic general-type workplace complaints. (*See* MTD at 22:34.) As explained in detail in Section II., A above, Martinez raised concerns specifically about billing Medicare prior to sonographers completing reports. Clearly, telling numerous PVA employees, including supervisors and upper management that she was concerned about billing Medicare prematurely for these incomplete reports (that is prior to evaluation of the patients' studies or at times prior to their examinations, which is required, and thus obvious to PVA staff as an allegation of fraud), amounts to engaging in protected activity.

#### 2. Martinez Alleges Defendant Had Knowledge of the Protected Activity and Terminated Her Because of It

Contrary to Defendant's assertions, it is not necessary that the employer was on notice of the possibility of *qui tam* litigation. (MTD at 23:36.) As stated above, the Fifth Circuit, before and after the 2009 amendment to the FCA, requires that an employer be aware only that the employee has concerns regarding illegality or fraud. Here, as outlined above in Section II., A, Martinez shared with PVA upper management her serious concerns relating to submission of Medicare claims. Shortly after these last complaints were made, Martinez was terminated. *Id.* Thus, Martinez also properly pleads facts sufficient to show she was terminated because of such complaints and investigation.

### E. Martinez's FCA Retaliation and Wrongful Termination In Violation of Public Policy Claims

Defendant argues that Martinez's *Sabine Pilot* claim and FCA claim are mutually exclusive, and that electing the FCA claim does not permit her to make the other claims. However, Defendant's argument is unclear and does not provide sufficient citation to the FAC to understand which portions of Martinez's claim PVA attempts to dismiss in this regard. It is

unclear if Defendant is seeking to dismiss the cause of action for wrongful termination in violation of public policy.

**F. Burnett Alleges Sufficient Facts under the FMLA**

The Fifth Circuit applies the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) framework to analyze retaliation claims under the FMLA. *Walpool v. Frymaster, L.L.C.* 2017 WL 5505396, at *3 (W.D. La. November 16, 2017). Under this framework, in order to establish a *prima facie* case of retaliation under the FMLA, plaintiff must show: (1) she was protected under the FMLA; (2) she suffered an adverse employment decision and (3) the decision was made because she took FMLA leave. *Id.* The test for FMLA retaliation does not require a heightened pleading standard.

The Fifth Circuit has held that "close timing between an employee's protected activity and an adverse action may provide the causal connection required to make a *prima facie* case of retaliation under the FMLA." *Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). The Circuit has recognized various time periods between the employee's protected activity and termination as sufficient on its own to establish the causal connection element of FMLA retaliation. *See Walpool* at *4 (citations omitted). Indeed, the Fifth Circuit has recognized time frames of two-and-a-half months as a sufficient time frame. *Id.*

Further, some District courts in the Fifth Circuit have recognized *a five-month time period as sufficient* for establishing the required casual connection. *Id.* (citing *Glover v. Hester*, 2011 WL 1467635, at *14 (W.D. La. 2011).

The FAC plausibly alleges each of the three requirements to establish a *prima facie* case of retaliation in connection with Burnett's termination. Burnett was protected under the first prong of the framework as she applied for FMLA leave on July 7, 2017 because her uncle became ill with lung cancer. (FAC ¶ 42.)

Burnett sufficiently pleads that she suffered an adverse employment decision by stating that on September 7, 2017, Brian Hembling, PVA's Business Coordinator, and John Gilpin, PVA's CEO, informed Burnett that her employment was being terminated. *Id.* at ¶ 44.

For purposes of a 12(b)(6) motion, under the Fifth Circuit standard, Burnett pleads facts sufficient to also meet the second and third prongs of the *McDonnell Douglas* framework. Burnett pleads that less than 2 months passed since her FMLA approval went into effect, and her termination. Furthermore, she alleges that other less senior staff were kept on as staff who worked in the same Northeast office as Burnett, and more staff were hired, yet she was let go allegedly due to an office closure. These facts are more than sufficient to make a *prima facie* case for FMLA retaliation and interference.

## V. CONCLUSION

For the foregoing reasons, Relators respectfully request that this Court deny Defendant PVA's motion, in its entirety. In the alternative, Relators respectfully request leave to amend.

Respectfully submitted,

Dated: March 6, 2019

By: /s/ *Justin T. Berger*

Justin T. Berger (*pro hac vice*)
Sarvenaz J. Fahimi (*pro hac vice*)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jberger@cpmlegal.com
sfahimi@cpmlegal.com

Wallace M. Brylak, Jr. (Bar No. 03283360)
BRYLAK LAW
15900 La Cantera Parkway, Suite 19245
San Antonio, Texas 78256
Telephone: (210) 733-5533
Facsimile: (210) 558-4804
wbrylak@brylaklaw.com

*Counsel for Relators*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March, 2019, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Sean McKenna
Law Office of Sean McKenna, PLLC
8710 Greenville Avenue, Building D, Suite B
Dallas, Texas 75240
sean@seanmckennalaw.com

Wallace M. Brylak, Jr.
Brylak & Associates
15900 La Cantera Pkwy, Suite 19245
San Antonio, TX 78256
wbrylak@brylaklaw.com

Thomas A. Parnham, Jr.
United States Attorney's Office
816 Congress Avenue, Suite 1000
Austin, Texas 78701
Thomas.Parnham@usdoj.gov

*/s/ Justin T. Berger*
Justin T. Berger