FILED
MAR 14 2019
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY ____________ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATED OF AMERICA *ex rel.*, TIFFANY MONTCRIEFF, *et al.*, | § | |
| Relators, Plaintiffs, | § | |
| v. | § | Case No. 5:17-CV-00317-XR |
| PERIPHERAL VASCULAR ASSOCIATES, P.A., | § | |
| Defendant. | § | |

**DEFENDANT'S REPLY TO RELATORS' OPPOSITION TO**
**<u>DEFENDANT'S MOTION TO DISMISS</u>**

COMES NOW Defendant Peripheral Vascular Associates, P.A. ("PVA" or "Defendant"), and files this Reply to Relators' Opposition to Defendant's Motion to Dismiss ("Opposition") (Dkt. #32), and respectfully shows the Court as follows:

## I. INTRODUCTION

1. Relators' Opposition fails to show that their First Amended Complaint ("Complaint") satisfies the minimum pleading thresholds that would permit this case to proceed. For the reasons briefed in PVA's Motion to Dismiss and set forth below, Relators have failed to allege regulatory violations or actual claims that could support an action under the False Claims Act ("FCA"). Moreover, Relators Martinez and Burnett have failed to plead sufficient facts to support their various employment-related claims. Because Relators have insufficiently alleged facts to support their claims, this action should be dismissed in its entirety and with prejudice.

## II. ARGUMENTS AND AUTHORITIES

### A. Relators Fail to Meet the Demanding Requirement of Materiality.

2. In *Universal Health Services v. United States ex rel. Escobar*, a unanimous Supreme Court laid out the FCA's stringent materiality requirements. 136 S. Ct. 1989 (2016). An FCA complaint must "plead[] facts to support allegations of materiality" "with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)[.]" *Id.* at n. 6.

3. "The materiality standard is demanding. The [FCA] is not 'an all-purpose antifraud statute,'... or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008). Thus:

> **A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.** Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* (emphasis added). As an example, specific allegations "that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" could support materiality. *Id.*

4. Here, Relators have utterly failed to meet the materiality requirements. Relators merely point to two Medicare regulations and state that non-compliance with these regulations must be material. But Relators have not plead any additional facts with particularity that demonstrate strict technical compliance with these regulations is material to the Government. Relators' position squarely contradicts the Supreme Court's, which has made clear that pleading non-compliance with a regulation, even one that expressly conditions payment on compliance, is not sufficient under the FCA. Without more, the Complaint does not plausibly or particularly plead materiality and must be dismissed under binding Supreme Court precedent.

**B. Relators Have Failed to Meet Their Burden to Plead Facts with Particularity.**

5. The case law is clear that under the FCA the relator bears the burden of proving all of the following: "(1) [that] 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim).'" *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (emphasis added) (citation omitted).

6. Paramount to the insufficient particularity of Relators' allegations is their failure to offer details of false claims *actually submitted* to the government. The FCA "[a]ttaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *United States ex rel. Spicer v. Wetbrook*, 751 F.3d 354, 364-65 (5th Cir. 2014) (quoting *Longhi*, 575 F. 3d at 467). Relators' reliance on *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), is wholly misplaced. Unlike in *Grubbs*, Relators here have only pled superficial undetailed and unsupported statements about the who, what, when, where, and how of the alleged fraud. Simply put, Relators have not pled facts sufficient to earn themselves a "ticket to the federal discovery apparatus," which is the key question under Rule 9(b). *See Grubbs*, 565 F.3d at 190.

| **SUMMARY OF COMPLAINT'S PLEADING DEFICIENCIES** |
| --- |
| **Alleged Scheme 1: *Billing for Professional Component Before Doctor Completes Report*** <br><br> PVA frequently bills Medicare for both the professional and technical components, even though a patient's status is 'Acquired,' [']Ready,' or 'QA' and the professional component is never completed. In these cases, PVA submits a bill to Medicare for its services after a sonographer completes a preliminary report, but before a doctor has seen the report, reviewed the patient's images, or interpreted or provided an independent assessment of the results. In most, if not all of these cases, the professional component is never completed, even though PVA is billing for it. (Compl. at ¶ 29). |

