**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel., TIFFANY MONTCRIEFF, et al.,** | § | |
| | § | |
| **Relators, Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 5:17-CV-00317-XR** |
| | § | |
| **PERIPHERAL VASCULAR ASSOCIATES, P.A.,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT PERIPHERAL VASCULAR ASSOCIATES' MOTION FOR SUMMARY JUDGMENT ON RELATORS' CLAIMS**

Defendant Peripheral Vascular Associates, P.A. ("PVA") offers the following in Support of its Motion for Summary Judgment on all of Relators' Claims.

## I. INTRODUCTION

All of Relators' claims fail as a matter of law because PVA did not knowingly present or cause to be presented any false or fraudulent claim for payment or approval, or any false record or statement material to a false or fraudulent claim within the meaning of the False Claims Act ("FCA") to any federal healthcare program.[1]

PVA was established in 1975 and has been in practice for 45 year as a vascular surgical practice offering a range of services to treat and diagnose peripheral vascular disease, including vascular ultrasound and other studies in its vascular labs. Although there is no dispute that PVA performed the vascular studies, Relators mistakenly allege that all of the Medicare payments

[1] Relators plead, and their contentions allege, only Medicare violations. No evidence is offered or alleged by PVA that it submitted any false or fraudulent claim for reimbursement to any other federal healthcare program. Any belief by Relators that any non-Medicare damages are relevant or material to this case therefore is not supported by any of Relators' evidence.

received by PVA for those services should be returned, plus penalties, because PVA submitted some claims to Medicare before a separate, "stand-alone" report in a picture archiving and communication system ("PACS") called Medstreaming was marked final. But there is no requirement that PVA have a final Medstreaming report for every vascular study. And, in any event, PVA physicians read and interpreted every vascular study.

Relators attempt to shoehorn the facts of this case into a violation of the "essentially punitive" FCA, seeking unspecified millions of dollars (or more) in damages, civil penalties, and attorney's fees. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1998 (2016) ("Congress also has increased the Act's civil penalties so that liability is essentially punitive in nature.") (internal quotations omitted). Relators have failed to prove multiple aspects of their claims because they have no claim—PVA simply did not knowingly present or cause to be presented any false or fraudulent claim for payment or approval, or any false record or statement material to a false or fraudulent claim.

Relators—three former employees—brought this case alleging initially that they were terminated in violation of various Federal laws, including retaliation under the FCA, and that PVA submitted false claims to a federal healthcare program. Relators' First Amended Complaint included allegations that PVA terminated one of them for reporting violations of the FCA. More than three years after this case was filed, Relators voluntarily dismissed their employment claims with prejudice and now proceed solely on their claims under the FCA.

Relators' theory of how PVA submitted false claims has been a moving target based on an imaginary requirement that a separate, stand-alone report be completed before a vascular study can be billed to Medicare. That theory, however, is not supported by any statute, regulation, or applicable Medicare guidance. At best, Relators, through their supposed experts, rely on articles, blog posts, and other non-governmental guidance, and try to bootstrap those into a Medicare

requirement.[2] Relators' strained theory is unsupported and, in fact, rejected by Supreme Court precedent. The Supreme Court held in *Azar v. Allina Health Services* that Medicare sub-regulatory guidance, or interpretive rules, cannot create or change a substantive legal standard. 139 S. Ct. 1804, 1813, (2019). If official guidance issued by any federal healthcare program like Medicare cannot be the basis for an FCA violation, this Court needs no further direction from the Supreme Court to know that guidance issued by non-governmental sources certainly cannot rise to that level.

Relators' claims and allegations are not supported by any evidence of fraud and cannot as a matter of law violate the FCA. The Supreme Court of the United States has cautioned that "The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *United Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989, 2003 (2016) (internal citation omitted). "[T]he False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Id.* at 2004. That is why a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Id.* at 1996. The materiality requirement is "rigorous" and "demanding," and "look[s] to the effect on the likely or actual behavior" of the Government. *Id* at 1996, 2002-2003. It is not "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 2003. Relators cannot satisfy the demanding materiality requirement. Relators must show that the Government would not pay the claims if it knew of the violations—a decision likely to be influenced only by significant violations. The answer here is simple and clear: the Government

[2] PVA has filed motions to exclude the testimony and opinions of Relators' three expert witnesses. *See* Docs. 82, 83, & 86.

would have continued to pay because it continues to pay to this day despite being well aware of the alleged violations.

Similarly, Relators cannot prove PVA acted with the requisite knowledge, or scienter. Like the FCA's materiality requirement, the Supreme Court in *Escobar* instructed that the "rigorous" scienter requirements be strictly enforced. *Id.* at 2002. It is not enough that Relators claim to identify a falsehood; they must show that PVA *knowingly* submitted a false claim.

Relators' case is not about fraud; it is not even about false or fraudulent claims. Relators' case is based on pleading obscured by the complicated, byzantine world of healthcare and how it is delivered and compensated. Relators' continued misdirection and changing theories do not show that PVA knowingly submitted false claims to, and defrauded, any federal healthcare program. Therefore, PVA is entitled to summary judgment as a matter of law.

## II. STATEMENT OF MATERIAL UNCONTROVERTED FACTS

### PVA's Practice

1. PVA is a full-service vascular surgery practice that diagnoses and treats various types of vascular disease. [Deposition of Lois A. Fiala, M.D. ("Fiala Dep."), attached as Exhibit A, at 16:18-17:4].

2. Vascular studies performed at PVA locations are done by an order of a PVA physician or outside, referring physician, which are documented in the patient's medical record. [Ex. A, Fiala Dep. at 23:3-27:2].

3. Vascular studies have two components, the technical component and the professional component. The technical component is performing the ultrasound, and the professional component is a physician reading the ultrasound. The technical and professional components can be billed separately or combined together into a "global" bill. [Ex. A, Fiala Dep. at 18:25-19:17; Declaration of Katherine Britt ("Britt Decl."), attached as Exhibit B, at ¶ 3].

4. PVA physicians read and interpret studies performed at PVA offices and at hospitals. [Ex. B, Britt Decl. at ¶ 4].

5. The technical component for studies performed at hospitals are billed by the hospital. [Ex. B, Britt Decl. at ¶ 7].

6. Vascular studies performed at PVA locations are done by either a physician or registered vascular technologist ("RVT"). [Ex. B, Britt Decl. at ¶ 6].

