# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA ex rel. TIFFANY MONTCRIEFF, ROBERTA MARTINEZ, and ALICIA BURNETT,

Plaintiffs,

vs. ) NO. SA-17-CV-00317-XR

PERIPHERAL VASCULAR ASSOCIATES P.A.,

Defendant.

ORAL DEPOSITION

PERIPHERAL VASCULAR ASSOCIATES P.A.

(KATHERINE E. BRITT)

OCTOBER 10, 2019

Reported by: Jean Thomas Fraunhofer,

Certified Shorthand Reporter in and for the State of Texas

ORAL DEPOSITION OF PERIPHERAL VASCULAR ASSOCIATES P.A. (KATHERINE E. BRITT), produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 10th day of October, 2019, from 9:40 a.m. to 6:31 p.m., before Jean Thomas Fraunhofer, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at NORTON ROSE FULBRIGHT US, LLP, 111 West Houston Street, Suite 1800, San Antonio, Texas 78205, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

# APPEARANCES

FOR PLAINTIFFS:

MICHAEL MONTANO
COTCHETT, PITRE & McCARTHY, LLP
840 Malcom Road
Burlingame, California 94010
Telephone: (650)697-6000
E-mail: mmontano@cpmlegal.com

FOR DEFENDANT:

SEAN McKENNA
LAW OFFICE OF SEAN McKENNA, PLLC
8710 Greenville Avenue
Building D, Suite B
Dallas, Texas 75240
Telephone: (786)973-3762
E-mail: sean@seanmckennalaw.com
JEFF J. WURZBURG
STEPHEN ROMERO
NORTON ROSE FULBRIGHT US, LLP
111 West Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210)270-7186
E-mail: jeff.wurzburg@nortonrosefulbright.com

A P P E A R A N C E S
( CONTINUED )

ALSO PRESENT: Francisco Vazquez
Melissa Scott (VIA SPEAKERPHONE)

# I N D E X

PAGE

PERIPHERAL VASCULAR ASSOCIATES P.A.
(KATHERINE E. BRITT)

Examination by Mr. Montano ..................... 10

Signature Page . . . . . . . . . . . . . . . . . 324

Court Reporter's Certificate . . . . . . . . . . 327

*****

E X H I B I T S


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 13 |
| Exhibit 2 | PVA Procedural Process For Reconciling Differences in Preliminary Reports and Final Reports (PVA0015629) | 41 |
| Exhibit 3 | PVA Clarification of Indications for Examinations (PVA0015425) | 93 |
| Exhibit 4 | May 2017 E-mail chain (PVA0039598-39601) | 163 |
| Exhibit 5 | 6/6/17 E-mail chain (PVA0115557-115559) | 207 |
| Exhibit 6 | August 2017 E-mail chain (PVA0095508-95512) | 214 |


///

E X H I B I T S
( CONTINUED )

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | 4/25/17 E-mail to William English, et al, from Kathy Britt (PVA0085455) | 223 |
| Exhibit 8 | DT read and study times spreadsheet (PVA0236767) | 244 |
| Exhibit 9 | Patient Account History Exported from Allscripts PM Database Using SAP Crystal Reports (PVA0015233) | 257 |
| Exhibit 10 | SVU Extracranial Cerebrovascular Duplex Ultrasound Evaluation (PVA0103238-103243) | 272 |
| Exhibit 11 | Patient Chart - Estrada (PVA0009825-9899) | 286 |

# E X H I B I T S
## ( CONTINUED )

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | Patient Chart - Deandra (PVA0006869-6974) | 295 |
| Exhibit 13 | PVA LE Arterial Segmental Pressure test (PVA0007726) | 307 |
| Exhibit 14 | PVA Account Inquiry (PVA0014087) | 307 |
| Exhibit 15 | Medstreaming Audit Pane (PVA0007722) | 307 |
| Exhibit 16 | PVA Cerebrovascular Duplex Scan (PVA0007628) | 313 |
| Exhibit 17 | PVA Account Inquiry (PVA0014061) | 313 |
| Exhibit 18 | Medstreaming screen capture (PVA0007624) | 313 |

///

E X H I B I T S

( CONTINUED )

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 19 | IAC Standards and Guidelines for Vascular Testing Accreditation (PVA0015495-15559) | 319 |

*****

P R O C E E D I N G S

(Witness sworn.)

