**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. TIFFANY MONTCRIEFF, ROBERTA MARTINEZ, and ALICIA BURNETT,**<br><br>Plaintiffs,<br><br>vs.<br><br>**PERIPHERAL VASCULAR ASSOCIATES P.A.,**<br><br>Defendant. | Civil Action No. SA-17-CV-00317-XR |

**RELATORS' OPPOSITION TO DEFENDANT PERIPHERAL VASCULAR ASSOCIATES' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION .... 1

II. FACTUAL BACKGROUND .... 3

A. PVA billed Medicare using an electronic version of the CMS-1500, and using CPT codes published by the American Medical Association. .... 3

B. PVA used CPT codes that misrepresented its services on thousands of claims. .... 3

C. The text of the AMA manual covering the CPT codes used by PVA requires completion of a written report reflecting the physician's interpretation .... 4

D. PVA's excuses do not justify its violations. .... 5

1. PVA submitted 11,728 charges for which there was no report in MedStreaming, and no Evaluation and Management patient visit. .... 6

2. PVA double-billed where a patient visit and vascular study interpretation are reflected only in the patient visit note. .... 7

E. PVA acted "knowingly." .... 8

1. In 2017, PVA acknowledged that its practices were noncompliant. .... 8

2. PVA closely tracked delays in physician interpretation and reporting. .... 10

3. PVA ran afoul of its own compliance policies, the policies of its accreditation society, and general industry standards. .... 10

a. PVA's compliance policies. .... 10

b. ICAVL and ACR standards confirm that PVA's conduct was knowing and reckless. .... 12

c. PVA's inpatient practices. .... 13

d. Industry standards, reflected in a variety of readily available sources, confirm that PVA knowingly violated proper billing practices. .... 14

e. PVA's own expert, Dr. Collier, does not follow PVA's noncompliant reporting and billing practices. .... 14

4. PVA risked patient health and safety .... 15

III. ARGUMENT .... 15

A. Summary Judgment under the False Claims Act. ..... 15

B. PVA's bills were "false." ..... 16

C. PVA acted knowingly. ..... 21

D. PVA's false statements were material. ..... 23

E. PVA's claims caused the government to pay out significant moneys. ..... 29

IV. CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**Page No(s).**

**Cases**

*Guillory v. Domtar Indus., Inc.*
95 F.3d 1320 (5th Cir. 1996) ........................................ 21

*Ohio Hosp. Ass'n v. Shalala*
201 F.3d 418 (6th Cir. 1999) ........................................ 1

*Peterson v. Weinberger*
508 F.2d 45 (5th Cir.1975) ........................................ 19

*Ruckh v. Salus Rehab., LLC*
963 F.3d 1089 (11th Cir. 2020) ........................................ 24, 28

*See United States ex rel. Longhi v. Lithium Power Technologies*
575 F. 3d 458 (5th Cir. 2009) ........................................ 16

*U.S. ex rel. Harman v. Trinity Industries Inc.*
872 F.3d 645 (5th Cir. 2017) ........................................ 24

*U.S. ex rel. Bias v. Tangipahoa*
816 F.3d 315 (5th Cir. 2016) ........................................ 16

*U.S. ex rel. Grubbs v. Kanneganti*
565 F.3d 180 (5th Cir. 2009) ........................................ 17

*U.S. ex rel. Harman v. Trinity Industries Inc.*
872 F.3d 645 (5th Cir. 2017) ........................................ 27

*U.S. ex rel. Longhi Lithium Power Technologies*
575 F.3d 458 (5th Cir. 2009) ........................................ 27

*U.S. ex rel. Parikh v. Citizens Med. Ctr.*
977 F. Supp. 2d 654 (S.D. Tex. 2013) ........................................ 17

*U.S. ex rel. Rigsby v. State Farm Fire Cas. Co.*
794 F.3d 457 (5th Cir. 2015) ........................................ 16

*U.S. ex rel. Sharp v. E. Oklahoma Orthopedic Ctr.*
No. 05-CV-572-TCK-TLW, 2009 WL 499375, at *6 (N.D. Okla. Feb. 27, 2009) .................. 23

*U.S. ex rel. Stewart v. Louisiana Clinic*
No. CIV.A. 99-1767, 2003 WL 21283944, at *3 (E.D. La. June 4, 2003) .................. 3

*U.S. ex rel. Swafford v. Borgess Med. Ctr.*
98 F. Supp. 2d 822 (W.D. Mich. 2000)
*aff'd*, 24 F. App'x 491 (6th Cir. 2001) ........................................ 19

*UMC Electronics Co. v. United States*
43 Fed. Cl. 776 (Fed. Cl. 1999) ........................................ 16

*United States ex rel. Atkins v. Mclnteer*
470 F.3d 1350, 1360 n.17 (11th Cir. 2006) .......... 25

*United States ex rel. Chandler v. Cook County*
277 F.3d 969 n.5 (7th Cir. 2002)
*aff'd,* 538 U.S. 119 (2003) .......... 25

*United States ex rel. Cressman v. Solid Waste Services, Inc.*
No. 13-5693, 2018 WL 1693349 (E.D. Pa. April 6, 2018) .......... 26

*United States ex rel. Cressman v. Solid Waste Servs., Inc.*, No
CV 13-5693, 2018 WL 1693349, at *6 (E.D. Pa. Apr. 6, 2018) .......... 27

*United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*
950 F.3d 277 (5th Cir. 2020) .......... 21

*United States ex rel. El-Amin v. George Washington University*
533 F. Supp. 2d 12 (D.D.C. 2008) .......... 25

*United States ex rel. Emerson Park v. Legacy Heart Care, LLC*
No. 3:16-CV-0803-S, 2019 WL 4450371, at *9 (N.D. Tex. Sept. 17, 2019) .......... 2, 17

*United States ex rel. Escobar v. Universal Health Servs., Inc.*
842 F.3d 103 (1st Cir. 2016) .......... 26

*United States ex rel. Longo v. Wheeling Hosp., Inc.*
No. 5:19-CV-192, 2019 WL 4478843, at *7 (N.D.W. Va. Sept. 18, 2019). .......... 26

*United States ex rel. Ruscher v. Omnicare, Inc.*
663 F. App'x 368 (5th Cir. 2016) .......... 1, 16, 23

*United States ex rel. Turner v. Michaelis Jackson & Assocs.*
No. 03-CV-4219-JPG, 2007 WL 496384, at *7 (S.D. Ill. Feb. 13, 2007) .......... 17

*United States v. Krizek*
111 F.3d 934 (D.C. Cir. 1997) .......... 16

*United States v. Krizek*
859 F. Supp. 5 (D.D.C. 1994) .......... 3

*United States v. Luce*
873 F.3d 999 (7th Cir. 2017) .......... 27

*United States v. Mackby*
261 F.3d 821 (9th Cir. 2001) .......... 19, 21

*United States v. Semrau*
693 F.3d 510 (6th Cir. 2012) .......... 17

*United States v. Wagoner*
No. 2:17-CV-478-TLS, 2018 WL 4539819, at *5 (N.D. Ind. Sept. 20, 2018) ......................... 17

*Universal Health Servs., Inc. v. United States ex rel. Escobar*
136 S. Ct. 1989, 2001, 195 L. Ed. 2d 348 (2016) ........................................................................ 1

*Universal Health Servs., Inc. v. United States*
136 S. Ct. 1989, 2001, 195 L. Ed. 2d 348 (2016) ...................................................................... 23

**Statutes**

31 U.S.C. § 3729(a)(1) ................................................................................................................ 30

45 C.F.R. § 162.1002 ..................................................................................................................... 3

# RELATORS' OPPOSITION

## I. INTRODUCTION

Defendant PVA's Motion for Summary Judgment revolves around a fundamental misconception that this is an "implied certification" case, in which the central question is one of "materiality" under the test laid out by the Supreme Court in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001, 195 L. Ed. 2d 348 (2016) (*Escobar*). To the contrary, this is a straightforward case of billing for services not rendered, in which "materiality" is indisputable. In other words, this is a case where the claims are "factually false," not "legally false." *See United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 373 (5th Cir. 2016) ("A claim is factually false when the information provided to the government for reimbursement is inaccurate.").

As detailed in Relators' Motion for Summary Judgment, and summarized again herein, Defendant PVA billed Medicare inaccurately for tens of thousands of "vascular laboratory" services. PVA billed those services to Medicare on the electronic version of the "CMS-1500" form, using Current Procedural Terminology (CPT) codes to identify the services performed. CPT codes, and their definitions, are published by the American Medical Association (AMA). *See Ohio Hosp. Ass'n v. Shalala*, 201 F.3d 418, 420 (6th Cir. 1999) ("The Rosetta Stone for the billing codes is found in an American Medical Association publication called 'Physicians' Current Procedural Terminology,' or 'CPT.'").

