**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**UNITED STATES OF AMERICA ex rel. TIFFANY MONTCRIEFF, ROBERTA MARTINEZ, and ALICIA BURNETT,**

Plaintiffs,

vs.

**PERIPHERAL VASCULAR ASSOCIATES P.A.,**

Defendant.

Civil Action No. SA-17-CV-00317-XR

**APPENDIX IN SUPPORT OF RELATORS' OPPOSITION TO DEFENDANT PERIPHERAL VASCULAR ASSOCIATES' MOTION FOR SUMMARY JUDGMENT**

| Facts | Evidence |
|---|---|
| 1. PVA billed Medicare and other federal payers for vascular studies and E/M Services using the electronic version of the CMS-1500 form. | Declaration of Sarvenaz J. Fahimi in Support of Relators' Motion for Summary Judgment or in the Alternative, Partial Summary Judgment ("Fahimi Decl.") at ¶ 5; Ex. 4 to Fahimi Decl., October 10, 2019 Dep. Tr. of Katherine Britt at 181:1-9. |
| 2. The CMS-1500 includes several explicit certifications by the provider, including that the claim submitted: (1) is "true, accurate and complete"; (2) "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment…"; and (3) that the "services on this form were medically necessary and personally furnished by me…" | Fahimi Decl. ¶ 41; Ex. 40 to Fahimi Decl., CMS-1500 claim certification form;<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested.") |
| 3. PVA billed Medicare and other federal payers for vascular studies and E/M Services using CPT codes. | Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., June 5, 2020 Dep. Tr. of Grady Alsabrook, M.D. at 32:11-22; 40:22-41:2; 48:22-49:9;<br><br>Fahimi Decl. ¶ 4; Ex. 3 to Fahimi Decl., June 3, 2020 Dep. Tr. of John Gilpin at 22:15-24;<br><br>Fahimi Decl. ¶ 6; Ex. 5 to Fahimi Decl., June 4, 2020 Dep. Tr. of Lois Fiala, M.D. at 17:13-18:7 (testifying it is a "billing code"); 20:14-20:16 (testifying billing globally for ultrasound services);<br><br>*See also* Fahimi Decl. ¶ 55; Ex. 54 to Fahimi Decl., Compendium of patient files for patients who had an E/M office visit *and* related ultrasound studies, including corresponding billing data for both, evidencing double dipping). |
| 4. CPT codes are 5-digit codes, the meaning of which are described in the AMA's CPT manual.<br><br>Use of the AMA's CPT codes for radiologic and other diagnostic procedures billed to Medicare has been mandated by Federal Regulation since at least 2002. | Fahimi Decl. ¶ 6; Ex. 5 to Fahimi Decl., Dep. Tr. of Dr. Fiala at 39:12-41:16,<br>Ex. 2 to Fiala Dep, CPT 2017 Professional Manual;<br><br>*See also* Fahimi Decl. ¶ 46; Ex. 45 to Fahimi Decl., excerpts from the 2020 CPT Professional Manual;<br><br>Fahimi Decl. ¶ 56; Ex. 55 to Fahimi Decl., excerpts from the CPT 2000 Manual; |

| | |
|---|---|
| | Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., June 1, 2020 Dep. Tr. of Barbara Burrow at 25:15-25:23 ("Q. What is the CPT code that you reference? A. So a CPT code is the -- is a number or sometimes a number and a letter that represents the ultrasound procedure. So, like, a carotid is a 93880. Q. And those are codes that are recognized by payors such as Medicare. Is that correct? A. Correct.");<br><br>Fahimi Decl. ¶ 38; Ex. 37 to Fahimi Decl. (Medicare Claims Processing Manual: Chapter 13 – Radiology Services and Other Diagnostic Procedures), § 10.1 ("Acceptable HCPCS codes for radiology and other diagnostic services are taken primarily from the CPT-4 portion of HCPCS. . . . Charges must be reported by HCPCS code.");<br><br>*See also* Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., June 1, 2020 Dep. Tr. of Barbara Burrow at 25:15-25:23 ("A. So a CPT code is the -- is a number or sometimes a number and a letter that represents the ultrasound procedure. So, like, a carotid is a 93880. Q. And those are codes that are recognized by payors such as Medicare. Is that correct? A. Correct."). |
| 5. Each 5-digit code can also be further detailed using a 2-character "modifier" code—the meanings of which are also described in the AMA's CPT manual. Pertinent here, some of the modifiers indicate that only part of the service described by the 5-digit code has been performed. In the case of ultrasound services of the type at issue in this case, the 5-digit CPT codes encompass both a "professional" and "technical" component, each of which can be billed for using a 2-character modifier. | Fahimi Decl. ¶ 5; Ex. 4 to Fahimi Decl., Britt Dep. Tr. at 84:13-84:18 (stating ". . .Global billing means you bill both, the professional and the technical component combined. You don't put a modifier. You don't separate billing a technical and billing a professional, so you would -- we bill it globally. We bill it as one CPT code without modifiers.");<br><br>Fahimi Decl. ¶ 4 Ex. 3 to Fahimi Decl. Gilpin Dep. Tr. at 24:14-25:5 (testifying that global billing is used by PVA and PVA gets reimbursed under one number for the professional and technical component)<br><br>*See also* Fahimi Decl. ¶ 197; Ex. 196 to Fahimi Decl., Expert Report of James Alexander, M.D. at p. 8. |
| 6. When both the technical and professional components have been | |

| | |
|---|---|
| completed, the provider may simply use the 5-digit CPT code, with no modifier. Doing so is sometimes referred to as billing on a "global" basis. | Fahimi Decl. ¶ 4; Ex. 3 to Fahimi Decl. Gilpin Dep. Tr. at 24:14-25:5 (testifying that global billing is used by PVA and PVA gets reimbursed under one number for the professional and technical component);<br><br>Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., Dr. Alsabrook Dep. Tr. at 30:5-15 (testifying ultrasound includes both the technical and professional components, and when both are done by PVA it is billed globally), 32:11-22, and Ex. 2 to Dr. Alsabrook Dep, CPT 2017 Professional Manual, (testifying each five-digit code has test it is indicated for billing). |
| 7. For all vascular studies performed in its vascular laboratories, PVA billed using the "global" CPT code, without modifier. | Fahimi Decl. ¶ 4; Ex. 3 to Fahimi Decl., Gilpin Dep. Tr. at 24:14-25:5 (testifying that global billing is used by PVA and PVA gets reimbursed under one number for the professional and technical component);<br><br>Fahimi Decl. ¶ 5; Ex. 4 to Fahimi Decl., Britt Dep. Tr. at 84:13-84:18 (stating "at Global billing means you bill both, the professional and the technical component combined. You don't put a modifier. You don't separate billing a technical and billing a professional, so you would -- we bill it globally. We bill it as one CPT code without modifiers.")<br><br>*See also* Decl. ¶ 9; Ex. 8 to Fahimi Decl., June 2, 2020 Dep. Tr. of Lyssa Ochoa, M.D., former PVA vascular surgeon at 26:9-11. |
| 8. The global CPT codes used by PVA require completion of a written report reflecting the physician's interpretation | Fahimi Decl. ¶ 5; Ex. 4 to Fahimi Decl., Britt Dep. Tr. at 74:16-19 (testifying physician completes a separate written report);<br><br>Fahimi Decl. ¶ 6; Ex. 5 to Fahimi Decl. Dr. Fiala Dep. Tr. at 32:9-33:3 (testifying that Medstreaming provides a time stamp signature for a physician to signify completion of an ultrasound report), 44:12-19 (testifying that a separate and distinct standalone report is needed for completing the professional component);<br><br>Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 150:1-14 (testifying that in order to avoid audits PVA needed to ensure there was "some sort of document with a signature on it" summarizing the ultrasound interpretation); |

| | |
|---|---|
| | Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., Dr. Alsabrook Dep. Tr. at 36:8-23, and Ex. 2 to Dr. Alsabrook Dep., CPT 2017 Professional Manual (testifying professional component must be documented);<br><br>Fahimi Decl. ¶ 4; Ex. 3 to Fahimi Decl., Gilpin Dep. Tr. at 29:2-13 (testifying that physicians do "sign off" on medstreaming);<br><br>*See also* Fahimi Decl. ¶ 9; Ex. 8, June 2, 2020 Dep. Tr. of Lyssa Ochoa, M.D., former PVA physician describing her current clinic policy using same database at 30:18-33:9 ("So once a registered vascular tech completes the preliminary findings, could you just describe for me what the next steps are in your interpretation and finalizing those scans? A. Once the RVT has completed their study, they will write a preliminary conclusion. The physician will review the study, the images themselves, and edit or change any of the interpretations that they see fit. And then, as you mentioned, we sign off, which means we finalize it and our name gets attached to the bottom of that study. Q. And that signing off you just mentioned, is that what you're saying you use MedStreaming to do? A. Correct. Q. So that would be considered like a standalone report for the scan. Is that correct? A. Correct. Q. And do you have any understanding of at what point or when those services for ultrasounds that are conducted at SAVE are considered complete for purposes of billing globally, as you mentioned, to Medicare? A. They are complete once the physician has finalized the report. Q. That same report we just talked about through MedStreaming. Correct? A. Correct. Q. So based on what you're saying, at your current practice at SAVE do you ever bill for the global service, which would include the professional component related to ultrasound services at SAVE, before that final report is signed that you just mentioned? A. No. Q. And why is that? A. You cannot bill for the physician's services until you have finalized that report.") (emphasis added); |

