**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel., TIFFANY MONTCRIEFF, et al.,** | § | |
| **Relators, Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 5:17-CV-00317-XR** |
| **PERIPHERAL VASCULAR ASSOCIATES, P.A.,** | § | |
| **Defendant.** | § | |

**DEFENDANT PERIPHERAL VASCULAR ASSOCIATES' RESPONSE TO RELATORS' MOTION FOR SUMMARY JUDGMENT**

Relators' Motion for Summary Judgment should be denied because they cannot prove that Peripheral Vascular Associates ("PVA") knowingly submitted any false claim that PVA knew was material to a federal healthcare program's payment decision. Relators' case is not built on any condition of payment set out in any Medicare or federal healthcare program statute or regulation designating some action as a requirement to bill for services. Rather, Relators base their allegations entirely on non-binding industry guidance in an attempt to improperly elevate their claims to replace existing payment rules to support their False Claims Act ("FCA") allegations. That position utterly fails in the face of clear law and evidence to the contrary.

Relators' claims are exactly the kind of allegations the Supreme Court sought to limit with its decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). There is no dispute PVA performed and interpreted vascular studies to treat patients. Yet Relators inexplicably seek to have PVA pay to them millions of dollars in reimbursement for services provided since 2014, trebled to more millions, and unspecified hundreds of millions in civil penalties and attorney's fees for one reason: despite no federal healthcare program statute,

regulation, rule, or guidance, Relators harbor an unsubstantiated belief PVA should have signed a MedStreaming report for every vascular study before submitting a bill. Relators' theory of liability is a bridge too far. Such a notion simply is preposterous. Courts have cautioned "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations." *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999). Relators do not even allege, let alone prove, that PVA failed to follow any statute or regulation. Relators' case relies only on unsupported theories of industry guidance with no tie to a federal healthcare program requirement. PVA has objected to the admissibility of opinions of Relators' proffered expert witnesses Dr. James Alexander (Dkt. 82), Robert D. Church (Dkt. 83) and Dr. Zachary Nye (Dkt. 86). Their testimony should be excluded and Relators' claims should fail as a matter of law.

Relators' position (albeit improperly conjoined amongst three separate relators in violation of the FCA) is tantamount to this: their theories should be a lottery ticket asking this Court to award them hundreds of millions of dollars in trebled damages, civil penalties, and attorney's fees—a catastrophic result for PVA and the surrounding community—without any basis in law or fact for such an outcome. In doing so, they ignore (and ask this Court to do so) the U.S. Supreme Court's recognition of the specific limitation of the FCA, that it "is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 136 S. Ct. at 2003 (internal citation omitted). "[T]he False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Id.* at 2004. That is why a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Id.* at 1996.

Relators have failed the "rigorous" and "demanding" tests mandated by the Supreme Court in *Escobar* requiring proof (not mere allegations) of FCA violations. That is especially true where, as here, the Department of Justice and specific federal healthcare agencies overseeing federal healthcare programs investigated Relators' claims and did not change their payment decisions. The Court should decline Relators' invitation to sanction FCA liability based on inapplicable, non-binding industry guidance, and deny Relators' Motion and grant summary judgment.

## I. PVA's Responses To Relators' Statement Of Uncontroverted Facts.

Relators include a section of their Motion titled "Background Statement of Uncontested Facts" that attempts to comply with Rule 56. PVA responds to those statements herein. Relators also include an "Appendix" that incorrectly includes legal arguments and conclusions that are not mere facts, sets out multiple "facts" together without identifying support for each, repeatedly cites unsupported documents and testimony, and seemingly is included outside the Motion to evade the Court's page limitations for motions for summary judgment. Out of an abundance of caution, PVA responds to the "facts" included in Relators' Appendix in Exhibit A to this Motion.

1. PVA billed Medicare and other federal payers for vascular studies and E/M Services using the electronic version of the CMS-1500 form. App. No. 1.

**RESPONSE**: Uncontroverted for purposes of this Motion.

2. The CMS-1500 includes several explicit certifications by the provider, including that the claim submitted: (1) is "true, accurate and complete"; (2) "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment…"; and (3) that the "services on this form were medically necessary and personally furnished by me…" App. No. 2.

**RESPONSE**: Uncontroverted for purposes of this Motion.

3. PVA billed Medicare and other federal payers for vascular studies and E/M Services using CPT codes. App. No. 3.

**RESPONSE**: Uncontroverted for purposes of this Motion. PVA objects to the admissibility of Ex. 54 as an improper summary document.

4. For all vascular studies performed in its vascular laboratories, PVA billed using the "global" CPT code, without modifier. App. No. 7; *see also* App. Nos. 4-6.

**RESPONSE**: Uncontroverted for purposes of this Motion. PVA objects to the admissibility of any expert report as improper hearsay under FRE 801, 802, and 805. PVA objects to the admissibility of opinions of Relators' proffered expert witness Dr. James Alexander as detailed in Dkt. 82.

