IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel., TIFFANY MONTCRIEFF, et al.,** | § | |
| **Relators, Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 5:17-CV-00317-XR** |
| **PERIPHERAL VASCULAR ASSOCIATES, P.A.,** | § | |
| **Defendant.** | § | |

**DEFENDANT PERIPHERAL VASCULAR ASSOCIATES' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION.

Relators' case is this: we know best, so the Court should substitute Relators' beliefs (as technicians) for the actual treating physicians' decisions how to best diagnose patients and communicate and bill vascular study reports. Because Peripheral Vascular Associates ("PVA") did not follow what Relators thought, despite the fact there is NO federal healthcare program statute or regulation supporting their beliefs, PVA committed fraud and should pay hundreds of millions of dollars. That is preposterous.

Repetition does not create veracity or favorable facts. Relators, in their ever morphing allegations, share the same shortcomings. They fail to cite any federal healthcare program statute or regulation that has the force and effect of law with which PVA "knowingly" did not comply. *See Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017). They also do not submit any specific evidence (obtained within their personal knowledge) that shows the submission of an actual false claim for reimbursement by a federal health care program. Indeed it remains wholly unclear, even after discovery, which of the three Relators actually has any direct

and independent knowledge of any contention in this case, thus neither of them are proper relators. *Rockwell Intern. Corp. v. U.S.* 549 U.S. 457, 471 (2007). Without the foregoing, Relators cannot meet the basic elements to show PVA knowingly violated the civil False Claims Act ("FCA").

Relators' case is not built on any condition of payment set out in any Medicare or federal healthcare program statute or regulation designating some action as a requirement to bill for vascular-related items or services. Relators, instead, continue to base their allegations entirely on non-binding industry guidance/suggestions that lack the force and effect of law to bootstrap their claims to replace and supplant existing federal healthcare program rules. There is no federal healthcare program requirement that PVA adhere to the industry guidance cited by Relators. Relators' position utterly fails in the face of clear contrary law and evidence. Here, there is no genuine issue of material fact in dispute. PVA's Motion for Summary Judgment should be granted because Relators have not proven PVA knowingly submitted any false or fraudulent claim material to a federal healthcare program's payment decision in violation of the FCA despite years of maligning PVA.

## II. PVA IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OR LAW BECAUSE RELATORS CANNOT MEET THEIR BURDEN TO SHOW PVA KNOWINGLY SUBMITTED AN IMPROPER CLAIM TO A FEDERAL HEALTHCARE PROGRAM.

Summary judgment is appropriate here because Relators' case consists entirely of untenable and misleading premises since they are unable, after extensive discovery, to meet any element necessary to demonstrate PVA submitted a false or fraudulent claim to a federal healthcare program within the meaning of the FCA. Summary judgment is appropriate if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If the moving party does not bear the burden of proof at trial, like PVA here, it may either: (1) identify evidence negating the existence of a material

element of the nonmoving party's claim; or (2) demonstrate that the nonmoving party lacks sufficient evidence to prove an essential element of its claim. *McKee v. CBF Corp.*, 299 F. App'x 426, 428 (5th Cir. 2008). "'A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) (internal quotations omitted). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Id.* (*citing SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)). This is exactly what Relators have done, and thus cannot defeat PVA's motion for summary judgment.

### A. *PVA Has Not Knowingly Submitted False Or Fraudulent Claims Within The Meaning Of The FCA.*

To find PVA liable under the FCA, Relators must prove that "(1) 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).'" *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009). Relators are unable to show any element proving PVA's violation of the FCA, let alone falsity. In fact, PVA's Motion for Summary Judgment must be granted as a matter of law on multiple grounds, one of which is that Relators have not demonstrated the submission of a single false claim.

PVA's vascular studies have two components, the technical component and the professional component. PVA performed every single vascular study submitted to a government health plan for reimbursement, and Relators have not contended or demonstrated otherwise. Relators thus cannot prove falsity - one of the basic elements for FCA liability. *Id.* Relators' proffered billing and coding expert acknowledged such.[1] Relators' allegations are based on a farce; that the interpretations of some of those studies were incomplete because a separate report in PVA's MedStreaming system, a picture archiving and communication system, was not signed at the time a bill was submitted. This is not a Medicare or federal healthcare program requirement for payment. There is no federal healthcare program statute, regulation, rule, or even non-binding guidance requiring a MedStreaming report or any other separate, stand-alone report to bill for a vascular study. "Medicare has not specifically promulgated regulations governing a physician's interpretation of venous ultrasound studies." *U.S. ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822, 824 (W.D. Mich. 2000), *aff'd*, 24 F. App'x 491 (6th Cir. 2001).[2] Relators and their alleged experts have a fundamental misunderstanding of vascular surgical practices, coding, and billing. Neither Medicare nor any other federal healthcare program requires a special report to submit a bill for reimbursement for a vascular study. This is without contradiction by Relators and their experts during their respective depositions. No statute, federal healthcare program regulation, rule, or even non-binding guidance requires a MedStreaming report or any other specialized stand-alone report. This utter failure to prove a false claim within the meaning of the FCA dooms Relators' allegations, regardless of whatever smoke and mirrors they allege or contentions of disputed facts they conjure.

---

[1] Remote Oral Deposition of Robert D. Church, Jr., attached hereto as Ex. A., Tr. 84:3-17.

[2] For a detailed discussion of the *Swafford* case, see Dkt. 94, Defendant Peripheral Vascular Associates' Motion for Summary Judgment, at 13-14.