- Rule 9(b) "What": Complaint fails to identify the specific statute, regulation, or contract provision that requires a doctor to fully complete his report before submitting a claim for a performed sonography.
- Rule 9(b) "How": Complaint fails to explain how submitting a claim before the doctor completes the report violates a statute, rule, or regulation.
- Rule 9(b) "Who": Complaint does not identify a single physician who did not complete a report but submitted a claim anyway.
- Rule 8 "Scienter": Complaint does not plead facts showing motive or indicating conscious behavior.
- Rules 8 & 9(b): The allegation "[i]n most, if not all of these cases, the professional component is never completed, even though PVA is billing for it" is conclusory without any supporting plausible and specific factual allegations.
- Rules 8 & 9(b) *Escobar*: Complaint makes no attempt to plausibly or specifically plead facts that support materiality.
- Rule 8 *Twombly*: Relators' allegations are not plausible because they are predicated on the accuracy of the MedStreaming "Status," which the allegations demonstrate is unreliable.

**Alleged Scheme 2: *Doctors Relied on Preliminary Reports from Sonographers***

[I]n the absence of a final report, doctors would sometimes ask Relators about preliminary ultrasound results or rely on the preliminary report drafted by Relators, without looking at the images themselves. Thus, the medical providers did not provide an independent assessment of the images. Patients are often told to come back to PVA for a new ultrasound every six months, even though a final professional assessment with a final report for a prior ultrasound has not been completed. (Compl. at ¶ 30).

- Rule 9(b) "What": Complaint fails to identify the specific statute, regulation, or contract provision that prohibits a physician from relying on a sonographer's report.
- Rule 9(b) *Grubbs*: No reliable indicia that a single claim was ever submitted where a doctor relied on a sonographer's preliminary report.
- Rule 9(b) "How": Complaint fails to explain how a doctor's reliance on a sonographer's report violates any statute, regulation, or contract provision.
- Rule 9(b) "Who": Complaint does not identify a single physician who inappropriately relied on a sonographer's report or any corresponding patient.
- Rule 9(b) "When": Complaint does not identify when a single claim was submitted for services where a doctor inappropriately relied on a sonographer's report.
- Rule 8 "Scienter": Complaint does not plead facts showing motive or indicating conscious behavior.
- Rules 8 & 9(b): Complaint provides no plausible basis for allegation that physicians did not review the images themselves.
- Rules 8 & 9(b) *Escobar*: Complaint makes no attempt to plausibly or specifically plead facts that support materiality

| |
|---|
| **Alleged Scheme 3:** ***Billing for Services Before Sonographer Completes Report***<br><br>PVA bills Medicare for both the technical and professional components before either is completed. In these instances, PVA bills Medicare after an ultrasound has been taken but before the sonographer has even completed a preliminary report. Thus, the bill is submitted while the patient's status remains "Ready" in MedStreaming. Medicare is billed even though there has been absolutely no analysis of the patient's imaging. (Compl. at ¶ 31) |
| ○ Rule 9(b) "What": Complaint fails to identify the specific statute, regulation, or contract provision that that requires a sonographer to fully complete a report before submitting a claim for a performed sonography.<br>○ Rule 9(b) "How": Complaint fails to explain how submitting a claim prior to a sonographer's full completion of the report violates any statute, regulation, or contract requirement.<br>○ Rule 9(b) "Who": Complaint does not identify a single sonographer who did not complete a report before the claim was submitted.<br>○ Rule 8 "Scienter": Complaint does not plead facts showing motive or indicating conscious behavior.<br>○ Rules 8 & 9(b) *Escobar*: Complaint makes no attempt to plausibly or specifically plead facts that support materiality.<br>○ Rule 8 *Twombly*: Relators' allegations are not plausible because they are predicated on the accuracy of the MedStreaming "Status," which the allegations demonstrate is unreliable. |
| **Alleged Scheme 4:** ***Billing for Imaging that Was Never Completed Due to Technical Errors***<br><br>PVA billed for imaging that was never completed due to technical errors. For example, sometimes a doctor would reject a preliminary report and send it back to a technician to fix, but PVA would nonetheless bill for the study. Likewise, PVA would also bill when ultrasound equipment failed and prevented images from uploading onto MedStreaming. (Compl. at ¶ 32). |
| ○ Rule 9(b) "What": Complaint fails to identify the specific statute, regulation, or contract provision that prohibits billing for an attempted but failed sonography or for billing for sonography where the physician requested a sonographer to correct an original report or where equipment failed.<br>○ Rule 9(b) *Grubbs*: No reliable indicia that a single claim was ever submitted for imaging that was never completed due to technical errors or where equipment failed.<br>○ Rule 9(b) "How": Complaint fails to explain how billing for an attempted but failed sonography or billing for a sonography where a report was corrected violates any statute, regulation, or contract provision.<br>○ Rule 9(b) "Who": Complaint does not identify a single patient whose sonography was never completed for technical reasons or whose report was corrected, nor any corresponding sonographer or physician.<br>○ Rule 9(b) "When": Complaint does not identify when a single claim was submitted for services that were never completed due to technical errors or where a physician requested a sonographer to correct an original report.<br>○ Rule 8 "Scienter": Complaint does not plead facts showing motive or indicating conscious behavior.<br>○ Rules 8 & 9(b) *Escobar*: Complaint makes no attempt to plausibly or specifically plead facts |