7. The technical component for studies performed at PVA are billed by PVA. [Ex. B, Britt Decl. at ¶ 8].

8. Once the technical component for a vascular study is performed, it may be immediately billed. [Deposition of James Alexander ("Alexander Dep."), attached as Exhibit C, at 54:11-14; Deposition of Robert Church ("Church Dep."), attached as Exhibit D, at 84:3-17].

9. PVA physicians are also treating physicians for most of the patients who receive vascular studies at PVA, meaning the PVA physician sees the patient in the office to treat him or her. [Ex. B, Britt Decl. at ¶ 9].

10. PVA adopted Medstreaming in 2014 as its picture archiving and communications system ("PACS") to streamline imaging storage and retrieval—the specific purpose of a PACS—and to manage workflow. [Ex. B, Britt Decl. at ¶ 10].

11. PVA invested thousands of dollars and heavily modified the Medstreaming system to create a cartooned image report that is easier for referring physicians, providers, health care workers, and patients to understand. [Ex. B, Britt Decl. at ¶ 11].

12. Every vascular study has a formal Medstreaming report. [Ex. B, Britt Decl. at ¶ 12].

13. There are many ways in which a physician reviews the results of a vascular study when it is performed: the physician may be in the room where the ultrasound is performed, printouts of studies called waveforms are brought to the physician to review with the patient, and

technologists provide the physician with completed worksheets, and preliminary reports depicting the results of the vascular ultrasound study. [Ex. A, Fiala Dep. at 34:7-22; Ex. B, Britt Decl. at ¶ 13; Deposition of Katherine Britt ("Britt Dep."), attached as Exhibit E, at 110:11-111:8; Deposition of Grady Alsabrook ("Alsabrook Dep."), attached as Exhibit F, at 31:23-10].

14. In addition to the Medstreaming report, results of vascular tests are communicated in various ways including direct conversations with patients, calls to referring physicians, letters to referring physicians and even providing the patient with a copy of the results at the time of the visit. [Ex. B, Britt Decl. at ¶ 14].

15. Some vascular studies performed at PVA locations are done without a PVA physician seeing and treating the patient ("Lab Only" studies). Those studies are typically performed for another physician who is treating the patient. [Ex. B, Britt Decl. at ¶ 15].

16. From 2015 through 2019, PVA performed 194,886 billable vascular studies performed at its locations. Of those studies, 9,458 (4.9%) were Lab Only. [Declaration of Brian Puente ("Puente Decl."), attached as Exhibit G, at ¶¶ 4-7].

17. PVA uses Allscripts Clinical Module ("Allscripts CM") as its electronic medical records system. [Ex. B, Britt Decl. at ¶ 16].

18. A patient's medical record is contained in Allscripts CM, and includes patient history, physical exam, and the physician's assessment and plan. [Ex. B, Britt Decl. at ¶ 17].

19. The medical records for patients seen by PVA physicians contain documentation of physician interpretations of vascular studies performed by PVA. [Ex. B, Britt Decl. at ¶ 18].

20. The following entries in the Allscripts CM medical records document physician interpretations of vascular studies performed before the vascular studies were billed to Medicare:

> NONINVASIVE TESTING: Noninvasive testing performed today with carotid ultrasound shows no right internal carotid artery stenosis and a left internal carotid artery stenosis of 60-79%. Antegrade vertebral flow bilaterally. When compared to the previous visit this is unchanged.

[Ex. B, Britt Decl. at ¶ 23, Ex. 5].

> *Carotid duplex ultrasound reveals less than 40% right carotid stenosis. There is 60-79% left internal carotid stenosis. Vertebral flow is antegrade bilaterally. When the current study is compared to that of 2/11/2015, the degree of stenosis on the right side appears to be less severe. These results were discussed in detail with the patient. At this time, I feel that no additional vascular imaging or intervention is required but careful follow-up should continue. He understands and agrees. I would like to follow him with you and see him again at the time indicated above with the vascular studies listed. I would be happy to see him at any time in the interim if I can be of assistance.*

[Ex. B, Britt Decl. at ¶ 20, Ex. 2].

> *TIA's or strokes, she had carotid ultrasound today that showed L: 1-39% and R: 40-59%. I reviewed the results with the patient. She is already on statin and ASA. She will return to see me in one year with repeat carotids.*

[Ex. B, Britt Decl. at ¶ 19, Ex. 1].

21. The patients identified in the records referenced in paragraphs 19-27 of the Declaration of Katherine Britt received vascular studies performed at PVA and were seen by a PVA physician as shown in the Allscripts CM medical records, which contain documentation of physician interpretations of vascular studies performed before the vascular studies were billed to Medicare. The Medstreaming reports for those patients were signed after the vascular studies were billed. [Ex. B, Britt Decl. at ¶¶ 19-29, Exs. 1-9].

22. PVA uses billing software called Allscripts Practice Management ("APM"). Once a an encounter is complete in Allscripts Clinical Module—PVA's electronic medical record system—it crosses over to APM through an interface called ChargePass, after which a voucher is created for review and processing by the coding and billing staff before being billed to a payer. [Ex. E, Britt Dep. at 27:5-8, 120:3-121:1, 158:18-159:25].

23. PVA employs a double-verification system wherein a second coder verifies the work by an initial coder before a claim is billed. [Ex. E, Britt Dep. at 161:5-23].

24. The billing team is comprised of staff members who post payments, audit claims, work with insurance companies, and work on denials of payments. [Ex. E, Britt Dep. at 131:11-18].

25. The billing and coding staff report to the PVA coding and compliance committee, which is made up a compliance officer, office managers, coders, technical directors, departmental directors, and physicians. [Ex. E, Britt Dep. at 197:17-198:6, 200:22-201:22].

26. The vascular coders, some of whom are certified professional coders, attend monthly meetings of the coding and compliance committee, and also receive continuing education regarding coding. The billing staff receives bi-weekly training. [Ex. E, Britt Dep. at 183:10-184:9, 196:8-18, 199:5-1].

27. Each coder at PVA monitors changes in payment requirements for certain payers and reports to the coding and compliance committee. [Ex. E, Britt Dep. at 235:18-236:8].