PERIPHERAL VASCULAR ASSOCIATES P.A.

(KATHERINE E. BRITT)

having been first duly sworn, testified as follows:

MR. MONTANO: Michael Montano, Cotchett, Pitre & McCarthy on behalf of the plaintiffs.

MR. McKENNA: Sean McKenna on behalf of Peripheral Vascular Associates.

MR. WURZBURG: As well, Jeff Wurzburg and Steve Romero.

EXAMINATION

BY MR. MONTANO

Q. Okay. Ms. Britt, good morning.

A. Good morning.

Q. Thank you for coming. Obviously, this is a difficult time for you. We appreciate you still coming in today to sit for this deposition.

Again, I'm Michael Montano. I represent plaintiffs in this case, and I'm going to be asking you some questions today to learn more about the policies and procedures at PVA, Peripheral --

A. Okay.

Q. -- Vascular Associates. Did you -- sorry.

Ms. Britt, would you state your full name

A. Yes.
Q. Would your CEO also know the average number of ultrasounds performed per month?
A. Yes.
Q. Where is PVA's financial information as it relates to medical billing stored?
A. In our software that is called Allscripts Practice Management.
Q. Who at PVA has access to that data?
A. During what years?
Q. 2018.
A. 2018, managers, staff, physicians. I think almost everybody at PVA had -- has access to Allscripts Practice Management software.
Q. Does anyone outside of PVA have access to the data in that system?
A. The only person that I can -- people that I can think of would be our IT that houses our data.
Q. And who is the IT provider?
A. Bridgehead.
THE REPORTER: I'm sorry?
THE WITNESS: Bridgehead.
Q. What kind of services does Bridgehead provide to PVA?
A. They're -- they host our cloud services.

tech does his test.

Q. So that could be after the Acquired stage? So you could -- you could bill for the technical component after the -- the --

A. Sure. You can bill for the technical component any time after the test is completed. If the technical component is completed, it's in -- it's preliminary.

Q. And when --

A. And remember -- so -- so can I explain to you, Michael, how it works?

So when we see a patient, we -- you have to remember that when our doctors do -- they have a vascular test. It's used to complement their visit. They have that result. They're giving their impression in their office note. They're signing off on that note. So really, their impression's already been done by validation of that office note. You see their interpretation even in their office notes.

Our techs will then enter the CPT codes into Allscripts, which creates the charges. So we -- PVA does not bill until that tech puts their codes in there and tells us that they performed the study. Once that study's been performed, they drop their codes in there so we know you've done your test. We don't just randomly throw out bills. We're -- this is our process.

So really, his impression's already been done at the office level because he's discussing it with the patient. He's got everything that he needs. The pre/final report is part of the QA and sign-off. That is not necessary to bill. Medicare tells you, you can bill the technical component or you can bill off the professional component date. We -- PVA chooses the technical. We bill globally.

Q. So PVA bills Medicare --

A. Mm-hmm.

Q. -- when the test is complete, correct?

A. When the test is performed -- that's correct -- it's completed. When the test is performed. Not complete. When you say "complete," define complete.

Q. Well, you've used the term, so I'm asking you.

A. Sure. When the test has been performed. I'm using "performed" and "complete" as meaning the same.

Q. And you know the test has been performed when the status in Medstreaming is acquired.

A. Not necessarily. So a test is performed when -- when -- when a vascular tech does that test physically. If a tech doesn't go into Medstreaming and change any of their statuses, you can't use Medstreaming as a guide to know whether a test is complete or not. You have to look at the test. You have to look for the

A. So --

Q. -- you used --

A. Right. So we use -- Allscripts PM is our Practice Management software, and that is -- that houses all of our registration, scheduling, billing.