The CPT codes that PVA used to bill Medicare for its vascular studies explicitly require a physician's interpretation, and documentation of that interpretation in the form of a report. The interpretation and report are an integral part of the service, and the service is not complete without it. As one of PVA's former physicians, Dr. Lyssa Ochoa, testified: "You cannot bill for the physician's services until you have finalized that report." Ex. 8 (Ochoa Dep. Tr.), at 33:8-9 (Unless otherwise noted, all referenced exhibits are attached to the Declaration of Sarvenaz Fahimi, filed herewith).

Misbilling of CPT codes is one of the most common forms of FCA violations in the healthcare field. *See, e.g., United States ex rel. Emerson Park v. Legacy Heart Care, LLC*, No. 3:16-CV-0803-S, 2019 WL 4450371, at *9 (N.D. Tex. Sept. 17, 2019) ("Relator alleged that Remaining Defendants are liable under the FCA for 'upcoding [E&M] services to the highest level billing codes'—i.e., charging Medicare for unnecessary services or services that were never actually provided. A defendant charging the Government for services not actually provided is a staple FCA violation.").

PVA's internal policies confirm its understanding of these concepts. For example, its "Medical Documentation & Coding Compliance Pledge," states:

- PVA "subscribes to the documentation standards published by the Health Care Financing Administration **and the American Medical Association**";
- "All services provided should be documented and coded"; and
- "It should be understood that the patient's chart is the only defense against of [sic] a claim of fraud or abuse. **If it is not documented, it never happened and cannot be billed**."

Ex. 20, at DEF000694 (emphasis added); Appendix in Support of Opposition (App.) No. 20.

In 2017, recognizing that its billing practices were out of bounds, PVA finally decided to change its ways, and began waiting to bill until studies were actually completed. *See* App. Nos. 16, 46, 47. The minutes from an April 5, 2017 meeting of PVA's Vascular Lab Committee, describe the project as a "structure shift," designed to **"Allow[] for Compliance,"** by **"billing after study interpreted."** Ex. 30 at DEF007691 (emphasis added); App. No. 79. Unfortunately, after a few short months, faced with decreased cash flow, PVA abandoned the project, and returned to violating the law.

Evidence such as this, detailed herein, leaves no genuine issue in dispute for trial, and as argued in Relators' Motion for Summary Judgment, Relators respectfully submit that summary judgment is warranted in their favor; at a minimum, the evidence submitted herein requires denial of Defendant's motion for summary judgment.

## II. FACTUAL BACKGROUND

### A. PVA billed Medicare using an electronic version of the CMS-1500, and using CPT codes published by the American Medical Association.

PVA, like all Medicare providers, submitted its claims for reimbursement on a paper or electronic version of the CMS-1500 form. *See* App. No. 1; Ex. 4 [Britt Dep. Tr.] at 181:5-9. The CMS-1500 includes several explicit certifications by the provider, including that the claim submitted: (1) is "true, accurate and complete"; (2) "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment…"; and (3) that the "services on this form were medically necessary and personally furnished by me…" Ex. 40, p. 2; App. No. 2; *see also United States v. Krizek*, 859 F. Supp. 5, 7–8 (D.D.C. 1994) ("The submission of a claim on the HCFA 1500 form is a certification by the provider to the government of the correctness of the information submitted and, among other things, that the services were performed by the provider....'").

Use of the AMA's CPT codes on the CMS-1500 to bill Medicare for radiologic and other diagnostic procedures has been mandated by Federal Regulation since at least 2002. *See* 45 C.F.R. § 162.1002; *see also U.S. ex rel. Stewart v. Louisiana Clinic*, No. CIV.A. 99-1767, 2003 WL 21283944, at *3 (E.D. La. June 4, 2003); App. No. 4; Ex. 37 (Medicare Claims Processing Manual: Chapter 13 – Radiology Services and Other Diagnostic Procedures), § 10.1 ("Acceptable HCPCS codes for radiology and other diagnostic services are taken primarily from the CPT-4 portion of HCPCS. . . . Charges must be reported by HCPCS code."); *see also* Ex. 2 (Burrow Dep. Tr.), at 25:15-25:23.

### B. PVA used CPT codes that misrepresented its services on thousands of claims.

In the case of ultrasound services and other venous studies of the type at issue in this case, the 5-digit CPT codes encompass both a "professional" and "technical" component. *See* App. No. 5. The technical component is the performance of the service by the non-physician staff. *See* App. Nos. 5-6. The professional component is the interpretation of the results by a physician, and documentation of that interpretation in a report. These components can in some

circumstances be billed separately, using a two-character CPT "modifier." Billing the CPT code without a modifier, however, signifies that all components of the service have been performed. Doing so is sometimes referred to as billing on a "global" basis. App. Nos. 6-7.

PVA knowingly violated these rules by submitting thousands of global CPT codes for vascular studies without having performed the "professional" half of the service.

### C. The text of the AMA manual covering the CPT codes used by PVA requires completion of a written report reflecting the physician's interpretation.

The services at issue in this case fall within the umbrella of Radiology, and are primarily categorized as "Non-Invasive Vascular Diagnostic Studies," which the AMA's CPT manual describes as follows:

> Vascular studies include patient care required to perform the studies, supervision of the studies and interpretation of study results with copies for patient records of hard copy output with analysis of all data, including bidirectional vascular flow or imaging when provided.

Ex. 45, at 694; App. No. 21.

The CPT Manual also contains an introductory section pertinent to Radiology, entitled "Radiology Guidelines (Including Nuclear Medicine and Diagnostic Ultrasound)." Those Radiology Guidelines end with a paragraph entitled "Written Report(s)," which states: "A written report, signed by the interpreting physician, should be considered an integral part of a radiologic procedure or interpretation." Ex. 45 at 475; App. No. 23. The CPT Manual also contains an introduction to "Diagnostic Ultrasound" services, which reiterates the requirement of a written report: "Use of ultrasound, without thorough evaluation of organ(s) or anatomic region, image documentation, and final, written report, is not separately reportable." Ex. 45 at 495; App. No. 24.

Accordingly, the global CPT code (which includes the Professional Component) cannot be billed unless the physician's interpretation of study results has been completed, as reflected in a written report in the patient record. App. No. 25. PVA's Compliance Officer, Dr. Grady Alsabrook, admitted this in his deposition. *See* Ex. 1 (Alsabrook Dep. Tr.), 36:25-37:9 ("Q.

And when PVA is submitting a bill to Medicare for the global service of a vascular diagnostic study, would you agree with me that the steps that you describe for the professional component need to be documented somewhere? A. I would agree that the steps of the -- of the professional component, as I've previously stated, need to be documented, yes."); App. No. 25.

This rule is also reiterated in the Medicare Claims Processing Manual, Chapter 13 – Radiology Services and Other Diagnostic Procedures, in section 20.1, entitled "Professional Component (PC)": "The interpretation of a diagnostic procedure includes a written report." Ex. 37 at ALEXANDER000425; App. No. 4.

PVA ran afoul of this rule with respect to 24.2% of the vascular studies it performed and billed, tainting 29.5% of the reimbursement payments it received (including 29.89% of all payments from Medicare Part B). *See* Ex. 200 (Nye Supp. Report), at Exs. 2 & 4d; App. No. 26.

**D. PVA's excuses do not justify its violations.**

PVA admits that it frequently did not complete a signed, interpretive written report in its reporting system (MedStreaming) prior to billing for the services. App. No. 27. Its only defense is that in those cases, its physicians' written interpretations are reflected outside of its MedStreaming system, in the notes of patient visits that occurred on the same day as the vascular studies. App. No. 29.

As detailed in the following sections, there are two fundamental flaws with PVA's defense: (1) for many patients, there was no visit with a PVA physician—they were only referred to PVA for a study and interpretation, and returned to their own non-PVA physician for treatment; and (2) for patients who had both a visit with a PVA physician and a vascular study, the CPT manual is crystal clear that an interpretive note in a patient chart does not allow billing of *both* the patient visit (an "Evaluation and Management" code in CPT parlance) and the interpretation of a study; instead, a stand-alone report must be generated. *See* App. Nos. 30-31.