| | |
|---|---|
| | *See also* Fahimi Decl. ¶ 46; Ex. 45 to Fahimi Decl., excerpts from the 2020 CPT Professional Manual;<br><br>Fahimi Decl. ¶ 56; Ex. 55 to Fahimi Decl., excerpts from the CPT 2000 Manual; |
| 9. Other than for a brief period in early 2017, described below, PVA billed vascular studies using "global" CPT codes, without modifier, regardless of whether a final report had been generated and signed by an interpreting physician. | Fahimi Decl. ¶ 6; Ex. 5 to Fahimi Decl. at Dr. Fiala Dep. Tr. at 44:12-19 (testifying that a separate and distinct standalone report is needed for completing the professional component), Dr. Fiala Dep. Tr. 62:7-67:23, Exs. 4, 5, 6 to Dr. Fiala Dep. including patient chart, final report of scan and bill submission to Medicare (testifying that the ultrasound study for the patient referenced in Exs. 4-6 was signed two years after the scan was completed and no signature was in the patient chart);<br><br>Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 49:16-50:18 (testifying that PVA physician does not put a note in patient charts where referring physician orders only an ultrasound), Ex. 1 to Burrow Dep. including a PVA patient file;<br><br>*See* Fahimi Decl. ¶¶ 57-196; Exs. 56-195, PVA patient charts and corresponding billing information. |
| 10. For 24.2% of vascular studies billed by PVA to Medicare, PVA used "global" CPT codes, without modifier, despite no final report having been generated and signed in the MedStreaming system by an interpreting physician. | Fahimi Decl. ¶ 201; Ex. 200 to Fahimi Decl., July 8, 2020 Supplemental Report of Zachary Nye, PhD. at p. 2-3, Exs. 2 and 4d of Supp. Report (percentage calculated of false billings for total payments in PVA system data for imaging);<br><br>*See, e.g.,* Fahimi Decl. ¶¶ 57-196; Exs. 56-195, PVA patient charts and corresponding billing information. |
| 11. The PVA physicians' interpretations of vascular studies may be reflected in one or both of two places: (1) a final, electronically signed MedStreaming report; and (2) an "encounter note" in the AllScripts Electronic Medical Record system reflecting a patient visit with a PVA physician, electronically signed by the PVA physician. | Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., Dr. Alsabrook Dep. Tr. at 94:2-16 (testifying that final report in Medstreaming and E&M note are only locations physicians at PVA document interpretation of imaging). |

| | |
|---|---|
| 12. Some of the individuals on which PVA performed vascular studies were referred to PVA only for the studies, and not for evaluation, management, or treatment. PVA referred to these as "testing only" patients. | Fahimi Decl. ¶ 11; Ex. 10 to Fahimi Decl., Hembling Dep. Tr. at 32:20-33:11 (testifying some patients are referred to PVA by treating physicians for testing only);<br><br>Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 29:24-30:9 (testifying "if it is a testing only and it is not seeing one of our physicians and it comes into our clinic, they're required to have an order from the doctor sending them.");<br><br>*see also* Fahimi Decl. ¶ 4; Ex. 3 to Fahimi Decl. Gilpin Dep. Tr. at 57:15-23 (testifying that patients can be referred to PVA with an "order to be seen to either do a direct study or a consult.")<br><br>*See, e.g.,* Fahimi Decl. ¶¶75-196; Exs. 74-195, PVA testing only patient charts and corresponding billing information;<br><br>Fahimi Decl. ¶ 54; Ex. 53 to Fahimi Decl., Compendium of testing only patients. |
| 13. "Testing only" patients did not receive E/M Services from PVA. | Fahimi Decl. ¶ 11; Ex. 10 to Fahimi Decl., Hembling Dep. Tr. at 32:20-33:11 (testifying some patients are referred to PVA by treating physicians for testing only);<br><br>Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 29:24-30:9 (testifying "if it is a testing only and it is not seeing one of our physicians and it comes into our clinic, they're required to have an order from the doctor sending them.");<br><br>*see also* Fahimi Decl. ¶ 4; Ex. 3 to Fahimi Decl. Gilpin Dep. Tr. at 57:15-23 (testifying that patients can be referred to PVA with an "order to be seen to either do a direct study or a consult.");<br><br>*See also* Fahimi Decl. ¶¶75-196; Exs. 74-195, PVA testing only patient charts and corresponding billing information;<br><br>Fahimi Decl. ¶ 54; Ex. 53 to Fahimi Decl., Compendium of testing only patients. |

| | |
|---|---|
| 14. With respect to "testing only" patients, there are no encounter notes in AllScripts reflecting a physician visit or physician interpretation of vascular studies. | Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 49:16-50:18 (testifying that PVA physician does not put a note in patient charts where referring physician orders only an ultrasound), Ex. 1 to Burrow Dep. including a PVA patient file;<br><br>*See also* Fahimi Decl. ¶¶75-196; Exs. 74-195, PVA testing only patient charts and corresponding billing information;<br><br>Fahimi Decl. ¶ 54; Ex. 53 to Fahimi Decl., Compendium of testing only patients. |
| 15. The CPT definitions explicitly prohibit billing for both an E/M Service and a vascular study based on a note such as this in a patient chart. | Fahimi Decl. ¶ 6; Ex. 5 to Fahimi Decl., Dr. Fiala Dep. Tr. at 55:4-15, 58:3-14 (testifying that all staff receive Medical Documentation and Coding Pledge at PVA, including section on "Duplicate Billing"), Ex. 3 to Fiala Dep., PVA Medical Documentation and Coding Pledge, including policy stating, "Duplicate billing occurs when a claim containing CPT and/or HCPCS codes defining a particular medical service is submitted more than once to a primary or secondary payor.";<br><br>Fahimi Decl. ¶ 5; Ex. 4 to Fahimi Decl., Britt Dep. Tr. at 126:25-127:13 (testifying that CPT codes are derived from the CPT "manual".);<br><br>Fahimi Decl. ¶ 46; Ex. 45 to Fahimi Decl., excerpts from the CPT 2020 Professional Manual;<br><br>Fahimi Decl. ¶ 56; Ex. 55 to Fahimi Decl., excerpts from the CPT 2000 Manual;<br><br>Fahimi Decl. ¶ 198; Ex. 197 to Fahimi Decl., July 8, 2020 Supplemental Report of James Alexander, M.D. at pages 20-21, Ex. 10 of Supp. Report, excerpts of CPT 2017 Professional Manual, Ex. 14 to Supp. Report, article from The Code: The official Medical Coding Newsletter of Miramed;<br><br>Fahimi Decl. ¶ 207; Ex. 206 to Fahimi Decl., July 21, 2020 Dep. Tr. of James Alexander, M.D. at 158:18-25 (testifying that the AMA and CPT worked together in formulating the CPT Manual); |

| | |
|---|---|
| | *See also* Fahimi Decl. ¶ 8; Ex. 7 to Fahimi Decl., July 23, 2020 Dep. Tr. of PVA expert Melissa Scott, CPC, CHC, CHIAP at 81:21-82:5; Scott Dep. Exs. 5-14 (testifying to authorities stating a stand-alone report is required, attached to Supp. Report of Dr. Alexander—Q. So I understand what you're saying, and I'm not asking you if they're authoritative. What I'm asking is if you're aware of any publication or articles that would be contrary to this, to what we just went over? A. I am not -- MR. COLE: Object to the form. THE WITNESS: Sorry. A. I am not aware of anything to the contrary, nor am I aware of anything that states otherwise. );<br><br>and Fahimi Decl. ¶ 7; Ex. 6 to Fahimi Decl., Dr. Collier Dep. Tr. at 43:17-44:7, 44:8-45:9; 49:22-50:4<br><br>("Q. So the vast majority of your services at the vascular lab, you have a patient visit and then that same day they have a scan or multiple scans performed? A. Correct. Q. And you bill for both the -- an E/M code and for the imaging. Correct? A. Correct. Q. And in all those cases where you bill for both an E/M code and an imaging code, by the time your company bills the payer, there's both a signed note in the history and physical EMR and there is a signed vascular lab report. Correct? [Objection] A. Correct. Since we went electronic, three or four years ago, yes.")<br><br>("BY MR. BERGER: Q. And prior to that time, was your practice different as far as the timing of billing, vis-à-vis the signing of reports? A. I'd have to say it probably was because I would dictate my report sort of through the hospital system. And, basically, we used their transcriptionist to do that. And if the patient came, I would fill out like a superbill and give it to my office manager, who did the billing. So before I signed off, I'm sure those bills were going out. Q. When you say you would dictate the report, you would dictate both the history and physical report and the vascular lab report? A. Yes, sir. Q. And did that result in two separate reports or just one report? A. Two separate reports. Q. Were there -- |

| | |
|---|---|
| | what would you call those separate reports?<br>A. Separate reports, not to sound funny.<br>Q. What was the name for the first one, what was the name for the second one? A. Well, one was, obviously, the office visit, whatever you want to call it, medical records. The other was the vascular lab report.")<br><br>("Q. [] So for your patients where you were doing both an evaluation and management visit and a scan on the same day, you can't think of any situation where you did not dictate and sign the two separate reports?<br>A. Correct. Yeah. The vascular lab and the medical history and physical were two different things.").<br><br>*See, e.g.,* Fahimi Decl. ¶¶57-74; Exs. 56-73, PVA patient files including patients seen for office visit as well as ultrasound studies;<br><br>*See also* Fahimi Decl. ¶ 55; Ex. 54 to Fahimi Decl., Compendium of patient files for patients who had an E/M office visit and related ultrasound studies, including corresponding billing data for both, evidencing double dipping). |
| 16. In 2017, PVA attempted to modify its practices to ensure that bills for vascular studies were not submitted until a final report in MedStreaming was generated and signed by a PVA physician. | Fahimi Decl. ¶ 4; Ex. 3 to Fahimi Decl., Gilpin Dep. Tr. at 35:24-36:9, 42:14-45:7 (testifying there was a change to policy), Ex. 1 to Gilpin Dep. including email from Barbara Burrow to Brian Hembling with attachments including "Vascular Lab Billing Process Change" and other attachments;<br><br>Fahimi Decl. ¶ 11; Ex. 10 to Fahimi Decl., Hembling Dep. Tr. at 55:6-56:8, 59:18-61:21 (testifying a change was made by the compliance committee where bills for studies could not be submitted until a final report was generated), Ex. 4 to Hembling Dep., email from Barbara Burrow to Brian Hembling with attachments including document providing, "Goal . . . The billing/coding process was changed this year. It is now required for a study to have a completed report to be signed and read before it is billed.");<br><br>Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 103:17-104:12, 108:21-110:9 (testifying "for a little bit we were |