5. Other than for a brief period in early 2017, described below, PVA billed vascular studies using "global" CPT codes, without modifier, regardless of whether a final report had been generated and signed by an interpreting physician. App. No. 9.

**RESPONSE**: Controverted. The statement is not supported by the cited documents and testimony. Relators' summary of the testimony is not accurate.

6. For 24.2% of vascular studies billed by PVA to Medicare, PVA used "global" CPT codes, without modifier, despite no final report having been generated and signed in the MedStreaming system by an interpreting physician. App. No. 10.

**RESPONSE**: Controverted. The statement is not supported by the cited documents or any other admissible evidence. PVA objects to the admissibility of any expert report as improper hearsay under FRE 801, 802, and 805. PVA objects to the admissibility of opinions of Relators' proffered expert witness Dr. Zachary Nye as detailed in Doc. 86. *See also* Dkt. 94, at 4-8.

7. The PVA physicians' interpretations of vascular studies may be reflected in one or both of two places: (1) a final, electronically signed MedStreaming report; and (2) an "encounter note" in the AllScripts Electronic Medical Record system reflecting a patient visit with a PVA physician, electronically signed by the PVA physician. App. No. 11.

**RESPONSE**: Controverted, but immaterial. The statement is not supported by the cited documents and testimony. Relators' summary of the testimony is not accurate. Dr. Alsabrook testified to his practice and that he did not know of other physicians' practices. *See also* Dkt. 94, at 4-8.

8. Some of the individuals on which PVA performed vascular studies were referred to PVA only for the studies, and not for evaluation, management, or treatment. PVA referred to these as "testing only" patients. App. No. 12.

**RESPONSE**: Uncontroverted for purposes of this Motion. PVA objects to the admissibility of Ex. 53 as an improper summary document.

9. "Testing only" patients did not receive E/M Services from PVA. App. No. 13.

**RESPONSE**: Controverted in part, but immaterial. The statement is not supported by the cited documents and testimony. None of the documents or testimony states that "testing only" patients never receive E/M services. PVA objects to the admissibility of Ex. 53 as an improper summary document.

10. With respect to "testing only" patients, there are no encounter notes in AllScripts reflecting a physician visit or physician interpretation of vascular studies. App. No. 14.

**RESPONSE**: Uncontroverted for purposes of this Motion, and immaterial. PVA objects to the admissibility of Ex. 53 as an improper summary document.

11. In 2017, PVA attempted to modify its practices to ensure that bills for vascular studies were not submitted until a final report in MedStreaming was generated and signed by a PVA physician. App. No. 16.

**RESPONSE**: Uncontroverted for purposes of this Motion, and immaterial.

12. After several months, PVA returned to its prior practice of billing for the global service upon completion of the technical component, regardless of whether a final MedStreaming report had been generated and signed. App. No. 17.

**RESPONSE**: Objection. The statements is not supported by admissible evidence. PVA objects to the testimony cited because the witness lacks foundation under FRE 602. To the extent a response is required, it is controverted. *See* Dkt. 94, at 4-8.

13. For certain tests, during some of the pertinent time period, PVA utilized a "pool" reading system, pursuant to which any number of PVA physicians could review and sign MedStreaming reports, irrespective of the physician name that appeared on the charge to a payer. App. No. 18.

**RESPONSE**: Uncontroverted that "For certain tests, during some of the pertinent time period, PVA utilized a 'pool' reading system, pursuant to which any number of PVA physicians could review and sign Medstreaming reports." Remainder controverted as unsupported by admissible evidence. The statement is not supported by the cited documents and testimony.

## II. Relators Cannot Prove PVA Submitted Any False Claims.

PVA's vascular studies have two components, the technical component and the professional component. The technical component is performing the ultrasound, and the professional component is a physician reading the ultrasound. The technical and professional components can be billed separately or combined together into a "global" bill. PVA performed

every single vascular study submitted to a government health plan for reimbursement, and Relators do not contend otherwise. Relators contend, however, that the interpretations of some of those studies were incomplete because a separate report in PVA's MedStreaming system was not signed at the time a bill was submitted. Relators hope and wish to convert PVA's use of MedStreaming, a picture archiving and communication system, into a Medicare requirement for payment. But just because PVA uses MedStreaming and completes a report within that system does not convert those reports into a Medicare condition of payment that is a requirement for reimbursement to any federal healthcare program.

There is no federal healthcare program statute, regulation, rule, or even non-binding guidance requiring a MedStreaming report or any other separate, stand-alone report to bill for a vascular study. In fact, "Medicare has not specifically promulgated regulations governing a physician's interpretation of venous ultrasound studies." *U.S. ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822, 824 (W.D. Mich. 2000), *aff'd*, 24 F. App'x 491 (6th Cir. 2001).[1] Finding no support in statutes, regulations, or governmental rules or guidance, Relators try to bootstrap Medicare's use of Current Procedural Terminology ("CPT") codes into a downstream requirement that PVA complete a separate, stand-alone report before billing for vascular studies. This simply is not correct and Relators have not offered any statutory or regulatory support for such a proposition.