It bears repeating that PVA adopted MedStreaming in 2014 as its picture archiving and communications system ("PACS") to streamline imaging storage and retrieval, and to manage workflow. PVA invested thousands of dollars and heavily modified the MedStreaming system to create a cartooned image report that is easier for referring physicians, providers, health care workers, and patients to understand. Every vascular study has a formal MedStreaming report. In addition to the MedStreaming report, results of vascular tests are communicated in various ways to treating and referring physicians.[3] These include direct conversations with patients, conversations and telephone calls with referring physicians, correspondence with referring physicians, and even providing the patient with a copy of the results at the time of the visit.[4] Without a federal healthcare program statute or regulation that requires a separate, stand-alone report prior to the submission of a claim, Relators' theory of falsity fails and it cannot defeat summary judgment. As PVA reiterated to Relators since the onset of this misguided litigation, and more recently to their experts, PVA utilizes an electronic medical records ("EMR") system called Allscripts which houses their patient medical records. The patient medical record includes patient history, physical exam, and the physician's assessment and plan. Included in the Allscripts records are notes of the physician's interpretation of ultrasound studies.

PVA's physicians' interpretations of vascular studies are documented in the patient's medical record. Medical records included with PVA's Motion for Summary judgment show physicians' interpretations of vascular studies before any bill is submitted. For example:

[3] Remote Oral Deposition of Grady Alsabrook, Jr., attached hereto as Ex. B, Tr. 31:23-32:10.
[4] *Id*.

> *Carotid duplex ultrasound reveals less than 40% right carotid stenosis. There is 60-79% left internal carotid stenosis. Vertebral flow is antegrade bilaterally. When the current study is compared to that of 2/11/2015, the degree of stenosis on the right side appears to be less severe. These results were discussed in detail with the patient. At this time, I feel that no additional vascular imaging or intervention is required but careful follow-up should continue. He understands and agrees. I would like to follow him with you and see him again at the time indicated above with the vascular studies listed. I would be happy to see him at any time in the interim if I can be of assistance.*

Relators again identify no federal healthcare program statute, regulation, rule, or guidance setting for a standard of what must be included in any "written report" documenting interpretation of a vascular study to support their allegations of FCA violations. "The False Claims Act is not 'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 136 S. Ct. at 2003 (internal citation omitted). "[A]bsent a showing of an objective and knowing falsehood, the FCA is an inappropriate instrument to serve as the Government's primary line of defense against questionable claims . . . ." *AseraCare*, 938 F.3d at 1301. "[A] defendant's decision in the face of a dispute [about] the requirements of government regulations is insufficient, without more, to constitute falsity." *Swafford*, 95 F. Supp. 2d at 832. Even if there were a dispute on this issue, PVA's decision to submit claims in a certain manner that does not comport with Relators' idealized version of a vascular practice does not demonstrate the falsity of a claim.

Relators' contentions are built on their own preferences for how they think billing should be done, and assert that PVA engaged in fraud and false statements for failing to do so. But there are many ways in which a physician reviews the results of an ultrasound study when the study is performed.[5] For example, a physician may be in the room where the ultrasound is performed, printouts of studies called waveforms are brought to the physician to review with the patient, and technologists provide the physician with completed worksheets depicting the results of the vascular ultrasound study. The physician's review and interpretation of a vascular study also

[5] Ex. B, Tr. 31:23-32:10.

comes in various forms and nothing requires that the review and interpretation be documented in a separate, stand-alone report.[6]

Not only are Relators unable to identify a single federal healthcare program statute or regulation with the force and effect of law that requires a separate, stand-alone report, there is no statute or regulation that requires a specific written report of any kind to bill for a vascular study.[7]

B. *Relators Cannot Show A Knowing Violation of Any Federal Healthcare Program Statute or Rule With the Force and Effect of Law.*

Relators critically do not offer a single statute, regulation, rules or guidance from any federal healthcare program supporting their FCA claims. Relators' contentions thus must fail as a matter of law. Relators understandably have ceased citing 42 C.F.R. § 415.120. After years of, first Relators' and then government's investigation, and now formal litigation, Relators now grasp that regulation does not apply to PVA. As the *Swafford* court recognized, compliance with that regulation is not a prerequisite for reimbursement by Medicare for vascular ultrasounds. *Swafford*, 95 F. Supp. 2d at 828. The *Swafford* court's conclusion is supported by the language of the regulation and statements by CMS. Section 415.120(a) discusses a "written report" to include in the medical record "maintained by the hospital." *See* 42 C.F.R. § 415.120(a). PVA is not a hospital, and although it interprets some ultrasounds performed at hospitals, those services are not at issue in this case. Medicare (CMS') comments implementing that regulation make clear section 415.120 applies only to services performed in a hospital and specifically to x-rays and electrocardiograms taken in an emergency room. *See Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 1996*, 60 Fed. Reg. 63,130-63,133 (Dec. 8, 1995). Medicare therefore since 1995

---

[6] Expert Report of Melissa Scott, CPC, CHC, CHIAP, June 23, 2020 at p. 5, attached hereto as Ex. C.
[7] *Id. See Also*, Ex. A Tr. 72:22-77:12; Remote Oral Deposition of James E. Alexander, Jr. M.D., attached hereto as Ex. D Tr. 146:24-150:22.

has publicly stated section 415.20 has no impact on or relevance to a practice like PVA. The *Swafford* court merely reiterates this.