that support materiality.

**Alleged Scheme 5: *Billing for Unnecessary Ultrasounds***

PVA also has a practice of ordering unnecessary ultrasounds. In these cases, PVA orders an ultrasound after a patient has been referred by a PCP, but before the patient has been evaluated by a PVA doctor. In other words, tests are ordered before the PVA doctor has seen the patient and determined what tests are necessary and appropriate. As a result, these initial ultrasounds are unnecessary and generally provide no useful information. Moreover, PVA doctors are often unaware that these initial ultrasounds have been taken, and thus will not look at them before ordering subsequent ultrasounds. (Compl. at ¶ 33).

- Rule 9(b) "What": Complaint fails to identify the specific statute, regulation, or contract provision that prohibits PVA from performing an ultrasound on a referred patient before being seen by a PVA physician.
- Rule 9(b) *Grubbs*: No reliable indicia that a single claim was ever submitted for an ultrasound performed on a referred patient before being seen by a PVA physician.
- Rule 9(b) "How": Complaint fails to explain how performing an ultrasound on a referred patient before the patient is seen by a PVA physician violates any statute, regulation, or contract provision.
- Rule 9(b) "Who": Complaint does not identify any patient who was referred to PVA but received an ultrasound before being seen by a PVA physician or any physician who billed for services for a patient he or she has not seen.
- Rule 9(b) "When": Complaint does not state when any claim for the alleged unnecessary ultrasounds was submitted to Medicare.
- Rule 8 "Scienter": Complaint does not plead facts showing motive or indicating conscious behavior.
- Rules 8 & 9(b) *Escobar*: Complaint makes no attempt to plausibly or specifically plead facts supporting materiality.
- Rule 8 *Twombly*: Relators' allegations are not plausible because they are predicated on the accuracy of the MedStreaming "Status," which the allegations demonstrate is unreliable.

**Alleged Scheme 6: *Fraudulent Ultrasound Orders***

Relator Tiffany Montcrieff personally witnessed a number of fraudulent ultrasound orders that were purportedly filed by her on behalf of a doctor. In fact, Montcrieff did not file these orders and had no knowledge of their existence until she discovered them on MedStreaming. (Compl. at ¶ 34).

- Rule 9(b) "What": Complaint fails to identify the specific statute, regulation, or contract provision that was violated by these purported fraudulent orders.
- Rule 9(b) *Grubbs*: No reliable indicia that a single claim was ever submitted as a result of a fraudulent ultrasound order.
- Rule 9(b) "How": Complaint does not explain how these purported fraudulent orders resulted in a violation of any statute, regulation, or contract provision.
- Rule 9(b) "Who": Complaint does not identify any doctor who filed a fraudulent order.
- Rule 9(b) "When": Complaint does not state when any claims for fraudulent ultrasound were

| |
|---|
| submitted to Medicare.<br>o Rule 8 "Scienter": Complaint does not plead facts showing motive or indicating conscious behavior.<br>o Rules 8 & 9(b) *Escobar*: Complaint makes no attempt to plausibly or specifically plead facts supporting materiality. |

7. The Fifth Circuit has recognized that the "*mens rea* requirement is not met by mere negligence or gross negligence." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) (citing *United States v. Krizek*, 111 F.3d 934, 941-42 (D.C. Cir. 1997) (noting that at least "aggravated gross negligence" or "an extreme version of ordinary negligence" is necessary under the FCA)). "Congress clearly had no intention to turn the FCA, a law designed to punish and deter fraud, into a vehicle for either 'punish[ing] honest mistakes or incorrect claims submitted through mere negligence' or imposing 'a burdensome obligation' ... rather than a 'limited duty to inquire.'" *United Healthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173, 290 (D.C. 2018) (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274-75 (D.C. Cir. 2010) (quoting S. Rep. No. 99-345, at 6, 19 (1986)).