28. PVA also has a vascular lab committee that meets to discuss issues relating to the vascular lab, including personnel, finance, and testing protocols. The vascular lab committee is comprised of two physicians, the chief executive officer, the technical director, and the director of the vascular lab. [Ex. E, Britt Dep. at 143:9-14, 203:21-25; Ex. A, Fiala Dep. at 69:6-13].

**Relators' *Qui Tam* Action and Investigation by OIG and DOJ**

29. Relators filed their initial Complaint under seal on April 12, 2017. [Doc. 1].

30. The DOJ investigated the case for several months, and a First Amended Complaint was filed under seal on December 21, 2017. [Docs. 2-3, 6-8].

31. The Office of Inspector General for the Department of Health and Human Services ("OIG") issued a subpoena to PVA on June 19, 2018, for medical and business records. [Ex. B, Britt Decl. at ¶ 30, Ex. 10].

32. As part of its subpoena, the OIG sought medical records for a specific list of patients identified by name and date of birth. [Ex. B, Britt Decl. at ¶ 31, Ex. 10].

33. On August 18, 2018, PVA produced more than 50,000 pages of documents to the OIG and DOJ, including 414 patient files requested by the OIG. [Ex. B, Britt Decl. at ¶ 32].

34. Following the production of documents and medical records, representatives of PVA, including me, met with the OIG Special Agent Thomas Gonzalez, Department of Justice ("DOJ") attorney Sean O'Connell, and Department of Defense Special Agent Melodie Jones to discuss the patient files and PVA's practices. [Ex. B, Britt Decl. at ¶ 33].

35. On November 26, 2018, after multiple extensions to investigate Relators' claims, the DOJ informed the Court of its decision to decline intervention. [Doc. 20].

36. At no time has any Government agency demanded or requested that PVA return federal funds received for vascular studies that were billed before a Medstreaming report was signed. [Ex. B, Britt Decl. at ¶ 34].

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If the moving party does not bear the burden of proof at trial, it may either: (1) identify evidence negating the existence of a material element of the nonmoving party's claim; or (2) demonstrate that the nonmoving party lacks sufficient evidence to prove an essential element of its claim. *McKee v. CBF Corp.*, 299 F. App'x 426, 428 (5th Cir. 2008)

"'A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) (internal quotations omitted). "Conclusional allegations and denials, speculation, improbable inferences,

unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut . . . ." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "'designed to secure the just, speedy, and inexpensive determination of every action.'" *Id.* (quoting FED. R. CIV. P. 1).

## IV. ARGUMENT AND AUTHORITIES

To find a defendant like PVA liable for an FCA claim, the plaintiff must prove that "(1) 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).'" *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009). Relators cannot satisfy the most basic elements of an FCA claim, and this Court should enter summary judgment in favor of PVA.

### A. <u>Relators' Allegations that PVA Made a False Claim Each Time It Submitted a Claim for Reimbursement Before Finalizing a Medstreaming Report Fail Because Those Claims Are Not Factually or Legally False.</u>

Relators have not identified one single patient for whom a study was not performed. Relators therefore must concede that PVA was entitled to receive payment from Medicare for the technical component of every single study performed. Even Relators' experts admit that Medicare Relators' claims focus solely on the professional component. To support their claim that PVA was not entitled to receive payment for the professional component, Relators must prove that PVA did not read or interpret vascular studies—something Relators cannot do.

Claims are false or fraudulent only if they are "aimed at extracting money the government otherwise would not have paid." *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 328–29 (S.D.N.Y. 2014) (quoting *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001)). Liability

must be predicated on an objective falsehood and not a difference in judgment or reasonable interpretation. *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297–98 (11th Cir. 2019). Differing interpretations "growing out of a disputed legal question are similarly not false under the FCA." *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999). Stated simply, "a lie is actionable but not an error." U.*S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

Relators allege PVA submitted a false claim to the federal government each and every time it submitted a claim for reimbursement for a vascular study without a finalized Medstreaming report. Relators' claims hinge on a theory that a final Medstreaming report is required to bill Medicare. But Relators have a fundamental misunderstanding of vascular surgical practices and medical billing. Medicare does not require a special report to bill for vascular studies. No statute, federal healthcare program regulation, rule, or even non-binding guidance requires a Medstreaming report or any other specialized report. Without a federal healthcare program statute or regulation that requires a separate, stand-alone report prior to the submission of a claim, Relators' theory of falsity fails.

PVA's physicians treat thousands of patients every year with suspected or actual vascular disease, which affects the arteries and veins. Vascular disease can lead to debilitating and deadly conditions, including stroke, aneurysm, and loss of limbs. PVA's physicians examine and monitor patients in a clinic setting, and perform vascular surgeries in the hospital setting. Some of the services provided in the clinic setting include vascular ultrasound studies, which provide information for a physician to determine the level of disease present in a patient's arteries or veins.

Vascular studies have two components, the technical component and the professional component. The technical component is performing the ultrasound, and the professional

component is a physician reading the ultrasound. The technical and professional components can be billed separately or combined together into a "global" bill.

PVA utilizes an electronic medical records ("EMR") system called Allscripts. A patient's medical record is contained in Allscripts, and includes patient history, physical exam, and the physician's assessment and plan. Also included in the Allscripts records are notes of the physician's interpretation of ultrasound studies.

PVA adopted Medstreaming in 2014 as its picture archiving and communications system ("PACS") to streamline imaging storage and retrieval, and to manage workflow. PVA invested thousands of dollars and heavily modified the Medstreaming system to create a cartooned image report that is easier for referring physicians, providers, health care workers, and patients to understand.[3] Every vascular study has a formal Medstreaming report. In addition to the Medstreaming report, results of vascular tests are communicated in various ways including direct conversations with patients, conversations and telephone calls with referring physicians, correspondence with referring physicians and even providing the patient with a copy of the results at the time of the visit. Relators wish to convert PVA's use of Medstreaming into a Medicare requirement. But just because PVA uses Medstreaming and completes a report within that system does not convert those reports into a Medicare condition of payment that is a requirement for reimbursement to any federal healthcare program.