Allscripts EMR is our patient medical record. There is a direct interface between Allscripts EMR and our Practice Management software. It's called charge -- it's a ChargePass. What it allows us to do is to drop CPT codes into an encounter and they will cross over into our Allscripts Practice Management software where a staff member will then pick it up, look at it, do what they need to do with it, and then it gets billed out to the payer. So it isn't an automated -- it's not like Allscripts shoots out -- if you enter something, that it's going to shoot out. There is a process by staff that have to import charges, review them, do some final things to them.

Q. You referred to Allscripts EMR.

A. Mm-hmm.

Q. Is that also referred to, at PVA, as Allscripts EHR?

A. Yes.

Q. And Allscripts Clinical Management is also referred to as ACM?

A. Allscripts CM, mm-hmm. Yes.
Q. Who at PVA has -- uses ACM?
A. All the staff. All staff.
Q. Every employee of --
A. Physicians. Every employee --
Q. -- PVA uses it?
A. -- of PVA. I would say with the exception of like our accountants. They wouldn't use the CM system or our human resources or credentialing, administrative staff.
Q. So physicians have access?
A. Physicians have access, staff have access. Absolutely.
Q. Technologists have access?
A. Yes, mm-hmm.
Q. People in the billing department have access?
A. They do.
Q. Okay. APM includes scheduling, right?
A. It does.
Q. It includes reminders to doctors? Reminders to doctors of upcoming appointments as well?
MR. McKENNA: I'm sorry. Reminders? Okay.
A. Reminders?
Q. Yeah. Does -- does APM remind doctors that

A. I would say just our staff. Staff, our IT department, our billing department, our -- just the staff and physicians at PVA have access to that data.

Q. So billing staff, correct?

A. Billing staff have access to reports.

Q. IT staff, correct?

A. IT staff.

Q. Scheduling staff?

A. I don't believe scheduling staff have access to Medstreaming.

Q. Okay. Can you describe the billing staff, what the roles are within the billing staff?

A. What the roles are?

Q. (Nods head.)

A. Our billing staff handle claims. They work with payers. So they handle appeals, denials. They contact payers regarding processing of payments. We have an entire billing team.

Q. Okay. We'll -- we'll come back to that.

A. Sure.

Q. Once Medstreaming data is entered, can it be altered after the fact?

A. Clarify what you mean by "data." Are you talking about a report? Are you talking about the data fields?

A. It's -- it's an internal policy process that has been -- it is the same that we use for our EMRs. If there's a change made, that there is notation as to why the change was made and who made that change.
Q. Is that policy reduced to writing anywhere?
A. I don't know. I don't know.
Q. You don't?
How are people trained on that policy?
A. Staff meetings. We have a coding committee, and our coding committee consists of managers, coders, vascular directors, and that information -- that information is disseminated into the practices by your management staff. And that process was a change that was made at a coding committee meeting. That, I know.
Q. Mm-hmm.
A. I remember there was discussion about it. And it's not as it pertained to the vascular. We're talking about PVA as a practice. Anytime anything is amended, we train our staff to notate why so that --
Q. And that includes for ultrasounds?
A. It would -- it would have applied to anything at PVA, prosthetics, office.
Q. Okay. Let's turn to Allscripts and its data systems.
A. Sure.

Q. Okay.
A. To -- for all departments. It's not particular to any.
Q. Where is Medicare billing information -- let me strike that.
Can you describe the process by which PVA obtains reimbursement from Medicare?
A. The process by which -- do you want me to start with --
Q. Well, if you send a form -- this CMS form, to whom do you send it?
A. It's an electronic billing, and it goes to our payers electronically --
Q. Mm-hmm.
A. -- from Allscripts.
Q. And you're including Medicare as a payer.
A. Yes, mm-hmm.
Q. What triggers the sending of that bill from Allscripts to either a carrier or MAC?
A. And we're talking about vascular lab?
Q. Mm-hmm, yes.
A. Okay. So in Allscripts clinical module, a vascular tech will enter their CPT codes. They will enter diagnosis codes. At the time, it was the vascular techs that did that. That change -- that process has

changed. We have coders who work for our practice. The tech will enter the test, the CPT code, and then send that -- forward that -- our process now is they forward it over to our coders. But those codes were entered into Allscripts.