**1. PVA submitted 11,728 charges for which there was no report in MedStreaming, and no Evaluation and Management patient visit.**

Most of the individuals on which PVA conducts vascular studies are its own patients; i.e., PVA's physicians are managing the patient's care. App. No. 32. PVA also, however, conducts vascular studies that are ordered by non-PVA physicians, on patients who are under the care of those non-PVA physicians. App. No. 32.

For these "testing only" patients, there is nowhere besides a MedStreaming report that the PVA physicians' interpretations could appear. *See* App. Nos. 11-14; 30. As confirmed by PVA's Compliance Officer, Dr. Alsabrook, and its Technical Director, Barbara Burrow, there is no patient visit note, because there is no patient visit. Ex. 1 (Alsabrook Dep. Tr.), at 94:2-94:16; Ex. 2 (Burrow Dep. Tr.), at 119:24-120:23.

Patient JL provides an example of this category of false claims. *See* Exs. 24-26. JL was referred to PVA for testing by a non-PVA physician, Dr. Juan E. Rubio, in April 2015. *See* Ex. 26, at PVA0005257. PVA performed a Cerebrovascular Duplex Scan on JL on April 21, 2015. *Id.* at PVA0005255. The MedStreaming report from that study was not signed by a PVA physician until almost *two years later*, on March 9, 2017. *See* Ex. 24. Medicare, however, was billed for the service shortly after the scan, and PVA received $88.23 from Medicare on May 7, 2015. *See* Ex. 25. There is no reflection in PVA's medical record for JL of any patient visit, or any other interpretation of the scan, other than the 2017 MedStreaming report. *See* Ex. 26. Accordingly, for patients such as JL who did not have an E/M visit, there is nowhere besides the MedStreaming Report that a physician's interpretation could be reflected. App. No. 39.

Using PVA's medical record and billing data, Dr. Nye has calculated that PVA submitted 11,728 charges for vascular studies performed on "testing only" patients such as JL, for which there was no signed MedStreaming report at the time the charge was submitted. *See* Ex. 200 (Nye Supp. Report) at Ex. 2; App. No. 33. Dr. Nye's analysis is corroborated by manual review of 121 "testing only" patients produced by PVA in discovery, all of which follow the same pattern as JL. *See* Exs. 74-195; *see* also App. Nos. 13-14, 30, 32, 40; Ex. 53 (index of "testing

only" patients). Accordingly, these 11,728 claims (filtered down to Medicare-payors in Section III.E below) were false, as they represented that they had completed a vascular study when in fact no physician interpretation had occurred or been documented. App. No. 33.

**2. PVA double-billed where a patient visit and vascular study interpretation are reflected only in the patient visit note.**

The remainder of PVA's false charges—57,450 in total—were for patients that PVA was treating. In other words, PVA's physicians had a visit with the patient, and a vascular study was performed on the same day. Patient visits are referred to as "E/M Services," in billing parlance (short for "Evaluation and Management"). App. Nos. 41-43.

PVA's defense to its submission of vascular study charges without a completed MedStreaming report is that the substance of the physician's interpretation is reported not in MedStreaming, but in the note describing the E/M patient visit. App. No. 42. For example, PVA's expert, Melissa Scott, asserts that the following sentences, appearing at the end of a patient visit note, constitute a valid written report for purposes of billing a vascular study:


Current Plans

- Lower Extremity Arterial Doppler (Add On Today): discussed with patient and provided information.

Note: She has severe arterial insufficiency of the right leg. She needs an angiogram.

*Fig. 1: E/M note from Melissa Scott Report (Ex. 202), page 37.*

The CPT definitions, however, explicitly prohibit billing for both an E/M Service and a vascular study based on a brief note such as this in a patient chart, as follows:

> The actual performance and/or interpretation of diagnostic tests/studies ordered during a patient encounter are not included in the levels of E/M services. Physician performance of diagnostic tests/studies for which specific CPT® codes are available may be reported separately, in addition to the appropriate E/M code. The physician's interpretation of the results of diagnostic tests/studies (ie, professional component) *with preparation of a separate distinctly identifiable signed written report* may also be reported separately, using the appropriate CPT® code with modifier 26 appended.

Ex. 45, at p. 6 (emphasis added). In other words, a note such as this allows PVA to bill for an E/M Service, using the E/M CPT codes, but not a vascular study in addition. PVA can only bill for both if it has prepared a "separate distinctly identifiable signed written report," documenting its physicians' interpretation. App. No. 43. As discussed in Section II.E.3.d below, a variety of healthcare industry publications reemphasize this prohibition, evidencing PVA's recklessness and deliberate ignorance. App. No. 44.

PVA billed Medicare and TriCare payors for both an E/M CPT code and a global vascular study CPT code, without a separate, stand-alone report, on 55,566 occasions, and was reimbursed $5,625,548 for those false vascular studies, as detailed in Section III.E below.

Ironically, many of the patient files submitted by PVA in support of its Motion exemplify this practice of double-dipping. For example, as to the patient attached as Exhibit 1 to the Britt Declaration, PVA performed an E/M visit and vascular scan on December 14, 2016. PVA billed Medicare for the E/M visit on December 19 (*See* Fahimi Decl. ¶ 209), and for the vascular study on December 16. *Id.* As of December 19, there was still no "separate distinctly identifiable signed written report" of the vascular study in the record. PVA thus billed for the vascular study without having completed all of the requirements of the service described in the CPT manual. *See id.*[1]

**E. PVA acted "knowingly."**

**1. In 2017, PVA acknowledged that its practices were noncompliant.**

In 2017, PVA attempted to change its practices to make them compliant. App. Nos. 16, 46, 47, 79. Documents surrounding the 2017 compliance project demonstrate PVA's knowledge.

---

[1] In addition to these violations, PVA further improperly billed for vascular studies which were performed without a valid physician's order—as required by Medicare. As just one example, the complete patient file for patient JS is devoid of any documentation of a physician's order for a carotid study. *See* Ex. 174 to Fahimi Decl. at PVA0004269-PVA0004271. Although PVA billed Medicare without documentation of the physician orders in many cases, given the magnitude of the other false claims, Relators do not intend to pursue this specific category at trial. This evidence, however, is still probative of PVA's pattern and practice of knowingly submitting false claims.

For example, the minutes from a February 8, 2017 meeting of PVA's Vascular Lab Committee lay out PVA's three motives for the "[t]ransition to billing after studies are read," as: (1) "Ensure billed to appropriate physician," (2) "Ensure no audit requests for incomplete medical records," and (3) "Allow for docs to read each others stuff." Ex. 31 at DEF007698; App. No. 47. PVA thus knew its practices subjected it to the very problems now being addressed in this False Claims Act lawsuit: "incomplete medical records," payor audits, misbilling under the wrong provider, and inadequate patient care due to missing reports.

Similarly, the minutes from an April 5, 2017 meeting of PVA's Vascular Lab Committee, describe the project as a "structure shift," designed to **"Allow[] for Compliance," by "billing after study interpreted."** Ex. 32 at DEF007691 (emphasis added); *see also* Ex. 31 at DEF007085 ("The billing/coding process was changed this year. It is now required for a study to have a completed report to be signed and read before it is billed.").

Unfortunately, PVA's effort was short lived. At the outset of the project, PVA feared that by waiting to bill until services were complete, there could be a "35% change in vascular lab office related revenue." Ex. 32 at DEF007698. As of April, PVA could not find a way to get its physicians to timely read studies so that billing would not be delayed. *See id.* at DEF007703 ("Takes significantly longer to bill exam"); DEF007704 ("Still having issues with physicians signing studies."). By June, PVA had reverted to its prior practice of billing once the study was *ready* to be read. *See* Ex. 32 at DEF007700.

E-mails also indicate that before PVA began using MedStreaming in 2014, PVA may have actually been compliant, and awaited final reports before billing. For example, in a 2013 e-mail string between Barbara Burrow and several other PVA employees regarding a set of patients from PVA's Hondo location, Ms. Burrow wrote: "I looked at the studies that were scanned in. Most of them were not actually interpreted and cannot be billed until they are." Ex. 14 (emphasis added); *see also* Ex. 12 ("being held for billing awaiting the complete report.").

These stints of compliance, no matter how remote or brief, demonstrate that PVA was well aware of the billing rules, and knowingly violated them.

**2. PVA closely tracked delays in physician interpretation and reporting.**

PVA closely tracked delays in physician reporting of vascular studies, and knew that studies were not being read. App. No. 50. For example, in mid-2016, Barbara Burrow began running detailed reports from MedStreaming that showed monthly averages of, at PVA's very best, 4 days to complete studies. Ex. 22. Most months far exceeded that, including an average of 29 days in January 2016. *Id.*; *see also* App. No. 51; Ex. 29 at DEF022557 (emphasis added).