| | |
|---|---|
| | billing and coding after the report was signed and read."), Ex. 8 to Burrow Dep., May 30, 2017 email from Barbara Burrow to Brian Hembling with attachments including "Vascular Lab Billing Process Change" documents. |
| 17. After several months, PVA returned to its prior practice of billing for the global service upon completion of the technical component, regardless of whether a final MedStreaming report had been generated and signed. | Fahimi Decl. ¶ 11; Ex. 10 to Fahimi Decl., Hembling Dep. Tr. at 62:11-63:19 (testifying the change to billing policy was no longer in place sometime in 2017 or 2018). |
| 18. For certain tests, during some of the pertinent time period, PVA utilized a "pool" reading system, pursuant to which any number of PVA physicians could review and sign MedStreaming reports, irrespective of the physician name that appeared on the charge to a payer. | Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 122:13-123:18, Ex. 8 to Burrow Dep., (referring to portion of exhibit 8 stating "physicians were having problems reading reports in a timely fashion" and testifying that document referencing "read times" and "office read groups" meant that PVA "can assign to a group of doctors where they can all see it, and the first one who gets to it can read and sign off.");<br><br>Fahimi Decl. ¶ 6; Ex. 5 to Fahimi Decl., Dr. Fiala Dep. Tr. at 72:21-73:24, Ex. 7 to Fiala Dep., including May 30, 2017 email with attachments and "read times," (testifying that PVA created read groups.) |
| 19. ICAVL certification helps market the quality of PVA, especially for hospitals. The certification is a selling point and ". . .good reminder to make sure that you meet certain standards." | Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 71:15-72:2 (testifying ICAVL is a ". . . good reminder to make sure that you meet certain standards");<br><br>*see also* Fahimi Decl. ¶ 6; Ex. 5 to Fahimi Decl., Dr. Fiala Dep. Tr. at 52:4-53:14 (testifying ICAVL is used for "promoting our group for marketing purposes.");<br><br>Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., Dr. Alsabrook Dep. Tr. at 22:9-18, 86:2-87:8 (testifying he has been the PVA Compliance Officer since 2016 and is "You know, I actually do not know much about ICAVL . . .") |

| | |
|---|---|
| | *See also* Fahimi Decl. ¶ 28; Ex. 27 to Fahimi Decl., PVA website excerpt. https://pvasatx.com/about-us/about-pva/ (PVA marketing the certification on PVA website) |
| 20. PVA's "Medical Documentation & Coding Compliance Pledge," purportedly applicable to all PVA employees, states:<br>• PVA "subscribes to the documentation standards published by the Health Care Financing Administration and the American Medical Association";<br>• "All services provided should be documented and coded"; and<br>• "It should be understood that the patient's chart is the only defense against of [sic] a claim of fraud or abuse. If it is not documented, it never happened and cannot be billed." | Fahimi Decl. ¶ 21; Ex. 20 to Fahimi Decl., PVA Medical Documentation & Coding Compliance Pledge at DEF000694;<br><br>*See also* Fahimi Decl. ¶ 9; Ex. 8, June 2, 2020 Dep. Tr. of Lyssa Ochoa, M.D., former PVA physician describing her current clinic policy using same database at 30:18-33:9 ("So once a registered vascular tech completes the preliminary findings, could you just describe for me what the next steps are in your interpretation and finalizing those scans? A. Once the RVT has completed their study, they will write a preliminary conclusion. The physician will review the study, the images themselves, and edit or change any of the interpretations that they see fit. And then, as you mentioned, we sign off, which means we finalize it and our name gets attached to the bottom of that study. Q. And that signing off you just mentioned, is that what you're saying you use MedStreaming to do? A. Correct. Q. So that would be considered like a standalone report for the scan. Is that correct? A. Correct. Q. And do you have any understanding of at what point or when those services for ultrasounds that are conducted at SAVE are considered complete for purposes of billing globally, as you mentioned, to Medicare? A. They are complete once the physician has finalized the report. Q. That same report we just talked about through MedStreaming. Correct? A. Correct. Q. So based on what you're saying, at your current practice at SAVE do you ever bill for the global service, which would include the professional component related to ultrasound services at SAVE, before that final report is signed that you just mentioned? A. No. Q. And why is that? A. You cannot bill for the physician's services until you have finalized that report.") (emphasis added). |
| 21. The services at issue in this case fall within the umbrella of Radiology, and are primarily categorized as "Non-Invasive | Fahimi Decl. ¶ 198; Ex. 197 to Fahimi Decl., July 8, 2020 Supplemental Report of expert Dr. Alexander at p. 635. |

| | |
|---|---|
| Vascular Diagnostic Studies," which the AMA's CPT manual describes as follows:<br><br>"Vascular studies include patient care required to perform the studies, supervision of the studies and interpretation of study results with copies for patient records of hard copy output with analysis of all data, including bidirectional vascular flow or imaging when provided."<br><br>Dr. Alsabrook agreed that this paragraph describes "the basic requirements for billing any noninvasive vascular diagnostic study." | Fahimi Decl. ¶ 46; Ex. 45 to Fahimi Decl., excerpts from 2020 CPT Professional Manual;<br><br>Fahimi Decl. ¶ 56; Ex. 55 to Fahimi Decl., excerpts from the CPT 2000 Manual;<br><br>Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., Dep. Tr. of Dr. Alsabrook at 33:21-34:10. |
| 22. Typically, and in PVA's case, the technical component of these studies is performed by a technologist, not a physician. Only a physician may perform the interpretation, analysis, and report aspects—i.e., the professional component—of the services. These descriptions of technical component, professional component, and global billing are not disputed, as evidenced by their equivalent description in the report of PVA's expert, Melissa Scott. | Fahimi Decl. ¶ 203; Ex. 202 to Fahimi Decl., June 23, 2020 PVA Expert Report of Melissa Scott, CPC, CHC, CHIAP at ¶¶29-30 of Report;<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested.");<br><br>Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes "incorrect reporting of diagnoses or procedures in order to maximize payments" and billing for services not provided.) |
| 23. The CPT Manual also contains an introductory section pertinent to Radiology, entitled "Radiology Guidelines (Including Nuclear Medicine and Diagnostic Ultrasound)." Those Radiology Guidelines end with a paragraph entitled "Written Report(s)," which states:<br><br>"A written report, signed by the interpreting physician, should be considered an integral part of a radiologic procedure or interpretation." | Fahimi Decl. ¶ 46; Ex. 45 to Fahimi Decl., excerpts from 2020 CPT Professional Manual;<br><br>Fahimi Decl. ¶ 56; Ex. 55 to Fahimi Decl., excerpts from the CPT 2000 Manual;<br><br>Fahimi Decl. ¶ 198; Ex. 197 to Fahimi Decl., Alexander Supp. Report at Ex. 14 & p. 455;<br><br>*See also* Fahimi Decl. ¶ 5; Ex. 4 to Fahimi Decl., Britt Dep. Tr. at 126:25-127:13 (testifying that CPT codes are derived from the CPT "manual".).<br><br>*See also* Fahimi Decl. ¶ 9; Ex. 8 to Fahimi Decl., June 2, 2020 Dep. Tr. of Lyssa Ochoa, M.D., former PVA physician describing her current clinic policy using same database at |

| | |
|---|---|
| | 30:18-33:9 ("So once a registered vascular tech completes the preliminary findings, could you just describe for me what the next steps are in your interpretation and finalizing those scans? A. Once the RVT has completed their study, they will write a preliminary conclusion. The physician will review the study, the images themselves, and edit or change any of the interpretations that they see fit. And then, as you mentioned, we sign off, which means we finalize it and our name gets attached to the bottom of that study. Q. And that signing off you just mentioned, is that what you're saying you use MedStreaming to do? A. Correct. Q. So that would be considered like a standalone report for the scan. Is that correct? A. Correct. Q. And do you have any understanding of at what point or when those services for ultrasounds that are conducted at SAVE are considered complete for purposes of billing globally, as you mentioned, to Medicare? A. They are complete once the physician has finalized the report. Q. That same report we just talked about through MedStreaming. Correct? A. Correct. Q. So based on what you're saying, at your current practice at SAVE do you ever bill for the global service, which would include the professional component related to ultrasound services at SAVE, before that final report is signed that you just mentioned? A. No. Q. And why is that? A. You cannot bill for the physician's services until you have finalized that report.") (emphasis added). |
| 24. The CPT Manual also contains an introduction to "Diagnostic Ultrasound" services, which reiterates the requirement of a written report:<br><br>"Use of ultrasound, without thorough evaluation of organ(s) or anatomic region, image documentation, and final, written report, is not separately reportable." | Fahimi Decl. ¶ 46; Ex. 45 to Fahimi Decl., excerpts from 2020 CPT Professional Manual;<br><br>Fahimi Decl. ¶ 56; Ex. 55 to Fahimi Decl., excerpts from the CPT 2000 Manual;<br><br>Fahimi Decl. ¶ 198; Ex. 197 to Fahimi Decl., Alexander Supp. Report at Ex. 14 & p. 455.<br><br>*See also* Fahimi Decl. ¶ 5; Ex. 4 to Fahimi Decl., Britt Dep. Tr. at 126:25-127:13 (testifying that CPT codes are derived from the CPT "manual".); |

| | |
|---|---|
| | *See also* Fahimi Decl. ¶ 9; Ex. 8, June 2, 2020 Dep. Tr. of Lyssa Ochoa, M.D., former PVA physician describing her current clinic policy using same database at 30:18-33:9 ("So once a registered vascular tech completes the preliminary findings, could you just describe for me what the next steps are in your interpretation and finalizing those scans? A. Once the RVT has completed their study, they will write a preliminary conclusion. The physician will review the study, the images themselves, and edit or change any of the interpretations that they see fit. And then, as you mentioned, we sign off, which means we finalize it and our name gets attached to the bottom of that study. Q. And that signing off you just mentioned, is that what you're saying you use MedStreaming to do? A. Correct. Q. So that would be considered like a standalone report for the scan. Is that correct? A. Correct. Q. And do you have any understanding of at what point or when those services for ultrasounds that are conducted at SAVE are considered complete for purposes of billing globally, as you mentioned, to Medicare? A. They are complete once the physician has finalized the report. Q. That same report we just talked about through MedStreaming. Correct? A. Correct. Q. So based on what you're saying, at your current practice at SAVE do you ever bill for the global service, which would include the professional component related to ultrasound services at SAVE, before that final report is signed that you just mentioned? A. No. Q. And why is that? A. You cannot bill for the physician's services until you have finalized that report.") (emphasis added). |
| 25. The global CPT code (which includes the Professional Component) cannot be billed unless the physician's interpretation of study results has been completed, as reflected in a written report in the patient record. | Fahimi Decl. ¶ 46; Ex. 45 to Fahimi Decl., excerpts from 2020 CPT Professional Manual;<br><br>Fahimi Decl. ¶ 56; Ex. 55 to Fahimi Decl., excerpts from the CPT 2000 Manual;<br><br>Fahimi Decl. ¶ 198; Ex. 197 to Fahimi Decl., Alexander Supp. Report at Ex. 14 & p. 455;<br><br>Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., Alsabrook Dep. Tr. 36:25-37:9 ("Q. And |