CPT codes are used by providers to indicate the services provided to patients. CPT codes are developed and published by the American Medical Association ("AMA"). CPT codes are copyrighted by the AMA, which grants CMS a limited license to used CPT codes in CMS

[1] For a detailed discussion of the *Swafford* case, see Dkt. 94, Defendant Peripheral Vascular Associates' Motion for Summary Judgment, at 13-14.

publications.[2] The AMA makes clear that it owns the CPT codes, and CMS does not control those codes.[3] For example, the AMA Terms and Conditions restricts CMS' use of CPT language: "Publications referencing CPT codes shall convey Medicare or Medicaid specific information and not CPT coding advice."[4] While Medicare utilizes CPT codes for billing of medical services, that does not mean that everything the AMA says regarding CPT coding is a Medicare prerequisite for payment. Coding advice or guidance from the AMA does not constitute CMS policy nor create a binding payment rule.

The AMA guidebook relied on by Relators is not a statute or regulation, and does not set forth any policy of a federal healthcare program. Following the Supreme Court's decision in *Azar v. Allina Health Services*, 139 S. Ct. 1804, 1813 (2019), even if the AMA's guidebook were sub-regulatory guidance, which it is not, it cannot serve as the basis for an FCA violation because it was not subject to notice and comment. It holds then that if specific sub-regulatory guidance, which is not even alleged or plead by Relators here, issued by CMS cannot create substantive standards, a guidebook issued by a private medical association must be afforded even less deference.

Even if the AMA guidebook created any substantive requirement, the language relied on by Relators does not support their theory. Relators cite to this language from the CPT guidebook:

> Vascular studies include patient care required to perform the studies, supervision of the studies and interpretation of study results with copies for patient records of hard copy output with analysis of all data, including bidirectional vascular flow or imaging when provided.[5]

---

[2] *See* AMA Terms and Conditions, available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/Downloads/AMA-Terms-Conditions.pdf (last accessed Sept. 9, 2020).
[3] *Id.*
[4] *Id.* at 3.
[5] Dkt. 95, at 7.

That paragraph is composed of two primary parts. First, it states that vascular studies include three parts: a) patient care required to perform the studies; b) supervision of the studies; and c) interpretation of study results. PVA without doubt performs all three parts. Its technicians care for the patient when performing the study. PVA's physicians supervise the studies. And PVA's physicians interpret the study results.

Second, the paragraph states that the patient records should include copies of "hard copy output with analysis of all data, including bidirectional vascular flow or imaging when provided." This simply requires that hard copy output of studies be included in a patient's records. PVA does this by scanning hard copy records into the patient's electronic medical record. An example is a waveform, which is a hard copy output containing analysis of data. The waveforms are provided to PVA physicians and included in the patient's medical record.

Relators also rely on language contained within the "Radiology Guidelines" section of the CPT guidebook. It must be noted that the specific section Relators rely on as a primary basis to impose punitive FCA liability is expressly qualified as *guidelines*. Not rules or payment requirements, but guidelines, that cannot support an FCA violation. Relators argue that this language supports their claims: "A written report, signed by the interpreting physician, should be considered an integral part of a radiologic procedure or interpretation."[6] That language does not say a written report "must" be included, or that one is required. That language is a clear guideline suggesting a course of action, not requiring one. Additionally, the language only references an undefined "written report." It does not say "separate" or "stand-alone" report despite Relators' contentions.

[6] Dkt. 95, at 8.

However, PVA physicians' interpretations of vascular studies are documented in the patient's medical record. Medical records included with PVA's Motion for Summary judgment show physicians' interpretations of vascular studies before any bill is submitted. For example:

> *Carotid duplex ultrasound reveals less than 40% right carotid stenosis. There is 60-79% left internal carotid stenosis. Vertebral flow is antegrade bilaterally. When the current study is compared to that of 2/11/2015, the degree of stenosis on the right side appears to be less severe. These results were discussed in detail with the patient. At this time, I feel that no additional vascular imaging or intervention is required but careful follow-up should continue. He understands and agrees. I would like to follow him with you and see him again at the time indicated above with the vascular studies listed. I would be happy to see him at any time in the interim if I can be of assistance.*

Relators identify no Medicare statute, regulation, rule, or guidance setting for a standard for what must be included in any "written report" documenting interpretation of a vascular study to support their allegations of FCA violations.

Nothing in the language cited by Relators requires a separate, stand-alone report. At best, that language from a medical association guidebook is ambiguous about what should be included in patient records, which does not support Relators' claims. Paramount is that Relators fail to provide a single applicable binding source that could be relied upon for FCA liability. Their attempt to create a requirement using industry guidance is based in fantasy. On this basis alone, their motion must be denied.