Relators now are left with nothing more than a misguided attempt to bootstrap Medicare's use of Current Procedural Terminology ("CPT") codes into some downstream requirement that PVA complete a separate, stand-alone report before billing for vascular studies is misleading and disingenuous and should not be permitted to lower fundamental FCA thresholds. This is not correct and Relators have not offered any statutory or regulatory support for such a proposition. Moreover, CPT codes do not have the force and effect of law under Department of Justice Guidance or U.S. Presidential Executive Orders and cannot serve a substantive basis for a FCA violation. *See Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases*, United States Department of Justice, January 25, 2018[8]; *Azar v. Allina Health Services*, 139 S. Ct. 1804, 1813 (2019).[9] Only federal healthcare program statutes or regulations promulgated pursuant to notice and feedback can do so. *Id.* Relators' continued assertions to the contrary are at best ignorance of clear prevailing Supreme Court precedence and, at worst, an attempt to mislead this Court.

The AMA guidance also relied on by Relators is not a statute or regulation and does not set forth any policy of any federal healthcare program. Following the Supreme Court's decision in *Allina Health Services*, even if AMA guidance were sub-regulatory guidance, which it is not, is not a basis for a FCA violation because it was not subject to the APA's notice and comment period. *See Allina Health Services*, 139 S. Ct. at 1804; *Polansky v. Executive Health Resources, Inc.*, 422

---

[8] Available at: https://www.justice.gov/file/1028756/download.

[9] *See Also* Impact of *Allina* on Medicare Payment Rules Memorandum, HHS Office of the General Counsel, October 31, 2019, attached as Exhibit D; *see also Department of Health and Services Good Guidance Practices* propose rule, 85 Fed. Reg. 51396, 51398 (Aug. 20, 2020) (proposing to require all guidance documents, unless the guidance is authorized by law to be binding, to state that "[t]he contents of this document do not have the force and effect of law and are not meant to bind the public in any way, unless specifically incorporated into a contract. This document is intended only to provide clarity to the public regarding the existing requirements under the law.")

F. Supp.3d 916 (2019). If specific sub-regulatory guidance, which is not even alleged or plead by Relators, issued by CMS cannot create substantive standards, a guidebook issued by a private medical association surely does not. *Id*. The old adage applies here: one cannot do indirectly what one cannot do directly.

All Relators' alleged expert witnesses took their cue from Relators and cite to articles, blog posts, and other non-governmental guidance to support Relators' discredited theory that a separate, stand-alone report is required. PVA has objected to the admissibility of opinions of Relators' proffered expert witnesses Dr. James Alexander (Dkt. 82), Robert D. Church (Dkt. 83) and Dr. Zachary Nye (Dkt. 86). Their testimony should be excluded and Relators' claims should fail as a matter of law. Relators must not be permitted to magically transform non-governmental sources in violation of *Allina Health Servs.* into an otherwise binding federal healthcare program requirement to impose treble damages and penalties against PVA. *Id*. Nothing in the language cited by Relators requires a separate, stand-alone report. Relators fail to provide a single applicable binding source to support their FCA claims. On this basis alone, their case should be dismissed with prejudice.

C. *There Is No Evidence PVA's Vascular Studies Were Not Medically Necessary.*

Relators have not provided the Court with even a scintilla of facts demonstrating vascular studies performed by PVA were not medically necessary. All of Relators' proffered experts disclaimed any ability to opine on the medical necessity of the vascular studies.[10] Much like their effort to elevate non-governmental guidance (not even meeting the level of agency subregulatory guidance) into some Medicare condition of payment, Relators again attempt to manufacture the nonsensical concept of "regulatory medical necessity." This not a Medicare or federal healthcare

---

[10] *See* Doc. 82, Defendant's Opposed Motion to Exclude Relators' Expert Witness James E. Alexander, M.D., at 12-14; Doc. 83, Defendant's Opposed Motion to Exclude Relators' Expert Witness Robert D. Church, Jr., at 11, 15.

program requirement – it is a made-up concept, until now, unknown to PVA and the medical field prior to Relators' utterance of the term. Relators once again urge, the now debunked assertion, that a separate, stand-alone report is required by a federal healthcare program to shoehorn that fake news theory into a prerequisite requirement for payment.[11]

The *Swafford* relator similarly challenged the allegedly "inadequate and pathetic patient care" reflected in the "interpretations" of the physicians that were derived from technicians' worksheets. *Swafford*, 98 F. Supp. at 829. That court, even assuming the accuracy of plaintiff's characterization of the physicians' activity, readily concluded that "as a matter of law, plaintiff c[ould not] demonstrate the falsity of defendants' claims under the FCA by proving their delivery of services fell short of the requisite standard of care." *Id.* at 830 (discussing Judge Easterbrook's opinion in *Luckey*, 183 F.3d at 732, and other circuit authorities). The *Swafford* court easily, and correctly, found that plaintiff could not prevail on an FCA claim, even if a relator "can demonstrate defendants' practice failed to conform to the standard of care applicable to the interpretation of" the ultrasounds at issue. *Id.* at 831; *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) ("[C]laims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA"). Relators' baseless allegations again fail to show any falsity resulting from PVA's performance of vascular studies or tests. Summary judgment is appropriate and should be granted to PVA.