8. Relators concede that their Complaint does not meet the stringent Rule 9(b) standard. Instead, they argue for the application of a relaxed Rule 9(b) standard. (Opposition at 17.) But Relators qualify for none of the exceptions that would allow for application of the relaxed standard. Relators fail to satisfy the minimal burden of providing representative examples of ***specific*** fraudulent submissions that would enable them to qualify for the relaxed standard. Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Although the relaxed Rule 9(b) standard may apply where the alleged fraud occurred over an extended period of time or consisted of numerous acts, the alleged fraud scheme must be accompanied by certain key details; otherwise, it does not sufficiently plead the submission of false claims under the FCA. *United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 781 (S.D. Tex. 2010) (applying *Grubbs* and finding that the

mere allegation of unlawful promotional tactics was insufficient to plead that the manufacturer caused the submission of false claims). A relator must "plead the fraudulent scheme with particularity and *provide representative examples of specific fraudulent acts conducted pursuant to that scheme*." *Bennett*, 747 F. Supp. 2d at 768–69 (emphasis added) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 509–10 (6th Cir. 2007)).

**C. Relators Have Failed to Plead Plausible Claims.**

9. Relators must provide enough facts to state a claim to relief that is plausible on its face to survive a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As sonographers and technicians, Relators assisted only in the early stages of the MedStreaming application and <u>did not</u> participate in the submission of claims. Relators' Complaint fails to provide reliable indicia to support their knowledge of the submission of any false claims. The fundamental argument presented by Relators is that they should be able to subject PVA to the burdens of multi-year FCA litigation simply by alleging minimal instances of possibly incorrect information in a workflow and clinical data management tool, without providing any specific reason to believe that false claims were actually presented to the government for payment in these instances. "Because the linchpin of an FCA claim is a false claim, 'the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)." *United States ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008) (quoting *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003)). Relators fail to identify even one submission of a false claim by PVA. Relators allege they "have identified <u>specific claims and details</u>, establishing a pattern of fraudulent activity by PVA." (Opposition at 13) (emphasis in original). However, Relators fail to offer facts supporting the *knowing submission* of a single false claim by PVA. To proceed in an FCA case, a relator must

allege more than statutory noncompliance; he must raise a fact issue as to whether the defendant "***knowingly*** defrauded the Government." *United States ex rel. Wright v. Comstock Res., Inc.*, 456 F. App'x 347, 353 (5th Cir. 2011) (emphasis added). Allegations that a defendant violated regulations "are not fraud unless the violator knowingly lies to the government about them." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (recognizing that the FCA "is not an appropriate vehicle for policing technical compliance with administrative regulations" but rather is "fraud prevention statute") (internal citation omitted). For these reasons, Relators have failed to meet their burden under Rule 12(b)(6) to plead a violation of the FCA.

**D. Martinez and Burnett Have Failed to Plead Facts to Support Their Employment Claims.**

**1. Martinez's FCA and TMFPA Retaliation Claims Fail.**

10. In the Opposition, Martinez basically argues that the standards for protected activity under the FCA have been relaxed since the passage of the 2009 amendments. (Opposition at 21). In doing so, she glosses over the fact that there are simply no allegations in the Complaint that show that Martinez was attempting to expose illegality or fraud. In addition, Martinez incorrectly asserts that "it is not necessary that the employer was on notice of the possibility of *qui tam* litigation." (Opposition at 22). However, she has failed to cite any legal authority for this proposition. Instead, she appears to claim that because the Fifth Circuit has allegedly not interpreted the relevant FCA provision since its amendment in 2009, the standards imposed by that court and others under the statute's prior language should be ignored. However, other courts in this District have considered this same question and continue to apply the earlier case law in examining an employee's alleged protected activity and an employer's alleged knowledge thereof. *See, e.g., Jamison v. Flou Fed. Sol., LLC*, No. 3:16-CV-0441-B, 2017 WL 3215289, at *6 (N.D. Tex. July 28, 2017); *Guerrero v. Total Renal Care, Inc.*, EP-11-cv-449-KC, 2012 WL 899228, at *7 (W.D. Tex. Mar. 12, 2012).