### 1. No Statute, Regulation, or Rule Requires a Separate Report to Bill for Vascular Ultrasound Studies.

[3] While practices can add EMR functionality to Medstreaming in addition to using it as a PACS, PVA does not do that.

There is no federal healthcare program statute, regulation, or rule that requires a Medstreaming or other separate report to bill Medicare[4] for the professional component of a vascular study. In fact, "Medicare has not specifically promulgated regulations governing a physician's interpretation of venous ultrasound studies." *U.S. ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822, 824 (W.D. Mich. 2000), *aff'd*, 24 F. App'x 491 (6th Cir. 2001).

Like Relators here, the relator in *Swafford* was an ultrasound technician at a medical facility who participated ultrasound studies and who claimed to have observed the defendant's practices in submitting claims for Medicare reimbursement. *Id.* at 824. Relator Swafford alleged that defendants—hospitals and physicians—defrauded the Government by falsely charging for services that they did not provide. *Id.* at 826. Specifically, the relator claimed that the physicians did not review original hard copy data, such as ultrasound video tape results generated by the technicians' studies. Instead, the relator alleged that the physicians merely reworked or plagiarized the technicians' worksheets to prepare a report, and billed the government for their "interpretations" of the technicians' reports, thereby allegedly making false claims. *Id.* The issue at summary judgment was whether the claims were false. *Id.* at 827.

The *Swafford* court analyzed the same regulations cited by Relators and their experts here, and rejected an argument that they control the billing of vascular ultrasound studies. Relators in this case assert that one of those "radiology services" regulations, 42 C.F.R. 415.120, requires a separate written report for every interpretation of a vascular ultrasound study. Relators rely on this language in the regulation for the alleged requirement of a separate report: "The carrier pays for interpretations only if there is a written report prepared for inclusion in the patient's medical

[4] PVA addresses Medicare in its Motion because Relators have only made allegations relating to Medicare and have made no allegations regarding what is required by other federal programs to bill for vascular studies.

record maintained by the hospital." 42 C.F.R. §. 415.120(a). It is important to note that nothing in that sentence requires the separate or "stand alone" report pushed by Relators—it only requires a "written report" in the patient's medical record.

Most importantly, § 415.120 does not even apply to PVA. As the *Swafford* court recognized, compliance with that regulation is not a prerequisite for reimbursement by Medicare for vascular ultrasounds. *Swafford*, 95 F. Supp. 2d at 828. The *Swafford* court's conclusion is supported by the language of the regulation and statements by CMS. Section 415.120(a) discusses a "written report" to include in the medical record "maintained by the hospital." PVA is not a hospital, and although it interprets some ultrasounds performed at hospitals, those services are not at issue in this case. CMS' comments in implementing the regulation make clear that § 415.120 only applies to services performed in a hospital and specifically to x-rays and electrocardiograms taken in the emergency room. Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 1996, 60 Fed. Reg. 63,130-63,133 (Dec. 8, 1995).

Like the relator in *Swafford*, Relators here suggest that vascular ultrasound services provided by PVA must follow a prescribed path, and any deviation from that path results in FCA liability. Relators' alleged schemes are built on their own preferences for how they think billing should be done, and assert that PVA engaged in fraud and false statements for failing to do so. But there are many ways in which a physician reviews the results of an ultrasound study when the study is performed: the physician may be in the room where the ultrasound is performed, printouts of studies called waveforms are brought to the physician to review with the patient, and technologists provide the physician with completed worksheets depicting the results of the vascular ultrasound study. The physician's review and interpretation of a vascular study can come

in various forms, and nothing requires that the review and interpretation be documented in a separate, stand-alone report.

To the extent there is alleged ambiguity about what the governing administrative regulations mean, the Supreme Court has held that precludes an FCA claim. "The False Claims Act is not 'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 136 S.Ct. at 2003 (internal citation omitted). "[A]bsent a showing of an objective and knowing falsehood, the FCA is an inappropriate instrument to serve as the Government's primary line of defense against questionable claims . . . ." *AseraCare*, 938 F.3d at 1301. "[A] defendant's decision in the face of a dispute [about] the requirements of government regulations is insufficient, without more, to constitute falsity." *Swafford*, 95 F. Supp. 2d at 832. Thus, even if there is a dispute on this issue, PVA's decision to submit claims in a certain manner does not demonstrate the falsity of the claims.

Not only are Relators unable to identify a single federal healthcare program statute or regulation that requires a separate, stand-alone report, there is no statute or regulation that requires a specific written report of any kind to bill for a vascular study.

**2. No Medicare Guidance Requires A Stand-Alone Report.**

Without a statute or regulation requiring a separate, stand-alone report, Relators could be expected to turn to Medicare guidance adopting such a requirement. But there is no Medicare Guidance applicable to PVA that requires a separate, stand-alone report to bill for vascular studies. Relators identify none in their First Amended Complaint, and their expert witnesses could not locate any.

Even if Medicare had issued sub-regulatory guidance on this topic, that guidance could not be used to establish falsity. Under the Supreme Court's ruling in *Azar v. Allina Health Services*, 139 S. Ct. 1804, 1813, (2019), sub-regulatory guidance, or Medicare interpretive rules, cannot

create or change a substantive legal standard without first going through notice and comment rulemaking. DOJ has formally adopted this view, under which it is not allowed to bring civil enforcement actions based on noncompliance with guidance documents. *See* DOJ Justice Manual § 1-20.100, available at https://www.justice.gov/jm/1-20000-limitation-use-guidance-documents-litigation ("civil enforcement actions brought by the Department must be based on violations of applicable legal requirements, not mere noncompliance with guidance documents issued by federal agencies, because guidance documents cannot by themselves create binding requirements that do not already exist by statute or regulation.").

Without applicable Medicare guidance to cite, Relators' expert witnesses cite to articles, blog posts, and other non-governmental guidance to support Relators' theory that a separate, stand-alone report is required. But Relators cannot bootstrap those non-governmental sources into a Medicare requirement to impose treble damages and penalties. Allowing Relators to impose Medicare requirements based on non-Governmental sources would obfuscate a fundamental principle of administrative law. If official guidance issued by Medicare cannot be the basis for liability under the False Claims Act, guidance issued by non-governmental sources certainly cannot provide that basis absent some specific promise by PVA that it would adhere to that non-governmental guidance. And no specific promise exists.