When you sign off on that note, it -- there is an interface. A charge -- it's called ChargePass. It sends over a placeholder, like a voucher. So it creates a voucher that sits there waiting for staff to process it. Office staff now import those charges. They look over the claim to make sure that there's everything that needs to be on the claim, modifiers, authorizations, co-payments are attached, whatever. They -- they basically scrub the claim. They then close their batch at the end of the day.

Those electronic batches are submitted the following day to the payers. They go to a clearinghouse first and that clearinghouse scrubs it again, making sure you have right provider ID numbers, date of births, all the data fields are completed. And if they're not, then they -- they come back to us, and then we get those corrected at the office level. Once they're clean, the clearinghouse then sends them electronically to the payer. Once they're paid, then they import back in.

Q. Computer-based?
A. Mm-hmm.
Q. And is it in the -- what program does that occur inside of?
A. It's in Allscripts CM. We have a double validation. It's placed in Allscripts CM. We have a coder that enters those diagnosis codes. After the tech puts a CPT code, the coder puts the diagnosis code based on the indications, based on the physician's findings. Those then cross over into the Practice Management where you have a second coder who now verifies that these are correct. So we have a double verification system.
Q. So after the voucher's created in ACM --
A. Mm-hmm.
Q. -- it gets popped out to APM, and that's where the vascular coder --
A. The second vascular lab coder will then import the charges because they -- ChargePass. They cross over into that little temporary hold. They open it up. They scrub it, make sure everything is attached, modifiers are applied, and then they save those documents. And those are the ones that get billed out then the next day.
Q. Is ChargePass a separate piece of software from Allscripts?

A. By looking at the report.
Q. So she'll compare the original report produced in Medstreaming to the code used in the voucher; is that right?
A. That is correct. From time to time, our vascular techs will put the incorrect code. So the coders will look at the report and correct that code.
Q. Your vascular techs, what kind of professional -- strike that.
What kind of training does PVA provide to the vascular coders?
A. Monthly meetings with a technical director and billing staff. They attend our coding committee meetings. They attend webinars, seminars from payers, Medicare webinars. They have access to any type of educational courses regarding coding that they'd like to attend. Society of Vascular Surgery. Our doctors invest quite a bit in our --
Q. Mm-hmm.
A. -- education and resources and provide us with the ability to continue.
Q. Is there an accreditation that exists for a vascular coder?
A. There's an accreditation for coders. Not vascular coders, just coders.

Q. Okay. What is that accreditation?
A. There are many of them, but it's -- you can become a certified professional coder.
Q. And does PVA require that all of their coders be certified professional coders?
A. We do not require them to be professional coders, certified professional coders. We do have quite a few certified professional coders, but we -- it's not a requirement.
Q. Okay. So you have some that are not certified professional coders?
A. That's correct.
Q. Once the certified -- well, once the vascular coder has done their second-layer review, is it that person who will send the voucher to the MAC?
A. No. They -- what they do is they simply have it in their holding. They have what's called a batch. It -- it's -- it lives in their work. They close -- close their work, and the next day our central billing office staff are the ones that pick up those files, those electronic files, and they process them through our clearinghouse. And then from the clearinghouse, they go to the -- to the Medicare payer.
Q. I'm confused as to the distinction between the vascular coders and the central billing staff. Didn't

copies of Medicare-approved billing procedures?
A. They're electronic. Our coders have electronic -- they access the Medicare Web site, the electronic manuals.
Q. So you rely on the Medicare Web site for those manuals?
A. That's correct, for the current versions.
Q. Do you provide training on those billing procedures?
A. We do.
Q. Those Medicare billing procedures?
A. We do.
Q. How often?
A. We have monthly coding committee meetings.
Q. Mm-hmm.
A. And it's at those meetings that we provide training. And then in addition, the managers will train necessary staff, office staff.
Q. Who is on the coding committee?
A. Our coding committee consists of office managers, coders.
Q. I'm sorry. So there's an office manager for each --
A. We have office --
Q. -- PVA office?