Even before 2016, PVA knew that it had a serious problem. For example, in a 2012 e-mail, a PVA employee, Monica Garcia, told Barbara Burrow that she "came across some unsigned reports by Dr. Sykes," and asked Ms. Burrow: "Does he have a lot of unsigned reports?" Ms. Burrow responded, "318," to which Ms. Garcia replied, "Yikes." Ex. 11. Similarly, in 2013, one of PVA's hospital accounts complained that "it appears we do not routinely receive dictations in a timely manner from your office on a regular basis. Sometime these studies are up to two weeks old before they reach our door." Ex. 15.

PVA has thus known for years that its vascular studies were not being timely read. Nonetheless, PVA continued its practice of billing as soon as the patient left the office.

**3. PVA ran afoul of its own compliance policies, the policies of its accreditation society, and general industry standards.**

**a. PVA's compliance policies.**

PVA did not follow its own written compliance policies. For example, PVA's compliance policies include a "Medical Documentation & Coding Compliance Pledge," pursuant to which PVA employees were to affirm: "*I understand that I am expected to adhere to the standards of documentation, medical coding, and conduct described in this pledge so that the Practice may fulfill its obligations to observe federal, state, and local laws affecting patients, colleagues, and institutional partners.*" Ex. 20 at DEF000693 (italics in original); *see also* App. No. 53. The second page of the Compliance Pledge includes a summary of the False Claims Act, followed by a paragraph on "Documentation," which begins:

> **Documentation.** The Practice subscribes to the documentation standards published by the Health Care Financing Administration **and the American Medical Association** as published and in effect January 1, 1998 and as periodically updated via CMS bulletins. **Procedural codes** as well as diagnosis codes **should only be selected which are supported in the chart**. . . . It should be understood that the patient's chart is the only defense against of [sic] a claim of fraud or abuse. **If it is not documented, it never happened and cannot be billed**.

*Id.* at DEF000694 (emphasis added); *see also* App. No. 54.

Attached to PVA's Compliance Pledge is its "Compliance Plan." Ex. 20 at DEF000696. The Compliance Plan includes an introductory section entitled "High Risk Areas," which highlights nine types of "illegal conduct," including the very three engaged in here: "1. Billing for items or services not actually rendered"; "3. Upcoding"; and "4. Duplicate billing." *Id.* at DEF000698; *see also* App. No. 57.

On the following page, the Compliance Plan reemphasizes the importance of "proper and timely documentation . . . **prior to billing** to ensure that only accurate and properly documented services are billed"; and that "procedures reported on the reimbursement claim be based on the medical record and other documentation." Ex. 20 at DEF000699 (emphasis added).

The Compliance Plan also includes a section specific to "diagnostic laboratory testing services." That section even more specifically confirms PVA's knowledge that, with respect to its vascular laboratory diagnostic services, it should "bill[] for laboratory services **only after they are performed**." *Id.* at DEF000700 (emphasis added). It further affirms the requirement that: "The CPT or HCPCS code used by the billing staff **accurately describes the services that was ordered by the physician and performed**." *Id.* (emphasis added).

PVA has a "Policies and Procedures Manual" that reiterates, and adds to, these concepts. Policy Number 03 states: "**According to Medicare and CPT general coding instructions**, 'a physician using CPT-4 terminology and coding should select the name of the procedure or service that most accurately identifies the service performed.'" Ex. 20 at DEF000717 (emphasis added). PVA's next policy, "Billing items or services not actually documented," is equally

damning of its practices, stating that "a claim should not be submitted by [PVA] if it is known that documentation does not exist and/or the service was not provided. Ex. 20 at DEF000718.

PVA also has a policy entitled "Misuse of provider identification numbers," confirming that, "[t]he performing physician is the physician that personally provides the service or supervision of the service. Services provided by anyone other than the physician whose PIN is claimed should <u>not</u> be claimed by [PVA]…" Ex. 20 at DEF000719 (emphasis added).

**b. ICAVL and ACR standards confirm that PVA's conduct was knowing and reckless.**

PVA is accredited by the Intersocietal Accreditation Commission (IAC, formerly known as ICAVL). App. No. 64. IAC accreditation is relevant to Medicare reimbursement. App. No. 65. The Local Coverage Determination covering Medicare in Texas, states in pertinent part:

> All non-invasive vascular studies must be:
> 1. Performed by a qualified physician; or
> 2. Performed under the general supervision of a qualified physician by a licensed* technologist who is certified in vascular technology; or
> 3. Performed in an **accredited** vascular laboratory.

Ex. 39 at ALEXANDER000076 (emphasis added). It continues: "Appropriate laboratory accreditation is limited to the American College of Radiology (ACR) Vascular Ultrasound Program, and the Intersocietal Accreditation Commission (IAC) . . . ." *Id.* IAC accreditation is thus one option through which providers can meet Medicare's requirements. PVA, having chosen to comply via IAC accreditation, is subject to its requirements.

The IAC standards, which are listed as required elements in PVA's accreditation application, are clear that physicians must review and interpret all studies within 48 hours, and generate a signed report within 4 business days of a patient visit. Ex. 35 at DEF005836; *see also* Ex. 49, §§ 3.1.2A ("A complete, accurate and signed final report must be generated [] as part of the record of examination"); 3.2A ("The report represents the final interpretation of the noninvasive examination and is part of the patient's legal medical record.").

The other Medicare-approved accreditation agency is the American College of Radiology (ACR). App. No. 67. ACR's guidelines also demonstrate the impropriety of PVA's practices. For example, the "ACR Practice Parameter for Communication of Diagnostic Imaging Findings," states, among other things: "An official interpretation (final report) by the interpreting physician must be generated and archived following any examination, procedure, or officially requested consultation regardless of the site of performance (hospital, imaging center, physician office, mobile unit, etc)." Ex. 23, p. 2. "The final report is the definitive documentation of the results of an imaging examination or procedure." *Id.*, p. 3; *see also* Ex. 51 at ALEXANDER001573 ("ACR Practice Parameter for Performing and Interpreting Diagnostic Ultrasound Examinations"); Exh. 52 at ALEXANDER001582 ("Practice Parameter for the Performance of Peripheral Venous Ultrasound Examination," which was "developed collaboratively by the [ACR], the American Institute of Ultrasound in Medicine (AIUM), the Society for Pediatric Radiology (SPR), and the Society of Radiologists in Ultrasound (SRU)").

The standards of PVA's Medicare-approved accreditation agencies thus put PVA on notice that its documentation practices fell far outside of appropriate.

**c. PVA's inpatient practices.**

Apart from at its own vast chain of offices, PVA also contracts with several local hospitals to perform vascular studies. App. No. 70. For services performed at those hospitals, PVA actually follows the rules, completing written reports within—at most—48 hours of the study being performed, and always billing <u>after</u> a final report is complete in MedStreaming. *Id.* As summarized by Barbara Burrow in an internal e-mail entitled "Hospital Process," billing does not occur "until after [a vascular study] has reached the Final stage which indicates it has been signed off by a physician." Ex. 18; *see also* Ex. 2 (Burrow Dep. Tr.), 118:6-8.

PVA also meticulously tracked its "Read Times" for interpretations of hospital-based studies, including identification and follow-up on any "Read Time Outliers," which it defined as "Routines read over 24 hrs after report completion." *See, e.g.,* Ex. 28 at DEF003022; *see also*

App. No. 71. PVA feared running afoul of these hospital guidelines. *See* Ex. 34 ("Cardiologist is upset and patient is pending discharge without a final read in the system."); App. No. 71.

Unfortunately, PVA only followed the rules when somebody else was watching. In its own practice, PVA's concerns with timeliness and appropriate billing practices evaporated.

**d. Industry standards, reflected in a variety of readily available sources, confirm that PVA knowingly violated proper billing practices.**

There is not a single industry publication that endorses, supports, or recommends PVA's billing practices. *See* App. No. 75. In contrast, there are innumerable industry publications that confirm the appropriate and legal methods of reporting and billing, which are consistent across all areas of specialty that utilize diagnostic ultrasound. *Id.* Sources as varied as articles from the American Institute of Ultrasound in Medicine (Ex. 42), American Urological Society (Ex. 43), and Society of Point of Care Ultrasound (Ex. 48), textbooks such as Surgical and Interventional Ultrasound (Ex. 44), Medicare publications (Ex. 47), and coding guides published by ultrasound equipment manufacturers (Ex. 41), all show that PVA knew, or acted in deliberate ignorance, of the billing and documentation requirements that it violated. PVA's own compliance expert, Melissa Scott, could not identify a single industry publication that was contrary to the guidance in publications such as these. *See* Ex. 202 (Scott Dep. Tr.), at 81:21-82:5.