| | |
|---|---|
| | when PVA is submitting a bill to Medicare for the global service of a vascular diagnostic study, would you agree with me that the steps that you describe for the professional component need to be documented somewhere? [Objection] A. I would agree that the steps of the -- of the professional component, as I've previously stated, need to be documented, yes.”);<br><br>*See also* Fahimi Decl. ¶ 9; Ex. 8, June 2, 2020 Dep. Tr. of Lyssa Ochoa, M.D., former PVA physician describing her current clinic policy using same database at 30:18-33:9 (“So once a registered vascular tech completes the preliminary findings, could you just describe for me what the next steps are in your interpretation and finalizing those scans? A. Once the RVT has completed their study, they will write a preliminary conclusion. The physician will review the study, the images themselves, and edit or change any of the interpretations that they see fit. And then, as you mentioned, we sign off, which means we finalize it and our name gets attached to the bottom of that study. Q. And that signing off you just mentioned, is that what you're saying you use MedStreaming to do? A. Correct. Q. So that would be considered like a standalone report for the scan. Is that correct? A. Correct. Q. And do you have any understanding of at what point or when those services for ultrasounds that are conducted at SAVE are considered complete for purposes of billing globally, as you mentioned, to Medicare? A. They are complete once the physician has finalized the report. Q. That same report we just talked about through MedStreaming. Correct? A. Correct. Q. So based on what you're saying, at your current practice at SAVE do you ever bill for the global service, which would include the professional component related to ultrasound services at SAVE, before that final report is signed that you just mentioned? A. No. Q. And why is that? A. You cannot bill for the physician's services until you have finalized that report.”) (emphasis added);<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 (“you are filing a |

| | |
|---|---|
| | bill with the federal government and certifying you earned the payment requested.”);<br><br>Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes “incorrect reporting of diagnoses or procedures in order to maximize payments” and billing for services not provided.) |
| 26. PVA billed for studies where the physician’s interpretation was not complete for 24.2% of the vascular studies it performed and billed, tainting 29.5% of the reimbursement payments it received (including 29.89% of all payments from Medicare Part B). | Fahimi Decl. ¶ 201; Ex. 200 to Fahimi Decl., Dr. Nye Supp. Report at Exs. 2 & 4d.; |
| 27. PVA admits that it frequently did not complete a signed, interpretive written report in its reporting system (MedStreaming) prior to billing for the services | Fahimi Decl. ¶ 4; Ex. 3 to Fahimi Decl., Gilpin Dep. Tr. at 35:24-36:9, 42:14-45:7 (testifying there was a change to policy), Ex. 1 to Gilpin Dep. including email from Barbara Burrow to Brian Hembling with attachments including “Vascular Lab Billing Process Change” and other attachments;<br><br>Fahimi Decl. ¶ 11; Ex. 10 to Fahimi Decl., Hembling Dep. Tr. at 55:6-56:8, 59:18-61:21 (testifying a change was made by the compliance committee where bills for studies could not be submitted until a final report was generated), Ex. 4 to Hembling Dep., email from Barbara Burrow to Brian Hembling with attachments including document providing, "Goal . . . The billing/coding process was changed this year. It is now required for a study to have a completed report to be signed and read before it is billed.";<br><br>Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 103:17-104:12, 108:21-110:9 (testifying “for a little bit we were billing and coding after the report was signed and read.”), Ex. 8 to Burrow Dep., May 30, 2017 email from Barbara Burrow to Brian Hembling with attachments including “Vascular Lab Billing Process Change” documents;<br><br>Fahimi Decl. ¶ 11; Ex. 10 to Fahimi Decl., Hembling Dep. Tr. at 62:11-63:19 (testifying the change to billing policy was no longer in |

| | |
|---|---|
| | place sometime in 2017 or 2018 and PVA went back to billing for ultrasounds not documented in Medstreaming);<br><br>Fahimi Decl. ¶¶ 57-196; Exs. 56-195 to Fahimi Decl., including PVA patient records and corresponding billing information. |
| 28. PVA billers are instructed to submit bills once a study is "ready to be read by a physician." | Fahimi Decl. ¶ 20; Ex. 19 to Fahimi Decl., October 7, 2019 email from Barbara Burrow to Kathy Britt, at DEF0181011. |
| 29. PVA's only defense to billing without record of a final report appears to be that in those cases, its physicians' written interpretations are reflected outside of its MedStreaming system, in the notes of patient visits that occurred on the same day as the vascular studies. | Fahimi Decl. ¶ 2; Ex.1 to Fahimi Decl., Dr. Alsabrook Dep. Tr. at 94:2-16 (testifying that final report in Medstreaming and E&M note are only locations physicians at PVA document interpretation of imaging). |
| 30. For many patients, there was no visit with a PVA physician—they were only referred to PVA for a study and interpretation, and their own non-PVA physician handled evaluation and management; | Fahimi Decl. ¶ 11; Ex. 10 to Fahimi Decl., Hembling Dep. Tr. at 32:20-33:11 (testifying some patients are referred to PVA by treating physicians for testing only);<br><br>Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 29:24-30:9 (testifying "if it is a testing only and it is not seeing one of our physicians and it comes into our clinic, they're required to have an order from the doctor sending them.");<br><br>*see also* Fahimi Decl. ¶ 4; Ex. 3 to Fahimi Decl., Gilpin Dep. Tr. at 57:15-23 (testifying that patients can be referred to PVA with an "order to be seen to either do a direct study or a consult.");<br><br>Fahimi Decl. ¶¶75-196; Exs. 74-195 to Fahimi Decl., including PVA patient files for testing only patients, and corresponding billing information;<br><br>Fahimi Decl. ¶ 54; Ex. 53 to Fahimi Decl., Compendium of testing only patients. |
| 31. For patients who had both a visit with a PVA physician and a vascular study, the CPT manual is crystal clear that an interpretive note in a patient chart does not allow billing of both the patient visit (an "Evaluation and Management" code in CPT parlance) and the interpretation of a study; | *See* Fahimi Decl. ¶ 46; Ex. 45 to Fahimi Decl., 2020 CPT Professional Manual;<br><br>Fahimi Decl. ¶ 56; Ex. 55 to Fahimi Decl., excerpts from the CPT 2000 Manual; |

| | |
|---|---|
| instead, a stand-alone report must be generated. | Fahimi Decl. ¶ 198; Ex. 197 to Fahimi Decl., Alexander Supp. Report at Ex. 14 & p. 455;<br><br>Fahimi Decl. ¶ 5; Ex. 4 to Fahimi Decl., Britt Dep. Tr. at 126:25-127:13 (testifying that CPT codes are derived from the CPT "manual".);<br><br>*See also* Fahimi Decl. ¶ 8; Ex. 7 to Fahimi Decl., July 23, 2020 Dep. Tr. of PVA expert Melissa Scott, CPC, CHC, CHIAP at 81:21-82:5; Scott Dep. Exs. 5-14 (testifying with regard to authorities stating a stand-alone report is required, and evaluation and management is distinct from interpretation of a study—"Q. So I understand what you're saying, and I'm not asking you if they're authoritative. What I'm asking is if you're aware of any publication or articles that would be contrary to this, to what we just went over? A. I am not -- MR. COLE: Object to the form. THE WITNESS: Sorry. A. I am not aware of anything to the contrary, nor am I aware of anything that states otherwise." )<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested.");<br><br>Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes "incorrect reporting of diagnoses or procedures in order to maximize payments" and billing for services not provided.) |
| 32. Most of the individuals on which PVA conducts vascular studies are its own patients; i.e., PVA's physicians are managing the patient's care. PVA also, however, conducts vascular studies that are ordered by non-PVA physicians, on patients who are under the care of those non-PVA physicians. PVA refers to those individuals as "testing only" patients. PVA's physicians do not see those patients, but only interpret the vascular studies conducted by PVA's technicians, the results of which are transmitted back to the referring | Fahimi Decl. ¶ 11; Ex. 10 to Fahimi Decl., Hembling Dep. Tr. at 32:20-33:11.<br><br>Fahimi Decl. ¶¶75-196; Exs. 74-195 to Fahimi Decl. (including PVA patient files and corresponding billing information);<br><br>*See also* Fahimi Decl. ¶ 54; Ex. 53 to Fahimi Decl., Compendium of testing only patients. |

| | |
|---|---|
| physician for diagnosis, management, and treatment. | |
| 33. Using PVA's medical record and billing data, Dr. Nye has calculated that PVA submitted 11,728 charges for vascular studies performed on "testing only" patients, for which there was no signed MedStreaming report at the time the charge was submitted. | *See* Fahimi Decl. ¶ 201; Ex. 200 to Fahimi Decl., Dr. Nye Supp. Report at Ex. 2;<br><br>*see also* Fahimi Decl. ¶ 202; Ex. 201 to Fahimi Decl., Dr. Nye 2nd Supp. Report at Exs. 10a & 10b (breakdown of the 11,728 charges by insurance type); |
| 34. Patient JL was referred to PVA for testing by a non-PVA physician, Dr. Juan E. Rubio, in April 2015. | *See* Fahimi Decl. ¶ 27; Exh. 26 to Fahimi Decl. at PVA0005257. |
| 35. PVA performed a Cerebrovascular Duplex Scan on JL on April 21, 2015. | Fahimi Decl. ¶ 27; Ex. 26 to Fahimi Decl. at PVA0005255. |
| 36. The MedStreaming report from patient JL's study was not signed by a PVA physician until almost two years later, on March 9, 2017. | Fahimi Decl. ¶ 25; Ex. 24 to Fahimi Decl.; PVA0005264. |
| 37. Medicare, however, was billed for the service for patient JL shortly after the scan, and PVA received $88.23 from Medicare on May 7, 2015. | Fahimi Decl. ¶ 26; Ex. 25 to Fahimi Decl.; PVA0013205 – PVA0013206. |
| 38. There is no reflection in PVA's medical record for JL of any patient visit, or any other interpretation of the scan, other than on March 9, 2017. | Fahimi Decl. ¶ 27; Ex. 26 to Fahimi Decl.; PVA0005251 – PVA0005259. |
| 39. For patients such as JL who did not have an E/M visit, there is nowhere besides the MedStreaming Report that a physician's interpretation could be reflected. | *See* Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., Dr. Alsabrook Dep. Tr. at 94:2-16 (testifying that final report in Medstreaming and E&M note are only locations physicians at PVA document interpretation of imaging);<br><br>Fahimi Decl. ¶¶ 75-196; Exs. 74-195 to Fahimi Decl. (including PVA patient files and corresponding billing information);<br><br>*See also* Fahimi Decl. ¶ 54; Ex. 53 to Fahimi Decl., Compendium of testing only patients. |
| 40. The records of all 8,757 "testing only" patients produced by PVA in discovery follow the same pattern as JL: they come to PVA for a vascular study only, and never see a PVA physician. With no physician E/M visit, there is nowhere besides the | *See* Fahimi Decl. ¶¶ 75-196; Exs. 74-195 (including records of testing only patients.);<br><br>*See also* Fahimi Decl. ¶ 54; Ex. 53 to Fahimi Decl., Compendium of testing only patients. |