**A. Relators' Double-Billing Claim Is Completely Unsupported.**

Relators' theory that PVA "double billed" or "double dipped" by billing for Evaluation & Management ("E/M") services is nonsensical. Despite acknowledging that the notes in the few medical records they reviewed "allows PVA to bill for an E/M Service,"[7] Relators confusingly ask this Court to award them more than $5 million. But Relators fail to show how any claim submitted by PVA for E/M services was false. Relators identify no requirements to bill for E/M services or what levels are appropriate. Even Relators' expert witness Mr. Church agrees they lack evidence

[7] Dkt. 95, at 11.

to support an argument that E/M services were improperly billed. Mr. Church testified that he did not review the medical records necessary to determine whether an E/M service was provided.[8]

Relators' theory about double-billing is a logical fallacy that is mutually exclusive of their theory that a MedStreaming report is required to bill for a vascular study. Relators only claim that an E/M service was billed improperly if it was billed along with a vascular study without a signed MedStreaming report before the billed date. Relators already claim it was improper to bill for the vascular study in those circumstances. It is Relators who want to double-dip to claim that the E/M service was allegedly improper because the vascular study did not have a MedStreaming report signed before the vascular study was billed. Missing in all this is any proof PVA failed to provide or document any E/M services.

Relators' "double billing" claim is nothing more than a repackaged argument that a separate, stand-alone report from MedStreaming is required to bill Medicare for a vascular study. Relators' claims are incorrectly premised on the belief that PVA could not bill for both an E/M service and a vascular study without a separate, stand-alone report for the vascular study. Relators cite to language in the AMA CPT guidebook as the sole support of their position.[9] Aside from the fact that the AMA's language is not a Medicare rule or requirement, it does not require a separate, stand-alone report for vascular services that are billed globally. Relators point to the sentence stating "The physician's interpretation of the results of diagnostic test/studies (i.e, professional component) with preparation of a separate distinctly identifiable signed written report may also be reported separately, using the appropriate CPT® code with modifier 26 appended."[10] That sentence discusses what the AMA recommends for physician interpretation of vascular studies

---

[8] Ex. B, Church Depo. 118:3-17. *See also* Docs. 83 & 102.
[9] Dkt. 95, at 11.
[10] *Id.*

when the physician or physician group does not perform the technical component of the study. The AMA is discussing when the physician interpretation can be billed separately with "modifier 26 appended." That modifier is used when the physician interpreting the study had no other involvement with the performance of the study or rendering care to the patient. PVA's regulatory compliance, coding, billing and reimbursement practices expert witness, who is a Certified Professional Coder, confirms this:

> The guidance specifies that when a physician does not render both the technical and professional components, the interpretation of the diagnostic test (professional component only) may still be separately billable when supported by a written report. What the guidance does not state is that in the context of an evaluation and management service, there should be a stand-alone report. It simply states that in the absence of a technical component, the interpretation must be documented in written report to be supported.[11]

An example of that situation would be when a radiologist reads an X-Ray or MRI performed in a hospital. The radiologist is typically not involved in the patient care, and her only association with the patient is interpreting the X-Ray or MRI. That professional component only would be reported with a "modifier 26 appended."

Relators' "double billing" claim is unsupported and unproven, and should be rejected by this Court and their Motion for Summary Judgment denied.

**B. Relators' Claims That PVA Billed Under The Wrong Provider Are Baseless.**

Relators' theories of liability tied to the name of the physician on any claim sent to Medicare are, like Relators' other claims, wrong. Relators argue through their expert witness that PVA may have billed under a physician's name who did not read and interpret a vascular study. But Relators' theory is just that—a theory. Neither Relators nor their expert witnesses have reviewed medical records to support their theory. Relators' expert witness Dr. Nye compared

[11] Scott Expert Report, ¶ 77.

information in two separate databases to offer an opinion that some number of imaging studies were performed in which the "billing MD" did not match the "reading MD."[12] This theory is a construct of Relators fishing for potential claims. Relators have identified no specific claim for which their belief became reality. And even if they could do that, there is no evidence that a difference in the names of the physicians was done with intent to defraud Medicare or any other federal healthcare program or would be material to such a program's payment decision. Mismatching physician names, without more, is exactly the type of "garden-variety" regulatory issue that *Escobar* cautioned was not appropriate for policing under the False Claims Act. *See Escobar*, 136 S. Ct. at 2003 ("The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations.").