D. *Relators Cannot Show PVA Violated The FCA's Rigorous Scienter Standard.*

Relators as a matter of law cannot meet the FCA's "rigorous" requirement to prove scienter. *See Escobar*, 136 S. Ct. at 2002. *Escobar* and its progeny state this FCA element must be strictly enforced. An FCA violation occurs only if there is a "knowing" presentment of a false

[11] *See Id.*

or fraudulent claim (here the only applicable provision). *See* 31 U.S.C. § 3729(a). The FCA defines "knowing" as: (1) "actual knowledge"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1). "It is a long-established rule of this Circuit that to show a violation of the FCA, the evidence must demonstrate 'guilty knowledge of a purpose on the part of [the defendant] to cheat the Government.'" *U.S. ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (quoting *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972) and *United States v. Priola*, 272 F.2d 589, 594 (5th Cir. 1959)). "Though the FCA is plain that 'proof of specific intent to defraud' is not necessary, that *mens rea* requirement is not met by mere negligence or even gross negligence." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) (quoting 31 U.S.C. § 3729(b)). "[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. *Lamers*, 168 F.3d at 1020. Indeed, "[l]iability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (quotation omitted). These cases and others show as a matter of law that PVA did not "knowingly" submit any claim, let alone a false or fraudulent one, to any federal healthcare program.

Relators allege changes in PVA's billing practices show PVA intentionally submitted false claims.[12] This is incorrect, but even if it were true, such evidence is inadmissible as a subsequent remedial measure. *See* FRE 407. Relators contend PVA's billing process was triggered "irrespective of whether a PVA physician had completed a written report, or even looked at the

[12] Dkt. 95, at 28.

results."[13] Relators ignore the fact that PVA's practice is to read and interpret vascular study results the same day in the office, and document the interpretation in the patient's medical record.[14] Results of those vascular studies are reviewed with the patient at the visit immediately following the study.[15] Relators' theory again misses the mark.

Whether PVA changed its process at some point to bill after MedStreaming reports were finalized or implemented, read groups has zero bearing on whether a false claim was knowingly submitted. MedStreaming reports are not required by any Medicare or federal healthcare program statute or regulation. There is not even any government-issued guidance suggesting one is required. Instead, Relators' entire case is based on their desire to turn non-binding guidance language from the AMA—none of which requires a separate, stand-alone report—into a governmental requirement for payment resulting in an alleged FCA violation. Relators' subjective interpretation of a guidance document prepared by a medical association does not satisfy the rigorous requirement to prove scienter. There simply is no federal healthcare statute, regulation, rule, or guidance requiring a separate, stand-alone report to bill for a vascular study. Relators' hopes and aspirations cannot overcome uncontroverted law supporting this Court's granting of PVA's full motion for summary judgment.

Relators inappropriately cite to *United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020), to support their unproven assertion PVA "knowingly" submitted false claims. The *Drummond* case rejects, rather than supports, Relators' position. *Id.* The defendants in *Drummond*, a laboratory services company and its CEO, were accused of seeking reimbursement from Medicare for miles lab technicians never traveled. *Id.* at 279. There

---

[13] Dkt. 95, at 12.
[14] Dkt. 94, at 5-7.
[15] *Id.*

was no dispute those defendants "sought and obtained round-trip, driving mileage reimbursements for the one-way shipment of samples via airplane with no technician onboard." *Id.* at 280. The government alleged those defendants violated an unambiguous, applicable Medicare statute that allows for reimbursement of laboratories' expenses "for trained personnel to travel to the location of an individual to collect the sample." *Id.* at 281 (quoting 42 U.S.C. § 13951(h)(3)(B)). The court found defendants' billing for travel that never took place was forbidden by the Medicare statute. *Id.*

Ironically, Relators cite a case that succinctly states exactly why PVA's position here is correct and that it did not knowingly submit any false claim to a federal healthcare program. *See id* at 281-82. The *Drummond* defendants argued their actions were permitted by language in the Medicare Claims Processing Manual. *Id.* The *Drummond* court rejected that contention because the offered Medicare manual was "sub-regulatory guidance," which amounted to a "'policy statement' that has 'no binding legal effect.'" *Id.* at 281 (quoting *Clarian Health W., LLC v. Hargan*, 878 F.3d at 357 ("it is clear that the [m]anual instructions constitute a policy statement for the same reason that they do not create or amend a substantive legal standard—they have no binding legal effect.")).

Unlike in *Drummond*, Relators identify not a single federal healthcare program statute or regulation requiring a separate, stand-alone report to bill for a vascular study. And the sources upon which Relators rely are not even "sub-regulatory guidance," which itself has "no binding legal effect." *See id.*

Relators cannot satisfy the FCA's "rigorous" scienter requirement. Relators focus on meeting minutes discussing potential changes to how PVA billed claims, and assert PVA, as a

result, submitted false certifications.[16] Apart from barring such evidence and conclusion under FRE 407, Relators fail to establish that any one individual at PVA knew MedStreaming reports were required to bill Medicare and how that particular individual caused or submitted a false claim or certification to be made. This is perhaps the most simplistic basis for establishing a defendant's scienter under the FCA. Indeed a "[r]elator must show that a particular individual [. . .] caused the false claim to be made, either knowingly or in reckless disregard of the truth of the certification." *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2015 WL 5178074, at *29 (S.D. Tex. Sept. 3, 2015), *aff'd sub nom. U.S. ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368 (5th Cir. 2016). A defendant "cannot be liable for FCA violations based on 'collective knowledge' of a number of employees." *Id.* (citation omitted). Despite this clear legal standard, Relators allege disparate documents with testimony from various witnesses who either did not prepare the actual documents at issue or had little involvement. Such a position cannot prove PVA knowingly violated the FCA and must fail as a matter of law.

PVA also did not act with reckless disregard or deliberate ignorance, the lesser of the FCA's scienter requirement. Relators' focus on PVA's compliance policies is misplaced. It is unclear how Relators believe PVA's compliance policies are fodder for their FCA claims. Relators ignore the fact that providers are not required to have compliance policies to bill for Medicare or any other federal healthcare program items or services. There simply is no federal healthcare statute, regulation, rule, or even non-binding guidance requiring a compliance plan for a physician group like PVA.[17] Whether an employee recognizes PVA's written policies at a deposition is not evidence PVA allegedly "cheated" the government. If anything, the fact that PVA has

---

[16] Dkt. 95, at 12-15, 27.