11. More specifically, in *Guerrero*, a case based on the amended FCA provision, the court

specifically recognized that it was "'insufficient for the relator to show that the employer knew that the whistleblower had concerns about compliance with the law; [ ]he must show that the employer was on notice of the distinct possibility of *qui tam* litigation.'" 2012 WL 899228, at *7 (quoting *United States ex rel. Gonzales v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95, 104 (W.D. Tex. 2010)). The court further recognized that in determining "whether an employer was on notice of possible *qui tam* litigation," courts analyze "whether the employee characterized his or her complaints in terms of fraud or illegality." *Guerrero*, 2012 WL 899228, at *7 (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir. 1994)). Under this standard, allegations that the employee "specifically told his supervisor that [a co-worker] was committing fraud," were sufficient to defeat a motion to dismiss. *Guerrero*, 2012 WL 899228, at *7. Here, Martinez has made no such allegations.

12. Moreover, in *Ligai*, the Fifth Circuit considered a claim of retaliation based on the amended FCA provision and held that the "expressed concerns did not rise to the level of protected activity under the FCA" where "none of [the plaintiff's] reports contained 'any suggestions that [he] was attempting to expose illegality or fraud within the meaning of the FCA.'" *United States ex rel. Ligai v. ESCO Tech., Inc.*, 611 F. App'x 219, 221 (5th Cir. 2015) (quoting *United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x. 366, 372 (5th Cir. 2011)). In so holding, the court cited both *Patton* and *Robertson*, indicating that though the amendments to the FCA expanded the scope of protections for possible whistleblowers, the guidance provided by the Fifth Circuit in those cases is still applicable. *See Ligai*, 611 F. App'x at 221.

13. Finally, the *Melchior* decision cited by Martinez was a Report and Recommendation from a Magistrate Judge that was not adopted by the District Court as the case was dismissed shortly after the report was issued. *See Melchior v. Apple Homecare Med. Supply, Inc.*, No. A-16-CV-1301-RP, 2018 WL 1876287 (W.D. Tex. Jan. 8, 2018). Furthermore, the factual allegations in

that case distinguish it from the case at hand. There, the pleading contained specifics as to the complaint that was allegedly made, quoting the plaintiff as stating "we can't say that we're providing a decompression tube just so that we can get paid on a g-tube extension. That's fraud." *Id.* at *4. In addition, she alleged that she "informed her supervisor that the proposed course of action of intentionally billing for the wrong tube was fraudulent." *Id.* There are simply no such allegations here.

14. As discussed in depth in PVA's Motion, Martinez allegedly "complained" to her supervisors that "she and other sonographers did not have enough time to complete their reports, and that reports were being billed before they were completed." (Compl. at ¶50). However, Martinez has no basis to allege that these reports were actually being submitted to the government, much less that any such activity was fraudulent under the FCA. Without allegations tying her "complaint" to fraud or illegality, Martinez cannot show that she engaged in protected activity or that PVA had the requisite notice for purposes of her FCA retaliation claim. As such, this claim must be dismissed.

**2. Martinez's *Sabine Pilot* Claim Fails.**

15. Martinez's response to PVA's motion to dismiss her *Sabine Pilot* or "wrongful termination in violation of public policy" claim is nonsensical. Martinez makes no effort to distinguish the case law holding that an FCA retaliation claim and a *Sabine Pilot* claim are "mutually exclusive." *See Robertson*, 32 F.3d at 952; *Wall v. Vista Hospice Care, Inc.*, No. 3:07-cv-604-M, 2012 WL 12886423, at *7 (N.D. Tex. July 23, 2012. As these courts have noted, *Sabine Pilot* claims require that the refusal to perform an illegal act be the "sole cause" of the employee's termination. *See, e.g., Robertson*, 32 F.3d at 952 (holding that a relator who alleges wrongful discharge for refusing to perform an illegal act cannot advance additional claims in the alternative). As noted, Martinez has alleged that she was "discharged because of her efforts to stop PVA from unlawfully billing

for incomplete ultrasound studies." (Compl. at ¶51). However, she also conclusively alleges that the "*sole reason* Martinez was fired was her refusal to perform an illegal act that would subject her to criminal penalties." (Compl. at ¶85) (emphasis added). These allegations are contradictory. Moreover, there are absolutely no factual allegations supporting the second statement, as Martinez has failed to plead what she allegedly refused to do and when; nor has she pled any facts that show any type of knowledge by PVA of this alleged refusal to perform an illegal act. As a result, even if Martinez's *Sabine Pilot* claim was not barred as a matter of law, she has failed to plead any factual basis for such a claim. Accordingly, this claim must be dismissed.[1]

**3. Burnett's FMLA Claims Fail.**

16. Burnett has essentially conceded that her FMLA interference claim should be dismissed by failing to respond to PVA's Motion on this claim. In the Opposition, she makes no effort to argue that she sufficiently pled any actions that PVA took that allegedly interfered with her rights under the FMLA. To the contrary, it is undisputed that Burnett applied for and was granted FMLA leave and that she never actually took any such leave. Accordingly, without any facts showing that Burnett's rights under the FMLA were actually interfered with, Burnett's interference claim must be dismissed.