### 3. Relators Are Unable To Support Their Theory That Vascular Studies Performed By PVA Were Not Medically Necessary.

Relators cannot credibly challenge the medical necessity of the vascular studies performed by PVA. Relators have no evidence contesting the medical necessity of any vascular study. All of Relators' supposed experts disclaimed any ability to opine on the medical necessity of the

vascular studies.[5] Instead, Relators try to save an argument that claims submitted by PVA were not medically necessary by inventing something they call "regulatory medical necessity." According to Relators, this new category of medical necessity is distinct from "clinical" medical necessity. But Relators have no support for their argument because it is really the same argument that a separate, stand-alone report is required and an attempt to shoehorn that theory into a Medicare requirement.[6]

Even if the lack of a separate, stand-alone report implicated the medical necessity of a procedure, allegations about providing care (or interpretations) below the standard of care are insufficient to impose liability under the FCA. In *Swafford*, the relator similarly challenged the allegedly "inadequate and pathetic patient care" reflected in the "interpretations" of the physicians that were derived from technicians' worksheets. 98 F. Supp. at 829. However, the district court—even assuming the accuracy of the plaintiffs' characterization of the physicians' activity—concluded that "as a matter of law, plaintiff c[ould not] demonstrate the falsity of defendants' claims under the FCA by proving their delivery of services fell short of the requisite standard of care." *Id.* at 830 (discussing Judge Easterbrook's opinion in *Luckey*, 183 F.3d at 732, and other circuit authorities). The *Swafford* court concluded that the plaintiff could not prevail on an FCA claim, even if a relator "can demonstrate defendants' practice failed to conform to the standard of care applicable to the interpretation of" the ultrasounds at issue. *Id.* at 831; *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) ("[C]laims for services rendered in violation of a statute do not necessarily constitute false or

---

[5] *See* Doc. 82, Defendant's Opposed Motion to Exclude Relators' Expert Witness James E. Alexander, M.D., at 12-14; Doc. 83, Defendant's Opposed Motion to Exclude Relators' Expert Witness Robert D. Church, Jr., at 11, 15.
[6] *See id.*

fraudulent claims under the FCA"). Relators' claims must fail because they have not put forth support for their empty allegations.

### B. <u>Relators' Claims Fail Because They Cannot Prove That PVA Submitted Claims With The Intent To Defraud The Government.</u>

Relators cannot meet the "rigorous" requirement to prove scienter, which must be strictly enforced. *See Escobar*, 136 S. Ct. at 2002. The FCA only applies to the *knowing* presentment of a false claim. 31 U.S.C. § 3729(a). The FCA defines "knowing" as (1) "actual knowledge"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1). "It is a long-established rule of this Circuit that to show a violation of the FCA, the evidence must demonstrate 'guilty knowledge of a purpose on the part of [the defendant] to cheat the Government.'" *U.S. ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (quoting *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972) and *United States v. Priola*, 272 F.2d 589, 594 (5th Cir. 1959)). "Though the FCA is plain that 'proof of specific intent to defraud' is not necessary, that *mens rea* requirement is not met by mere negligence or even gross negligence." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) (quoting 31 U.S.C. § 3729(b)). A relator "cannot survive summary judgment merely by submitting evidence of false claims; she must have evidence that the defendants knowingly or recklessly cheated the government." *Taylor-Vick*, 513 F.3d at 232. "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (quotation omitted). "[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. *Lamers*, 168 F.3d at 1020.

Relators cannot show that PVA submitted false claims to the Government with actual knowledge of their falsity. Even if Relators were able to identify a statute or regulation requiring a separate, stand-alone report to bill Medicare, there is no evidence that PVA knew of any such statute or regulation. Without that evidence, Relators' claims fail.

Similarly, Relators cannot show that PVA acted with reckless disregard or deliberate ignorance. Relators' arguments about requiring a Medstreaming report are premised on their *opinion* of how to properly document a physician's interpretation of a vascular study. There is no objective Medicare requirement mandating a separate, stand-alone report. Relators' subjective belief about what Medicare *should* require does not create liability under the FCA. And even if there were a statute or regulation that under some interpretation could require a separate, stand-alone report, the FCA's scienter requirement cannot be satisfied when there are "legitimate grounds for disagreement over the scope of a contractual or regulatory provision." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003) (Jones, J., specially concurring) (citing *Lamers*, 168 F.3d at 1018); *see also U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 832 (8th Cir. 2013) ("Mayo's reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA.").

Additionally, PVA's practices belie an argument that it acted with the necessary intent to defraud the Government. PVA is a full-service specialty vascular practice. PVA has trained and experienced billers and coders on staff to process claims. After services are provided to patients, those services go to the coding staff at PVA. After the coding staff codes the claims, those claims go to the billing team, which is comprised of staff members who post payments, audit claims, work with insurance companies, and work on denials of payments.

The billing and coding staff report to the PVA coding and compliance committee, which is made up office managers, coders, technical directors, departmental directors, and physicians.

The vascular coders, some of whom are certified professional coders, attend the monthly committee meetings, and also receive continuing education regarding coding. The billing staff receives bi-weekly training. Each coder at PVA monitors changes in payment requirements for certain payers and reports to the committee. PVA's compliance officer is a member of the coding and compliance committee. PVA also has a vascular lab committee that meets to discuss issues relating to the vascular lab, including personnel, finance, and testing protocols. The vascular lab committee is comprised of two physicians, the chief executive officer, the technical director, and the director of the vascular lab.

PVA has teams, committees, and processes in places to ensure that services provided by PVA physicians and staff are properly coded and billed. Those are not the actions of an entity that acts with reckless disregard or deliberate ignorance. To the extent Relators can show that some claims were false in any way, they cannot show that PVA submitted those claims *knowing* them to be false. Every medical practice makes billing errors, and that is not enough to impose liability under the punitive FCA. Relators must show that PVA intended to cheat the Government—negligence or even gross negligence is not enough. *Taylor-Vick*, 513 F.3d at 232; *Farmer*, 523 F.3d at 338.