A. Correct.
Q. So all of those office managers are part of the coding committee?
A. They are.
Q. Okay. Is there a separate manager -- is there a -- is there a person whose role in a person is analogous to the office manager in the PVA facility?
A. No.
Q. No.
A. No, they --
Q. That layer is just cut out at the hospital?
A. Your technical director over -- is over your hospital lab and your office lab, supervisors, lead techs. We don't have a lab manager.
Q. Okay.
A. Like a hospital lab manager.
Q. Okay. I'm sorry. So you were describing the coding committee includes --
A. Yes.
Q. -- office managers. Who else?
A. Office managers, coders, vascular lab coders, technical directors, the directors, and physicians. We have a coding compliance officer. We have doctors -- two other physicians that attend.
Q. When you say just directors, who are you

referring to?
A. We have directors. Like, I'm director of clinical administration. We have a director --
Q. Departmental directors?
A. Departmental directors. Correct. And physicians as well.
Q. And also physicians, yeah. Are any of the physicians also departmental directors?
A. Yes. But we have a departmental director, but she's not part of the coding committee.
Q. Okay. Who --
A. But they --
Q. Go ahead.
A. I'm sorry. But they could be in their -- their zones. They're directors of other areas.
Q. Who trains the vascular coders?
A. Barbara Burrow, technical director. Our coders, we have multiple certified coders in our practice. They have trained. Billing reps. It's -- it's an entire time.
Q. Is there -- is there one person who is ultimately responsible for ensuring the proper training of the vascular coders?
A. Barbara Burrow.
Q. And who is responsible for overseeing the

training of Lorraine Garcia?
A. Phyllis Davenport.
Q. What is Phyllis's role?
A. She is our billing manager.
Q. Billing manager. And what steps does the billing manager take to ensure the proper training of the people in the billing department?
A. They have monthly meetings. Actually, they have biweekly meetings with continue --
Q. Do you mean that as every other week?
A. Every other week with continuous training.
Q. And is -- I'm sorry. So I understand, is there -- there's a billing committee as well?
A. No.
Q. No. Is there any other committee besides the coding committee?
A. Yes. Within our company?
Q. Yeah.
A. We have many committees.
Q. Okay. I won't make you name them all.
A. Lots of committees.
Q. What's the committee -- if there is one, what is the committee that oversees the billing department?
A. It would be the coding committee.
Q. So the billing committee reports up to the

coding committee?
A. There is no billing committee. So the billing --
Q. I'm sorry. Does the billing department --
A. -- department? The billing department managers are part of the coding committee. The coding -- yes.
MR. McKENNA: Hey, Michael?
MR. MONTANO: Yeah.
MR. McKENNA: We've been going for about an hour or longer. I can't remember.
MR. MONTANO: It's been about that time. I'm --
MR. McKENNA: Go ahead.
MR. MONTANO: -- getting through this part of the --
MR. McKENNA: Okay.
MR. MONTANO: -- this passage. Just give me a few minutes, if you would.
Q. (BY MR. MONTANO) Does PVA have a chief compliance officer?
A. A chief compliance officer?
Q. Does it have a compliance officer whose job it is to ensure compliance with Medicare procedure?
A. Yes.
Q. Who is that person?

A. Dr. Grady Alsabrook.
Q. Is Dr. Grady on the coding committee?
A. He is.
Q. Does Dr. -- Dr. Alsabrook have a title within the company apart from doctor?
A. He's -- he's part -- he's one of the owners.
Q. He's one of the owners?
A. And he is the coding compliance officer for our practice.
Q. So someone asks to speak -- calls and asks to speak with the coding compliance officer, he's the only person to whom the call would be sent?
A. That's correct.
Q. What steps does he take to make sure that he is up to date on Medicare billing policies?
A. He attends -- or he holds monthly coding committee meetings. He sends staff to coding seminars, a lot of education. He --
Q. Does he --
A. -- sits in webinars with us. He attends meetings, society meetings where coding is discussed. And he's on forums for coding. He...
Q. Okay. Remind me. Does PVA develop and put into place its own billing procedures apart from those that come off the shelf from Medicare?