**e. PVA's own expert, Dr. Collier, does not follow PVA's noncompliant reporting and billing practices.**

PVA's expert, Dr. Paul E. Collier, is a vascular surgeon in Pennsylvania. He owns and operates four vascular laboratories that perform vascular studies of the exact same type as PVA. App. No. 76. Dr. Collier, however, does not follow PVA's illegal billing practices. App. No. 77. Instead, he interprets and signs every vascular study within 24 hours, and never bills until he has done so. Ex. 6 (Collier Dep. Tr.), at 39:14-40:15; *see also* App. No. 77.

Dr. Collier also has never engaged in PVA's "double-dipping" practice of billing for both an E/M service and a vascular study without completing two separate, stand-alone reports, one for the visit, and one for the interpretation. *Id.* at 43:17-44:7, 49:22-50:4; *see also* App. No. 78.

Similarly, one of PVA's former physicians, Dr. Lyssa Ochoa, who now owns and operates her own vascular practice, confirmed that in her own practice, she never bills until she has read and signed her MedStreaming reports. Ex. 8 (Ochoa Dep. Tr.), at 32:25-33:9; *see also* App. No. 68. Even one of PVA's current physicians, Dr. Lois Fiala, agreed that "having an separate and distinct, or standalone, report is important to completing the professional component associated with ultrasound studies." Ex. 5 (Fiala Dep. Tr.), at 45:12-19.

**4. PVA risked patient health and safety**

The physician's interpretation and report is not only a billing requirement, it is a patient health imperative. Medicare does not reimburse for diagnostic tests used for "screening" purposes; i.e., patients must have a symptom or history that requires the vascular studies to be performed. *See* Ex. 39 (LCD L35397) at ALEXANDER000074; App. No. 72. And the sonographers who conduct the studies are not qualified or licensed to interpret the studies or diagnose problems. App. No. 72. Accordingly, without a physician's interpretation, a vascular study is meaningless, and puts patient health and safety at risk. PVA knows this, which is why, in the hospital context, as described above, PVA is essentially fully compliant with the rules and industry standards. App. No. 72. But even in the hospital context, PVA sometimes slips up, and the consequences can be dire, as demonstrated in a 2017 e-mail from Dr. Alsabrook to other PVA physicians, in which he describes how a "deficit in inpatient vascular lab documentation and signing" led to "a near miss to negatively affect patient care." Ex. 17; *see also* App. No. 73.

Though this is a pure billing fraud case, any suggestion that PVA's practices were "harmless error" should be disregarded. The components included in the AMA's CPT codes are required for good reason—not just to prevent fraud, but to ensure good patient care.

## III. ARGUMENT

### A. Summary Judgment under the False Claims Act.

The basic elements of an FCA violation are (1) a false statement or fraudulent course of conduct; (2) made "knowingly"; (3) that was material; and (4) that caused the government to pay

out money or to forfeit moneys due. *See United States ex rel. Longhi v. Lithium Power Technologies*, 575 F. 3d 458, 468 (5th Cir. 2009).

The FCA defines "knowingly" as acting with actual knowledge of falsity, with deliberate ignorance of the truth or falsity, or with reckless disregard of the truth or falsity. 31 U.S.C. § 3729(b). Congress intended for the FCA to apply to those who refuse "to learn of information which an individual, in the exercise of prudent judgment, had reason to know." *UMC Electronics Co. v. United States*, 43 Fed. Cl. 776, 793 (Fed. Cl. 1999) (quoting S. REP. No. 99-345, at 21 (1986)). "Reckless disregard" under the FCA is measured "without reference to the subjective intent of the defendant." *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997).

"Because the FCA is 'remedial,' its provisions are to be construed 'broadly to effectuate its purpose.'" *U.S. ex rel. Bias v. Tangipahoa,* 816 F.3d 315, 324 (5th Cir. 2016) (quoting *U.S. ex rel. Rigsby v. State Farm Fire Cas. Co.*, 794 F.3d 457, 468 (5th Cir. 2015)).

**B. PVA's bills were false.**

PVA argues that its claims were not false because no Medicare statute or regulation requires preparation of a written report. The argument misses the mark, because it assumes the framework of a "legally false" claim, rather than a "factually false" claim. As explained by the Fifth Circuit:

> FCA claims can be either legally false or factually false. *E.g., United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (recognizing factually false claims as "the paradigmatic case" and legally false claims as the "certification theory"). A claim is factually false when the information provided to the government for reimbursement is inaccurate. [Citation.] A claim is legally false when "a claimant ... falsely certifies compliance with [a] statute or regulation." *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997).

*United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 373 (5th Cir. 2016)

PVA's FCA violations are based first and foremost on the false information that it submitted on its CMS-1500 forms. Using a CPT code that misrepresents the services provided on a bill to Medicare is a factually "false" claim for purposes of the FCA, as it constitutes billing for services not performed, or misrepresenting the services performed. *See, e.g., U.S. ex rel.*

*Grubbs v. Kanneganti*, 565 F.3d 180, 192 (5th Cir. 2009) ("Also alleged are specific dates that each doctor falsely claimed to have provided services to patients and often the type of medical service or its Current Procedural Terminology code that would have been used in the bill."); *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013); *United States ex rel. Emerson Park v. Legacy Heart Care, LLC*, No. 3:16-CV-0803-S, 2019 WL 4450371, at *9 (N.D. Tex. Sept. 17, 2019) ("Relator alleged that Remaining Defendants are liable under the FCA for 'upcoding [E&M] services to the highest level billing codes'—i.e., charging Medicare for unnecessary services or services that were never actually provided. A defendant charging the Government for services not actually provided is a staple FCA violation."); *United States v. Wagoner*, No. 2:17-CV-478-TLS, 2018 WL 4539819, at *5 (N.D. Ind. Sept. 20, 2018); *United States ex rel. Turner v. Michaelis Jackson & Assocs.*, No. 03-CV-4219-JPG, 2007 WL 496384, at *7 (S.D. Ill. Feb. 13, 2007) ("relators have shown why the bill submitted to Medicare was false: it was billed pursuant to CPT 99213 rather than CPT 66984"); *Krizek*, 859 F. Supp. at 7–8.

As explained by the Sixth Circuit Court of Appeals in an opinion affirming the criminal conviction of a physician for Medicare fraud, though the CPT codes and their definitions are published by a private organization (the AMA), their misuse logically gives rise to legal liability. *See United States v. Semrau*, 693 F.3d 510, 530–31 (6th Cir. 2012). In *Semrau*, the defendant physician argued that "misuse of CPT codes cannot constitute criminal conduct because they are the product of a private organization and have not been formally promulgated by the government." *Id.* at 530. The Sixth Circuit disagreed, explaining as follows:

> As an initial matter, it seems clear that the CPT codes themselves create no laws or liability but are merely a government-sanctioned means of summarizing several pieces of information into a concise, standardized number. Congress directed the Secretary of Health and Human Services to "prescribe such regulations as may be necessary to carry out the administration of" Medicare, 42 U.S.C. § 1395hh(a)(1), and to "establish a uniform procedure coding system for the coding of all physicians' services," *id.* § 1395w–4(c)(5). The Secretary acted on this authority by adopting the CPT code set drafted by the AMA. 45 C.F.R. § 162.1002. Dr. Semrau's attorney himself acknowledged during the trial that CPT codes "are simply a shorthand way of incorporating the description of the service." Thus, when Dr. Semrau submitted a claim for "99312," he was

> effectively submitting a claim for the services associated with that number in the AMA's CPT code set, as defined above.
>
> It is illogical to suggest that a person could escape liability because a claim comes in the form of a number instead of the words directly associated with that number. This is particularly true for the statute in question because "[t]he broad language of § 1347 shows that Congress intended for this statute to include within its scope a wide range of conduct so that all forms of health care fraud would be proscribed, regardless of the kind of specific schemes unscrupulous persons may concoct." *United States v. Lucien,* 347 F.3d 45, 51 (2d Cir.2003). In short, § 1347 "is simply a fraud statute." *United States v. Franklin–El,* 554 F.3d 903, 911 (10th Cir.2009). "Although the health care fraud statute does not (and could not) specify the innumerable fraud schemes one may devise," *id.* at 910–11, it is difficult to imagine a more obvious way to commit healthcare fraud than billing for services not actually rendered. Indeed, this court and other circuits have previously upheld convictions for CPT "upcoding." [Citations].