| | |
|---|---|
| MedStreaming report that a physician's interpretation could be reflected. | |
| 41. In all specialties, including vascular disease management, patient visits, in billing parlance, are referred to as "E/M Services" (short for "Evaluation and Management"). And like vascular studies, E/M Services are billed using the CPT codes published by the AMA. The specific E/M code to be utilized, and the corresponding level of reimbursement, depends on the complexity of the patient visit. | Fahimi Decl. ¶ 2; Ex.1 to Fahimi Decl. , Dr. Alsabrook Dep. Tr. at 48:10-51:23. |
| 42. PVA's defense to its submission of vascular study charges without a completed MedStreaming report is that the substance of the physician's interpretation is reported not in MedStreaming, but in the note describing the E/M patient visit, which is signed by the physician. | Fahimi Decl. ¶ 203; Ex. 202 to Fahimi Decl., Melissa Scott Report at p. 37, referring to two-line E/M note as sufficient for documenting ultrasound study;<br><br>*See also* Fahimi Decl. ¶ 55; Ex. 54 to Fahimi Decl., Compendium of patient files for patients who had an E/M office visit *and* related ultrasound studies, including corresponding billing data for both, evidencing double dipping). |
| 43. Unfortunately for PVA, the CPT definitions explicitly prohibit billing for both an E/M Service and a vascular study based on a note such as this in a patient chart, as follow | Fahimi Decl. ¶ 46; Ex. 45 to Fahimi Decl., 2020 CPT Professional Manual;<br><br>Fahimi Decl. ¶ 56; Ex. 55 to Fahimi Decl., excerpts from the CPT 2000 Manual;<br><br>Fahimi Decl. ¶ 198; Ex. 197 to Fahimi Decl., Dr. Alexander Supp. Report at p.20;<br><br>*See also* Fahimi Decl. ¶ 8; Ex. 7 to Fahimi Decl., July 23, 2020 Dep. Tr. of PVA expert Melissa Scott, CPC, CHC, CHIAP at 81:21-82:5; Scott Dep. Exs. 5-14 (testifying with regard to authorities stating a stand-alone report is required, attached to Supp. Report of Dr. Alexander—Q. So I understand what you're saying, and I'm not asking you if they're authoritative. What I'm asking is if you're aware of any publication or articles that would be contrary to this, to what we just went over? A. I am not -- MR. COLE: Object to the form. THE WITNESS: Sorry. A. I am not aware of anything to the contrary, nor am I aware of anything that states otherwise. ) |

| | |
|---|---|
| | *See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested.");<br><br>Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes "incorrect reporting of diagnoses or procedures in order to maximize payments" and billing for services not provided.);<br><br>*See* Fahimi Decl. ¶¶ 57-74; Exs. 56-73 of Fahimi Decl., patient records including corresponding billing for patients who had an office visit and related ultrasound study at PVA;<br><br>*See also* Fahimi Decl. ¶ 55; Ex. 54 to Fahimi Decl., Compendium of patient files for patients who had an E/M office visit *and* related ultrasound studies, including corresponding billing data for both, evidencing double dipping. |
| 44. A variety of healthcare industry publications reemphasize this prohibition, evidencing PVA's recklessness and deliberate ignorance. | Fahimi Decl. ¶ 198; Ex. 197 to Fahimi Decl., Dr. Alexander Supp. Report at Exs. 23-29 to Supp. Report.<br><br>*See also* Fahimi Decl. ¶ 8; Ex. 7 to Fahimi Decl., July 23, 2020 Dep. Tr. of PVA expert Melissa Scott, CPC, CHC, CHIAP at 81:21-82:5; Scott Dep. Exs. 5-14 (testifying with regard to authorities shown stating a stand-alone report is required—Q. So I understand what you're saying, and I'm not asking you if they're authoritative. What I'm asking is if you're aware of any publication or articles that would be contrary to this, to what we just went over? A. I am not -- MR. COLE: Object to the form. THE WITNESS: Sorry. A. I am not aware of anything to the contrary, nor am I aware of anything that states otherwise. ) |
| 45. It was PVA's standard practice to trigger its billing process as soon as the vascular study was conducted on the patient by the technologist, irrespective of whether a | Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 110:10-23. |

| | |
|---|---|
| PVA physician had completed a written report, or even looked at the results. | |
| 46. The effort to change billing practices was weak, and short lived. | Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Tr. 108:21-109:11 (Q. [W]hat were the substantive changes that were made? A. Well, for a little bit we were billing and coding after the report was signed and read.”). |
| 47. The reasons for the 2017 compliance project, and its implementation, were summarized in a document shared between Brian Hembling and Barbara Burrow entitled “Vascular Lab Billing Process change.” As stated in that document, “The billing/coding process was changed this year. It is now required for a study to have a completed report to be signed and read before it is billed.” | Fahimi Decl. ¶ 32: Ex. 31 to Fahimi Decl., May 30, 2017 email from Barbara Burrow to Brian Hembling including attachment “Vascular Lab Billing Process Change.”; DEF007085; DEF007698. |
| 48. PVA’s “Goal” was a “5 business day average billing time for vascular lab by the end of the year.” “Physicians were having issues reading reports in a timely fashion.” Accordingly, “Read groups were created so that any physician could read.” | Fahimi Decl. ¶ 32; Ex. 31 to Fahimi Decl., May 30, 2017 email from Barbara Burrow to Brian Hembling including attachment “Vascular Lab Billing Process Change.”; DEF007085, DEF007086; DEF007698;<br><br>*See also* Fahimi Decl. ¶ 31; Ex. 30 to Fahimi Decl. (the first available PVA physician would read a vascular study that had “not been read for over 48 hrs.”);<br><br>*See also* Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Dep. Tr. at 112:4-112:13; 144:12-144:14; 143:21-144:2. |
| 49. Internal e-mails also indicate that years prior, before PVA began using MedStreaming, PVA may have actually awaited final reports before billing. For example, in a 2013 e-mail string between Barbara Burrow and several other PVA employees regarding a set of patients from PVA’s Hondo location, after reviewing the records, Ms. Burrow wrote: “I looked at the studies that were scanned in. Most of them were not actually interpreted and cannot be billed until they are. I have spoken with Al, who will speak to the doctors.” | Fahimi Decl. ¶ 15; Ex. 14 to Fahimi Decl., email dated September 5, 2013 from Barbara Burrow to Kimberly Martin, DEF164346-164348;<br><br>*See also* Fahimi Decl. ¶ 13; Ex. 12 to Fahimi Decl., DEF0162835 (2012 e-mail from Ms. Burrow to a PVA physician urging him to sign his reports, and that “One is being held for billing awaiting the complete report.”). |
| 50. Internal documents show that PVA closely tracked delays in physician interpretation and reporting of vascular studies, and knew that studies were not being | Fahimi Decl. ¶ 23; Ex. 22 to Fahimi Decl., November 6, 2017 “read and study times” for PVA, PVA0236767. (monthly averages of between 103 hours (June 2017), and 696 |

| | |
|---|---|
| read. For example, Barbara Burrow ran a detailed report from data in MedStreaming that tracked the average time it took for PVA to generate a preliminary report in MedStreaming, and for PVA's physicians to then read and sign those reports, at each of PVA's "downtown" locations ("DT Zone"), on a monthly basis. | hours (January 2016), between the patient encounter and the PVA physicians' interpretation. In other words, at its very best, PVA averaged 4 days to complete its studies. Most months far exceeded that, including an average of 29 days in January 2016.) |
| 51. Burrow began running these and other reports in mid-2016. Their purpose, as she described it in an e-mail to PVA physicians Dr. Fiala and Dr. Macris, was to "[r]eport how long it takes the tech to complete the report after the appointment, and how long it takes after it is completed for the physician to sign. Weekend time is taken out. ICAVL states the whole process should take no more than 4 business days. Used to evaluate lab overall, individual techs, and report on physician read times." | Fahimi Decl. ¶ 30; Ex. 29, June 3, 2016 email from Barbara Burrow to Dr. Lois Fiala at DEF022557;<br><br>*See also* Fahimi Decl. ¶ 3; Ex. 2, Burrow Dep. Tr. at 83:2-83:13 ("Q. So what does it mean where it says, "Also, please check if the studies that were not read in time were assigned to the appropriate physician"? What were you meaning with that? A. We had a personal goal for PVA to get studies read quickly. For a regular study, the goal is 48 hours. Q. And that goal was just for the report to be completed or for any other type of goal associated with that? A. That goal was for 48 hours to when the physician signed the report.")<br><br>*See also* Fahimi Decl. ¶ 3; Ex. 2 Burrow Dep. Tr. 68:18-69:6 ("Q. What does that mean? Can you elaborate on that, specifically where it says "DT office completion time," that portion I read? MR. COLE: Object to the form of the question. A. How long it would take the reports -- the reports going into MedStreaming to be written up and how long after that it took for a physician to sign off on it. We were shooting for four. BY MS. FAHIMI: Q. Four days. Correct? A. What did you say? Q. Four days. Is that correct? A. We were shooting for four business days.") |
| 52. An internal e-mail string indicates that as early as 2012, PVA knew that it had a serious problem with physicians failing to read studies and prepare reports. In the e-mail, a PVA employee, Monica Garcia, tells Barbara Burrow that she "came across some unsigned reports by Dr. Sykes," and asks Ms. Burrow: "Does he have a lot of unsigned reports?" Ms. Burrow responds, "318," to which Ms. Garcia replies, "Yikes." (Exh. 11). Similarly, in 2013, one of PVA's hospital | Fahimi Decl. ¶ 12; Ex. 11 to Fahimi Decl., May 24, 2012 from Monica Garcia to Barbara Burrow;<br><br>Fahimi Decl. ¶ 16; Ex. 15 to Fahimi Decl., September 6, 2013 email from Daniel Garcia to Barbara Burrow, DEF0164363-DEF0164364. |