## III. PVA did not submit claims with any demonstrated intent to defraud a federal healthcare program.

Relators cannot as a matter of law meet the "rigorous" requirement to prove scienter under the FCA, which must be strictly enforced. *See Escobar*, 136 S. Ct. at 2002. The FCA only applies to the knowing presentment of a false claim. 31 U.S.C. § 3729(a). The FCA defines "knowing" as: (a) "actual knowledge"; (b) "deliberate ignorance of the truth or falsity of the information"; or (c) "reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1). "It is a long-established rule of this Circuit that to show a violation of the FCA, the evidence must demonstrate 'guilty knowledge of a purpose on the part of [the defendant] to cheat the Government.'" *U.S. ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (quoting *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972) and *United States v. Priola*, 272 F.2d 589, 594 (5th Cir. 1959)). "Though the FCA is plain that 'proof of specific intent to defraud' is not necessary, that *mens rea* requirement is not met by mere negligence or even gross negligence." *U.S. ex rel.*

[12]Dkt. 86-2, Nye Supp. Report at 5.

*Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) (quoting 31 U.S.C. § 3729(b)). "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (quotation omitted). "[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. *Lamers*, 168 F.3d at 1020.

Relators claim that changes in PVA's billing practices show PVA intentionally submitted false claims.[13] They contend PVA's billing process was triggered "irrespective of whether a PVA physician had completed a written report, or even looked at the results."[14] Relators ignore the fact that PVA's practice is to read and interpret vascular study results the same day in the office, and document the interpretation in the patient's medical record.[15] Results of those vascular studies are reviewed with the patient at the visit immediately following the study.[16]

Whether PVA changed its process at some point to bill after MedStreaming reports were finalized or implemented read groups has zero bearing on whether a false claim was submitted. MedStreaming reports are not required by any Medicare or federal healthcare program statute or regulation. There is not even any government-issued guidance suggesting one is required. Instead, Relators' entire case is based on their desire to turn non-binding guidance language from the AMA—none of which requires a separate, stand-alone report—into a governmental requirement for payment resulting in an alleged FCA violation. Relators' subjective interpretation of a

[13] Dkt. 95, at 28.
[14] Dkt. 95, at 12.
[15] Dkt. 94, at 5-7.
[16] *Id.*

guidance document prepared by a medical association does not satisfy the rigorous requirement to prove scienter.

If an applicable statute or regulation is subject to multiple reasonable interpretations, like here at best for plaintiffs, a defendant does not act with sufficient knowledge for liability under the FCA simply by following one of the interpretations. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 & n.20 (2007) ("[t]o the extent that they argue that evidence of subjective bad faith can support a willfulness finding even when the company's reading of the statute is objectively reasonable, their argument is unsound."); *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 657-58 & n.39 (5th Cir. 2017) (citing *Safeco* with approval and finding the trial testimony supported the defendant's assertion that a "reasonable interpretation of any ambiguity inherent in a regulation belies the scienter necessary" to violate the FCA); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003) (FCA's scienter requirement cannot be satisfied when there are "legitimate grounds for disagreement over the scope of a contractual or regulatory provision.") (Jones, J., specially concurring) (citing *Lamers*, 168 F.3d at 1018); *U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 832 (8th Cir. 2013) ("Mayo's reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA."). The same is true no matter the defendant's subjective intent. *Safeco*, 551 U.S. at 70 & n.20. Relators may believe that separate, stand-alone reports should be required, but, just as PVA's subjective intent would not subject it to FCA liability, Relators' subjective belief does not create an objective Medicare or federal healthcare requirement.

Even if guidance from the AMA or industry groups could create payment rules affecting PVA's right to payment from Medicare (which it cannot), those rules would be unenforceable under the Supreme Court's *Allina* decision, and could not serve as a basis for creating liability

under the punitive FCA. In *Allina*, the Supreme Court held that sub-regulatory guidance, or Medicare interpretive rules, cannot create or change a substantive legal standard without first going through notice and comment rulemaking. *Allina*, 139 S. Ct. at 1813. The *Allina* decision highlights the need for courts to ensure "[s]trict enforcement of the FCA's knowledge requirement" so actions taken in the absence of binding statutory or regulatory language "are not converted into FCA liability, thereby avoiding the potential due process problems posed by penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) (internal quotations omitted). This is directly applicable to reject Relators' claims. There simply is no federal healthcare statute, regulation, rule, or guidance requiring a separate, stand-alone report to bill for a vascular study. Relators' hopes and aspirations cannot overcome uncontroverted law supporting this Court's granting of PVA's full motion for summary judgment.

Relators instead cite to *United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020), to support their misplaced argument that PVA intentionally submitted false claims. The *Drummond* case, however, rejects rather than supports Relators' arguments. The defendants in *Drummond*, a laboratory services company and its CEO, were accused of seeking reimbursement from Medicare for miles lab technicians never traveled. *Id.* at 279. There was no dispute that the defendants "sought and obtained round-trip, driving mileage reimbursements for the one-way shipment of samples via airplane with no technician onboard." *Id.* at 280. The government alleged those defendants violated a Medicare statute that allows for reimbursement of laboratories' expenses "for trained personnel to travel to the location of an individual to collect the sample." *Id.* at 281 (quoting 42 U.S.C. § 13951(h)(3)(B)). The court found that the defendants' billing for travel that never took place was forbidden by the Medicare

statute. *Id.* The defendants argued their actions were permitted by language in a Medicare Claims Processing Manual. *Id.* at 281-82. But the court rejected that contention because the manual was "sub-regulatory guidance," which amounted to a "'policy statement' that has 'no binding legal effect.'" *Id.* at 281 (quoting *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017) ("it is clear that the Manual instructions constitute a policy statement for the same reason that they do not create or amend a substantive legal standard—they have no binding legal effect.").