[17] Although Relators' proffered expert witness Mr. Church opines that compliance plans are required by federal law, his opinion is uninformed and incorrect and should be stricken. *See* Dkt. 83, Defendant's Opposed Motion to Exclude Relators' Expert Witness Robert D. Church, Jr., at 17-18.

comprehensive compliance policies, formed compliance and vascular lab committees that meet regularly, and has processes in place to check and double-check bills (reviewed by certified coders) before submission to a federal healthcare program is overwhelming evidence PVA did not knowingly cheat the government.[18] Such actions are not that of an entity acting with reckless disregard or deliberate ignorance within the meaning of the FCA. PVA therefore did not violate the FCA. Relators' subjective belief about what Medicare *should* require versus what it actually *does*, cannot create FCA liability. If there were such a statute or regulation that under some strained interpretation (there is not) supporting Relators' allegation of a separate, stand-alone report, the FCA's scienter requirement is not satisfied if there are "legitimate grounds for disagreement over the scope of a contractual or regulatory provision." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003) (Jones, J., specially concurring) (citing *Lamers*, 168 F.3d at 1018); *see also U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 832 (8th Cir. 2013) ("Mayo's reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud under the FCA."). The law is clear: a disagreement, by the parties on the reading of an actual statute or regulation does not trigger FCA liability, nor can an ambiguous statute or regulation result in a knowing FCA violation. *Id.*

"[T]he FCA is a fraud prevention statute, and not a general enforcement device for federal statutes, regulations and contracts." *U.S. ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 369 (5th Cir. 2011) (quotation omitted). It is well settled that if a case turns on a defendant's state of mind, courts are hesitant to find the requisite intent was present. *Taylor-Vick*, 513 F.3d at 231. While every medical practice or healthcare provider makes innocent billing errors that is not sufficient to impose punitive FCA liability. *See Escobar*, 136 S. Ct. at 2003 ("[the FCA] is not

[18] *See* Dkt. 94, at 7-8.

'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations."). Relators plainly "cannot survive summary judgment merely by submitting evidence of false claims; she must have evidence that the defendants knowingly or recklessly cheated the government." *Taylor-Vick*, 513 F.3d at 232. Relators' evidence does not even approach, let alone climb that hill, and is certainly lacking impose FCA liability against PVA. PVA is therefore entitled to summary judgment.

E. *Relators Cannot Prove Any Alleged False Claim Was Material To a Government Payment Decision***.**

PVA did not knowingly submit a claim to a federal healthcare program in violation of the FCA. Moreover Relators have failed to show PVA "knowingly violated a requirement that [PVA] knows is material to the government's payment decision." *See Escobar*, 136 S. Ct. at 1996. Relators' claims are exactly the kind of allegations the Supreme Court sought to limit in *Escobar*. *Id*. There is no dispute PVA performed and interpreted vascular studies to treat Medicare patients. Yet Relators inexplicably still seek to force PVA pay to them and their attorneys potentially hundreds of millions of dollars for services it appropriately billed, despite having no support from any federal healthcare program statute, regulation, rule, or guidance. Relators harbor the unsubstantiated belief that PVA should have signed a MedStreaming report for every vascular study before submitting a bill for reimbursement. Courts have cautioned "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations." *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999). Relators failed the "rigorous" and "demanding" tests mandated by the Supreme Court in *Escobar* requiring proof (not mere allegations) of specific and material FCA violations. *Escobar*, 136 S. Ct. at 1996. Relators cannot show any alleged false claim or statement made by PVA was material to a federal healthcare program's payment decision, a standard elevated and required by Escobar. *Id*. at 2003-04. The

Court should decline Relators' sweeping invitation to sanction PVA based on inapplicable, non-binding industry guidance, and grant PVA's motion for full summary judgment.

1. Materiality Applies In All FCA Cases.

Relators' argument that *Escobar's* materiality test only applies to implied false claims is wrong. The Supreme Court analyzed "The False Claims Act's materiality requirement" and provided rules for "evaluating materiality under the False Claims Act." *Escobar*, 136 S.Ct. at 2001-03. The Supreme Court in *Escobar* did not limit its materiality holding to implied false claims. In fact, the Supreme Court clearly stated that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 136 S. Ct. at 2002.

Mistakenly believing that the materiality requirements in *Escobar* do not apply to factually false claims, Relators attempt to convert their legally false claims into factually false claims. They argue that PVA misrepresented the CPT code applicable to the service provided and cite case law involving allegations of improper use of one CPT code when the service provided fell under a separate code. But Relators' case is not that PVA used the wrong CPT code. There is no evidence contradicting the fact that PVA performed, read, and interpreted vascular studies for patients in its offices. Those services correspond with CPT codes, and those codes accurately reflect the services provided. Rather, Relators wish to graft additional requirements onto the use of those codes that do not appear in the codes themselves. Relators take language from an AMA guidebook, which is specifically noted as guidance and has never been adopted by the government through any action, and attempt to argue that a failure to follow that *guidance* constitutes a factually false claim. Relators are well aware that PVA interpreted the vascular studies, but it is their belief that those interpretations must be documented in a separate, stand-alone report—for Relators, it is not enough

that the interpretations are included in the medical record. Notwithstanding the legal infirmity of their arguments, they claim that PVA made express false certifications when it submitted Medicare claim forms, which contain a certification that the submitter certifies that the information is accurate.[19] By their very nature as *express false certification* claims, they are legally false claims, not factually false claims.