17. Burnett claims that she sufficiently pled an FMLA retaliation claim by alleging that she

---

[1] Martinez also argues that PVA's motion "does not provide sufficient citation to the [First Amended Complaint] to understand which portions of Martinez's claim PVA attempts to dismiss in this regard." (Opposition at 22). This argument is simply not supported by even a cursory review of PVA's Motion. In that Motion, PVA cites to the contradictory factual allegations in the Complaint noted above and states that "[b]ecause Martinez has asserted that she was fired for another reason, namely, her report of allegedly fraudulent activity under the FCA, her claim under the *Sabine Pilot* doctrine is precluded" and that "Martinez's *Sabine Pilot* claim must be dismissed with prejudice." (Motion at ¶38). To claim that she could not determine which portions of the claim are subject to dismissal is ridiculous. Further, if Martinez is somehow claiming that her wrongful termination claim is not based on the *Sabine Pilot* doctrine, she has provided no legal or factual support for any type of alternate claim.

was terminated less than 2 months after applying for FMLA leave and that other employees with less seniority were not laid off following a reduction in force at PVA's Northeast office. (Opposition at 24). However, Burnett's arguments are misplaced as she has failed to allege facts that show she was treated less favorably than employees who had not requested FMLA leave. In fact, she has not identified a single alleged comparator by name much less alleged that these unnamed employees had or had not requested FMLA leave. This lack of specifics is fatal to her FMLA retaliation claim. Moreover, the temporal proximity between her application for FMLA leave and her termination is not so close that it can establish a causal link between the two events. As such, this claim should be dismissed.

**E. Dismissal Should be With Prejudice.**

18. Relators already have been granted an opportunity to amend their pleadings. As set forth above, even with this second chance they have not plead any facts giving rise to their requested relief. There is no reason to believe Relators would have anything more to offer given a third attempt. Leave to amend a pleading may be denied where, as here, the party seeking leave has repeatedly failed to cure deficiencies by amendments previously allowed and when amendment would be futile. *See United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (finding that the district court's denial of leave to file a third amended complaint was not an abuse of discretion). Because further amendment would be futile, Relators' claims should be dismissed with prejudice.

WHEREFORE, Defendant Peripheral Vascular Associates P.A. respectfully requests that the Court grant its Motion to Dismiss, dismiss Relators' claims in their entirety and with prejudice, and grant PVA such other and further relief, both at law and in equity, both general and specific, to which PVA may show itself justly entitled.

Respectfully submitted,

By: */s/ Sean McKenna*
Sean McKenna
State Bar No. 24007652
sean@seanmckennalaw.com
Law Office of Sean McKenna, PLLC
8710 Greenville Avenue, Suite B
Dallas, Texas 75240
Telephone: 786-973-3762
Facsimile: 1-888-492-2847

Stephen J. Romero
State Bar No. 24046756
stephen.romero@nortonrosefulbright.com
Norton Rose Fulbright US LLP
300 Convent Street, Suite 2100
San Antonio, Texas 78205-3792
Telephone: 210-224-5575
Facsimile: 210-270-7205

Counsel for Defendant
Peripheral Vascular Associates, P.A.

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of March, 2019, I electronically caused the foregoing instrument to be filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Justin T. Berger
Adam M. Shapiro
Cotchett Pitre & McCarthy, LLP
840 Malcolm Road
Burlingame, CA 94010

Wallace M. Brylak, Jr.
Brylak & Associates
15900 La Cantera Pkwy, Suite 19245
San Antonio, TX 78256

AUSA Thomas A. Parnham, Jr.
United States Attorney's Office for the Western District of Texas
816 Congress Avenue, Suite 1000
Austin, Texas 78701
Thomas.Parnham@usdoj.gov

*<u>/s/ Sean McKenna</u>*
Sean McKenna