Relators contend there are thousands of allegedly "false billings" to argue that the number of claims alone shows recklessness. But it is necessary to put into perspective the studies underlying those claims compared to PVA's business as a whole. PVA performed 194,886 billable vascular studies at its multiple locations from 2015 to 2019. Although Relators include in their calculations patients who received vascular studies and an E/M office visit, as noted above, the documentation of the physician's interpretation is contained within the medical record notes, which Relators did not review. Those records contain documentation of physicians' interpretations of vascular studies before any bill is submitted, like this:

| |
|---|
| NONINVASIVE TESTING: Noninvasive testing performed today with carotid ultrasound shows no right internal carotid artery stenosis and a left internal carotid artery stenosis of 60-79%. Antegrade vertebral flow bilaterally. When compared to the previous visit this is unchanged. |

Or this:

| |
|---|
| *Carotid duplex ultrasound reveals less than 40% right carotid stenosis. There is 60-79% left internal carotid stenosis. Vertebral flow is antegrade bilaterally. When the current study is compared to that of 2/11/2015, the degree of stenosis on the right side appears to be less severe. These results were discussed in detail with the patient. At this time, I feel that no additional vascular imaging or intervention is required but careful follow-up should continue. He understands and agrees. I would like to follow him with you and see him again at the time indicated above with the vascular studies listed. I would be happy to see him at any time in the interim if I can be of assistance.* |

Or this:

| |
|---|
| *TIA's or strokes, she had carotid ultrasound today that showed L: 1-39% and R: 40-59%. I reviewed the results with the patient. She is already on statin and ASA. She will return to see me in one year with repeat carotids.* |

During that same time period, PVA performed 9,458 tests without a corresponding E/M office visit. Those tests are a palpably low percentage of PVA's business. Even if all of the tests were improperly billed—and they were not—that would only account for 4.9% of all the billable tests performed at PVA locations, not just ones billed to Medicare. An error rate that low does not support an argument that PVA engaged in a fraudulent scheme to cheat the Government, and, in fact, supports the opposite conclusion. *See United States v. Prabhu*, 442 F. Supp. 2d 1008, 1034 (D. Nev. 2006) (a 5.5% error rate "disproves the contention that Defendants 'knowingly' engaged in a pattern of submitting false or fraudulent claims that would entitle the Government to treble damages and substantial civil fines.").

Relators' theories do not make sense as a scheme to defraud the Government. Even if PVA submitted studies before a Medstreaming report was completed, those reports were all completed. In those cases, the Government paid for, and the patient received, a full service. Moreover, one purpose of PVA using Medstreaming is to send those reports to referring physicians. If PVA were not reading and interpreting studies, and referring physicians were not receiving the results of those studies at the levels suggested by Relators, referring physicians would complain and refer their patients elsewhere. Yet, that has not happened. It is in PVA's interest to competently perform

services so it can treat patients and enable referring physicians to treat patients. Not reading vascular studies benefits no one. Relators' case is simply a theory looking for a problem.

Relators thus cannot satisfy the FCA's "rigorous" scienter requirement to prove that PVA knowingly submitted false claims to the Government. *See Escobar*, 136 S. Ct. at 2002. The Court should therefore grant PVA's Motion and enter judgment against Relators on their claims.

### C. <u>Each of Relators' Claims Fail Because They Cannot Satisfy the Rigorous and Demanding Materiality Requirement to Prove a Violation of the FCA</u>

In addition to their inability to prove scienter, Relators cannot prove that PVA "knowingly violated a requirement that [PVA] knows is material to the Government's payment decision." *See Escobar*, 136 S. Ct. at 1996. Relators cannot prove that any alleged false claims or statements made by PVA were material to the Government's payment decision, a standard elevated and required by *Escobar*. The Supreme Court's unanimous decision in *Escobar* "clarif[ied] some of the circumstances in which the False Claims Act imposes liability." *Escobar*, 136 S. Ct. at 1995. In narrowing and specifying appropriate claims under the False Claims Act, the Supreme Court held that a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act" and clarified "how that rigorous material requirement should be enforced." *Id.* at 1996. The Supreme Court emphasized:

> The materiality standard is demanding. The False Claims Act is not "an all-purpose antifraud statute," or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.

*Id.* at 2003 (internal citations omitted). Acknowledging the "essentially punitive" nature of the FCA—treble damages plus a civil penalty of $23,331 per false claim—*Escobar* reinforces the "rigorous" and "demanding" materiality inquiry. *Id.* at 1994, 1996, 2002-03; 15 C.F.R. 6.3.

Relators have failed to satisfy the test mandated by the Supreme Court in *Escobar* requiring proof (not mere allegations) of materiality, including "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 2003. Relators have not, and cannot, point to a single act taken by the Government that supports their burden to prove materiality. In fact, the situation described in *Escobar* is precisely the case here, that "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* at 2003-04.

Relators filed their initial Complaint under seal on April 12, 2017. After being served with the Complaint, the DOJ began an investigation. Relators filed their First Amended Complaint under seal on December 21, 2017. On June 19, 2018, the OIG issued a subpoena to PVA demanding production of medical and business records. As part of its subpoena, the OIG sought medical records for a specific list of patients identified by name and date of birth. On August 21, 2018, PVA produced more than 50,000 pages of documents to the OIG and DOJ, including 414 patient files. Following the production of documents and medical records, PVA met with Special Agents from the OIG and Department of Defense, and a DOJ attorney. On November 26, 2018, after multiple extensions to investigate Relators' claims, the DOJ informed the Court of its decision to decline intervention. Since that time, the DOJ has received all pleadings filed in the case.

For more than three years, Relators have continually made the Government well aware of their allegations of false claims, false records, and false statements. But not a single Government

agent in any agency has demanded or even requested that PVA alter those practices in any regard. Agencies overseeing federal healthcare programs were made specifically aware of the facts. Yet, PVA continues to receive reimbursement by the Government for treatment provided to patients at rates unaffected by Relators' contentions. The Government's continued payment of claims in full despite its investigation and involvement is "very strong evidence that those requirements are not material." *See id.* at 2003-04.