A. -- to reference.
Q. And these are guidance documents that have been developed by PVA itself?
A. That is correct.
Q. Okay.
A. And in the past, we used paper. Same -- similar guidance.
Q. Okay. And Dr. -- the compliance -- the compliance doctor, what was his name?
MR. VAZQUEZ: Grady Alsabrook.
Q. Dr. Alsabrook, he is the person who authors these guidances, as you refer to them?
A. He -- he reviews them and ultimately gives them the okay.
Q. Okay. And who actually put the pen to paper and write them?
A. It would have been our technical director and Brian Hembling and Barbara Burrow, who are in charge; and Dr. Fiala, who's in charge of the vascular lab committee. So we have a vascular lab committee as well.
Q. Who's in the vascular lab committee?
A. The vascular lab committee is -- there are two physicians, our CEO Brian Hembling, and Barbara Burrow, the technical director and the director of the vascular lab, are all part of that committee.

paragraph?

A. There are so many rules to follow, and if we don't stay on top of those rules and educate everyone on them on a daily basis, then the payers win.

Q. Did PVA accept Ms. Britt's advice to start educating coders on a daily basis?

A. Yes, we educate daily.

Q. And what is the form of that education?

A. Verbal. We work with our -- our staff. We cross-code. We cross-check each other. Like the vascular lab, how they check each other's work, we daily -- so let me back up.

Do we -- do I educate every single day and keep a calendar? No. What this means is, we are more hands-on with our education and our codings and our coders and making sure that we are constantly staying on top of everything.

Q. Whose responsibility is it to stay up to date on the rule changes that may come from Medicare?

A. So our code -- at our coding committee, we -- what we did is each coder was responsible for a couple of payers, and we rotate those positions. And we may say Coder A, we need to you to look at the Aetna Web site and the United Web site and the Medicare Web site for changes. Coder B. Because there's so many payers

out there. So it was -- it's a shared responsibility.

Q. And so that -- that coder's responsibility is to educate their colleagues?

A. Correct. At -- at our coding committee meeting, we ask at every meeting, you know, Are there any payer updates? And at that time, we are able to share with the committee members any payer changes so that it can then be disseminated down to the staff.

Q. Okay. Now, that sentence that you just read also makes references to "payers winning." What does that mean?

A. Payers winning. I will tell you that I attend a lot of seminars. I'm a certified professional coder, and we hear all the time that payers incorrectly deny claims. We get them all the time. We get claims from payers that say, Hey, this is incorrect. We need a refund. When, in fact, it's not.

You know, to me, I look at it as the payers, this is their business. Well, we provide a service. We should be paid for the services that we provide. So when you have payers that consistently deny claims inappropriately, then basically they're taking money back from practices that they shouldn't. And we know -- we know what we've done. We know how to bill. We know how to code. And so we defend our coding

CHANGES AND SIGNATURE

WITNESS: PERIPHERAL VASCULAR ASSOCIATES P.A.

(KATHERINE E. BRITT)