*Id.* at 530–31.

When PVA billed using the global CPT codes, it was representing that it had completed a physician's interpretation, and a written report reflecting the physician's interpretation. Yet for 24.2% of its global billings, a PVA physician had not prepared and signed a final report in MedStreaming. PVA was thus falsely representing via submission of the global CPT codes that it had rendered the complete global service.

In response, PVA argues that in those instances its physicians' written reports exist outside of MedStreaming, in notes that accompany a visit. This defense fails for two reasons.

First, as detailed above in Section II.D.1, for "testing only" patients, there was no patient visit. Accordingly, the only place that a PVA physician could have documented their interpretation was in a MedStreaming final report. For 8,757 global CPT claims to Medicare, there was no patient visit, and no MedStreaming report. All of those claims are false.

Notably, PVA *admits* in its Motion that it has no defense to these "testing only" cases. Instead, PVA attempts to dismiss them as "a palpably low percentage of PVA's business." Mot. at 21. Because they "only account for 4.9%" of these tests, PVA argues that "[a]n error rate that low does not support an argument that PVA engaged in a fraudulent scheme to cheat the Government, and, in fact, supports the opposite conclusion." *Id.* This remarkable proposition—that false billings do not violate the FCA so long as they are a relatively small percentage of total

claims—is without support. The sole case that PVA cites on this point, *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1034 (D. Nev. 2006), makes the point that a low error rate would tend to negate the element of *scienter*. But a low rate of false billings is not probative of falsity itself.

In any event, PVA is using the wrong metric: its "error" rate is not 4.9%. Instead, the pertinent percentage is 24.2%: Across all vascular studies, whether "testing only" or testing plus E/M visit, PVA billed without a final interpretation 24.2% of the time, tainting 29.5% of the reimbursement payments it received (including 29.89% of all payments from Medicare Part B). *See* Ex. 200 (Nye Supp. Report), at Exs. 2 & 4d; App. No. 26. An "error rate" that high—a quarter of all tests—cuts against PVA's claim of mere negligence. Other than suggesting that it was merely negligent, PVA's motion includes no defense as to the "testing only" patients.

Second, as detailed above in Section II.D.2, for patients who had both a vascular study and an Evaluation and Management visit, the vascular study cannot be billed for in addition to the E/M code unless there is a separate, stand alone report reflecting a physician's interpretation. By billing for the vascular study on a global basis, PVA was representing that it completed the entire service described in the CPT manual, when it had not. These claims too are false.

In addition, the claims that PVA submitted under the wrong provider's name are false. PVA's practices and delays inevitably led to its bills representing the wrong "rendering" physician. App. No. 18. Billing under the wrong physician's name constitutes a false claim. *See United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001) ("a claim may be false even if the services billed were actually provided, if the purported provider did not actually render or supervise the service.") (citing *Peterson v. Weinberger,* 508 F.2d 45, 52 (5th Cir.1975)). With respect to 1,690 claims, PVA not only submitted global CPT codes when the physician had not completed and documented their interpretation, but PVA also billed under the wrong rendering physician. Those claims were false for purpose of the FCA.

In its Motion, PVA relies heavily on a vascular study case from the Western District of Michigan: *U.S. ex rel. Swafford v. Borgess Med. Ctr*., 98 F. Supp. 2d 822, 824 (W.D. Mich. 2000), *aff'd*, 24 F. App'x 491 (6th Cir. 2001). Though transpiring within the same specialty, the

alleged fraud at issue in *Swafford* is factually distinct from what is alleged here, and that distinction merely highlights the falsity of PVA's conduct. In *Swafford*, the relator did not allege that the physicians failed to complete a stand-alone report before billing, but that the physicians did not put sufficient thought and care into those reports. *Id.* at 826.

> Instead, plaintiff contends the physicians merely reworded and/or plagiarized the technician's or technologist's "worksheet" to prepare a physician's ultrasound report. Defendant physicians then billed the government through Champus, Medicare or Medicaid for these "interpretations" which, according to plaintiff, constituted mere plagiarism of the worksheet prepared by the technician/technologist.

*Id.* The relator argued that the physicians, instead of relying on the technologists' worksheets, were required to review and interpret all of the raw data and images in preparing their final reports. *Id.* at 829. The court disagreed, finding no enforceable requirement that the physician review the raw data instead of a technologist's summary of that data. *Id.* at 829-31.

Here, each of the three categories of PVA's false claims stands in stark contrast to *Swafford*:

First, as to the 11,728 claims for "testing only" patients, there was no report at all. Accordingly, there is no dispute about the quality of the interpretation, as there is no evidence of any interpretation having been done at all. *See, supra*, § II.D.1. Those claims thus fall squarely within the "actual falsehood" category that the court in *Swafford* found inapplicable. *See Swafford*, 98 F. Supp. 2d at 831-32 (explaining that the relator failed to present evidence amounting to a "factual claim as to whether defendants (at a minimum) actually performed some work by reading and/or reviewing work performed by the technician/technologists.").

Second, as to the 57,450 false claims for vascular studies performed in conjunction with E/M visits but without a stand-alone report, while there is nothing in the CPT code definitions that mandates an interpreting physician review the raw data as the relator asserted in *Swafford*, there *is* an explicit requirement that a "separate distinctly identifiable signed written report" be produced in order to bill for a vascular study on top of an E/M visit. *See, supra*, § II.D.2.

Third, as to the 1,690 false claims with the wrong rendering provider, such claims are factually false, and do not rely on any qualitative or subjective analysis. *See United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001).

In sum, *Swafford* boiled down to "plaintiff's disagreement with the qualitative nature and degree of review necessary for defendant physicians to claim to 'interpret'" vascular studies. 98 F. Supp. 2d at 833. Here, in contrast, PVA violated black-and-white billing rules, and falsely billed for services not rendered.

**C. PVA acted knowingly.**

PVA acted recklessly, in deliberate ignorance, and even with actual knowledge, that it was submitting false claims. *See, supra*, Section II.E.

As recently emphasized by the Fifth Circuit in an FCA case, "presence of an intent issue does not automatically preclude summary judgment; the case must be evaluated like any other to determine whether a genuine issue of material fact exists." *United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020) (quoting *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996)). In *Drummond*, the defendants argued that their "good-faith reliance on the CMS Manual creates a genuine fact dispute about whether they had the requisite mental state to violate the False Claims Act." *Id.* The Fifth Circuit rejected the argument, holding that "there is no plausible reading of the CMS Manual that could support the defendants' billing practices." *Id.*

So too here, there is no "plausible reading" of the CPT manual, or any Medicare guidance, that could justify PVA's practices. To the contrary, as detailed above in Sections II.E.3.d every Medicare and industry publication touching the issues makes clear that PVA's practices were out of bounds. Even PVA's own expert, Dr. Collier, does not follow PVA's practices. *See, supra*, § II.E.3.e. Most notably, as detailed in Section II.E.1, in 2017 PVA embarked on a short-lived "Compliance" project to increase the speed at which studies were read, and to **"Allow[] for Compliance," by "billing after study interpreted."** Ex. 30 at DEF007691 (emphasis added). PVA knew that its practices were not compliant.

In its Motion, PVA argues that it "has teams, committees, and processes in place to ensure that services provided by PVA physicians and staff are properly coded and billed. Those are not the actions of an entity that acts with reckless disregard or deliberate ignorance." Mot. at 20. The evidence, however, demonstrates that PVA's processes were designed to fail. For example, Martha McGee, PVA's Billing Supervisor, who has been with PVA for 14 years, testified that PVA's "Medical Documentation and Coding Compliance Pledge" did not look familiar to her. Ex. 9 (McGee Depo Tr.), at 20:2-11. Similarly, PVA's Compliance Officer, Dr. Alsabrook, testified that PVA does not actually engage in the internal billing audit procedure laid out in its Compliance Manual. Ex. 1 (Alsabrook Tr.), at 21:17-21. And when PVA's Vascular Lab Committee finally took up the issue in 2017, it abandoned the "Compliance" project within a matter of months. *See, supra*, § II.E.1. Accordingly, PVA's "teams, committees, and processes" demonstrate not that it acted innocently, but that it acted with full knowledge, or at least in reckless disregard or deliberate ignorance, of the billing requirements and its violations thereof.