| | |
|---|---|
| accounts complained that "it appears we do not routinely receive dictations in a timely manner from your office on a regular basis. Sometime these studies are up to two weeks old before they reach our door." (Exh. 15.) Ms. Burrow responded, attempting to alleviate the concerns: "I know the turnaround time for signed studies is 48 hrs, I'll see what is holding them up." | |
| 53. PVA's compliance policies include a "Medical Documentation & Coding Compliance Pledge," pursuant to which PVA employees were to affirm: "I understand that I am expected to adhere to the standards of documentation, medical coding, and conduct described in this pledge so that the Practice may fulfill its obligations to observe federal, state, and local laws affecting patients, colleagues, and institutional partners." | Fahimi Decl. ¶ 21; Ex. 20 to Fahimi Decl., June 5, 2015 PVA Coding and Compliance Pledge at DEF0000693 (entirety of Compliance Plan DEF0000693-DEF000747). |
| 54. The second page of the Compliance Pledge includes a summary of the False Claims Act, followed by a paragraph on "Documentation," which begins:<br><br>"Documentation. The Practice subscribes to the documentation standards published by the Health Care Financing Administration and the American Medical Association as published and in effect January 1, 1998 and as periodically updated via CMS bulletins. Procedural codes as well as diagnosis codes should only be selected which are supported in the chart. All services provided should be documented and coded. Documentation in the chart should support a diagnosis code to its highest level of specificity. It should be understood that the patient's chart is the only defense against of [sic] a claim of fraud or abuse. If it is not documented, it never happened and cannot be billed." | Fahimi Decl. ¶ 21; Ex. 20 to Fahimi Decl., June 5, 2015 PVA Coding and Compliance Pledge at DEF0000694;<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested.");<br><br>Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes "incorrect reporting of diagnoses or procedures in order to maximize payments" and billing for services not provided.) |
| 55. The Compliance Pledge further describes a supposed internal "[e]valuation of billing practices," "[t]o insure compliance with Federal, State, and local laws." The Pledge states: "It is anticipated that the compliance officer will review or cause to be reviewed approximately ten claims per provider per year for services provided during the preceding three-month period." "Under and over coding issues will be identified in | Fahimi Decl. ¶ 21; Ex. 20 to Fahimi Decl., June 5, 2015 PVA Coding and Compliance Pledge at DEF0000694-DEF0000695 |

| | |
|---|---|
| the evaluations along with recommended corrective actions." | |
| 56. Unfortunately, PVA's Compliance Officer, Dr. Alsabrook, testified that he is unaware of such a review ever taking place. | Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., Dr. Alsabrook Dep. Tr. at 21:17-21. |
| 57. Attached to PVA's Compliance Pledge is a "Compliance Plan." The Compliance Plan includes an introductory section entitled "High Risk Areas," which highlights nine types of "illegal conduct," including the very three engaged in here:<br>"1. Billing for items or services not actually rendered";<br>"3. Upcoding"; and<br>"4. Duplicate billing | Fahimi Decl. ¶ 21; Ex. 20 to Fahimi Decl., June 5, 2015 PVA Coding and Compliance Pledge at DEF000698;<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested.");<br><br>Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes "incorrect reporting of diagnoses or procedures in order to maximize payments" and billing for services not provided.) |
| 58. The Compliance Plan also includes a section specific to "diagnostic laboratory testing services." That section even more specifically confirms PVA's knowledge that, with respect to its vascular laboratory diagnostic services, it should "bill[] for laboratory services only after they are performed." It further affirms the requirement that: "The CPT or HCPCS code used by the billing staff accurately describes the services that was ordered by the physician and performed. | Fahimi Decl. ¶ 21; Ex. 20 to Fahimi Decl., June 5, 2015 PVA Coding and Compliance Pledge at DEF000700;<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested.");<br><br>Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes "incorrect reporting of diagnoses or procedures in order to maximize payments" and billing for services not provided.) |
| 59. PVA also has a "Policies and Procedures Manual" that reiterates, and adds to, these concepts. Policy Number 03 in the Manual is entitled "Up-coding." It defines "Up-coding" as "the practice of selecting higher paying CPT®/HCPCS codes that are defined more accurately by lower paying CPT®/HCPCS codes." | Fahimi Decl. ¶ 21; Ex. 20 to Fahimi Decl., June 5, 2015 PVA Coding and Compliance Pledge 03, DEF000717;<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested."); |

| | |
|---|---|
| | Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes "incorrect reporting of diagnoses or procedures in order to maximize payments" and billing for services not provided.) |
| 60. "Billing items or services not actually documented," is equally damning of its own practices. | Fahimi Decl. ¶ 21; Ex. 20 to Fahimi Decl., June 5, 2015 PVA Coding and Compliance Pledge 04, DEF000718. |
| 61. PVA also has a policy entitled "Misuse of provider identification numbers," confirming its understanding that on the CMS-1500 form, "[t]he performing physician is the physician that personally provides the service or supervision of the service. Services provided by anone other than the physician whose PIN is claimed should not be claimed by [PVA]…" | Fahimi Decl. ¶ 21; Ex. 20 to Fahimi Decl., June 5, 2015 PVA Coding and Compliance Pledge 05, DEF000719. |
| 62. Several PVA employees testified that they had never seen PVA's compliance policies, or had never received any formal training on compliance. Dr. Alsabrook, PVA's Compliance Officer, testified that he had never seen PVA's compliance manual until he joined the coding compliance committee. | Fahimi Decl. 2; Ex. 1 to Fahimi Decl., Dr. Alsabrook Dep. Tr. at 19:15-19 ("I do not recall seeing this manual until I was on the committee.");<br><br>Fahimi Decl. 10; Ex. 9 to Fahimi Decl., June 3, 2020 Dep. Tr. of Martha McGee at 9:8-12; 20:2-11 (testifying she has been the Billing Supervisor at PVA for the past 7 years and did not recall receiving the Compliance Pledge or policies.) |
| 63. Dr. Alsabrook has been PVA's Compliance Officer since 2016. Though PVA has no written job description of that role, Dr. Alsabrook testified that his role was "[t]o follow all Medicare rules and regulations, to maintain and ensure that fraud, erroneous billing, excessive payments are not performed at PVA, and follow best practices as merge from Medicare, the societies for which PVA are members of, and utilize for expertise." | Fahimi Decl. ¶ 2; Ex. 1 to Fahimi Decl., Dr. Alsabrook Dep. Tr. at 22:15-18; 23:1-23:6. |
| 64. PVA heavily touts its accreditation by IAC, including on its website. | Fahimi Decl. ¶ 28; Ex. 27 to Fahimi Decl., PVA website excerpt. https://pvasatx.com/about-us/about-pva/ |
| 65. Contrary to PVA's assertions, IAC accreditation is relevant to Medicare reimbursement. | *See* Fahimi Decl. ¶ 40; Ex. 39 to Fahimi Decl., Local Coverage Determination (LCD) at p. 7, ALEXANDER000076. |

| | |
|---|---|
| 66. There are only two qualifying accreditation organizations: "Appropriate laboratory accreditation is limited to the American College of Radiology (ACR) Vascular Ultrasound Program, and the Intersocietal Accreditation Commission (IAC) division of Vascular Testing." | See Fahimi Decl. ¶ 40; Ex. 39 to Fahimi Decl., Local Coverage Determination (LCD) at p. 7, ALEXANDER000076. |
| 67. The other Medicare-approved accreditation agency is the American College of Radiology (ACR). ACR's guidelines also demonstrate the impropriety of PVA's practices. For example, ACR publishes detailed guidelines entitled "Practice Parameters." ACR's Practice Parameter entitled "ACR Practice Parameter for Communication of Diagnostic Imaging Findings" states, among other things: "Quality patient care can only be achieved when study results are conveyed in a timely fashion to those responsible for treatment decisions." | Fahimi Decl. ¶ 24; Ex. 23 to Fahimi Decl., ACR Practice Parameter for Communication of Diagnostic Imaging Findings, ALEXANDER000504-512, at ALEXANDER000505;<br><br>*See* Fahimi Decl. ¶ 40; Ex. 39 to Fahimi Decl., Local Coverage Determination (LCD) at p. 7, ALEXANDER000076;<br><br>*See also* Fahimi Decl. ¶¶198, 200; Exs. 197, 199, Relators' Expert Supp. Reports of Dr. Alexander and Church. |
| 68. "An official interpretation (final report) by the interpreting physician must be generated and archived following any examination, procedure, or officially requested consultation regardless of the site of performance (hospital, imaging center, physician office, mobile unit, etc)." | Fahimi Decl. ¶ 24; Ex. 23 to Fahimi Decl., ACR Practice Parameter for Communication of Diagnostic Imaging Findings ALEXANDER000504-512, at ALEXANDER000505;<br><br>*See also* Fahimi Decl. ¶ 9; Ex. 8, June 2, 2020 Dep. Tr. of Lyssa Ochoa, M.D., former PVA physician describing her current clinic policy using same database at 30:18-33:9 ("So once a registered vascular tech completes the preliminary findings, could you just describe for me what the next steps are in your interpretation and finalizing those scans?<br>A. Once the RVT has completed their study, they will write a preliminary conclusion. The physician will review the study, the images themselves, and edit or change any of the interpretations that they see fit. And then, as you mentioned, we sign off, which means we finalize it and our name gets attached to the bottom of that study. Q. And that signing off you just mentioned, is that what you're saying you use MedStreaming to do? A. Correct. Q. So that would be considered like a standalone report for the scan. Is that correct? A. Correct. Q. And do you have any understanding of at what point or when those services for ultrasounds that are |