Unlike the government in *Drummond*, Relators in this case identify no federal healthcare program statute or regulation requiring a separate, stand-alone report to bill for a vascular study. And the sources upon which Relators rely are not even "sub-regulatory guidance," which itself has "no binding legal effect." *See id.*

The evidence identified by Relators also fails to satisfy the FCA's "rigorous" scienter requirement. Relators focus on meeting minutes discussing potential changes to how PVA billed claims, and assert PVA as a result submitted false certifications.[17] Relators fail to establish that any individual at PVA knew MedStreaming reports were required to bill Medicare and how that particular individual caused or submitted a false claim or certification to be made. A "[r]elator must show that a particular individual [. . .] caused the false claim to be made, either knowingly or in reckless disregard of the truth of the certification." *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2015 WL 5178074, at *29 (S.D. Tex. Sept. 3, 2015), *aff'd sub nom. U.S. ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368 (5th Cir. 2016). A defendant "cannot be liable for FCA violations based on 'collective knowledge' of a number of employees." *Id.* (citation omitted). Despite this, Relators allege disparate documents with testimony from witnesses who

---

[17] Dkt. 95, at 12-15, 27.

either did not prepare the actual documents at issue or had little involvement. Such a position must fail as a matter of law.

Relators' focus on PVA's compliance policies is misplaced. It is unclear how Relators believe PVA's compliance policies are fodder for their FCA claims. Relators ignore the fact that providers are not required to have compliance policies to bill for Medicare or any other federal healthcare program items or services. There simply is no federal healthcare statute, regulation, rule, or guidance requiring a compliance plan.[18] And whether an employee recognizes PVA's written compliance policies at a deposition is not evidence that PVA allegedly "cheated" the government. If anything, the fact that PVA has comprehensive compliance policies, formed compliance and vascular lab committees that meet regularly, and has processes in place to check and double-check bills (reviewed by certified coders) before submission to a federal healthcare program is overwhelming evidence PVA did not knowingly cheat the government.[19] Such actions are not that of an entity acting with reckless disregard or deliberate ignorance within the meaning of the FCA. PVA therefore did not violate the FCA.

The law is clear that "the FCA is a fraud prevention statute, and not a general enforcement device for federal statutes, regulations and contracts." U.*S. ex rel. Patton v. Shaw Servs.*, L.L.C., 418 F. App'x 366, 369 (5th Cir. 2011) (quotation omitted). It is well settled that if a case turns on a defendant's state of mind, courts are hesitant to grant summary judgment finding that the requisite intent was present. *Taylor-Vick*, 513 F.3d at 231. While every medical practice or healthcare provider may make innocent billing errors that is not enough to impose liability under

[18] Although Relators' proffered expert witness Mr. Church opines that compliance plans are required by federal law, his opinion is uninformed and incorrect and should be stricken. *See* Dkt. 83, Defendant's Opposed Motion to Exclude Relators' Expert Witness Robert D. Church, Jr., at 17-18.

[19] *See* Dkt. 94, at 7-8.

the punitive FCA. *See Escobar*, 136 S. Ct. at 2003 ("[the FCA] is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations."). A relator plainly "cannot survive summary judgment merely by submitting evidence of false claims; she must have evidence that the defendants knowingly or recklessly cheated the government." *Taylor-Vick*, 513 F.3d at 232. Relators' evidence does not even approach, let alone, climb that hill, and is certainly insufficient to impose liability under the FCA.

## IV. Relators cannot prove that any alleged false claims were material to the government's payment decision.

Relators cannot prove PVA "knowingly violated a requirement that [PVA] knows is material to the government's payment decision." *See Escobar*, 136 S. Ct. at 1996. Relators cannot show any alleged false claim or statement made by PVA was material to a federal healthcare program's payment decision, a standard elevated and required by *Escobar*. The Supreme Court's unanimous decision in *Escobar* "clarif[ied] some of the circumstances in which the False Claims Act imposes liability." *Escobar*, 136 S. Ct. at 1995. In narrowing and specifying appropriate claims under the FCA, the Supreme Court held that a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act" and clarified "how that rigorous material requirement should be enforced." *Id.* at 1996. The Supreme Court emphasized:

> The materiality standard is demanding. The False Claims Act is not "an all-purpose antifraud statute," or a vehicle for punishing garden-variety breaches of contract or regulatory violations. A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.