In any event, *Escobar's* materiality requirement is not limited to legally false claims. At the outset, the court in *Escobar* recognized that "the common law could not have conceived of fraud without proof of materiality." *Escobar*, 136 S.Ct. at 2002 (quoting *Neder v. United States*, 527 U.S. 1, 22 (1999)). The court in *Escobar* next analyzed "§ 3729(a)(1)(A)'s materiality requirement" and set forth rules to apply "when evaluating materiality under the False Claims Act . . . ." *Id.* at 2003. It is clear that all claims under the FCA must be material for liability to attach. It is easy to understand why this is true in any context. For example, the government could require that everyone seeking payment for manufacturing a product include the address of the factory where the product was manufactured. Of course, including an incorrect address could render a claim technically false, but that does not mean it is automatically fraudulent. "The False Claims Act does not adopt such an extraordinarily expansive view of liability." *Id.* at 2004. The manufacturer's potential liability under the FCA would depend on whether the address is material to the government's payment decision—whether it affected "the other party's course of action." *Id.* at 2001.

2. <u>Relator's Argument For A Relaxed, Broad Materiality Standard Conflicts With The Unambiguous Holding Of *Escobar*.</u>

Relators fail in their Response to present evidence to satisfy the demanding burden to prove that the government would not have paid claims submitted by PVA. Relators' arguments in

---

[19] Dkt. 107, at 3.

opposition to summary judgment are simply that PVA did not comply with guidelines that they equate to requirements, so the government *should not have* paid or *could have* refused payment. Relators argue that they merely need to point to a requirement and show that PVA did not comply with that requirement because any such failure could have influenced the government's decision to pay. Those arguments are fundamentally at odds with *Escobar*, in which the Supreme Court emphasized that courts must enforce the FCA's "rigorous" and "demanding" inquiry into whether a misrepresentation would be "material to the Government's payment decision." *Escobar*, 136 S. Ct. at 1996, 2002-03. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* at 2003. Similarly, it is not enough to demonstrate that "the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* Relators' arguments are insufficient; they must submit *proof* of materiality.

Application of the materiality standard is straightforward in this case. Relators have to prove that the government would not have paid claims had it known of PVA's actions. But Relators have not, indeed cannot, point to a single act taken by the government supporting their burden to prove materiality. *Escobar* and its progeny are clear. Relators must be strictly held to their burden of proof on materiality. Because they have no proof, the Court should enter summary judgment for PVA.

3. <u>The Government's Knowledge Is Relevant Unrebutted.</u>

[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 136 S. Ct. at 2002-03 (original brackets and quotations omitted). The fundamental inquiry is whether the government would have acted differently had it known of the misrepresentation.

The only evidence of the government's likely or actual behavior is its continued payment to PVA despite knowledge, and investigation, of Relators' claims. Relators do not rebut this fact. Instead, they argue that investigations conducted by the Department of Justice, Office of Inspector General, Department of Health and Human Services, and Department of Defense are irrelevant. Relators' position is nonsensical—the materiality inquiry is focused on evidence of the government's behavior. Those agencies received the exact records Relators say are so clearly false, investigated Relators' claims, including interviewing PVA employees, and took no action to change position. That those agencies conducted investigations and made no changes to payment decisions past or present is "very strong evidence that those requirements are not material." *See id.* at 2003-04. Indeed "[s]uch very strong evidence becomes compelling when an agency armed with robust investigatory powers to protect public health and safety is told what Relators have to say, yet sees no reason to change its position." *U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 35 (1st Cir. 2017). The Fifth Circuit has recognized the relevance of this evidence under *Escobar*'s materiality requirement, noting "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017).[20] Relators have not met that burden here. In fact, the situation described in *Escobar* is precisely the case here, that "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* at 2003-04.

---

[20] Relators contend that the government must be aware that an actual false claim was submitted before governmental knowledge is relevant. They argue "there is a vast difference between the government being made aware of allegations, and having actual knowledge of fraud." Dkt. 107, at 26. That position is rejected by the quoted language in *Harman*, which focuses on when the government "learns of the *alleged* fraud." *Harman*, 872 F.3d at 663 (emphasis added). Similarly, Relators' argument that a defendant must essentially admit to fraud before the government's knowledge becomes relevant is illogical.

F. *Relators' Remaining Allegations All Are Without Merit And Lack Even the Most Rudimentary Support.*

All of Relators' allegations not specifically addressed above are unsupported by any evidence and, moreover, were not timely or adequately disclosed. Because PVA was denied an opportunity to conduct discovery on these new theories of liability, it is entitled to summary judgment on those claims. A properly pleaded complaint must give "fair notice of what the claim is and the grounds upon which it rests." *Ashcroft v. Iqbal*, 556 U.S. 662, 698–99 (2009). Relators did not plead claims relating to evaluation and management ("E/M") or mismatching physician names. Those claims also appear nowhere on Relators' Rule 26(a) or supplemental disclosures. Further, those claims were not contained in Relators' timely-served expert reports. PVA nonetheless briefly addresses these flawed contentions.