In the wake of *Escobar* and with a mandate to require materiality of payment requirements, numerous courts dismissed *qui tam* lawsuits in which the Government was aware of the allegations, conducted an investigation, yet continued to pay the relevant claims. *See D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) ("The fact that CMS has not denied reimbursement for Onyx in the wake of D'Agostino's allegations casts serious doubt on the materiality of the fraudulent representations that D'Agostino alleges."); *U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) ("[W]e have the benefit of hindsight and should not ignore what actually occurred: the [Defense Contract Audit Agency] investigated McBride's allegations and did not disallow any charged costs. . . . This is 'very strong evidence' that the requirements allegedly violated . . . are not material."); *Abbott v. BP Exploration & Production, Inc.*, 851 F.3d 384, 388 (5th Cir. 2017) ("As recognized in *Escobar*, when the [Department of the Interior] decided to allow the Atlantis to continue drilling after a substantial investigation into Duffy's allegations, that decision represents 'strong evidence' that the requirements in those regulations are not material."); *U.S. ex rel. Nelson v. Sanford-Brown Ltd.*, 830 F.3d 445, 447 (7th Cir. 2016) ("Here, Nelson has offered no evidence that the government's decision to pay SBC would likely or actually have been different had it known of SBC's alleged noncompliance with Title IV regulations. On the contrary, the subsidizing agency and other federal agencies in this case have

already examined SBC multiple times over and concluded that neither administrative penalties nor termination was warranted.").

In *United States ex rel. Cressman v. Solid Waste Services, Inc.*, No. 13-5693, 2018 WL 1693349 (E.D. Pa. April 6, 2018), the plaintiff alleged that the defendant violated the FCA by submitting false claims to various federal governmental agencies without disclosing an alleged violation of various environmental laws arising out of an incident at one of its waste transfer stations. *Cressman*, 2018 WL 1693349, at *1. Analyzing *Escobar*, the court stated: "to meet the materiality requirement for his FCA claims, Plaintiff must present evidence that the Federal Agencies for whom Defendant performed waste pickup services would not have paid Defendant's claims had they known of the [violation] at Defendant's Souderton Division transfer station." *Id.* at *6. Finding that the plaintiff presented no such evidence, the court granted the defendant's motion for summary judgment:

> the government agencies to whom Plaintiff has submitted invoices for payment since the February 25, 2013 Discharge Incident/Violation have continued to pay Defendant for the waste pickup services performed even after Plaintiff filed the underlying suit and after the Department of Justice investigated the allegations contained in Plaintiff's complaint and declined to intervene on behalf of the Federal Agencies. Here, in the four years since learning of Plaintiff's allegations in this matter, including the regulatory violations asserted and relied upon by Plaintiff, the Department of Justice has not initiated any proceedings or taken any action against Defendant. Significantly, after investigating Plaintiff's underlying FCA claims, the Department of Justice declined to intervene and prosecute Plaintiff's suit in the name of and on behalf of the United States Government.
>
> [. . .]
>
> "[b]ecause the False Claims Act was passed to protected the Federal treasury . . . it is the government's materiality decision that ultimately matters."

*Id.* (quoting *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F3d 481, 492 (3d Cir. 2017).

In this case—which presents a scenario that is virtually identical to *Cressman*—the Government has consistently paid Medicare claims submitted by PVA all with actual and

constantly updated knowledge of Relators' allegations. If the Government thought or even suspected that PVA's practice of billing for vascular studies was material, it would have taken some action to avoid paying PVA or recouping money previously paid (as the Government routinely does when it discovers an overpayment).

For comparison regarding the issue of materiality under *Escobar*, it is instructive to look at the case of *United States v. Luce*, 873 F.3d 999 (7th Cir. 2017). In *Luce*, the United States brought an action under the FCA alleging that the defendant, owner of a mortgage company, defrauded the Government by falsely asserting that he had no criminal history so he could participate in the Fair Housing Act's ("FHA's") insurance program. *Id.* at 1000. Citing *Escobar*, the Seventh Circuit described the facts relevant to the materiality inquiry:

> HUD's action upon learning of Mr. Luce's indictment and false certifications confirms the centrality of this requirement: It instituted debarment proceedings to end Mr. Luce's participation in the program. It did not simply refuse payment in one instance, but terminated its relationship with the loan originator so that no future payments could be made.

*Id.* In sharp contrast to *Luce*, the Government has taken no action—no regulatory, administrative, or legal action—against PVA despite learning of the facts supporting Relators' claims and thoroughly investigating those claims. The Government's continual lack of any action is more than enough to show that Relators cannot satisfy their burden of proving the FCA's "demanding" and "rigorous" materiality requirement.

Further undercutting the materiality of any alleged false claim is that Relators' theory boils down to a dispute about timing of when a vascular study was interpreted, not whether it was interpreted or should be paid. This is not an FCA violation. Relators contend it is improper to submit a claim for a vascular study until a Medstreaming report is signed. But even under Relators' analysis, 94.12% of those claims had a completed Medstreaming report within 30 days of claim

submission.[7] If PVA waited to submit those claims until the Medstreaming report was signed, it would have submitted them 30 days later at most, and would have used the same date of service of when the technical component was performed.[8] There would have been no effect on the reimbursement of those services.[9] Yet, Relators ask this Court to sanction their quest to impose on PVA treble damages and hundreds-of-millions-of-dollars in penalties under the FCA, which, under the circumstances, would violate the excessive fines clause of the Eighth Amendment. But "the False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Escobar*, 136 S. Ct. at 2004. That is why a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement *must be material to the Government's payment decision* in order to be actionable under the False Claims Act." *Id.* at 1996 (emphasis added).

Relators simply cannot prove that PVA "knowingly violated a requirement that [PVA] knows is material to the Government's payment decision." *See id.* This Court should therefore grant PVA's Motion and enter judgment for PVA on all claims.

### D. Relators' Theories About Double-Billing And Billing Under An Incorrect Physician Name Are Baseless.

Relators, through their unqualified expert witnesses, theorize that PVA double-billed because it billed for both a vascular study and office visit, evaluation and management ("E/M"). This is nothing more than a repackaged argument that a separate, stand-alone report from

---

[7] Doc. 86-1, Nye Report, Ex. 3.

[8] Additionally, PVA's expert witness Ms. Scott details how Novitas, the Medicare Administrative Contractor, will accept as adequate documentation attestations of signatures for documents after a service is performed. Doc. 84-1, Expert Report of Melissa Scott, at 24-25 (citing FAQ: Signatures, *available at* https://www.novitas-solutions.com/webcenter/portal/MedicareJH/pagebyid?contentId=00005015 (last accessed August 19, 2020)).