DATE: OCTOBER 10, 2019

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

| PAGE | LINE | CHANGE | REASON CODE |
|---|---|---|---|
| 15 | 15 | Change to “operational practice improvements” | (1) |
| 21 | 14 | Change to "yes", Dr. Macris | (1) |
| 21 | 16 | Change to "yes", Brian Hembling and Barbara Burrow | (1) |
| 23 | 1 | Change “consultations” to “services” | (1) |
| 53 | 23 | Answer should have been "no, however orders are kept in patient records" | (1) |
| 63 | 22 | Change registration "package" to "process" | (1) |
| 64 | 18 | Change "If" to "It" | (3) |
| 105 | 19 | Change “Medstreaming” to “Focus” | (1) |
| 107 | 11 | Change to "The vascular tech or scribe" | (1) |
| 113 | 9 | Insert "images" after "machine" | (1) |
| 115 | 8 | Change "all day" to "frequently" | (1) |
| 130 | 3 | Change "app" to "database" | (1) |
| 145 | 20 | Change "critical" to "clinical" | |
| 146 | 22 | Change "yes" to "yes, it was our process" | (1) |
| 147 | 14 | Change "staffers signed" to "staffers are assigned" | (3) |
| 154 | 19 | Change "cross" to "across" | (3) |

CHANGES AND SIGNATURE

WITNESS: PERIPHERAL VASCULAR ASSOCIATES P.A.

(KATHERINE E. BRITT)

DATE: OCTOBER 10, 2019

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

| PAGE | LINE | CHANGE | REASON CODE |
|---|---|---|---|
| 167 | 17 | Change to "Not to my knowledge" (1) | |
| 173 | 15 | Change to "Yes, quarterly quality improvement meetings" (1) | |
| 194 | 18 | Change "on the technical date" to "on the day the technical component was performed." (1) | |
| 283 | 14 | Change "records" to "information" (1) | |
| 287 | 4 | Change to "documentation of a visit of an action" (1) | |
| 291 | 19 | Change to "This is the time a chart is opened for a scheduled appointment to be documented" (1) | |
| 292 | 13 | Change to "This is the time the chart was opened for documenting the visit or service provided." (1) | |
| 293 | 22 | Change to "I believe this is the time the chart was opened for the visit scheduled" (1) | |
| 294 | 7 | Change to "the time the chart was opened." (1) | |
| 298 | 6 | Change to "That was the time the chart was opened" (1) | |
| 312 | 7 | Change "sheets" to "reports" (1) | |
| 176 | 12 | Change to "No, Novitas is a contractor to the government." (1) | |
| 188 | 16 | Change "doesn't" to "does an" (3) | |

CHANGES AND SIGNATURE

WITNESS: PERIPHERAL VASCULAR ASSOCIATES P.A.
(KATHERINE E. BRITT)

DATE: OCTOBER 10, 2019

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

| PAGE | LINE | CHANGE | REASON CODE |
|---|---|---|---|
| 203 | 23 | Change to "our CEO, and Brian Hembling" | (1) |

I, PERIPHERAL VASCULAR ASSOCIATES P.A. (KATHERINE E. BRITT), have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Katherine E Britt

PERIPHERAL VASCULAR
ASSOCIATES P.A. (KATHERINE
E. BRITT)

THE STATE OF TEXAS )

COUNTY OF BEXAR )

Before me, DRUSILLA JONES, on this day personally appeared PERIPHERAL VASCULAR ASSOCIATES P.A. (KATHERINE E. BRITT), known to me or proved to me on the oath of — or through TEXAS DRIVERS LICENSE (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this 7TH day of JANUARY, 2020.

DRUSILLA JONES
Notary Public, State of Texas
Comm. Expires 02-18-2023
Notary ID 128515613

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

My Commission Expires: 02-18-2023

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF PERIPHERAL VASCULAR ASSOCIATES P.A.

(KATHERINE E. BRITT)

OCTOBER 10, 2019

I, Jean Thomas Fraunhofer, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, PERIPHERAL VASCULAR ASSOCIATES P.A. (KATHERINE E. BRITT), was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Pages contain any changes and the reasons therefor;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount

of time used by each party at the time of the deposition:

MICHAEL MONTANO (6 Hours, 25 Minutes)

Attorney for Plaintiffs

SEAN McKENNA (0 Hours, 0 Minutes)

Attorney for Defendant

That $_________ is the deposition officer's charges to the Plaintiffs for preparing the original deposition and any copies of exhibits.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Certified to by me on this 18th day of October, 2019.

Jean Thomas Fraunhofer, CSR
Texas CSR 7990
Expiration: 12/31/2020