PVA also argues that thousands of false billings are not significant, because "it is necessary to put into perspective the studies underlying those claims compared to PVA's business as a whole." Mot. at 20. Relators' expert, Dr. Nye, has done just that, as follows:

- 24.2% of all vascular studies were falsely billed without documentation of a physicians' interpretation (*see* Ex. 200 (Nye Supp. Report), at Ex. 2);
- 35.5% of all of PVA's patients who had a vascular study performed at PVA had at least one study falsely billed (*see id.*);
- 29.5% of the reimbursement payments PVA received (including 29.89% of all payments from Medicare Part B), were tainted by the false billings (*see id.* at Exs. 2 & 4d); and
- In contrast to PVA's outpatient Vascular Lab business, only 1.26% of its hospital-based business was tainted by false claims (*see id.* at Ex. 4.e.i).

Putting the numbers "into perspective" thus does not help disprove PVA's *scienter*. Instead, it shows that over a quarter of its vascular studies were misbilled. And it shows, as detailed above in Section II.E.3.c., that when a third party was watching—i.e., the hospitals with which it

contracted—PVA actually followed the rules, completing written reports within—at most—48 hours of the study being performed, and always billing after a final report is complete in MedStreaming. *See, supra*, § II.E.3.c.

**D. PVA's false statements were material.**

PVA next argues that its violations were not material, relying on the *Escobar* test. *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2001, 195 L. Ed. 2d 348 (2016). The *Escobar* materiality test, however, only applies to "implied certification" cases:

> Accordingly, we hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

*Id.*

As detailed above, this is not a case of "implied certification" or "legal falsity." *See United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 373 (5th Cir. 2016). Instead, it is a case of factual falsity, and billing for the wrong service, or services not rendered, is always "material" for purposes of the FCA. *See, e.g., U.S. ex rel. Sharp v. E. Oklahoma Orthopedic Ctr.*, No. 05-CV-572-TCK-TLW, 2009 WL 499375, at *6 (N.D. Okla. Feb. 27, 2009) ("[W]here the allegation is a factually false claim, any 'materiality' requirement would seem to be easily met in that the government paid a claim in a factually wrong amount, paid for a service that was not actually provided, or paid an amount greater than it should have based on the service actually provided.").

Moreover, even if analyzed under the framework of *Escobar*, PVA's submissions on the CMS-1500 forms meet the *Escobar* test. As recently explained by the Eleventh Circuit in a healthcare fraud FCA case dealing with skilled nursing facilities ("SNFs"):

> SNFs receive money from Medicare based on the services they provide. In this case, the SNFs indicated they had provided more services—in quantity and quality—than they, in fact, provided.

> Therefore, Medicare paid the SNFs higher amounts than they were truly owed. This plain and obvious materiality went to the heart of the SNFs' ability to obtain reimbursement from Medicare.

*Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020). The same is true of PVA: it indicated that it "had provided more services" than it had, and as a result, Medicare paid "higher amounts than they were truly owed." *See id.*

Even post-*Escobar*, the Fifth Circuit requires "proof only that the defendant's false statements could have influenced the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *U.S. ex rel. Harman v. Trinity Industries Inc.*, 872 F.3d 645, 661 (5th Cir. 2017). As detailed above, Medicare reimburses for services rendered based on charges submitted by providers on the CMS-1500 form, using CPT codes. The CPT codes determine the amount of money that Medicare reimburses the provider. There is no other mechanism or documentation that triggers Medicare's reimbursement. Accordingly, there can be no dispute that the CPT codes submitted by PVA "could have influenced the government's pay decision." *See id.*

Moreover, Medicare makes clear in various publications that it considers billing for services not rendered, and naming the wrong provider,[2] to be quintessential examples of fraud and abuse. For example, CMS publishes a manual for providers entitled "Medicare Fraud & Abuse: Prevent, Detect, Report," which reminds providers, among other things:

- "**When you submit a claim for services provided to a Medicare beneficiary, you are filing a bill with the Federal Government and certifying you earned the payment requested and complied with the billing requirements**."
- "Examples of improper claims include: . . . Billing codes that reflect [] a more expensive treatment than was provided. . . . Billing services not provided. . . . Billing separately for services already included in a global fee, like billing an evaluation and management service the day after surgery."

---

[2] A 2013 e-mail string also confirms that PVA knows its charges must be billed under the physician who actually read the study. *See* Ex. 16 ("Dr. Macris is the one who read the study, so the lab should be billed under him.").

- "'If you didn't document it, it's the same as if you didn't do it.' The same can be said for Medicare billing."

Ex. 204, at 11 (emphasis in original)

The Medicare Program Program Integrity Manual, Chapter 4 – Program Integrity, similarly provides a detailed list of "Examples of Medicare Fraud," including those at issue here:

- "Incorrect reporting of diagnoses or procedures to maximize payments;"
- "Billing for services not furnished and/or supplies not provided."
- "Misrepresenting dates and descriptions of services furnished or the identity of the beneficiary or the individual who furnished the services;"

Ex. 205, § 4.2.1. These publications confirm the materiality to Medicare of these practices.

PVA argues that the Government is aware of PVA's practices but has continued to pay PVA, and therefore its violations could not have been material. In support of its argument, PVA points to the fact that the Department of Justice investigated the allegations in Relators' complaint, including by issuing a subpoena, receiving documents, and having a meeting. Under PVA's logic, any non-intervened FCA case would fail the materiality test. This is illogical, and unsupported by caselaw. As repeatedly emphasized by the courts, a declination to intervene should not be construed as a comment by the government on the merits of a claim. *See United States ex rel. Atkins v. Mclnteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) (the United States' "absence from the fray" does not mean that the relator's claims lack merit); *United States ex rel. Chandler v. Cook County*, 277 F.3d 969, 974 n.5 (7th Cir. 2002), *aff'd,* 538 U.S. 119 (2003) ("there is no reason to presume that a decision by the Justice Department not to assume control of the suit is a commentary on its merits. The Justice Department may have myriad reasons for permitting the private suit to go forward including limited prosecutorial resources and confidence in the relator's attorney."); *United States ex rel. El-Amin v. George Washington University*, 533 F. Supp. 2d 12, 21-22 (D.D.C. 2008) ("assuming the government looked unfavorably upon each qui tam action in which it did not intervene would seem antithetical to the purpose of the qui tam

provision – to encourage private parties to litigate on behalf of the government . . . [and inaction cannot be seen] as evidence of how the government appraised the merits of the relator's case").

Moreover, PVA has submitted no admissible evidence of the government's *actual* knowledge. As the First Circuit explained on remand in *Escobar*, for purposes of materiality, there is a vast difference between the government being made aware of allegations, and having actual knowledge of fraud:

> [M]ere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance. Additionally, there is no evidence in the complaint that MassHealth, the entity paying Medicaid claims, had actual knowledge of any of these allegations (much less their veracity) as it paid UHS's claims. Because we find no evidence that MassHealth had actual knowledge of the violations at the time it paid the claims at issue, we need not decide whether actual knowledge of the violations would in fact be sufficiently strong evidence that the violations were not material to the government's payment decision so as to support a motion to dismiss in this case.

*United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016).

Moreover, PVA's argument is at odds with its overall insistence that it did nothing wrong, and that there exists no clear guidance, as explained in another post-*Escobar* decision:

> This Court doubts that the hospital industry would warmly welcome a rule that required the Government to cut off hospital funding whenever a qui tam action is filed or forfeit its right to seek reimbursement. "The Government does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be wrongdoing. To this day, defendants claim they did not have the requisite scienter to violate the FCA. All the evidence defendants have put forth in support of their scienter cuts against their materiality argument that the Government was aware of AKS/FCA violations as early as 2011 but nonetheless continued to pay claims." *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 2017 WL 4803911 (D. S.C. Oct. 23, 2017).

*United States ex rel. Longo v. Wheeling Hosp., Inc.*, No. 5:19-CV-192, 2019 WL 4478843, at *7 (N.D.W. Va. Sept. 18, 2019).

The cases PVA relies on only further highlight the important distinction between "implied certification" cases and factual falsity cases such as this. For example, in *United States ex rel. Cressman v. Solid Waste Services, Inc.*, No. 13-5693, 2018 WL 1693349 (E.D. Pa. April 6, 2018), the court emphasized:

> There are two categories of false claims under the FCA: a factually false claim and a legally false claim. A claim is factually false when the claimant misrepresents what goods or services it provided to the United States Government. Here, **Plaintiff does not allege a factually false claim, but rather asserts only a legally false claim**.