| | |
|---|---|
| | conducted at SAVE are considered complete for purposes of billing globally, as you mentioned, to Medicare? A. They are complete once the physician has finalized the report. Q. That same report we just talked about through MedStreaming. Correct? A. Correct. Q. So based on what you're saying, at your current practice at SAVE do you ever bill for the global service, which would include the professional component related to ultrasound services at SAVE, before that final report is signed that you just mentioned? A. No. Q. And why is that? A. You cannot bill for the physician's services until you have finalized that report.") (emphasis added);<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested.");<br><br>Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes "incorrect reporting of diagnoses or procedures in order to maximize payments" and billing for services not provided.) |
| 69. "The final report is the definitive documentation of the results of an imaging examination or procedure." | Fahimi Decl. ¶ 24; Ex. 23 to Fahimi Decl., ACR Practice Parameter for Communication of Diagnostic Imaging Findings, ALEXANDER000504-512 at ALEXANDER000506. |
| 70. Apart from at its own vast chain of offices, PVA also performs services at several local hospitals, with which it is contracted to perform vascular studies. For services performed at those hospitals, PVA actually follows the rules, completing written reports within—at most—48 hours of the study being performed, and always billing after a final report is complete in MedStreaming. As the billing process was summarized by Barbara Burrow in an internal e-mail entitled "Hospital Process," billing does not occur "until after [a vascular study] has reached the Final stage which indicates it has been signed off by a physician" | Fahimi Decl. ¶ 19; Ex. 18 to Fahimi Decl, October 7, 2019 email from Barbara Burrow to Kathy Britt, DEF0181009-DEF0181010;<br><br>Fahimi Decl. ¶ 14; Ex. 13 to Fahimi Decl., December 21, 2012 email from Carl Negley to Bellinda Conte, Stephanie Pierce, and Teena Wright ("Routine studies- Every effort will be made for the final interpretation to be available within 24 hours of the study completion.");<br><br>*See also* Fahimi Decl. ¶ 3; Ex. 2 to Fahimi Decl., Burrow Tr. 118:6-8; |

| | |
|---|---|
| 71. PVA also meticulously tracked its "Read Times" for interpretations of hospital-based studies, including identification and follow-up on any "Read Time Outliers," which it defined as "Routines read over 24 hrs after report completion."<br><br>PVA feared running afoul of these hospital guidelines, and knew that delays would risk patient health. | *See, e.g.,* Fahimi Decl. ¶ 29; Ex. 28, April 12, 2016 email from Barbara Burrow to Relator Alicia Burnett at DEF003022.<br><br>*See also* Fahimi Decl. ¶ 35; Ex. 34, September 6, 2018 email from Manolito Flores to Barbara Burrow, subject "Missing Final Report" ("Cardiologist is upset and patient is pending discharge without a final read in the system."). |
| 72. Medicare does not reimburse for diagnostic tests used for "screening" purposes; i.e., patients must have a symptom or history that requires the vascular studies to be performed. And, of course, the sonographers who conduct the studies are not qualified or licensed to interpret the studies or diagnose problems. Accordingly, without a physician's interpretation, a vascular study is meaningless, and puts patient health and safety at risk. PVA knows this, which is why, in the hospital context, as described above, PVA is essentially fully compliant with the rules and industry standards. | Fahimi Decl. ¶ 40; Ex. 39 to Fahimi Decl., LCD at ALEXANDER000074;<br><br>*See* Fahimi Decl. ¶ 198; Ex. 197 to Fahimi Decl., Dr. Alexander Supp. Expert Report at pp. 11-12;<br><br>Fahimi Decl. ¶ 200; Ex. 199 to Fahimi Decl., Supp. Expert Report of Robert Church at 5;<br><br>*See also* Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN4649244, February 2019, MLN Booklet at p. 11 ("you are filing a bill with the federal government and certifying you earned the payment requested.");<br><br>Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Integrity Manual, Chapter 4 at 4.2.1 (stating fraud includes "incorrect reporting of diagnoses or procedures in order to maximize payments" and billing for services not provided.) |
| 73. But even in the hospital context, PVA sometimes slips up, and the consequences can be dire, as a 2017 e-mail from Dr. Alsabrook to other PVA physicians demonstrates: (Exh. 17). As the e-mail indicates, a "deficit in inpatient vascular lab documentation and signing" led to "a near miss to negatively affect patient care." | Fahimi Decl. ¶ 18; Ex. 17 to Fahimi Decl., February 22, 2017 email from Lyssa Ochoa M.D. to Dr. Alsabrook at DEF043216;<br><br>Q. So somewhere in the patient's chart you would expect there to be documentation of the reading physician's interpretation within a few days of the study being completed?<br>MR. COLE: Object to the form. A. I think -- I think the next appropriate convenient time period is fine. So multiple days sounds sufficient.<br>(Alsabrook, M.D., Grady D. - Vol. 1, 85:17-85:24, June 5, 2020) |

| | |
|---|---|
| 74. In at least two other ACR Practice Parameters the need for adequate documentation is highlighted:<br><br>"Practice Parameter for Performing and Interpreting Diagnostic Ultrasound Examinations" ("Adequate documentation is essential for high-quality patient care. There should be a permanent record of the ultrasound examination and its interpretation. . . . An official interpretation (final report) of the ultrasound examination should be included in the patient's medical record."); and "Practice Parameter for the Performance of Peripheral Venous Ultrasound Examination, which was "developed collaboratively by the American College of Radiology (ACR), the American Institute of Ultrasound in Medicine (AIUM), the Society for Pediatric Radiology (SPR), and the Society of Radiologists in Ultrasound (SRU)" | Fahimi Decl. ¶ 52; Ex. 51, ALEXANDER001570-1575 at ALEXANDER001573;<br><br>Fahimi Decl. ¶ 53; Ex. 52, ALEXANDER001576-1586 at ALEXANDER001582.<br><br>*See also* Fahimi Decl. ¶ 8; Ex. 7 to Fahimi Decl., July 23, 2020 Dep. Tr. of PVA expert Melissa Scott, CPC, CHC, CHIAP at 81:21-82:5; Scott Dep. Exs. 5-14 to Scott Dep. (testifying to authorities stating a stand-alone report is required, attached to Supp. Report of Dr. Alexander—Q. So I understand what you're saying, and I'm not asking you if they're authoritative. What I'm asking is if you're aware of any publication or articles that would be contrary to this, to what we just went over? A. I am not -- MR. COLE: Object to the form. THE WITNESS: Sorry. A. I am not aware of anything to the contrary, nor am I aware of anything that states otherwise. ) |
| 75. There is not a single industry publication that endorses, supports, or suggests PVA's billing practices.<br>In contrast, there are innumerable industry publications, articles, and websites that confirm the appropriate and legal methods of reporting and billing, which are consistent across all areas of specialty that utilize diagnostic ultrasound | Fahimi Decl. ¶ 43; Ex. 42 to Fahimi Decl., American Institute of Ultrasound in Medicine, J Ultrasound Med 2020; 39:E1-E4, "Practice Parameter for Documentation of an Ultrasound Examination": "Accurate and complete documentation and communication by all members of the diagnostic ultrasound health care team are essential for high-quality patient care. There must be a permanent record of the ultrasound examination and its interpretation." ALEXANDER000089; "A signed final report of the ultrasound findings and impression should be included in the patient's medical record and is the definitive documentation of the study." ALEXANDER000090<br><br>Fahimi Decl. 44; Ex. 43 to Fahimi Decl., American Urological Association, "Medical Documentation Requirements: Diagnostic Urologic Ultrasound and Ultrasound-Guided Procedures":<br>"the professional component is the interpretation of the test and creation of a detailed written report." ALEXANDER000094; |

| | |
|---|---|
| | "The American Medical Association clarified that if an imaging test is performed on the same day as an Evaluation & Management (E&M) service, that each should be separately documented and billed, as stated in the E&M Services Guidelines Section in the CPT® book." ALEXANDER000099;<br><br>Fahimi Decl. ¶ 49; Ex. 48 to Fahimi Decl., Society of Point of Care Ultrasound (SPOCUS), San Antonio, Texas, "SPOCUS Reimbursement Statement":<br>"Written Interpretation: Ultrasound documentation reflects the nature of the exam. As the clinical ultrasound exam is immediately interpreted, the findings should be immediately communicated to other providers and consultants by a separate written report and interpretation maintained in the patient's medical record." pp. 4-5.<br><br>Fahimi Decl. ¶ 45; Ex. 44 to Fahimi Decl., Surgical and Interventional Ultrasound, Chapter 17. Documentation, Coding, Billing, and Compliance, Beth Schrope:<br>"Professional component refers to the physician interpretation services accompanied by a separate, distinctly identifiable report." (ALEXANDER000418).<br><br>Fahimi Decl. ¶ 48; Ex. 47 to Fahimi Decl., MLN Matters Number SE1134 Revised, Department of Health And Human Services, Centeres for Medicare & Medicaid Services:<br>"Medicare Carriers and MACs generally distinguish between an 'interpretation and report' of an EKG procedure and a 'review' of the procedure. A professional component billing based on a review of the findings of these procedures, without a complete, written report similar to that which would be prepared by a specialist in the field, does not meet the conditions for separate payment of the service." (p. 3)<br><br>Fahimi Decl. ¶ 42; Ex. 41 to Fahimi Decl., "SonoSite Ultrasound Reimbursement Information" (Jan. 2019): "Use of ultrasound, without thorough evaluation of organ(s) or anatomic region, image documentation, and final, written report, is not separately reportable."; |