*Id.* at 2003 (internal citations omitted). Acknowledging the "essentially punitive" nature of the FCA—treble damages, plus a maximum civil penalty of $23,331 per false claim—*Escobar*

reinforces the "rigorous" and "demanding" materiality inquiry. *Id.* at 1994, 1996, 2002-03; 15 C.F.R. § 6.3.

Relators wholly have failed to satisfy the test mandated by the Supreme Court in *Escobar* requiring proof (not mere allegations) of materiality, including "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 2003. Relators have not, and cannot, point to a single act taken by a federal healthcare program that supports their burden to prove materiality. In fact, the situation described in *Escobar* mirrors precisely the case here, that "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* at 2003-04.

Relators filed their initial Complaint under seal on April 12, 2017. After being served with the Complaint, the Department of Justice began an investigation. Relators filed their First Amended Complaint under seal on December 21, 2017. On June 19, 2018, the Department of Health and Human Services Office of Inspector General ("OIG") issued a subpoena to PVA demanding production of medical and business records. As part of its subpoena, the OIG sought over 400 medical patient records identified by name and date of birth. On August 21, 2018, PVA produced more than 50,000 pages of documents to the OIG and DOJ, including 414 patient files. Following the production of documents and medical records, PVA met with Special Agents from the OIG, Department of Defense, and the lead DOJ attorney. On November 26, 2018, after multiple extensions to investigate Relators' claims, DOJ informed PVA and the Court of its decision to decline intervention in this civil action. Since that time, the DOJ has received all pleadings filed in the case.

For more than three years Relators have continually made the government well aware of their allegations of PVA's false claims, false records, and false statements. With that information and following the government's investigation, not a single government agent in any agency has demanded or even requested PVA alter those practices in any regard. Not one audit request was made by a federal healthcare program. Not one agency or contractor has raised any issue with PVA's medical practices or submission of claims. Agencies overseeing federal healthcare programs were made specifically aware of the facts. Yet, PVA continues to receive reimbursement by the government for treatment provided to patients at rates unaffected by Relators' contentions.

The same is true for the alleged "testing only" patients Relators identify in their Motion. Relators assert that claims submitted for "testing only" patients who did not receive E/M services were false because the MedStreaming reports were the only documentation of the study interpretation and they were not signed until after the claims were submitted. Relators rely on their counsel's review of 121 patient files to support this claim. Putting aside the propriety of such a review (which is completely improper),[20] every single one of those 121 files already was provided to the OIG and DOJ in 2018, and resulted in no federal agency supporting Relators' claims. The OIG is the agency that oversees the Medicare and Medicaid programs and investigates allegations of fraud. At no time has any government agency asked PVA to change its practices or demanded repayment. Despite being aware of the specific patients and issues Relators identify, the Government has never changed its payment decisions as to PVA. But Relators continue to

[20] Although Relators' contend their counsel's review of records confirms the opinions of their expert witness Dr. Nye, it does the opposite. Dr. Nye's untimely opinion is that PVA submitted charges for 11,728 "testing only" studies without a signed MedStreaming report. Dkt. 95-1, Relators' Appx., ¶ 33. Relators' counsel's review allegedly identified 8,757 such studies. *Id.* ¶ 40. The discrepancies between the two reviews underscore the unreliability of that otherwise inadmissible evidence.

waste significant time and resources of PVA, DOJ, OIG, and the judiciary seeking to substitute their wishes and beliefs for federal agency rules regarding what should be done regarding vascular testing. That is not the basis for a FCA action. Relators' continued push in this case simply constitutes a shakedown against PVA for millions of dollars. This was and is not Congress' intent nor DOJ or the OIG's policy.

The government's continued payment of claims in full despite its investigation and involvement in this case is "very strong evidence that those requirements are not material." *See id.* at 2003-04. Indeed "[s]uch very strong evidence becomes compelling when an agency armed with robust investigatory powers to protect public health and safety is told what Relators have to say, yet sees no reason to change its position." *U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 35 (1st Cir. 2017). This is why "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *Harman* 872 F.3d at 663. Relators have not met that burden here.

Relators cannot carry their substantial burden by claiming the professional component of a vascular study is incomplete until a MedStreaming report is signed. As detailed above and in PVA's Motion for Summary Judgment, there is no federal healthcare program statute, regulation, rule or guidance requiring a MedStreaming or other separate, stand-alone report. Medicare has not conditioned payment upon completion of such a report. Even if Relators could identify a condition of payment, that would be insufficient to prove materiality under the FCA. *Escobar*, 136 S. Ct. at 2003.