Relators, through their unqualified expert witnesses, theorize PVA double-billed because they sought reimbursement for both a vascular study and an office visit or evaluation and management ("E/M"). This is nothing more than repackaged allegations that a separate, stand-alone report from MedStreaming is required to bill Medicare for a vascular study. Relators are ill informed and again demonstrate their experts lack a fundamental understanding of vascular physician practices. Relators incorrectly assert the belief PVA could not bill for both an E/M service and a vascular study without a separate, stand-alone report for the vascular study. Relators, though their experts or otherwise, do not make any attempt to support a claim that PVA ever improperly billed for an E/M service. The closest, yet still not relevant, Relators come is through Mr. Church, one of their designated expert witnesses. Mr. Church undermines his own speculation when he acknowledges it is proper to bill for a vascular scan and evaluation and management service where there is proper documentation and a separately identifiable evaluation, and the only way to test that theory is by review of medical records. Yet neither he nor any other of Relators'

experts actually reviewed any medical records despite Relators having access to thousands and thousands of such files.[21]

Relators' theory about double-billing is a logical fallacy that is mutually exclusive of its theory that a MedStreaming report is required to bill for a vascular study. Relators only claim that an E/M service was billed improperly if it was billed along with a vascular study without a signed MedStreaming report before the billed date. Relators already claim it was improper to bill for the vascular study in those circumstances. It is Relators who want to double-dip; to also claim that the E/M service was improper because the vascular study did not have a MedStreaming report signed before the vascular study was billed. Missing in all this is any allegation that PVA failed to provide or document any E/M services.

Relators' theories of liability tied to the name of the physician on any claim sent to Medicare also are, like Relators' other claims, unproven. Relators' claim, through their expert witnesses, that PVA may have billed under a physician's name who did not read and interpret a vascular study. But Relators' theory is just that, an unsubstantiated theory. Relators nor their expert witnesses actually reviewed medical records. Relators' expert witness Dr. Nye compared information in two separate databases to offer an opinion some number of imaging studies were performed in which the "billing MD" did not match the "reading MD."[22] This theory is a construct of Relators' conjecture and their continued fishing for potential claims. Relators identified no such specific claim in their amended complaints. Further there is no evidence a difference in the names of the physicians was material or a payment decision by a federal healthcare program or done in violation of the FCA's scienter requirement. Mismatching physician names, without more, is

---

[21] *See* Doc. 83, Defendant's Opposed Motion to Exclude Relators' Expert Witness Robert D. Church, at 16.
[22] Doc. 86-2, Nye Supp. Report at 5.

exactly the type of "garden-variety" regulatory issue that *Escobar* cautioned was not appropriate for policing under the FCA. *See Escobar*, 136 S. Ct. at 2003.

Relators further allege, with no evidence, PVA performs unnecessary ultrasounds because they are not ordered by a physician or they are performed without a valid order.[23] There is no evidence such a practice occurred. The medical records produced to Relators, and reviewed by PVA during discovery, supports this uncontroversial fact. Such orders are clearly documented in patient medical records. The record in this case does not support Relators' claim based on this theory, and summary judgment on it is proper.

For the same reasons, Relators' so-called theory based on the FCA's reverse false claim provision fails. A relator asserting a reverse false claim must prove the following elements: "(1) a false record is created; (2) the provider knows the record is false; (3) the false record or statement is made, used, or caused to be made or used; (4) to conceal, decrease, or avoid an obligation to pay the Government; and (5) the misrepresentation is material." *U.S. ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 632 (N.D. Tex. 2018). Relators have submitted no credible facts showing PVA actually did any of the *Hendrickson* factors triggering FCA reverse false claims liability. *See id*. In addition to failing to prove any false claims, Relators have no evidence PVA created any false record to conceal, decrease, or avoid an obligation to pay the government. For the reasons stated above, all Medicare and federal healthcare program reimbursement paid to PVA were for valid services. Nothing in Relators' record suggests PVA fraudulently retained federal funds owed to the Government.

Finally, Relators have put forth no valid facts or evidence of actual damages suffered by a federal healthcare program or the government. Relators have not submitted any admissible

---

[23] Doc. 8 at ¶¶ 26, 33.

evidence of the amount paid to PVA for the professional component on each vascular study Relators allege was billed improperly. Nor have they submitted evidence of any statistical analysis that would permit them to extrapolate from a smaller set of claims to the whole. That glaring omission dooms their theory of proving any significant damages to the government.

Relators' expert witness Dr. Nye is not a statistician or even pretends to be such an expert. Yet his opinion purports to calculate the total amount billed for vascular studies. However, he did not break out the amounts for the technical component and professional component and, aside from one Medicare category, did not offer an opinion on whether a payer was governmental.[24] Such an unscientific approach should result in his expert opinion not only be stricken as improper and failing to aid the trier of fact, it does nothing to support Relators' notion of "damages."

Relators make numerous objections to the Declarations of Katherine Britt and Brian Puente.[25] Their objections miss the mark. Relators attempt to argue PVA "improperly relies upon and seeks to admit evidence which was never disclosed," specifically referencing medical records that were attached as exhibits to the Britt declaration.[26] This assertion not only is absurd, but disingenuous. Relators state PVA did not disclose files in its Rule 26 Initial Disclosures or in response to production of documents.[27] However, in the initial disclosures PVA produced on September 23, 2019 that "relevant medical and billing records" would be relied upon by PVA.[28] Not even three weeks later, on October 10, 2019, PVA's corporate representative reiterated in her deposition testimony that the professional component is documented in the electronic medical record:

---

[24] *See* Doc. 86, Defendant's Opposed Motion to Exclude Relators' Expert Witness Zachary Nye and Strike his Supplemental Reports, at 7.
[25] *See* Doc. 94, Ex. B and Ex. G. PVA's Responses to Relators' Appendix are attached as Ex. H.
[26] Doc. 107-2 at p. 2.
[27] *Id.*
[28] Defendant's Rule 26(A)(1) Initial Disclosures § 2(b); *see also* Defendant's Rule 26(A)(1) Supp. Disclosures § 2(b), attached hereto as Ex. E.