[9] The same is true of the studies with Medstreaming reports signed more than 30 days after submission of a claim.

Medstreaming is required to bill Medicare for a vascular study, and should similarly be rejected by this Court. Relators' claims are incorrectly premised on the belief that PVA could not bill for both an E/M service and a vascular study without a separate, stand-alone report for the vascular study. Relators, though their experts or otherwise, do not make any attempt to support a claim that PVA ever improperly billed for an E/M service. The closest Relators come is through Mr. Church, one of their designated expert witnesses. But Mr. Church undermines his own baseless theory when he acknowledges that it is proper to bill for a vascular scan and evaluation and management service where there is proper documentation and a separately identifiable evaluation, and the only way to test that theory is by review of medical records, which neither he nor any other of Relators' experts did.[10]

Moreover, Relators' theory about double-billing is a logical fallacy that is mutually exclusive of its theory that a Medstreaming report is required to bill for a vascular study. Relators only claim that an E/M service was billed improperly if it was billed along with a vascular study without a signed Medstreaming report before the billed date. Relators already claim it was improper to bill for the vascular study in those circumstances. It is Relators who want to double-dip to also claim that the E/M service was improper because the vascular study did not have a Medstreaming report signed before the vascular study was billed. Missing in all this is any allegation that PVA failed to provide or document any E/M services.

Relators' theories of liability tied to the name of the physician on any claim sent to Medicare are, like Relators' other claims, untested and unproven. Relators argue through their expert witness that PVA may have billed under a physician's name who did not read and interpret a vascular study. But Relators' theory is just that—a theory. Neither Relators nor their expert

---

[10] *See* Doc. 83, Defendant's Opposed Motion to Exclude Relators' Expert Witness Robert D. Church, at 16.

witnesses have reviewed medical records to support their theory. Relators' expert witness Dr. Nye compared information in two separate databases to offer an opinion that some number of imaging studies were performed in which the "billing MD" did not match the "reading MD."[11] This theory is a construct of Relators fishing for potential claims. Relators have identified no specific claim for which their belief became reality. And even if they could do that, there is no evidence that a difference in the names of the physicians was done with intent to defraud the Government or would be material to the Government. Mismatching physician names, without more, is exactly the type of "garden-variety" regulatory issue that *Escobar* cautioned was not appropriate for policing under the False Claims Act. *See Escobar*, 136 S. Ct. at 2003 ("The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations.").

### E. Relators Have No Evidence To Support Claims That Scans Were Performed Without A Valid Order.

Relators mistakenly allege in the First Amended Complaint that PVA performs unnecessary ultrasounds because they are not ordered by a physician or they are performed without a valid order.[12] Relators' claims fail because there is no evidence that allegedly fraudulent practice takes place. Vascular studies are performed at PVA pursuant to a valid order. Those orders are documented in the medical record. The record in this case does not support Relators' claim based on this theory, and summary judgment on it is proper.

### F. Relators Cannot Prevail On Their "Reverse-False-Claim" Theory.

For the same reasons Relators' claims based on submission of false claims or records fail, so does its claim under the FCA's reverse-false-claim provision. A relator asserting a reverse false

---

[11]Doc. 86-2, Nye Supp. Report at 5.
[12] Doc. 8 at ¶¶ 26, 33.

claim must prove of the following elements: "(1) a false record is created; (2) the provider knows the record is false; (3) the false record or statement is made, used, or caused to be made or used; (4) to conceal, decrease, or avoid an obligation to pay the Government; and (5) the misrepresentation is material." *U.S. ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 632 (N.D. Tex. 2018). Relators have no evidence that PVA created any false record to conceal, decrease, or avoid an obligation to pay the Government. For the reasons stated above, Medicare payments received by PVA were for valid services. Nothing in the record suggests that PVA fraudulently retained federal funds that were owed to the Government. The Court should enter summary judgment against Relators on this claim.

### G. <u>Relators Cannot Prove Damages.</u>

Relators have put forth no evidence of the specific damages suffered by the Government. Relators' theory is that PVA billed for the professional component before a separate, stand-alone report was signed. But Relators have no admissible evidence of the amount the Government paid for the professional component on each study Relators allege was billed improperly. Instead, Relators' expert witness Dr. Nye only calculated the total amount billed for vascular studies—he did not break out the amount for the technical component and professional component and, aside from one Medicare category, did not offer an opinion on whether a payer was governmental.[13]

Once the technical component for a vascular study is rendered, it may be immediately billed. The technical component of a vascular study makes up the majority of the fee payable to PVA, and it is undisputed that PVA performed every study it billed. Moreover, "the False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Escobar*, 136 S. Ct. at 2004.

[13] *See* Doc. 86, Defendant's Opposed Motion to Exclude Relators' Expert Witness Zachary Nye and Strike his Supplemental Reports, at 7.

## V. CONCLUSION

For these reasons, PVA respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment for Defendant PVA on all claims.

Respectfully submitted,

By: *<u>/s/ Sean McKenna</u>*

Sean McKenna
State Bar No. 24007652
smckenna@spencerfane.com
Mark A. Cole
*Admitted Pro Hac Vice*
mcole@spencerfane.com
SPENCER FANE LLP
2200 Ross Avenue, Suite 4800 West
Dallas, Texas 75201
Telephone: 214-459-5890
Facsimile: 214-750-3612

Stephen J. Romero
State Bar No. 24046756
stephen.romero@nortonrosefulbright.com
Jeff Wurzburg
State Bar No. 24105140
jeff.wurzburg@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
Frost Tower 111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: 210-224-5575
Facsimile: 210-270-7205

Counsel for Defendant
Peripheral Vascular Associates, P.A.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of August, 2020, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record and a copy of the sealed documents will be served via Electronic Mail to:

Justin T. Berger
Sarvenaz J. Fahimi
Cotchett Pitre & McCarthy, LLP
840 Malcolm Road
Burlingame, CA 94010

Wallace M. Brylak, Jr.
Brylak & Associates
15900 La Cantera Parkway, Suite 19245
San Antonio, TX 78256

John M. Deck
United States Attorney's Office for the
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216

*/s/ Sean McKenna*
Sean McKenna