*Id.* at *4 (citations omitted; emphasis added). The court then reiterated in detail the framework established by *Escobar* for analyzing materiality in a *legally false claim*. *See id.* at *4-*7. That framework is wholly inapplicable here.

Moreover, the court's application of the *Escobar* test in *Cressman* is at odds with the Fifth Circuit's approach to materiality. Specifically, in *Cressman*, the court incorrectly treated the *Escobar* factors as required elements, stating: "[T]o meet the materiality requirement for his FCA claims, Plaintiff **must** present evidence that the Federal Agencies for whom Defendant performed waste pickup services **would not have paid** Defendant's claims had they known of the" underlying regulatory violation. *United States ex rel. Cressman v. Solid Waste Servs., Inc.*, No. CV 13-5693, 2018 WL 1693349, at *6 (E.D. Pa. Apr. 6, 2018) (emphasis added). This "would not have paid" standard was specifically rejected by the Fifth Circuit years ago, in *U.S. ex rel. Longhi Lithium Power Technologies*, 575 F.3d 458 (5th Cir. 2009), and reaffirmed post-*Escobar* in *U.S. ex rel. Harman v. Trinity Industries Inc.*, 872 F.3d 645, 661 (5th Cir. 2017) (requiring "proof only that the defendant's false statements could have influenced the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so.").

The next case relied upon by PVA, *United States v. Luce*, 873 F.3d 999 (7th Cir. 2017), is even more distinguishable than *Cressman*. Again, unlike this case, *Luce* was a false certification case. *Id.* at 1000. Moreover, the question of materiality in *Luce* did not revolve around the extent of government action or inaction following the filing of an FCA case. Instead, the government action that served as a basis for a finding of materiality was the defendant's suspension by HUD's Office of Inspector General, based on criminal indictments that preceded the FCA case by years. *See id.* at 1002-03. There are no parallels to be drawn between *Luce* and this case.

The government's declination in this case is simply irrelevant, as the *Escobar* test does not apply here. But even under the *Escobar* framework, PVA's claims to Medicare indicating that it "had provided more services" than it had, constitutes "plain and obvious materiality [that] went to the heart" of PVA's "ability to obtain reimbursement from Medicare." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020).

PVA's final argument regarding materiality is that because it *eventually* completed all of its reports, its violations are insignificant. This "no harm, no foul" argument is without legal support, and flies in the face of fundamental Medicare principles. Medicare pays for services rendered—past tense. The CMS-1500 form is clear that it is for billing services rendered—past tense. *See, e.g.,* Ex. 40, at p. 2 (certifying that the "services on this form were medically necessary and personally furnished by me…") (emphasis added).

Moreover, Medicare pays only for services that were medically necessary. It does not reimburse for diagnostic tests used for "screening" purposes; i.e., patients must have a symptom or history that requires the vascular studies to be performed. *See* Ex. 39 (LCD L35397) at ALEXANDER000074; App. No. 72. If a physician's interpretation is performed days, weeks, or months after an ultrasound, then the test must not have been necessary in the first place. As described above in Section II.E.4, without a physician's interpretation, a vascular study is meaningless, and puts patient health and safety at risk.

PVA's internal documents, and the testimony of its personnel, confirm the importance and materiality of performing the studies promptly, and not billing until interpretation was complete. For example, as detailed in Section II.E.1, in documents related to the 2017 compliance project, PVA's Vascular Lab Committee laid out three motives for the "[t]ransition to billing after studies are read," as (1) "Ensure billed to appropriate physician," (2) "Ensure no audit requests for incomplete medical records," and (3) "Allow for docs to read each others stuff." Ex. 31 at DEF007698; App. No. 47. PVA thus knew these issues were important, and even understood why. Similarly, PVA closely monitored its delays in physician read times, and

in the hospital context, is essentially fully compliant with the rules and industry standards. *See, supra,* § II.E.3.c; App. No. 72.

Any suggestion that PVA's practices were "harmless error" is both irrelevant, and simply wrong. Medicare pays only for services rendered, and for good reason—to prevent billing fraud, ensure medical necessity, and ensure good patient care.[3]

**E. PVA's claims caused the government to pay out significant moneys.**

PVA's final argument is that "Relators have put forth no evidence of the specific damages suffered by the Government." Mot. at 30. To the contrary, the amounts that PVA's false claims caused the government to pay out—i.e., damages—are detailed in the work of Relators' data expert, Dr. Nye, and summarized as follows.

**"Testing-Only":** As to the "testing only" patients, single damages as to federal payers total $820,893, on 8,757 false claims. *See* Ex. 207 (data extracted from Exhibits 10a and 10b of the Second Supplemental Report of Dr. Nye, with non-federal and non-Medicare payors filtered out[4]).

**"Double Dipping":** As to testing and E/M visit patients for which PVA submitted vascular study global CPT codes without a separate, stand-alone physician interpretation and report, single damages as to federal payers total $5,625,548, on 55,566 false claims. *See* Ex. 207 (data extracted from Exhibits 4d Supplemental and 11 of the Second Supplemental Report of Dr. Nye, with non-federal and non-Medicare payors filtered out).

---

[3] Similarly, PVA's argument under a "reverse false claims" theory fails as well. As the case PVA relies upon makes clear, "[t]he reverse false claims provision also imposes liability where a defendant concealed its obligation to return payments." *United States ex rel. Hendrickson v. Bank of America, N.A*., 343 F. Supp. 3d 610, 632 (N.D. Tex. 2018) (decided on motion to dismiss), *aff'd* 779 Fed. Appx. 250 (5th Cir. 2019) (citing United States ex rel. Ligai v. ETS-Lindgren Inc., No. H-112973, 2014 WL 4649885, at *12 (S.D. Tex. Sept. 16, 2014)). PVA is liable for reverse false claims because PVA knowingly concealed an obligation to return payments as evidenced by signing the reports months and even years later to conceal payments that should have been returned.

[4] These figures are based on conservative assumptions when filtering out non-Medicare-related payors from Dr. Nye's results. Accordingly, should the case proceed to trial, these figures may increase.

**Wrong Provider:** As to all of the vascular study charges in the "testing only" and "double dipping" categories, where PVA submitted a vascular study global CPT code under the name of a physician who did not ultimately read the study, single damages to federal payers total $167,870, on 1,690 false claims. *See* Ex. 207 (data extracted from Exhibits 9a and 9b of the Second Supplemental Report of Dr. Nye, with non-federal and non-Medicare payors filtered out).

Treble damages and statutory penalties on the foregoing figures are mandatory. *See* 31 U.S.C. § 3729(a)(1).

PVA's brief argument that it should receive an offset of the value of the technical component, is wrong for two reasons: First, this is not a traditional upcoding case where the provider rendered a complete service of one type, but billed for a complete service of another type. In that situation, the patient receives the benefit of a complete service, just a different type than what was billed for. Here, instead, PVA completed a partial service, but billed for a complete service. The technical component, standing alone, is a worthless service, as described in Sections I and II.B-C above. Though the technical component can be billed separately when another provider is performing the professional component, both still must be completed. Second, even if it were entitled to some offset for the value of the technical component, PVA has presented no evidence of the amount of that offset.

## IV. CONCLUSION

For the foregoing reasons, Relators respectfully request that the Court deny Defendant's Motion.

Dated: September 11, 2020

By: */s/ Justin T. Berger*

Justin T. Berger (*pro hac vice*)
Sarvenaz J. Fahimi (*pro hac vice*)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jberger@cpmlegal.com
sfahimi@cpmlegal.com

Wallace M. Brylak, Jr. (Bar No. 03283360)
BRYLAK LAW
15900 La Cantera Parkway, Suite 19245
San Antonio, Texas 78256
Telephone: (210) 733-5533
Facsimile: (210) 558-4804
wbrylak@brylaklaw.com

*Counsel for Relators*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of September, 2020, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Wallace M. Brylak, Jr.
Brylak & Associates
15900 La Cantera Pkwy, Suite 19245
San Antonio, TX 78256
wbrylak@brylaklaw.com

Sean McKenna
Mark A. Cole
Spencer Fane LLP
2200 Ross Avenue
Suite 4800 West
Dallas, TX 75201
smckenna@spencerfane.com
mcole@spencerfane.com

Stephen J. Romero
Jeff Wurzburg
Norton Rose Fulbright US LLP
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, TX 78205
stephen.romero@nortonrosefulbright.com
jeff.wurzburg@nortonrosefulbright.com

John M. Deck
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
John.deck@usdoj.gov

*/s/ Justin T. Berger*
Justin T. Berger