| | |
|---|---|
| | *See also* Fahimi Decl. ¶ 8; Ex. 7 to Fahimi Decl., July 23, 2020 Dep. Tr. of PVA expert Melissa Scott, CPC, CHC, CHIAP at 81:21-82:5; Scott Dep. Exs. 5-14 (testifying to authorities stating a stand-alone report is required, attached to Supp. Report of Dr. Alexander—Q. So I understand what you're saying, and I'm not asking you if they're authoritative. What I'm asking is if you're aware of any publication or articles that would be contrary to this, to what we just went over? A. I am not -- MR. COLE: Object to the form. THE WITNESS: Sorry. A. I am not aware of anything to the contrary, nor am I aware of anything that states otherwise.) |
| 76. PVA's expert, Dr. Collier, is a vascular surgeon in Pennsylvania. He owns and operates four vascular laboratories that perform vascular studies of the exact same type as PVA. | Fahimi Decl. ¶ 7; Ex. 6 to Fahimi Decl., July 22, 2020 Dep. Tr. of Dr. Paul E. Collier, M.D. at 14:10-16 (owns and operates four labs); 14:24-25. |
| 77. Dr. Collier, however, does not follow PVA's illegal billing practices. Instead, he interprets and signs every vascular study within 24 hours, and never bills until he does so. | Fahimi Decl. ¶ 7; Ex. 6 to Fahimi Decl. Dr. Collier Dep. Tr. at 39:14-40:15<br><br>("Q. Are there ever any situations where you review and sign more than 24 hours after the scan is complete? A. It would be unusual. It might be something that -- say I was, like, off on a Friday and I didn't check it until Monday. But usually, I check in pretty much every day, even if I'm on vacation. I still have to read them officially.<br><br>Q. Are there any other situations at your practice where you -- your practice bills a payor for a vascular imaging study before the vascular lab report has been reviewed and signed by you? [Objection] A. In this day and age, I'd say -- I would have to say probably not. We -- since Streamline is hooked to our billing company, you know, to the best of my knowledge, they don't bill until I sign out on it. I think that's the way it's set up now with the billing company that we have. The billing company and Streamline are sort of -- I don't want to say one and the same, but they're sort of the same group that do it. So I think until I sign off on, like, an H&P or a vascular lab study, it doesn't get billed until the signature is on it.") |

| | |
|---|---|
| 78. Dr. Collier also has never engaged in PVA's "double-dipping" practice of billing for both an E/M service and a vascular study without completing two separate, stand-alone reports, one for the visit, and one for the interpretation. | Fahimi Decl. ¶ 7; Ex. 6 to Fahimi Decl., Dr. Collier Dep. Tr. at 43:17-44:7, 44:8-45:9; 49:22-50:4<br><br>("Q. So the vast majority of your services at the vascular lab, you have a patient visit and then that same day they have a scan or multiple scans performed? A. Correct. Q. And you bill for both the -- an E/M code and for the imaging. Correct? A. Correct. Q. And in all those cases where you bill for both an E/M code and an imaging code, by the time your company bills the payer, there's both a signed note in the history and physical EMR and there is a signed vascular lab report. Correct? [Objection] A. Correct. Since we went electronic, three or four years ago, yes.")<br><br>("BY MR. BERGER: Q. And prior to that time, was your practice different as far as the timing of billing, vis-à-vis the signing of reports? A. I'd have to say it probably was because I would dictate my report sort of through the hospital system. And, basically, we used their transcriptionist to do that. And if the patient came, I would fill out like a superbill and give it to my office manager, who did the billing. So before I signed off, I'm sure those bills were going out. Q. When you say you would dictate the report, you would dictate both the history and physical report and the vascular lab report? A. Yes, sir. Q. And did that result in two separate reports or just one report? A. Two separate reports. Q. Were there -- what would you call those separate reports? A. Separate reports, not to sound funny. Q. What was the name for the first one, what was the name for the second one? A. Well, one was, obviously, the office visit, whatever you want to call it, medical records. The other was the vascular lab report.")<br>("Q. [] So for your patients where you were doing both an evaluation and management visit and a scan on the same day, you can't think of any situation where you did not dictate and sign the two separate reports? A/Correct. Yeah. The vascular lab and the medical history and physical were two different things."); |

| | |
|---|---|
| | *See also* Fahimi Decl. ¶ 55; Ex. 54 to Fahimi Decl., Compendium of patient files for patients who had an E/M office visit *and* related ultrasound studies, including corresponding billing data for both, evidencing double dipping); and corresponding patient records at ¶¶57-74 of Fahimi Decl.; Exs. 56-73, including patient records of patients who had both services done at PVA. |
| 79. Most notably, in 2017 PVA embarked on a short-lived "Compliance" project to increase the speed at which studies were read, and to "Allow[] for Compliance," by "billing after study interpreted." | Fahimi Decl. ¶ 31; Ex. 30 to Fahimi Decl. at DEF007691; |
| 80. As to the "testing only" patients for which PVA submitted vascular study global CPT codes without a physician interpretation and report, the number of false claims, and resulting reimbursements, are as follows:<br>Reimbursements , False Claims<br>Medicare Part B: $433,218 4,924<br>Medicare Railroad Part B: $2,249 32<br>Medicare Advantage Plans: $336,324<br>Tri-Care: $27,580 17<br><br>Total: $852,850 | Fahimi Decl. ¶ 202; Ex. 201 to Fahimi Decl., Second Supplemental Report of Dr. Nye at Exs. 10a and 10b with non-federal and non-Medicare payors filtered out. |
| 81. Reimbursements (i.e., payments received by PVA) are reflected as negative values in PVA's data and Dr. Nye's summaries, but listed as positive values here. There are also a limited number of "Takebacks" contained in PVA's data and Dr. Nye's summaries. The figures here incorporate those "Takebacks."<br>These Reimbursement amounts are extracted from Exhibit 10b to the Second Supplemental Report of Dr. Nye, which breaks out the Reimbursement totals of Exh. 2 to his Supplemental Report by Payor and Insurance Name.<br>Most claims to Tri-Care are characterized in PVA's data as secondary payor claims. Reimbursements from secondary payors are not captured in the claim count of Dr. Nye, to be conservative and avoid duplicate claim counts. Accordingly, Relators do not seek | Fahimi Decl. ¶ 202; Ex. 201 to Fahimi Decl., Second Supplemental Report of Dr. Nye at Exs. 10a and 10b of the Second Supplemental Report of Dr. Nye, with non-federal and non-Medicare payors filtered out. |

| | |
|---|---|
| statutory penalties for claims to secondary payors. | |
| 82. The PVA Compliance Plan reemphasizes the importance of billing only for services that have been provided and properly documented. | *See* Fahimi Decl. ¶ 21; Ex. 20, PVA Compliance and Coding Pledge at DEF000699 |
| 83. A 2013 e-mail string also confirms that PVA knows its charges must be billed under the physician who actually read the study. See Exh. 16 ("Dr. Macris is the one who read the study, so the lab should be billed under him."). | Fahimi Decl. ¶ 17; Ex. 16 September 26, 2013 email from Andrea Salinas-Cervera to Barbara Burrow at DEF0164397-164400. |
| 84. Moreover, Medicare makes clear in various publications that it considers billing for services not rendered, and naming the wrong provider, to be quintessential examples of fraud and abuse. For example, CMS publishes a manual for providers entitled "Medicare Fraud & Abuse: Prevent, Detect, Report," which reminds providers, among other things:<br>• "When you submit a claim for services provided to a Medicare beneficiary, you are filing a bill with the Federal Government and certifying you earned the payment requested and complied with the billing requirements."<br>• "Examples of improper claims include: . . . Billing codes that reflect [] a more expensive treatment than was provided. . . . Billing services not provided. . . . Billing separately for services already included in a global fee, like billing an evaluation and management service the day after surgery."<br>• "'If you didn't document it, it's the same as if you didn't do it.' The same can be said for Medicare billing." | Fahimi Decl. ¶ 205; Ex. 204 to Fahimi Decl., CMS MLN 4649244 at 11. |
| 85. The Medicare Program Integrity Manual, Chapter 4 – Program Integrity, similarly provides a detailed list of "Examples of Medicare Fraud," including all of those at issue here:<br>• "Incorrect reporting of diagnoses or procedures to maximize payments;"<br>• "Billing for services not furnished and/or supplies not provided."<br>• "Misrepresenting dates and descriptions of services furnished or the identity of the beneficiary or the individual who furnished the services;" | Fahimi Decl. ¶ 206; Ex. 205 to Fahimi Decl., Medicare Program Integrity Manual, Chapter 4 at § 4.2.1. |
| 86. "Double Dipping": As to testing and E/M visit patients for which PVA submitted | Fahimi Decl. ¶ 201; Ex. 200 to Fahimi Decl., Dr. Nye Supplemental Report at Exhibit 4d; |

| | |
|---|---|
| vascular study global CPT codes without a separate, stand-alone physician interpretation and report, the number of false claims, and resulting reimbursements, are as follows:<br>Reimbursements False Claims<br>Medicare Part B: $2,812,970<br>Medicare Railroad Part B: $17,475<br>Medicare Advantage Plans: $5,424,053<br>Tri-Care: $184,020<br>Total: $5,625,548 | Fahimi Decl. ¶ 202: Ex. 201 to Fahimi Decl., Second Supplemental Report of Dr. Nye at 11 (with non-federal and non-Medicare payors filtered out). |
| 87. Wrong Provider: As to all of the vascular study charges in the "testing only" and "double dipping" categories, where PVA submitted a vascular study global CPT code under the name of a physician who did not ultimately read the study, the number of false claims, and resulting reimbursements, are as follows:<br>Reimbursements False Claims<br>Medicare Part B: $86,635 962<br>Medicare Railroad Part B: $231 3<br>Medicare Advantage Plans: $75,405 721<br><br>Tri-Care: $5,599 4<br>Total: $167,870 1,690 | Fahimi Decl. ¶ 201; Ex. 200 to Fahimi Decl., Dr. Nye Supplemental Report at Exhibit 4d; Fahimi Decl. ¶ 202: Ex. 201 to Fahimi Decl., Second Supplemental Report of Dr. Nye at 11 (with non-federal and non-Medicare payors filtered out). |

# CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September, 2020, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Wallace M. Brylak, Jr.
Brylak & Associates
15900 La Cantera Pkwy, Suite 19245
San Antonio, TX 78256
wbrylak@brylaklaw.com

Sean McKenna
Mark A. Cole
Spencer Fane LLP
2200 Ross Avenue
Suite 4800 West
Dallas, TX 75201
smckenna@spencerfane.com
mcole@spencerfane.com

Stephen J. Romero
Jeff Wurzburg
Norton Rose Fulbright US LLP
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, TX 78205
stephen.romero@nortonrosefulbright.com
jeff.wurzburg@nortonrosefulbright.com

John M. Deck
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
John.deck@usdoj.gov

*/s/ Justin T. Berger*
Justin T. Berger