Similarly, it is insufficient for Relators to contend Medicare or any other federal healthcare program would have the option to decline payment, which is, at best, what Relators ask this Court to find by relying on the AMA's CPT Guidebook. Even if that non-binding guidance from a non-

governmental association could serve as a basis for Medicare denying a claim, Relators have not provided a scintilla of *proof* Medicare or other federal programs would reject those claims. Such an assertion is pure conjecture and should summarily be dismissed. Despite years of prosecuting their baseless claims against PVA, Relators have not identified a single claim denied by Medicare because a provider did not sign a MedStreaming report. While Relators may hope and wish to believe Medicare and other federal programs would outright deny claims for vascular studies that did not check the boxes of all the best practices, Relators have no proof. The "rigorous" and "demanding" materiality inquiry reinforced by *Escobar* cannot be satisfied by speculation about what the government might do; the test requires *proof* that the government would change its payment decision.

In the wake of *Escobar* and with a mandate to require materiality of payment requirements, numerous courts dismissed *qui tam* lawsuits in which the government was aware of the allegations, conducted an investigation, yet continued to pay the relevant claims. *See D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) ("The fact that CMS has not denied reimbursement for Onyx in the wake of D'Agostino's allegations casts serious doubt on the materiality of the fraudulent representations that D'Agostino alleges."); *U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) ("[W]e have the benefit of hindsight and should not ignore what actually occurred: the [Defense Contract Audit Agency] investigated McBride's allegations and did not disallow any charged costs. . . . This is 'very strong evidence' that the requirements allegedly violated . . . are not material."); *Abbott v. BP Exploration & Production, Inc.*, 851 F.3d 384, 388 (5th Cir. 2017) ("As recognized in *Escobar*, when the [Department of the Interior] decided to allow the Atlantis to continue drilling after a substantial investigation into Duffy's allegations, that decision represents 'strong evidence' that the requirements in those regulations are not material.");

*U.S. ex rel. Nelson v. Sanford-Brown Ltd.*, 830 F.3d 445, 447 (7th Cir. 2016) ("Here, Nelson has offered no evidence that the government's decision to pay SBC would likely or actually have been different had it known of SBC's alleged noncompliance with Title IV regulations. On the contrary, the subsidizing agency and other federal agencies in this case have already examined SBC multiple times over and concluded that neither administrative penalties nor termination was warranted.").[21] These cases demonstrate Relators' claims fail, and should be dismissed with prejudice.

**V. Relators' Claims Fail Because Their Pursuit Of Non-Intervened FCA Claims Is A Violation Of The Appointments Clause And Constitutional Requirement Of Separation Of Powers.**

Although the Court is bound by the Fifth Circuit's decision in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001), the Supreme Court has not specifically addressed whether a relator's pursuit of non-intervened FCA claims is consistent with the Constitution's Appointments Clause or separation of powers requirements in the Take Care Clause and elsewhere. The dissent in *Riley* clearly articulates "the encroachment on executive power that results from turning over litigation of the government's business to self-appointed relators [and] the consequent violations of separation of powers" to conclude that "FCA violates the Take Care Clause, the Appointments Clause, and separation of powers principles." *Riley*, 252 F.3d at 758, 778 (Smith, J. dissenting). PVA includes this reference here to preserve the argument that should Relators be permitted to assert such claims, PVA intends to pursue all available appellate avenues.

**VI. Conclusion**

Relators' Motion for Summary Judgment should be denied with prejudice. Relators fail to identify a single false submission, statute, regulation, or even any federal health care program guidance supporting the basis for PVA's liability under the FCA. After three years of investigation

[21] For detailed discussion of additional cases applying *Escobar*'s materiality standard, see Dkt. 94, at 25-27.

with no such finding, Relators' claims must fail and be dismissed as a matter of law. The DOJ, the OIG, and Relators all have exhausted their review of PVA's practices and claims. None of those entities and person credibly have identified a single claim as false or fraudulent in violation of the FCA. At some point this case should cease. That time is now.

Dated: September 11, 2020

Respectfully submitted,

By: *<u>/s/ Sean McKenna</u>*

Sean McKenna
State Bar No. 24007652
smckenna@spencerfane.com
Mark A. Cole
*Admitted Pro Hac Vice*
mcole@spencerfane.com
SPENCER FANE LLP
2200 Ross Avenue, Suite 4800 West
Dallas, Texas 75201
Telephone: 214-459-5890
Facsimile: 214-750-3612

Stephen J. Romero
State Bar No. 24046756
stephen.romero@nortonrosefulbright.com
Jeff Wurzburg
State Bar No. 24105140
jeff.wurzburg@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
Frost Tower 111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: 210-224-5575
Facsimile: 210-270-7205

Counsel for Defendant
Peripheral Vascular Associates, P.A.

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of September, 2020, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Justin T. Berger
Sarvenaz J. Fahimi
Cotchett Pitre & McCarthy, LLP
840 Malcolm Road
Burlingame, CA 94010

Wallace M. Brylak, Jr.
Brylak & Associates
15900 La Cantera Parkway, Suite 19245
San Antonio, TX 78256

John M. Deck
United States Attorney's Office for the Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216

*<u>/s/ Sean McKenna</u>*
Sean McKenna