> Q. So the doctor meets with the patient?
>
> A. Mm-hmm.
>
> Q. How is that meeting documented?
>
> A. It's documented in our EMR, in an encounter, in an office encounter.
>
> Q. What is EMR?
>
> A. Electronic medical record. Allscripts is our electronic medical record.[29]

PVA's corporate representative further explained:

> So when we see a patient, we – you have to remember that when our doctors do – they have a vascular test. It's used to complement their visit. They have that result. They're giving their impression in their office note. They're signing off on that note. So really, their impression's already been done by validation of that office note. You see their interpretation even in their office notes.[30]

Additionally, PVA's expert witness Melissa Scott detailed in her report that interpretations of vascular studies were documented in the Allscripts medical record.[31]

Relators made the deliberate decision not to pursue medical records, knowing it would have disproven their misbegotten theory. Relators' proffered billing and coding expert paradoxically testified that reviewing medical records was "outside the scope of my work" while also acknowledging that documentation of a separately identifiable event warranting reimbursement would be found in a medical record.[32] Relators should not be permitted to use their willful indifference as a shield to deliberate avoidance of factual information that would disprove their theory of false claims.

---

[29] Deposition of Katherine E. Britt, October 10, 2019, attached hereto as Ex. F, Tr. 70:15-22.
[30] *Id.*at 110:11-18.
[31] Doc. 84-1, Expert Report of Melissa Scott. That was not the first time Relators were privy to Ms. Scott's findings. They were provided to Relators' counsel at a meeting on October 28, 2019.
[32] Ex. A, Tr. 118:13-20 and 118:21-120:15.

Relators next contend "the patient data and time period associated with exhibits 1-9 of the Britt declaration was covered by Relators' requests for production of documents, and multiple meet and confer conferences, these specific records were not provided." This is inaccurate. Relators never requested medical records during discovery.[33] The meet and confer conferences referenced by Relators resulted in the parties agreeing to the parameters of MedStreaming and Allscripts *data* to be produced by PVA in response to Relators' Requests for Production of Documents. Relators have known since as early as October 2019, via discussions with counsel for PVA, that MedStreaming alone did not provide complete records, and medical records were necessary to have a fulsome appreciation of professional services provided to patients. To avoid the consequences of Relators' complete failure to seek patient medical records, Relators point fingers at PVA, despite being fully aware that PVA intended to rely on such records.

Relators' non-plead, leftover claims and shotgun approach do not remotely approach credible contentions and rely on pure speculation. For these reasons, PVA is entitled to judgment on such claims as a matter of law.

## III. CONCLUSION.

Relators' position (albeit improperly conjoined amongst three separate relators in violation of the FCA) is tantamount to this: three former and disgruntled PVA employees are looking for a lottery ticket worth tens or hundreds of millions of dollars in trebled damages, civil penalties, and attorney's fees, a catastrophic result for PVA and the surrounding community, without any basis in law or fact for such an outcome. "[T]he [FCA] is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Escobar*, 136 S. Ct. at 2004. That is why a "misrepresentation about compliance with a statutory, regulatory, or contractual

[33] *See* Relators Request for Production of Documents Sets One – Six, attached hereto as Ex. G.

requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Id.* at 1996. That is especially true where, as here, the U.S. Department of Justice and three federal agencies charged with protecting federal healthcare programs investigated Relators' claims and found no actionable violations. Those agencies, perhaps more tellingly, did not even direct the Medicare or other program contractors to initiate any audit. Indeed, not one single audit request to PVA has been made by a federal healthcare program despite the Department of Justice's continued monitoring of this case. No federal healthcare program or their contractors have raised any issue with PVA's medical practices or submission of claims. The government's continued payment of claims in full despite its investigation and involvement in this case is "very strong evidence that those requirements are not material" and thus do not constitute fraud. *See id.* at 2003-04. "Such very strong evidence becomes compelling when an agency armed with robust investigatory powers to protect public health and safety is told what [r]elators have to say, yet sees no reason to change its position." *U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 35 (1st Cir. 2017). Because Relators' case fails on multiple grounds, and at all levels, PVA is entitled to judgment as a matter of law on all Relators' claims, and should be awarded its costs.

Dated: September 18, 2020

Respectfully submitted,

By: */s/ Sean McKenna*

Sean McKenna
State Bar No. 24007652
smckenna@spencerfane.com
Mark A. Cole
*Admitted Pro Hac Vice*
mcole@spencerfane.com
SPENCER FANE LLP
2200 Ross Avenue, Suite 4800 West
Dallas, Texas 75201
Telephone: 214-459-5890
Facsimile: 214-750-3612

Stephen J. Romero
State Bar No. 24046756
stephen.romero@nortonrosefulbright.com
Jeff Wurzburg
State Bar No. 24105140
jeff.wurzburg@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
Frost Tower 111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: 210-224-5575
Facsimile: 210-270-7205

Counsel for Peripheral Vascular Associates, P.A.

CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September, 2020, I caused this pleading to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Justin T. Berger
Sarvenaz J. Fahimi
Cotchett Pitre & McCarthy, LLP
840 Malcolm Road
Burlingame, California 94010

Wallace M. Brylak, Jr.
Brylak & Associates
15900 La Cantera Parkway, Suite 19245
San Antonio, Texas 78256

AUSA John M. Deck
United States Attorney's Office for the Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216

*/s/ Sean McKenna*
Sean McKenna

101046883.2