# EXHIBIT C

GLASSRATNER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**UNITED STATES OF AMERICA ex rel. TIFFANY MONTCRIEFF, ROBERTA MARTINEZ, and ALICIA BURNETT**

*Plaintiffs,*

v.

**PERIPHERAL VASCULAR ASSOCIATES P.A.**

*Defendant.*

**Civil Action No. SA-17-CV-00317-XR**

---

**EXPERT REPORT OF MELISSA SCOTT, CPC, CHC, CHIAP**
**JUNE 23, 2020**

## Contents

1.0 Introduction and Summary of Conclusions ........................................................ 3
2.0 Professional Background ........................................................................ 6
3.0 Scope of Review ........................................................................................ 7
4.0 Background................................................................................................ 8
5.0 Data and Information................................................................................. 9
6.0 PVA Practice Overview ............................................................................11
7.0 Nye's Opinions..........................................................................................17
8.0 Analyses of Nye's Opinions and His Cited Bases for Calculations..................................18
9.0 Analyses of Church's Opinions and His Cited Bases for These Opinions .........................20
10.0 Alexander's Opinions ...............................................................................26
11.0 Analyses of Alexander's Opinions and His Cited Bases for These Opinions ....................27
12.0 Conclusion ...............................................................................................30
13.0 Appendix 1 – Melissa Scott Curriculum Vitae ..................................................31
14.0 Appendix 2 – Documents Considered ...........................................................36
15.0 Appendix 3 – Patient Sampling ....................................................................37

## 1.0 Introduction and Summary of Conclusions

1. GlassRatner Advisory & Capital Group, LLC ("**GlassRatner**") was retained on September 18, 2019 by Norton Rose Fulbright US, LLP ("**Counsel**") on behalf of Peripheral Vascular Associates, PA ("**PVA**" or "**Defendant**").

2. The United States of America ex rel. Tiffany Montcrieff, Roberta Martinez, and Alicia Burnett ("**Plaintiffs**") have brought this matter against Defendant.

3. GlassRatner was retained to assist Counsel in its representation of Defendant in connection with various matters including, but not limited to, review of documentation, coding, billing, claim submission, compliance with applicable regulatory and industry standard practices, and litigation support including expert witness if so required.

4. In order to perform this engagement, I relied on other GlassRatner professionals with extensive background in healthcare revenue cycle operations, internal audit, as well as fraud, waste and abuse investigation with designations of Certified Professional Coder (CPC), Certified Coding Specialist (CCS), Certified in Healthcare Compliance (CHC), Certified Healthcare Internal Audit Professional (CHIAP), Certified Internal Auditor (CIA), Certified Information Security Auditor (CISA), Registered Health Information Administrator (RHIA), and Registered Nurse (RN). In addition, I relied upon the analyses of a Ph.D. level Economist. All of whom worked under my direct supervision and control. Experts in this field routinely rely on the support of individuals with such expertise as needed. I have relied on the work of the GlassRatner team to support my review of information related to this matter, and any references to "our" and "we" recognize this reliance.

5. I reserve the right to revise and supplement my analyses, opinions and report to the extent additional relevant information becomes available.

6. The opinions presented in this report are based on my review of the documents provided in discovery production, as well as industry guidance referred to in this report and contained in the attached **Appendices**, independent research, and my past experience, education, training and professional judgment, all of which are regularly relied upon by experts in my field as well as Courts and other triers of fact in matters such as this.

7. Based on the analyses contained herein, my opinions are that:

**Opinion 1** There is no credible evidence to support that PVA engaged in intentional practices of billing for incomplete services or services not rendered, which would implicate False Claims Act liability.

**Opinion 2** Hypothetically, if there was a point in time in which there were an administrative failure at PVA which inadvertently allowed claim submission for global billing prior to the completion of the professional component, upon retrospective review by the Plaintiffs own experts, the reports have since been finalized. This alters the contention that services were billed that were incomplete/not provided to a debate regarding the timing of billing and whether claims were submitted prematurely. While the hypothetical situation resulting in premature billing may have impacted the appropriate timing of payment, the date of service represented on the claim and resulting reimbursement would remain unchanged once the report was finalized.

With respect to the contested claims from PVA, it is evident that Nye relied upon a system flag that a final report has been completed. The services were in fact rendered and billed in accordance with Novitas policies for reporting date of service. The claims were paid on the basis that the services were medically necessary. Novitas' policy would allow a provider to submit an attestation if a signature was missing from the corresponding records without refuting payment. This not a situation where services were misrepresented on a claim. It is my opinion that there is no evidence to support an overpayment scenario from the hypothetical situation described above.

**Opinion 3** Unlike Plaintiffs experts, I conducted objective analysis of the people, process, and technology aspects of PVA operations which support the provision of services, capture of medical record documentation, and justify the reimbursement for vascular diagnostic testing in question. Through this assessment I was able to identify that neither Medstreaming nor Allscripts house a single data field with real-time interfacing for capture of the date/time of service for the Technical Component of vascular diagnostic testing. Additionally, there are multiple ways in which a provider may capture the written interpretation of the Professional Component of

these services and an audit of user activity in Medstreaming cannot be relied upon as the sole source of truth for when this action has been finalized. This is the fundamental flaw upon which the Plaintiffs/Plaintiffs' experts assertions relied on.

**Opinion 4** Both Church and Alexander's opinions rely heavily on the validity of Nye's purported "false billing" calculations. While his reliance on incorrect sources of truth had already presented a fatal flaw to his opinion's validity, his error is further compounded by an overinclusion of non-governmental payer data. While Church implicitly associates Nye's inflated statistics with false Medicare billing, Alexander too fails to differentiate this oversight in his opinions regarding false billings.

**Opinion 5** A separate stand-alone report is not required to bill for a professional component interpretation and evaluation and management service during the same encounter. Additionally, there are no Correct Coding Initiative edits which indicate these services should be bundled or to require the use of a modifier when appropriate in order to differentiate the provision of a separate and distinct service. In the absence of authoritative guidance to indicate otherwise, there is no support for the allegation of "double dipping."

**Opinion 6** PVA is not an independent diagnostic testing facility and often serves in the role of both Treating and Interpreting Physician. Unlike a radiologist performing a diagnostic intervention or diagnostic procedure, the PVA practitioner who is both the interpreter and user of the results for patient care management, is allowed broader scope of practice when it comes to diagnosis assignment as they are not reliant on a third party's interpretation for assignment of definitive diagnoses. Plaintiffs' experts application of references specific to diagnostic radiology practices to PVA indicate there is a fundamental misunderstanding regarding applicable rules and guidelines for diagnosis coding as well as reporting requirements outside of an Independent Diagnostic Testing Facility setting.

## 2.0 Professional Background

8. I am a healthcare professional with approximately 23 years' experience in healthcare operations, with specialization in regulatory compliance, coding, billing and reimbursement practices. I lead the healthcare industry practice within GlassRatner; overall the firm has approximately 100 employees in multiple offices across the United States. Before joining the firm, I held senior leadership positions within the healthcare consulting groups at Change Healthcare, Altegra Health, and Sinaiko Healthcare Consulting[1]. Additionally, I have served as Director of Revenue Cycle for St. Luke's Health System, Revenue Cycle Manager for the Department of Medicine at Oregon Health & Science University and have served as a billing and compliance analyst for Kaiser Permanente.

9. My practice is diverse and includes assignments such as coding and billing fraud expert, extension of payer special investigative units, accounts receivables analysis, and regulatory compliance consultant. I have served as faculty for the National Healthcare Antifraud Association ("NHCAA") as well as America's Health Insurance Plans ("AHIP") providing training on investigative techniques to identify improper billing. I have been designated as an expert witness in complex billing and reimbursement disputes, as well as matters of fraud. My Curriculum Vitae is attached as **Appendix 1** to this Report, which sets out additional information about my qualifications and a list of cases where I have provided testimony.

10. I am Certified in Healthcare Compliance ("CHC") from the Compliance Certification Board ("CCB") and also hold the specialty designations of a Certified Professional Coder ("CPC") from the American Academy of Professional Coders ("AAPC") as well as Certified Healthcare Internal Audit Professional ("CHIAP") from the Association of Healthcare Internal Auditors ("AHIA"). I hold an undergraduate business degree from Linfield College in McMinnville, Oregon, and have completed graduate-level business courses with Western Governor's University in Salt Lake City, Utah. I authored a chapter for Thomson Reuters' Health Law Practice Guide in April 2012 titled "Fundamentals of Medical Coding and Reimbursement."

[1] Sinaiko Healthcare Consulting, Altegra Health and Change Healthcare were related by way of merger and acquisition.

## 3.0 Scope of Review

11. In order to perform this engagement, I relied on my experience and subject matter knowledge. Additionally, I was assisted by other GlassRatner professionals with extensive experience in healthcare regulatory practices, coding and billing, and economic damages, all of whom worked under my direct supervision and control. I have relied on the work of the team to support my review of information related to this matter, and references to "our" and "we" refer to this team.

12. My review was based on documents and information referred to in **Appendix 2** of this report.

13. The approaches and methodologies used in our work did not comprise an examination or audit in accordance with generally accepted auditing standards, the objective of which is an expression of an opinion regarding the fair presentation of financial statements in accordance with generally accepted accounting principles. Accordingly, this report is not an Audit Opinion on any of the financial or other data included in our analysis.

14. I reserve the right to supplement, amend and/or otherwise modify this report, my analysis, my estimates of value and/or my opinions should additional information become available subsequent to the date of this report, which could have an impact on my analysis or opinions.

15. The hourly rates charged by GlassRatner for professional services provided in this matter range from **$280-375** for staff and my time has been billed at **$375** per hour. Our compensation in this assignment was not contingent upon developing or reporting predetermined results or the outcome of the matter.

## 4.0 Background

16. This report has been prepared in connection with the lawsuit filed in the United States District Court for the Western District of Texas, San Antonio Division, captioned as United States of America ex rel. Tiffany Montcrieff, Roberta Martinez, and Alicia Burnett v. Peripheral Vascular Associates P.A., Civil Action No. SA-17-CV-00317-XR (the “Litigation”).

17. It is my understanding that the government declined to intervene.

18. This “Litigation” relates to the Defendant’s billing practices for vascular diagnostic testing procedures.

## 5.0 Data and Information

19. The analyses presented in this report relied upon the following sources. These sources were provided by the Plaintiffs and are the same sources utilized in their own analyses to estimate the alleged damages and fraudulent claims:

    a. Expert Report of Zachary Nye, PhD, prepared March 27, 2020

    b. Data provided as part of Nye's Report

    c. Expert Report of Robert D. Church, Jr, prepared March 27, 2020

    d. Data provided as part of Church's Report

    e. Expert Report of James E. Alexander, Jr, MD, prepared March 27, 2020

    f. Data provided as part of Alexander's Report

    g. Other data provided by Plaintiffs

    h. Data and interviews provided by Defendant

**Data Provided as part of Zachary Nye's Report**

20. There are several files provided as part of Nye's report. The named files below include only those considered in my analysis.

    a. "Medical Records Dataset": PVA's medical records for services conducted during the calendar years 2015 through 2019.[2] The information contained in the Medical Records Dataset includes: test/service date; patient name; patient number; exam type; referring MD; reading MD; sonographer; QA date and time; and the "final" report date and time. In total, there are 192,944 records in the Medical Records Dataset.

    b. "Billing System Data for Imaging": PVA's billing records for patient imaging conducted during the calendar years 2015 through 2019.[3] The information contained on the Billing System Data for Imaging includes, but is not limited to: patient name; patient date of birth; patient number; test date; transaction type (e.g., charge, payment, adjustment, or refund); transaction amount; posting date; payor; procedure code and modifiers; procedure description; and location. In total, there are 877,070 records in the Billing System Data for Imaging.

---

[2] DEF0022374–79, containing data for calendar years 2015–2019, respectively.
[3] DEF0022373.

c. "Billing System Data for E/M Services": PVA's billing records for E/M services during the calendar years 2015 through 2019.[4] The file layout and fields contained in the Billing System Data for E/M Services are the same as the file layout and fields contained in the Billing System Data for Imaging.[5] In total, there are 776,185 records in the Billing System Data for E/M Services.

**Sources Provided as part of Robert D. Church's Report**

21. There are several files provided as part of Church's report. The named files below include only those considered in my analysis.

    a. First Amended Complaint

    b. Report of Zachary Nye

    c. Schedule of Data Relied Upon (Church list of 45 Sources)

**Sources Provided as part of James Alexander's Report**

22. There are several files provided as part of Alexander's report. The named files below include only those considered in my analysis.

    a. First Amended Complaint

    b. Report of Zachary Nye

[4] ProdAnalysisTable_DataExtraction_2.18.20.xlsx. This file also includes data for calendar year 2020, which is not included in the analyses described herein.

[5] Herein, unless otherwise noted, "Billing System Data" refers to both the Billing System Data for Imaging and the Billing System Data for E/M Services.

## 6.0 PVA Practice Overview

23. PVA was founded in 1975 and has grown to be recognized as one of the largest single specialty vascular surgery groups[6]. The group's primary service areas are San Antonio and South Texas.

24. PVA offers routine follow up, 24/7 emergency consultation, and interventional care.

25. The organization's National Provider Identifier ("NPI") is 1396791570, which is associated with the following taxonomy designations

    a. 193400000X - Single Specialty Group

    b. 2086S0129X - Vascular Surgery

**Vascular Laboratory Accreditation & Staffing**

26. PVA's Vascular Laboratory was the first lab Accredited by the Intersocietal Accreditation Commission ("IAC", formerly known as the Intersocietal Commission for the Accreditation of Vascular Laboratories or "ICAVL") in the state of Texas[7]. IAC reaccreditation occurs every 3 years.

27. In compliance with Novitas Local Coverage Determination L353978, PVA's vascular laboratory testing is performed under the general supervision of a qualified physician by a licensed technologist who is certified in vascular technology.

**Vascular Laboratory Billing**

28. Reimbursement for vascular diagnostic testing is two-part, consisting of a Technical Component ("TC" or modifier -TC) and Professional Component ("PC" or modifier -26).

29. Reimbursement for the Technical Component of a procedure accounts for equipment, supplies, and clinical staff (such as technicians). As such, this portion of the service is generally reimbursed to the facility or practice that provides or pays for the equipment, supplies, and/or clinical staff.

30. Reimbursement for the Professional Component of a procedure accounts for those services provided by the physician, and may include supervision, interpretation, and a written report.

---

[6] Accessed June 17, 2020 https://pvasatx.com/about-us/about-pva/
[7] Accessed June 17,2020 https://pvasatx.com/service-lines/vascular-lab/
[8] Accessed June 17, 2020 https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=35397&ver=64&articleId=56505&name=331*1&UpdatePeriod=855&bc=AAAAEAAAAAAA&

31. PVA's standard practice is to bill "globally" for the technical and professional components of the vascular diagnostic testing they provided, meaning they do not submit separate claims for reimbursement of the technical and professional components. This practice is in accordance with Novitas guidelines[9], which state

> *If the same provider is performing both the technical and professional component of a service, the global service (i.e. the procedure code without the TC or 26 Modifier) should be reported*

**Technology**

32. PVA utilizes Allscripts for Electronic Medical Record ("EMR") and billing functions.

33. In my experience, it is not uncommon for specialists such as vascular surgeons to adopt additional technology above and beyond the standard EMR software to enhance the unique reporting needs integrating detailed diagnostic imaging with text-based data.

34. In the case of PVA, the practice adopted Medstreaming for enhanced reporting and the ability to generate reports for external physicians.

35. The equipment used by PVA to conduct vascular diagnostics is not interfaced real-time to Allscripts or Medstreaming. As such, the actual date and time that a technical component is initiated or completed is not captured in real-time in either system.

**Vascular Laboratory Workflow**

36. PVA may perform diagnostic testing as a result of

    a. Hospital consultations – order may be generated from a non-PVA provider or upon consultation with a PVA provider

    b. Office-based consultations – order may be generated by the referring non-PVA provider or upon consultation with a PVA provider

    c. Follow up appointments for established patients – order generated by the PVA provider who is managing the patient's condition as captured within the current or prior encounter note

[9] Accessed June 17, 2020 at https://www.novitas-solutions.com/webcenter/portal/MedicareJH/pagebyid?contentId=00097119

d. Requests from external physicians (test only, no consult) – order generated from a non-PVA provider who is independently managing the patient's condition, no examination of patient requested/required by PVA provider

37. Regulations pertaining to order requirements for diagnostic testing are found in 42 CFR § 410.32(a)[10]

> *(2)(i)Ordering the service. The physician or (qualified nonphysican practitioner, as defined in paragraph (a)(2) of this section), who orders the service must maintain documentation of medical necessity in the beneficiary's medical record.*

38. The Centers for Medicare & Medicaid Services ("CMS")[11] and Novitas[12] have both issued guidance which states

> *Although CMS does not require the order to be signed by the physician, the treating (ordering) physician must clearly document in the beneficiary's record the intent to order the diagnostic test, and document the medical necessity supporting the ordered service.*

39. The technical component of vascular diagnostic testing may be performed onsite at a PVA location, at a hospital, or satellite clinic.

40. The image produced by the diagnostic testing equipment constitutes the technical component of the service, regardless of their status or existence in Medstreaming.

41. Once the diagnostic image has been obtained and the technical component is completed, the Vascular Technician ("Technician") loads the images into Medstreaming to begin creation of a preliminary report.

42. It should be noted that manually completed worksheets may also be used to communicate preliminary results to PVA physicians. These are separate from those created in Medstreaming but are also scanned and made part of the medical record.

43. When the PVA physician is also the Treating Physician[13,] they have access to the diagnostic images, as well as a written or verbal preliminary report from the Technician, which is

---

[10] Accessed June 17, 2020 at https://www.govregs.com/regulations/expand/title42_chapterIV_part410_subpartB_section410.32#title42_chapterIV_part410_subpartB_section410.32

[11] CMS Internet Only Manual, Publication 100-02, Benefit Policy Manual, Chapter 15, Sections 80 & 80.6

[12] Accessed June 17, 2020 at https://www.novitas-solutions.com/webcenter/portal/MedicareJH/pagebyid?contentId=00027224

[13] As defined in §1861(r) of the Social Security Act

integral to the formation of the assessment and treatment plan in the patient's medical record.

44. The interpretation of the test results, or the professional component of the diagnostic service, is captured in the encounter documentation for the office visit when the PVA physician is also the Treating Physician.

45. It is important to delineate the difference between a Treating Physician, "who furnishes, pursuant to State law, a consultation or treats a beneficiary for a specific medical problem, and who uses the result of a diagnostic test in the management of the beneficiary's specific medical problem"[14] and one who is simply performing a diagnostic procedure to be used for the management of a patient by a Treating Physician, such as a diagnostic radiologist.

46. In the instance where the Treating Physician is conducting the diagnostic test and using the results to manage the patient, a separate stand-alone report is not required when summarized within the body of the corresponding encounter note.

**Independent and Objective Analysis of Medical Records, Audit Trails, and Timing of Claim Submission**

47. I conducted a review of medical records, the Medstreaming Audit Trail log, and timing of claim submission for five PVA patients. The samples were selected from Nye's alleged false billings and are all reflective of Medicare patients. Excerpts of documents relied upon are included in **Appendix 3**, and the numbers indicated before the descriptors in the table below are flagged on the corresponding documentation for reference to where the specific date and time stamps are located. For example, a 1 identifies the Technical Component date and time, a 2 identifies the E/M Encounter E-Signature date and time, and so forth. My analysis revealed the following

| Sample # | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| CPT Billed | 93926 | 93880 | 93880 | 93880 | 93880 |
| 1. Technical Component | 1/21/2016 11:32:59AM | 9/11/2015 9:24:08AM | 7/21/2016 2:00:40PM | 1/19/2017 8:29:16AM | 5/18/2016 12:29:22PM |
| 2. E/M Encounter E-Sig | 1/27/2016 1:07PM | 9/11/2015 1:46PM | 7/21/2016 5:41PM | 1/24/2017 8:37AM | 5/18/2016 1:23PM |
| 3. Original Bill Date to Medicare | 1/27/2016 | 9/16/2015 | 7/22/2016 | 1/24/2017 | 5/19/2016 |
| 4. Medstreaming "Exam was Opened" | 1/26/2016 10:33:52AM | 9/11/2015 9:53:07AM | 7/21/2016 2:33:04PM | 1/19/2017 2:43:43PM | 5/18/2016 1:06:50PM |
| 5. Medstreaming "Changed Exam Status" QA | 1/26/2016 11:57:31AM | 9/11/2015 10:00:50AM | 7/21/2016 3:49:12PM | 7/31/2017 3:13:39PM | 5/18/2016 3:13:36PM |
| 6. Medstreaming "Final Report" | 1/28/2016 4:08:37PM | 9/18/2015 1:12:53PM | 7/25/2016 3:23:37PM | 8/2/2017 6:25:28PM | 5/19/2016 7:41:49PM |
| 7. Medstreaming Final Report E-Sig | 1/28/2016 4:04:45PM | 9/18/2015 1:12:52PM | 7/25/2016 3:21:10PM | 8/2/2017 5:25:27PM | 5/19/2016 7:29:37PM |
| Interpretation included in Encounter Note? | Yes | Yes | Yes | Yes | Yes |
| Billed Prematurely? | No | No | No | No | No |
| Medstreaming Audit Log Match to Report E-Sig? | No | No | No | No | No |

[14] Chapter 15, Section 80.6.1, Medicare Benefit Policy Manual

48. All of the samples reviewed were supported by a technical component (flag 1) which pre-dated the bill date to Medicare (flag 3).

49. All of the samples reviewed included an interpretation within the evaluation and management encounter (flag 2), which was completed and signed electronically prior to the original bill date to Medicare (flag 3).

50. Flags 4-6 are obtained from the Medstreaming Audit Trail log. The Plaintiffs have equated flag 4 to be equivalent to flag 1 for capture of the technical component completion date and time, to which I have repeatedly stated as false and is shown by review of the underlying documentation in Appendix 3.

51. Flag 5 – Medstreaming “Changed Exam Status” QA has been included as it represents a key step in the process by which a report can be finalized in Medstreaming. As stated previously in the PVA workflow overview, a Technician must manually create the preliminary report in Medstreaming and change the status to QA in order for the report to move to the physician’s worklist for review and approval.

52. Sample 4 is a prime example of how the Technician’s failure to change status to QA in a timely manner can impact the PVA physician’s ability to finalize a report. The diagnostic testing was completed January 19, 2017 (flag 1). The PVA physician used the interpretive worksheet with the test results, which was subsequently scanned into the encounter, to manage the patient’s care as evident by the evaluation and management encounter documentation. This documentation, which included the interpretation of test results, was completed and electronically signed on January 24, 2017 (flag 2) – the same day the claim was billed (flag 3). While the Medstreaming Audit Trail indicates the technical component exam was opened on January 19, 2017 (flag 4), the Technician did not change the status to QA until July 31, 2017 (flag 5). The PVA physician reviewed and finalized the report within two days (flag 6) once the report became available on their worklist.

53. Also of significance on Sample 4, the “final” report produced from Medstreaming shows it was reviewed and electronically signed on 8/2/2017 at 5:25:27PM (flag 7). However, the final report date and time reflected on the Medstreaming Audit Trail reflects 8/2/2017 at 6:25:28PM (flag 6) for this very same report. Discrepancies between the date and time reflected on the Medstreaming Audit Trail log Final Report event (flag 6) and Medstreaming Final Reports (flag 7) are evident on all five samples reviewed.

54. This analysis is not intended to represent an opinion on the overall quality or accuracy of coding, rather to emphasize the complexity of the analyses required to accurately opine on the timing of when services were rendered, documentation completed and electronically signed, and a claim is submitted to Medicare.

55. Due to disparate systems, reliance on manual processes, and variability in how a final interpretation may be captured, a computer algorithm cannot replace the need for a manual review of records by an individual that understands documentation requirements, coding, and billing requirements in addition to the processes and systems specific to PVA.

## 7.0 Nye's Opinions

56. Nye's overall conclusion states (footnotes correspond to Nye's report references)

   a. *The total number of unique Patient Visits with a False Billing in the Billing System Data for Imaging is 26,695, out of a total of 123,620 unique Patient Visits, for a rate of 21.6%. The total number of unique patients with a False Billing in the Billing System Data for Imaging is 15,948 out of a total of 52,621 unique Patients, for a rate of 30.3%.[12] (See Exhibit 2.)*

   b. *There is a total of 40,102 False Billings in the Billing System Data for Imaging out of a total of 180,123 billings, for a rate of 22.3%. (See Exhibit 2.) Exhibit 3 contains a frequency distribution of the number of days each charge was posted before the Final Report Date.*

   c. *There is a total of $15,747,941 in payments for all records in the Billing System Dataset for Imaging.[13] For Patient Visits with a False Billing, there is a total of $4,363,894 in payments in the Billing System Dataset for Imaging.[14]*

      i. *Exhibit 4a provides the total payments in the Billing System Dataset for Imaging associated with False Billings by the number of days each charge was posted before the Final Report Date.*

      ii. *Exhibit 4b provides the total payments in the Billing System Dataset for Imaging associated with False Billings by reading MD.[15]*

      iii. *Exhibit 4c provides the total payments in the Billing System Dataset for Imaging associated with False Billings by month and year of the posting date of the charge.*

      iv. *Exhibit 4d provides the total payments in the Billing System Dataset for Imaging associated with False Billings by payor.[16] and*

      v. *Exhibit 4e provides the total payments in the Billing System Dataset for Imaging associated with False Billings by location.[17]*

57. Nye makes no specific reference to his personal opinion(s) within his conclusion, just calculations.

58. As discussed below, Nye's calculations have a multitude of fundamental flaws and rely too heavily on Plaintiffs' assertions without independent validation of his underlying data sets.

## 8.0 Analyses of Nye's Opinions and His Cited Bases for Calculations

59. Nye represents that he is a financial economist and Vice President at Stanford Consulting Group, Inc. Furthermore, he holds an A.B. in Economics from Princeton University; an M.Sc. in Finance from the London Business School; and a Ph.D. in Finance from the Paul Merage School of Business at the University of California, Irvine. However, Nye's report appears to rely only on assumptions without independent verification or validation of accurate source data upon which to complete his calculations.

**Reliance on Incorrect Assumptions to Derive Calculations in Support of Plaintiffs Unfounded Allegations**

60. Nye's analysis is fundamentally flawed. His estimations implicitly assume that the date and time the technical and professional components for vascular diagnostic testing at PVA reside within Medstreaming. This is not a credible assumption. Medstreaming is not the source system for diagnostic imaging at PVA, nor is there a CMS mandate that it be used as the sole source to produce the written interpretation required to bill a professional component for a diagnostic test.

61. Chapter 13, Section 20.1, of the Medicare Claims Processing Manual[15] states

> *A/B MACs (B) must pay for the PC of radiology services furnished by a physician to an individual patient in all settings under the fee schedule for physician services regardless of the specialty of the physician who performs the service.*
>
> …
>
> *The interpretation of a diagnostic procedure includes a written report.*

62. Perhaps what is more important is what Section 20.1 does not specify – a reference that the written report must be stand-alone and cannot be intrinsic to the Treating Provider's encounter note or captured by way of Medstreaming. No such guidance can be found through Novitas or any other authoritative sources.

63. The only way to truly ascertain the date and time a technical component provided by PVA was completed is to review the image from the diagnostic testing equipment, which is not interfaced in real-time nor captured in a manner which a system-generated audit report (as that which was relied upon by Nye) of user activity from Medstreaming or Allscripts would accurately reflect.

---

[15] Accessed June 17, 2020 https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c13.pdf

64. Capture of the actual date and time would require manual review of each imaging printout.

65. Likewise, in order to ascertain whether a PVA physician documented his written interpretation within the body of an encounter note prior to the creation of a final report in Medstreaming, this too would require manual review of each patient's records in question.

66. As discussed below, Church's loosely-based opinion is unfounded, speculative, reliant upon flawed assumptions and erroneous "false billing" calculations identified by Nye.

## 9.0 Analyses of Church's Opinions and His Cited Bases for These Opinions

67. Church represents that he is a Certified Public Accountant, Certified Fraud Examiner, Accredited Healthcare Fraud Investigator, and holds approximately thirty (30) additional professional certifications and designations. He represents that he has over thirty-seven (37) years in the field of public accounting and over twenty-five (25) years in the areas of forensic accounting and health care fraud and abuse. However, Church's report appears to rely heavily upon the previously identified erroneous "false billing" calculations from Nye's report, as well as unfounded assertions.

**Erroneous Application of Calculations from Nye**

68. Church perpetuates the misinterpretation of information in his uses of Nye's calculations in support of his arguments.

69. In the first paragraph of page 10 of Church's report, he states

> *The data reveals that false billings, as explained and defined above under Medicare guidelines, for imaging include 40,102 claims, or 22.3% of the total, for the time period of 2015-2019 alone. The unique patient visits totaled 26,695 or 21.6% of the total Medicare billing, equating to false billings of $4,363,894, representing 27.7% of the total Medicare payments issued to PVA. This information leads to the conclusions: a) PVA is billing for services not rendered, b) without the establishment of medical necessity and c) that any compliance plan that PVA has in place is dormant and a non-functioning document, in violation of federal law (discussed in Opinion 3 below).*

70. Church is quoting the calculations in Exhibit 2 of Nye's report as shown below

| Summary of False Billings in the Billing System Data for Imaging | | | |
|---|---|---|---|
| | **Total** | **Total with a False Billing** | **Percent with a False Billing** |
| Billings | 180,123 | 40,102 | 22.3% |
| Unique Patient Visits | 123,620 | 26,695 | 21.6% [1] |
| Unique Patients | 52,621 | 15,948 | 30.3% [1] |
| Total Payments in the Billings System Data for Imaging | -$15,747,941 | -$4,363,894 | 27.7% |

Notes:
1) This figure excludes Patient Visits where the total payments associated with the visit equals zero.

However, Church incorrectly applies the totals and percentages in Exhibit 2 to Medicare billings when they are representative of multiple payers, including non-governmental. Church relies heavily upon Nye's analyses as the underlying foundation for his assertions. However, Nye's calculations are flawed and do not provide fact-based data points to prove the Plaintiffs allegations.

**Incorrect Application of Guidelines Applicable to an Independent Diagnostic Testing Facility**

71. Church makes several references to guidance applicable to diagnostic radiology services and coding and applies the standards to the practices at PVA. The Medicare Benefit Policy Manual, Chapter 15, Section 80.6.1 provides delineation between a treating physician and radiologist performing a diagnostic interventional or diagnostic procedure

> *A "treating physician" is a physician, as defined in §1861(r) of the Social Security Act (the Act), who furnishes a consultation or treats a beneficiary for a specific medical problem, and who uses the results of a diagnostic test in the management of the beneficiary's specific medical problem.*
>
> *A radiologist performing a therapeutic interventional procedure is considered a treating physician. A radiologist performing a diagnostic interventional or diagnostic procedure is not considered a treating physician.*

72. As the National Provider Identifier registry will show, PVA does not fall under the taxonomy of an Independent Diagnostic Testing Facility, 293D00000X, Medicare specialty code 47.

73. As the Treating and Interpreting Physician, Church is incorrect in his statements that "the final report must be generated and signed before any diagnosis codes are attached." [16]

**Unfounded References to Requirement for Stand-Alone Interpretation Report and Double-Dipping**

74. As cited previously, there is no authoritative source guidance which mandates the requirement for a separate stand-alone report for interpretation of diagnostic test results when rendered by the treating physician.

75. The American Medical Association's Current Procedural Terminology (CPT) Professional Guidelines for Evaluation and Management (E/M) Services[17] states

[16] Church Report, Page 6, Paragraph 3
[17] Referenced under Levels of E/M Services, noted as present in editions 2017-2020 (search not all inclusive)

> *Any specifically identifiable procedure (ie, identified with a specific CPT® code) performed on or subsequent to the date of initial or subsequent E/M services should be reported separately.*
>
> *The actual performance and/or interpretation of diagnostic tests/studies ordered during a patient encounter are not included in the levels of E/M services. Physician performance of diagnostic tests/studies for which specific CPT® codes are available may be reported separately, in addition to the appropriate E/M code. The physician's interpretation of the results of diagnostic tests/studies (ie, professional component) with preparation of a separate distinctly identifiable signed written report may also be reported separately, using the appropriate CPT® code with modifier 26 appended.*
>
> *The physician or other health care professional may need to indicate that on the day a procedure or service identified by a CPT® code was performed, the patient's condition required a significant separately identifiable E/M service above and beyond other services provided or beyond the usual preservice and postservice care associated with the procedure that was performed. The E/M service may be caused or prompted by the symptoms or condition for which the procedure and/or service was provided. This circumstance may be reported by adding modifier 25 to the appropriate level of E/M service. As such, different diagnoses are not required for reporting of the procedure and the E/M services on the same date.*

76. The guidance clearly indicates that performance and/or interpretation (does not have to be global) of diagnostic tests/studies ordered during a patient encounter are not bundled into levels of evaluation and management service and may be billed separately.

77. The guidance specifies that when a physician does not render both the technical and professional components, the interpretation of the diagnostic test (professional component only) may still be separately billable when supported by a written report. What the guidance does not state is that in the context of an evaluation and management service, there should be a stand-alone report. It simply states that in the absence of a technical component, the interpretation must be documented in written report to be supported.

**Lack of Medical Coding Expertise**

78. While Church lists myriad certifications in his CV, he did not cite certification in coding. He also did not disclose that he consulted with a certified coder to form the basis of his analyses or opinions.

79. Church makes several references to the timing of assignment of final diagnoses throughout his report where it appears he is confusing the role of PVA physicians, as both the treating and interpreting physician, with that of a primary care provider waiting on the read of a diagnostic radiology report from an unaffiliated radiologist.

Church cites that he has "relied on forty-five 45) different resources when researching rules, regulations, provisions, mandates and procedures associated with the matters contained in this Expert Report."[18] However, several of the references listed are not applicable to the matter or were from older sources with questionable applicability to current guidelines and standards.

**Inaccurate Application of Mandatory Compliance Program Requirements**

80. I do not agree with Church's opinion that "a compliance program is mandated by federal law."[19]

81. The Office of Inspector General issued the "OIG Compliance Program for Individual and Small Group Physician Practices"[20] on October 5, 2000, at which time a model was set forth to promote voluntary healthcare corporate compliance programs. The benefits of which were further reinforced under the provisions of U.S. Sentencing Guidelines[21].

82. It wasn't until 2010 that we saw an effort to move compliance programs from voluntary, or recommended best practice, to a required program. The Affordable Care Act ("ACA"), Section 6401[22], requires the implementation of an effective compliance program for all Medicare and Medicaid providers. However, this has been the source of much confusion as the timing and effective date for mandatory compliance was deferred to the Secretary of Health and Human Services ("HHS"), but the ACA failed to set a deadline for these actions. To date, there has been no formally issued enforcement timeline.

[18] Church Report, Page 26, Paragraph 3
[19] Church Report, Page 17, Paragraph 2
[20] 65 Fed. Reg. 59434-59552
[21] Accessed June 17, 2020 https://www.ussc.gov/guidelines/2015-guidelines-manual/2015-chapter-8
[22] Accessed June 17, 2020 https://www.hhs.gov/sites/default/files/ppacacon.pdf

83. While I advocate that an effective compliance program is a best practice and worthy undertaking, there is no underlying federal law in effect which mandates a compliance program.

84. Church states[23]

> *A copy of all compliance plan complaints, discoveries, write-ups, adjustments, modification to address all related issues should be scrutinized to determine if PVA actually adhered, at all, to any compliance matter. This lends towards the lack of attention to compliance, despite the contentions apparently made by PVA.*

85. While Church recommends a methodology to evaluate whether PVA was conducting investigations into allegations of non-compliance, he has already assumed guilt on the basis of his third opinion. In the absence of conducting a review as he himself has described, this is mere speculation.

**Unfounded Assertions**

86. As identified previously, many of the assertions throughout Church's loosely formed opinions rely upon the erroneous conclusions derived from the Nye Report. Perhaps the most puzzling of Church's unfounded allegations is that PVA billed for items or services not documented.[24] He fails to take into account that the very method by which Plaintiffs and Nye were able to formulate an automated, although flawed, mechanism to quickly analyze a large amount of data by way of a computer generated algorithm - as opposed to the slower, manual review required for an accurate analysis regarding timeliness of completion - relied upon the **finalization** of a report within Medstreaming. Finalization equates to final report, meaning the service is in fact documented.

**Relevance of "Pre-Mature" Billing Allegation**

87. While I dispute the accuracy of the method by which Plaintiffs, Plaintiffs' Counsel, and Plaintiffs' Experts have determined timeliness, their reliance on the eventual presence of a "final report" in Medstreaming cannot be overlooked.

88. If the service was rendered, as it must have been according to the Plaintiffs identification of the presence of a final report in Medstreaming, the date of service reported on the claim

[23] Church Report, Page 17, Paragraph 3 (2)
[24] Church Report, Page 19, Paragraph 6 (11)

would remain the same regardless of the date the report was finalized. As such, there would be no resulting impact to the reimbursement received.

89. Even in the complete absence of a signature, a provider would be allowed the opportunity to attest to its accuracy according to the Texas Medicare Administrative Contractor. Novitas issued guidance[25] which clarifies

> ***What happens if a signature is missing from submitted documentation or it is illegible?***
>
> *If medical documentation received is missing the physician/non-physician signature or the signature is illegible, our medical review area will request a signature attestation statement. Once you receive that request, you have 20 days to return an attestation statement for unsigned documents and/or signature log for an illegible signature. We will not accept a "signed" version of the same document previously sent for review.*

[25] Accessed June 17, 2020 https://www.novitas-solutions.com/webcenter/portal/MedicareJH/pagebyid?contentId=00005015

## 10.0 Alexander's Opinions

90. Alexander's overall conclusion and opinion states

> *OPINION 1: Any imaging service that is billed as a global service which includes both the Technical Component (TC) and the Professional Component (-26) and either the Technical Component or the Professional Component which is not completed at the time of billing to Medicare or other payer is considered incomplete and not a valid claim to be billed to Medicare or other payer. Additionally incomplete services (in effect, services not rendered) cannot be considered medically necessary within Medicare or other payer requirements.*
>
> *OPINION 2: On a regular basis, PVA submitted invalid and false claims to Medicare for services that had not yet been rendered; i.e., incomplete services.*
>
> *OPINION 3: PVA's premature billing and delays in report interpretation are not "harmless" errors; they implicate patient safety, and fall outside of standard medical practices.*
>
> *OPINION 4: PVA's physicians "rubber stamped" a significant number of reports without proper analysis or interpretation.*
>
> *OPINION 5: In many circumstance PVA improperly billed for both a patient visit and a scan.*

91. As discussed below, Alexander's opinion, like Church, relies on erroneous underlying data calculated from Nye as well as unfounded and speculative assumptions.

## 11.0 Analyses of Alexander's Opinions and His Cited Bases for These Opinions

92. Alexander represents that he is President of James E. Alexander, Jr. MD, PA, and a Partner of Healthcare Compliance Management, LLC, a healthcare compliance consulting corporation, and has been Managing Member of the corporation since January of 2003. The corporation provides healthcare compliance consulting services to a wide variety of healthcare entities. Prior to this, he was the Associate Medicare Medical Director for the Medicare Division (Part A and Part B for the state of Texas) for Blue Cross and Blue Shield of Texas, Medicare Contractor Medical Director (CMD) for Texas Medicare Part A and Part B for TrailBlazer Health Enterprises, LLC, the Texas Medicare contractor. However, Alexander's report appears to be tainted by the same inaccuracies and misconceptions as Church and Nye.

**Billing for Incomplete Services/Services Not Provided would Invalidate Nye's Calculation Methodology**

93. In the description Nye provides regarding his methodology, he states[26] (footnote correlate to Nye Report citations)

> *I have been informed by Counsel that the date a final report was completed (i.e., the "Final Report Date") is contained in the Medical Records Dataset.[7] The Medical Records Dataset was merged with the Billing System Dataset by the "Patient Number" and "Test Date."[8, 9, 10] A charge was flagged as a False Billing if the posting date of the charge occurred prior to the Final Report Date.[11]*

94. Per the direction given by Plaintiffs' Counsel, a final report date was identified for all the records included within Nye's data set which, although flawed, allowed him to complete his calculations. As such, there cannot be reimbursement for incomplete or services not rendered as articulated by Alexander. Rather, the debate would be whether there was a timing issue when the original claims, which are now supported by final reports in Medstreaming, were submitted for payment.

**Reliance on Nye's Erroneous Calculations of Delays for Linkage to Patient Safety**

95. Due to the previously identified inadequacies in Nye's calculations, Alexander's references to frequency of errors and timing of claim submission are irrelevant and should not be relied upon to draw conclusions regarding patient safety implications due to delay of diagnosis. Furthermore, it is my understanding that the causes of action indicated in the first amended complaint do not allege malpractice.

[26] Nye Report, Page 6, Paragraph 7

**Incorrect Interpretation of Coding Guidelines**

96. Like Church, Alexander misinterprets the same section of the Current Procedural Terminology with respect to the need for stand-alone written reporting for professional component interpretations. As such, allegations of double billing in the instance in which both an evaluation and management service and test were provided on the same date are unfounded.

97. As cited previously, clarification offered in Evaluation and Management Guidelines indicates that performance and/or interpretation of diagnostic tests/studies ordered during a patient encounter are not bundled into levels of evaluation and management services and may be billed separately.

98. There is no authoritative guidance from Medicare, Novitas, or any other coding bodies to suggest a stand-alone report is required, nor is there guidance which suggests these services should be bundled.

99. Of note, he also lacks a formal certified coding credential and does not disclose reliance upon a certified coder in the formation of his opinion.

**Unfounded Allegations of "Rubber Stamping" Final Report Batches**

100. Nye makes reference that in addition to his opinion, he was "asked by Counsel to provide the following *[Exhibits 5-8]* calculations based on the PVA Datasets."[27] While Nye does not draw conclusions based upon the requested calculations, Alexander references Nye's analyses as the basis for his allegations that PVA physicians "rubber stamped" a significant number of reports without proper analysis or interpretation. Like Nye's other analyses, these calculations also relied upon flawed data points.

101. After conducting a comparison of the Audit Trail log generated in Medstreaming to the date and time stamps appended to e-signatures on final Medstreaming reports, I have identified discrepancies in which the Final Report times do not match.

102. It is my understanding that the functionality of PVA's configuration of Medstreaming does not allow providers the option to "select all" and "batch" sign a group of reports simultaneously without individual review as has been asserted by Alexander.

103. Rather, physicians may individually review, edit, and finalize a grouping of reports during a session. When the session is closed, it appears that the Audit Trail may append the same

[27] Nye Report, Page 5, Paragraph 9

time to all the reports individually reviewed in the session. However, upon scrutiny of the individual reports it is apparent that the date and time of electronic signature do not match the Audit Trail. See Appendix 3 for examples.

## 12.0 Conclusion

104. The Plaintiffs' have purported that PVA engaged in improper billing practices, primarily related to the interpretation of vascular diagnostic testing. Allegations include billing for incomplete services or services not rendered for the professional component, double billing, batch approvals of interpretive reports, and questionable medical necessity in the absence of final interpretive reports.

105. The assumptions upon which Plaintiffs' have based their assertions will describe the narrative they have spun. The Plaintiffs' experts relied heavily upon the narrative they were told and the data they were pointed to by Plaintiffs' Counsel in order to formulate opinions in support of the allegations made.

106. However, when tested with accurate data and an understanding of the documentation, coding, and billing requirements – the allegations Plaintiffs and their experts have asserted are unsubstantiated.

107. Plaintiffs' experts relied upon computerized analyses in place of the claim-by-claim manual review required to accurately assess the accuracy of PVA's billing practices, and as such, have arrived at unfounded conclusions. Although the sampling I conducted for the purpose for demonstrating the flaws within Plaintiffs' analyses was limited, it demonstrates the need to consider disparate systems, reliance on manual processes, and variability in how a final interpretation may be captured in order to reach an accurate conclusion with respect to Plaintiffs allegations.

108. A computer algorithm cannot replace the need for a manual review of records by an individual that understands documentation requirements, coding, and billing requirements in addition to the processes and systems specific to PVA. My independent and objective review of such information refutes the Plaintiffs allegations, as well as the Plaintiffs experts' opinions in support of their claims.

Respectfully Submitted By:

Melissa H. Scott

Melissa H. Scott, CHC, CPC, CHIAP
Senior Managing Director
June 23, 2020

## 13.0 Appendix 1 – Melissa Scott Curriculum Vitae



# MELISSA H. SCOTT

CHC, CPC, CHIAP

### CONTACT

951-440-4920
mscott@glassratner.com
LinkedIn: melissa-h-scott

### EDUCATION

Bachelor of Science
Business Management
Linfield College
2004

### CREDENTIALS

Certified in Healthcare Compliance (CHC)
2006

Certified Professional Coder (CPC)
2007

Certified Healthcare Internal Audit Professional (CHIAP)
2019

### EXPERIENCE

**GLASSRATNER ADVISORY & CAPITAL APR 2019 - PRESENT**
Senior Managing Director, Healthcare Industry Group

- Seasoned healthcare executive with over 21 years of experience
- Lead a division providing services to providers, payers and their respective law firms
- Specialize in forensic analytics, litigation support, internal audit & enterprise risk management, compliance programs, revenue cycle optimization, and government mandated claims & arrangement transaction reviews
- Serve as subject matter expert for litigation matters with specialization on the investigation of fraud, waste and abuse (FWA)

**CHANGE HEALTHCARE MAR 2016 - APR 2019**
Director, Advisory Services Division

- Organization formerly known as Altegra Health/Sinaiko Healthcare Consulting
- Recruited back by former leadership to manage a team specializing in provider, payer and litigation support
- Specialized in forensic analytics, litigation support, internal audit & enterprise risk management, compliance programs, revenue cycle optimization, and government mandated claims & arrangement transaction reviews
- Provided independent and objective assessments as an Independent Review Organization (IRO) for entities under Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG)
- Provided FWA education for the National Health Care Antifraud Association (NHCAA) and America's Health Insurance Plans' (AHIP) Fraud, Waste and Abuse Work Group, focusing on investigation techniques for the Federal Bureau of Investigation (FBI) and Commercial Payers' Special Investigation Units (SIU)

1 of 4

# MELISSA H. SCOTT

CHC, CPC, CHIAP

## PUBLICATIONS

**ASCP LabMedicine**
Clinical Laboratory Compliance: Something Old, Something New
Jul 2009

**ADVANCE for Medical Laboratory Professionals**
Understanding the Importance of Genetic Test Code Modifiers
Jan 2010

Sign on the Dotted Line
Jan 2011

Operating Ethically
Jan 2013

BCR-ABL Capture
Feb 2013

CBC Billing
Mar 2013

Reimbursement Rates: Billing a client less than Medicare/Medicaid reimbursement can be a grey area
Apr 2013

Provision of Phlebotomy Services
May 2013

Interim MoPath Reimbursement
June 2013

**HCCA Compliance Today**
Waived Laboratory Tests: Meeting Regulatory Requirements and Implementing Best Practices
Jul 2010

**AHIA New Perspectives**
Next Level Laboratory Audits: Adopt a Bidirectional Approach
Jun 2011

**Health Law Practice Guide**
Fundamentals of Medical Coding & Reimbursement
Apr 2012

**Healthcare Finance**
Interview: How Hospitals can Know when to Outsource Revenue Cycle Management
Mar 2018

## EXPERIENCE

**ST LUKES HEALTH SYSTEM AUG 2014 - MAR 2016**
Director, Revenue Cycle

- Led insurance billing operations for health system recognized by Truven as one of the Nation's Top 15
- Scope included 7 hospitals; 1,000 staffed beds; 150+ clinics; 1,300+ physicians
- Produced 3.5 million claims annually; revenues of $1.8 billion
- Oversight included the following departments: Hospital/Professional Billing & Insurance Recovery, Electronic Data Interchange (EDI), Audit & Appeals, Government Payer Rules & Regulations
- Drove Key Performance Indicators (KPIs) to ensure strategic goal execution
- Optimized organizational structure and developed synergies across people, process & technologies
- Developed payer alliances to increase efficiency of claim and contract dispute resolution

**BEND MEMORIAL CLINIC OCT 2013 - AUG 2014**
Consultant/Director of Revenue Cycle

- Managed complete revenue cycle - from patient access through adjudication - for a multi-specialty clinic consisting of 125+ physicians and ancillary services (incl. infusion, laboratory & imaging)
- Responsible for generation of $215 million annual claims volume
- Oversight included the following departments: Appointment Center, Referrals, Authorizations & Benefits, Registration, Credentialing, Coding & Charge Entry, Insurance & Accounts Receivables, Payment Posting, EDI, Billing Call Center, Patient Collections, and Patient Financial Counselors
- Managed investigation and remediation of revenue cycle failures and compliance violations
- Optimized organizational structure and developed synergies across people, process & technologies

## SPEAKING ENGAGEMENTS

**National Healthcare Antifraud Association (NHCAA)**
Clinical Laboratory Investigation - 2013 Annual Training Conference

Understanding the Codes: Molecular Pathology Investigation - 2013 Annual Training Conference

Clinical Laboratory Red Flags - 2014 Skills & Schemes Conference

Investigating Laboratory Services - 2015 Annual Training Conference

Conducting a Lab Audit - 2015 Annual Training Conference

Functional Medicine FWA Investigation - 2015 Annual Training Conference

Drug Assays - 2016 NETS Webinar

Laboratory Schemes & Red Flags - 2016 Skills & Schemes Conference

**America's Health Insurance Plans (AHIP)**
Urine Drug Assays - 2016 Medical Director's Webinar

Drug Assays - 2017 Fraud, Waste & Abuse Workgroup Webinar

**Farmer's Insurance**
Clinical Laboratory FWA Investigation - 2017 Special Investigation Unit (SIU) Training Webinar

**Association of Healthcare Internal Auditors (AHIA)**
Clinical Laboratory Auditing: Chart to Bill - 2017 Annual Meeting

# MELISSA H. SCOTT

CHC, CPC, CHIAP

## EXPERIENCE

**CHANGE HEALTHCARE FEB 2008 - OCT 2013**
Senior Consultant

- Provided consultative subject matter expertise focused on the healthcare market segment
- Managed client engagements with physician offices, hospitals, integrated health systems, academic medical centers, health plans, law firms and health information technology (HIT) vendors - among others
- Specialized in support of issues related to healthcare reform (meaningful use, ICD-10, changing reimbursement models, etc.), forensic analytics, FWA investigation, litigation support, audits, risk management, compliance program framework, revenue cycle, and HIT selection & implementation
- Served as IRO for clients operating under CIA with the OIG
- Conducted gap assessments and designed & implemented optimized workflows and processes to ensure accurate charge capture while mitigating FWA exposure - both for due diligence and court mandated engagements
- Originally founded as Sinaiko Healthcare Consulting in 1990, operated as Altegra Health 2011-2016

**OREGON HEALTH SCIENCE UNIVERSITY MAR 2007 - FEB 2008**
Manager, Revenue Cycle

- Provided oversight of revenue cycle functions for the Department of Medicine within a thriving academic medical center
- Oversight included claim volumes reflective of over 1 million patient encounters annually
- Analyzed KPIs to ensure optimization of charge capture, coding and billing practices
- Coordinated interdisciplinary teams to achieve revenue cycle performance optimization
- Oversight included the following departments: Allergy & Clinical Immunology, Arthritis-Rheumatic Diseases, Cardiovascular Medicine, Endocrinology, Diabetes & Clinical Nutrition, Gastroenterology, General Internal Medicine, Hematology & Oncology, Health Promotion & Sports Medicine, Hospital Medicine, Infectious Diseases, Nephrology & Hypertension, and Pulmonary Critical Care

## SPEAKING ENGAGEMENTS (CONTINUED)

**Cutera**
Aesthetics Market Outlook - 2018 Aesthetics Practice Summit

Aesthetics Marketing Strategies - 2018 Aesthetics Practice Summit

Juliet Nd:Yag Laser: Innovations in Gynecologic & Dermatologic Tissue Remodeling - 2018 Aesthetics Practice Summit

Aesthetics Market Outlook - 2019 Aesthetics Practice Summit

Aesthetics Marketing Strategies - 2019 Aesthetics Practice Summit

**American Bankruptcy Institute (ABI)**
Issues Facing Community & Critical-Access Hospitals: What is the Answer, and When is it Too Good to be True? - 2019 Insolvency Symposium

## MEMBERSHIPS

American Academy of Professional Coders (AAPC)

American Bankruptcy Institute (ABI)

Association of Healthcare Internal Auditors (AHIA)

Health Care Compliance Association (HCCA)

National Healthcare Antifraud Association (NHCAA)

# MELISSA H. SCOTT

CHC, CPC, CHIAP

## EXPERIENCE

**KAISER PERMANENTE JUN 2005 - MAR 2007**
Business Analyst

- Conducted auditing and monitoring within the laboratory, imaging, and pharmacy departments to identify and address potential regulatory exposure in revenue cycle operations
- Audited orderable, performable and billable record linkages within the Epic EAP to ensure charge capture accuracy and billing compliance
- Consulted on Charge Description Master (CDM) maintenance
- Prepared financial statements, KPI and utilization reports
- Managed capital equipment budget and requests
- Educated business unit leaders on interpretation of reports and root cause analysis of statistical data
- Wrote and maintained policies and procedures using ISO:9001 standards

**OREGON MEDICAL LABORATORIES JUL 2000 - JUN 2005**
Client Relations Manager

- Managed daily operations of three laboratory Patient Service Centers
- Oversaw specimen collection, accessioning, processing, and transport functions for outreach facilities & clients
- Assessed workflow and consulted on laboratory IT/connectivity needs of physician office clients
- Facilitated interface design with client Practice Management/Electronic Medical Record systems
- Installed and trained users on laboratory information system use and outreach lab program software
- Provided ongoing relationship management, education, and support to physician & hospital clients
- Led teams of external design consultants to produce strategic marketing materials
- Created and implemented new client/staff orientation and onboarding programs
- Served as first line of defense for service failure issues for external clients

WWW.GLASSRATNER.COM

**Testimony Experience**

- *Group Health Cooperative v. Alere Home Monitoring, Inc.,* District Court, Western Washington, Case No. 2:15-cv-01681. [Expert Report Production]

- *Campbellton-Graceville Hospital Corporation - Florida Northern Bankruptcy Court*, Case No. 4:17-bk-40185. [Active Matter]

- *Medical Practice Solutions, LLC; IOS Management Services, LLC; and CGR Investments, LLC v. Neuron Shield, LLC; Neuron Shield Partners I, LP; Neuron Integrity Texas, PLLC; Neuron Integrity Partners, LLC; David Masel. M.D.; Dinesh Chandiramani; Neuron Shield 2, LLC; Neuron Shield Partners 2, LP; Neuron Shield 3, LLC; Neuron Shield Partners 3, LP; Neuron Shield 4, LLC; Neuron Shield Partners 4, LP; Neuron Shield Monitoring Associates, PC; Neuron Shield 5, LLC; Neuron Shield 6, LLC; Neuron Shield South Carolina, LP; Neuron Shield Holding Company; LLC; Neuron Shield 7, LLC; Neuron Shield Monitoring Associates, PLLC; Neuron Shield Monitoring Associates, PLLC; Neuron Shield 8, LLC; Neuron Shield Monitoring Associates, and PC; Neuron Shield 9, LLC,* District Court, Dallas County Texas, Cause No. DC-17-00534. [Active Matter]

- *Chris Robertson, Amber Robertson and Robertson Family Dental v. Philip Nunally,* Circuit Court of Hamilton County, Tennessee, 2nd Division, Docket No. 17-c-237 [Expert Report Production, Active Matter]

## 14.0 Appendix 2 – Documents Considered

- First Amended Complaint for the case dated December 21, 2017
- First Amended Complaint Detail
- OIG eDiscovery Production
- Documents from Plaintiffs' data analyst expert, Zachary Nye, PhD
- Documents from Plaintiffs' expert, Robert Church
- Documents from Plaintiffs' expert, Dr. James Alexander
- Sample of PVA ultrasound finalized report records produced by PVA, along with billing (submission of global claims which include the technical and professional component relating to ultrasounds) and reimbursement records for those patients
- Interviews with PVA staff and Counsel

## 15.0 Appendix 3 – Patient Sampling

### SAMPLE 1

A. Technical Component Image




B. Encounter Note Excerpt

Assessment & Plan (Jeffrey M. Martinez MD; 1/27/2016 1:06 PM)
Atherosclerosis with claudication of extremity (440.21 | I70.219)
Current Plans

- Non-User of Tobacco (1036F)
- Aspirin or other antithrombotic therapy not used, reason not given (G8599)
- Current Medications Documented (G8427)
- Schedule for AIF angiogram with possible RLE intervention.
- I discussed the problem with the patient. We discussed what may happen if we leave this untreated as well as the options for diagnostic and interventional procedures. The risks and benefits of treatments were presented and the patient was offered an opportunity to ask questions. Surgical options were discussed including risks and benefits and all questions were answered.
- Follow up in 2 weeks or as needed.

Diminished pulses in lower extremity (785.9 | R09.89)
Current Plans

- Lower Extremity Arterial Doppler (Add On Today): discussed with patient and provided information.

Note: She has severe arterial insufficiency of the right leg. She needs an angiogram.

Medical Decision Making (Jeffrey M. Martinez MD; 1/27/2016 1:07 PM)
**Amount/ complexity of data to be reviewed:**
- Order and/or review of diagnostic test(s)

Signed by Jeffrey M Martinez, MD (1/27/2016 1:07 PM) 2

## C. Interpretive Worksheet Attached to Encounter Note

### Scanned Documents

| # | Date | Title | Approved By | Comments |
|---|---|---|---|---|
| 1 | 01/21/2016 | Arterial Doppler wksht | Sheehan, Cyndy | No |




## D. Electronic Claim Submission Log

| Claim# | Bill Media | Billing Prov | Local Use Text | Orig Voucher# | Orig Payor | Orig Bill Date | Orig Media |
|---|---|---|---|---|---|---|---|
| [redacted] | | MARTJEF | | [redacted] | MEDICARE | 01/27/2016 | 3 ronic |

| Dates of Service | Procedure | Mods | Description | Diag1 | Description | TOS | Units | Fee Amt | Pmts/Adjs | Amt Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 01/21/2016 | 93926 | | Arterial Duplex Lwr Ext/Bpg Uni/Lmtd | I70.211 | Atherosclerosis of native arteries of extremities with inter | MEDICAL | 1.00 | $343.00 | $343.00 | $0.00 |

## E. Medstreaming Audit Trail Log

MedStreaming - Exam Viewer [Customer : PVA] [User bpuente] - LE Arterial Duplex Scan - 1/21/2016 11:34:59 AM

Exam List | Not Yet Ready | Ready for reading | QA | Indications | Personnel | Worksheet | Worksheet Macro | Report | Finalize | Reject | Rx | Labs | View

Audit trail

| Date/Time | Username | Event | Description |
|---|---|---|---|
| 1/26/2016 10:33:52 AM | CSHEEHAN | Exam was opened | 4 ened exam |
| 1/26/2016 10:37:15 AM | CSHEEHAN | Changed exam status | Status changed to Ready |
| 1/26/2016 10:37:15 AM | CSHEEHAN | Preliminary report | Report_READY_20160126103714.pdf : Preliminary Report PDF Snapshot uploaded |
| 1/26/2016 11:57:31 AM | CSHEEHAN | Changed exam status | 5 atus changed to QA |
| 1/26/2016 11:57:32 AM | CSHEEHAN | Preliminary report | Report_QA_20160126115711.pdf : Preliminary Report PDF Snapshot uploaded |
| 1/28/2016 4:08:37 PM | JMARTINEZ | Changed exam status | 6 atus changed to Final |
| 1/28/2016 4:08:37 PM | JMARTINEZ | Final report | Report_FINAL_20160128160445.pdf : Final Report PDF Snapshot uploaded[Generate Report Utility Call] |
| 1/28/2016 4:09:45 PM | medstreaming | exam ONREADY ONFINAL | Exam OnFinal forwarding trigger submitted |
| 6/16/2020 7:49:29 PM | bpuente | Exam was opened | Opened exam |

## F. Medstreaming "Final" Report

PVA
Peripheral Vascular Associates
DOCTORS OF ARTERIES & VEINS

Northeast
8811 Village Drive, Suite 150
San Antonio, TX 78217
Phone: (210) 656-5098
Fax: (210) 656-5219

ACCREDITED FACILITY IAC INTERSOCIETAL ACCREDITATION COMMISSION VASCULAR TESTING

### LE Arterial Duplex Scan

**Patient:** **DOB:** 07/15/1939 **Age:** 76y **Sex:** Female
**MRN:** **ICD9:** I70.211 **CPT:** 93926 **Room:**
**Referring:** Gonzalez Jr, Filomeno MD **Sonographer:** Sheehan, Cyndy **DOS:** 01/21/2016
**Indications:** Add on per Dr. Martinez to evaluate for arterial insufficiency due to c/o pain in right leg with dancing. HX: HLP

**Impressions:**

**Right:** Calcification visualized in the common femoral artery with no evidence of hemodynamically significant stenosis. No previous study for comparison.

**Left:** Calcification visualized in the common femoral artery with no evidence of hemodynamically significant stenosis.

Recommendations: Periodic reevaluation is suggested if clinically indicated

| Right Side | Vel cm/s | WaveForm | Stenosis |
|---|---|---|---|
| CFA | 57 | Biphasic | None |



| Left Side | Vel cm/s | WaveForm | Stenosis |
|---|---|---|---|
| | 113 | Triphasic | None |

Reading Physician: Martinez, Jeffrey MD, FACS Electronically signed on 01/28/2016 16:04:45. 7

## SAMPLE 2

### A. Technical Component Image




### B. Encounter Note Excerpt

Assessment & Plan (Grady D. Alsabrook MD; 9/11/2015 1:43 PM)
Occlusion and stenosis of carotid artery w/o mention of cerebral infarction (433.10 | I65.29) (433.10 | I65.29)
Current Plans

- Pt Education - How to access health information online: discussed with patient and provided information.
- Current Medications Documented (G8427)
- Aspirin or other antithrombotic therapy used (G8598)
- Non-User of Tobacco (1036F)

Occlusion and stenosis of multiple and bilateral precerebral arteries (433.30 | I65.8)
Current Plans

- Schedule carotid ultraound before next office visit.
- Follow up in 3 months or as needed.

Note: The pt has a mild right carotid stenosis and no significant carotid stenosis to the left side by repeat carotid US testing today. My independent review of the recent CT scan of the carotids indicate a R caoritd bifurcation stenosis of 50% which correlates with the radiology read stating a focal >55% highly calcific stenosis at the right ICA origin. The left ICA is calcified at the bifurcation, but no stenosis was evidenced. I do not recommend an arteriogram given the good correlation of the US and the CT scan. The symptoms were of a right facial droop, which would be from a left cerebral etiology. No endarterectomy or stenting is recommended for a 1-39% stenosis, albeit calcified, to the left carotid system.
She is on antiplatelets, a statin, and a B-blocker already.



Signed by Grady D Alsabrook, MD (9/11/2015 1:46 PM) 2

## C. Electronic Claim Submission Log

| Claim# | Bill Media | Billing Prov | Local Use Text | Orig Voucher# | Orig Payor | Orig Bill Date | Orig Media |
|---|---|---|---|---|---|---|---|
| [redacted] | Electronic | ALSAGRA | | [redacted] | MEDICARE | 09/16/2015 3 | Electronic |

| Dates of Service | Procedure | Mods | Description | Diag1 | Description | TOS | Units | Fee Amt | Pmts/Adjs | Amt Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 09/11/2015 | 93880 | | Dup Scan Xtrc Art Compl Bi Std | I65.8 | Occlusion and stenosis of other precerebral arteries | MEDICAL | 1.00 | $508.00 | $508.00 | $0.00 |

## D. Medstreaming Audit Trail Log

MedStreaming - Exam Viewer [Customer : PVA] [User bpuente] - [redacted] - Cerebrovascular Duplex Scan - 9/11/2015 9:30:00 AM

Exam List | Not Yet Ready | Ready for reading | QA | Indications | Personnel | Worksheet | Worksheet Macro | Report | Finalize | Reject | Rx | Labs | View

Audit trail

| Date/Time | Username | Event | Description |
|---|---|---|---|
| 9/11/2015 9:53:07 AM | CSHEEHAN | Exam was opened | 4 ened exam |
| 9/11/2015 10:00:13 AM | CSHEEHAN | Changed exam status | Status changed to Ready |
| 9/11/2015 10:00:13 AM | CSHEEHAN | Preliminary report | Report_READY_20150911100012.pdf : Preliminary Report PDF Snapshot uploaded |
| 9/11/2015 10:00:50 AM | CSHEEHAN | Changed exam status | 5 tus changed to QA |
| 9/11/2015 10:00:50 AM | CSHEEHAN | Preliminary report | Report_QA_20150911100050.pdf : Preliminary Report PDF Snapshot uploaded |
| 9/11/2015 10:01:14 AM | medstreaming | exam ONREADY ONFINAL | Exam OnReady forwarding trigger submitted |
| 9/18/2015 1:12:53 PM | GALSABROOK | Changed exam status | 6 tus changed to Final |
| 9/18/2015 1:12:53 PM | GALSABROOK | Final report | Report_FINAL_20150918131252.pdf : Final Report PDF Snapshot uploaded[Generate Report Utility Call] |
| 6/16/2020 5:06:46 PM | bpuente | Exam was opened | Opened exam |

## E. Medstreaming "Final" Report

PVA Peripheral Vascular Associates DOCTORS OF ARTERIES & VEINS

Northeast
8811 Village Drive, Suite 150
San Antonio, TX 78217
Phone: (210) 656-5098
Fax: (210) 656-5219

ACCREDITED FACILITY IAC VASCULAR TESTING

### Cerebrovascular Duplex Scan

Patient: [redacted] DOB [redacted] Age: 81y Sex: Female
MRN [redacted] ICD9: 433.10 433.30 CPT: 93880 Room:
Referring: Wellford, Armistead MD Sonographer: Sheehan, Cyndy DOS: 09/11/2015
Indications: Evaluate known carotid artery stenosis by outside facility. Recent TIA with symptoms involving the right arm and left facial drooping. HX: CVD, CHF, CAD, DM, HTN, VV

**Impressions:**

**Right:** Mild stenosis, 40-59%, in the internal carotid artery. Antegrade flow in the vertebral artery. No previous study for comparison.

**Left:** Minimal stenosis, 1-39%, in the internal carotid artery. Antegrade flow in the vertebral artery.

**Recommendation:** Periodic reevaluation is suggested if clinically indicated

| Right 40-59% | | | | Left 1-39% | | |
|---|---|---|---|---|---|---|
| B.P. | 150 / | | | 142 / | | |
| | PSV | EDV | PLAQUE | PSV | EDV | PLAQUE |
| D.ICA | 74 | 15 | None | 101 | 26 | |
| M.ICA | 87 | 16 | Heterogeneous | 101 | 23 | |
| P. ICA | 124 | 22 | Heterogeneous | 74 | 16 | Heterogeneous |
| D. CCA | 69 | 10 | Heterogeneous | 65 | 15 | Heterogeneous |
| M. CCA | 74 | 15 | None | 85 | 20 | Heterogeneous |
| P.CCA | 74 | 12 | None | 84 | 18 | None |
| ECA | 102 | 15 | Heterogeneous | 117 | 0 | |
| VERT | 97 | 14 | None | 82 | 18 | None |




**Velocity**
1-39% = <110 systolic, <40 end diastolic
40-59% = ≥110 systolic, <40 end diastolic
60-79% = >130 systolic, ≥ 40 end diastolic
80-99% = >250 systolic, ≥ 100 end diastolic

**Ratio**
0-49% = <2
50-69% = ≥2, <3.3
70-99% = ≥ 3.3

| Right | | Left |
|---|---|---|
| 1.7 | ICA /CCA Ratio | 1.2 |
| Antegrade | Vertebral Flow | Antegrade |

The right internal carotid artery could not be completely visualized due to shadowing from plaque. The left internal carotid artery could not be completely visualized due to shadowing from plaque. Validated velocity measurements with angiographic measurements, velocity criteria are extrapolated from diameter data as defined by Carotid duplex sonography: A multicenter recommendation for standardized imaging and Doppler criteria 1988

Reading Physician: Alsabrook, Grady MD Electronically signed on 9/18/2015 1:12:52 PM. 7

**SAMPLE 3**

A. Technical Component Image




B. Encounter Note Excerpt

Assessment & Plan (Alfred L. Laborde MD; 7/21/2016 5:41 PM)
Atherosclerosis of native arteries of the extremities with intermittent claudication (I70.219)
Current Plans

- Pt Education - How to access health information online: discussed with patient and provided information.
- Current Medications Documented (G8427)
- Aspirin or other antithrombotic therapy used (G8598)
- Pt Education - Atherosclerosis ": blood vessel problems

Occlusion and stenosis of carotid arteries of both sides (I 65.23)
Current Plans

- Pt Education - Carotid Artery Disease ": artery disease

History of tobacco use (Z87.891)
Current Plans

- Non-User of Tobacco (1036F)

Note: Noninvasive studies were performed. Bilateral carotid artery shows: 1-39% stenosis. At this time I have discussed the findings with Mr. His right ABI was 0.68 and the left ABI was 0.67. I have recommended continued follow up on a yearly basis. I will repeat his noninvasive studies at that time and keep you posted on his progress.

History and Physical Note
**Chart Review Note** (Laborde, Alfred L MD; 7/21/2016 5:41 PM)
I have reviewed the history and physical note and findings.

Completed and submitted for review by Sabrina Casiano MA (7/21/2016 3:22 PM)

Signed by Alfred L Laborde, MD (7/21/2016 5:41 PM)

**JUNE 23, 2020**

## C. Interpretive Worksheet Attached to Encounter




## D. Electronic Claim Submission Log

| Claim# | Bill Media | Billing Prov | Local Use Text | Orig Voucher# | Orig Payor | Orig Bill Date | Orig Media |
|---|---|---|---|---|---|---|---|
| [redacted] | Electronic | LABOALF | | [redacted] | MEDICARE | 07/22/2016 3 | Electronic |

| Dates of Service | Procedure | Mods | Description | Diag1 | Description | TOS | Units | Fee Amt | Pmts/Adjs | Amt Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/21/2016 | 93880 | | Dup Scan Xtrc Art Compl Bi Std | I65.23 | Occlusion and stenosis of bilateral carotid arteries | MEDICAL | 1.00 | $508.00 | $508.00 | $0.00 |

## E. Medstreaming Audit Trail Log

MedStreaming - Exam Viewer [Customer : PVA] [User bpuente] - Cerebrovascular Duplex Scan - 7/21/2016 2:00:00 PM

Exam List | Not Yet Ready | Ready for reading | QA | Indications | Personnel | Worksheet | Worksheet Macro | Report | Finalize | Reject | Rx | Labs | View | P

Audit trail

| Date/Time | Username | Event | Description |
|---|---|---|---|
| 7/21/2016 2:33:04 PM | MJOHNSON | Exam was opened | (4) dit Exam/Patient Details |
| 7/21/2016 3:46:28 PM | MJOHNSON | Exam was opened | Opened exam |
| 7/21/2016 3:48:29 PM | MJOHNSON | Changed exam status | Status changed to Ready |
| 7/21/2016 3:48:29 PM | MJOHNSON | Preliminary report | Report_READY_20160721154822.pdf : Preliminary Report PDF Snapshot uploaded |
| 7/21/2016 3:49:12 PM | MJOHNSON | Changed exam status | (5) tatus changed to QA |
| 7/21/2016 3:49:12 PM | MJOHNSON | Preliminary report | Report_QA_20160721154908.pdf : Preliminary Report PDF Snapshot uploaded |
| 7/21/2016 3:49:13 PM | MJOHNSON | Changed exam status | Status changed to QA |
| 7/21/2016 3:50:20 PM | MJOHNSON | Changed exam status | Status changed to QA |
| 7/25/2016 3:23:37 PM | ALABORDE | Changed exam status | (6) Status changed to Final |
| 7/25/2016 3:23:38 PM | ALABORDE | Final report | Report_FINAL_20160725152110.pdf : Final Report PDF Snapshot uploaded[Generate Report Utility Call] |
| 7/25/2016 3:24:32 PM | medstreaming | exam ONREADY ONFINAL | Exam OnFinal forwarding trigger submitted |
| 6/17/2020 11:24:33 AM | bpuente | Exam was opened | Opened exam |

## F. Medstreaming "Final" Report

Peripheral Vascular Associates
DOCTORS OF ARTERIES & VEINS

4330 Medical Drive, Suite 120
San Antonio, TX 78229
Phone: (210) 614-7414
Fax: (210) 616-0509

IAC Accredited Facility – Vascular Testing

### Cerebrovascular Duplex Scan

**Patient:** | **DOB:** | **Age:** 84y | **Sex:** Male
**MRN:** | **ICD9:** I65.23 | **CPT:** 93880 | **Room:**
**Referring:** Chinea, Eugenio MD | **Sonographer:** Johnson, Micah | **DOS:** 07/21/2016
**Indications:** Follow up of carotid artery stenosis. No new complaints.

**Impressions:**

**Right:** Minimal stenosis, 1-39%, in the internal carotid artery. Antegrade flow in the vertebral artery. No significant change in comparison to study done 6-10-15.

**Left:** Minimal stenosis, 1-39%, in the internal carotid artery. Antegrade flow in the vertebral artery. No significant change in comparison to study done 6-10-15.

**Right 1-39%**

| | PSV | EDV | PLAQUE |
|---|---|---|---|
| D.ICA | 72 | 18 | None |
| M.ICA | 113 | 29 | None |
| P. ICA | 51 | 13 | Heterogeneous |
| D. CCA | 59 | 13 | None |
| M. CCA | 52 | 13 | None |
| P.CCA | 61 | 9 | None |
| ECA | 78 | 0 | Heterogeneous |

Velocity Criteria
1-39% = <110 systolic, <40 end diastolic
40-59% = ≥110 systolic, <40 end diastolic
60-79% = >130 systolic, ≥40 end diastolic
80-99% = >250 systolic, ≥100 end diastolic




**Left 1-39%**

| | PSV | EDV | PLAQUE |
|---|---|---|---|
| D.ICA | 75 | 25 | None |
| M.ICA | 135 | 32 | None |
| P. ICA | 91 | 15 | Heterogeneous |
| D. CCA | 65 | 13 | None |
| M. CCA | 57 | 12 | None |
| P.CCA | 63 | 9 | None |
| ECA | 91 | 0 | Heterogeneous |

Ratio Criteria
0-49% = <2
50-69% = ≥2, <3.3
70-99% = ≥3.3

| Right | | | Left | |
|---|---|---|---|---|
| 51 | 15 | VERT | 32 | 11 |
| 2.2 | | ICA /CCA Ratio | 2.4 | |
| Antegrade | | Vertebral Flow | Antegrade | |

Plaque noted in the right external carotid artery. Plaque noted in the left external carotid artery. Velocities in the internal carotid artery are likely elevated due to tortuosity of the vessel bilaterally. No significant plaque or focal stenosis was visualized at the segments of elevated velocities bilaterally.

Reading/Performing: Laborde, ALFRED MD Electronically signed on 07/25/2016 15:21:10. (7)

## SAMPLE 4

### A. Technical Component Image




### B. Encounter Note

Note: 72 yo with DM, HTN, HLPD, CAD and ESRD on dialysis. Presents for 4 month follow-up. Patient continues to have life limiting claudication of the right lower extremity. It has affected her daily living. We have tried an exercise regimen for the past 4 months but patient has not seen improvements. Today she had arterial testing that showed right worse than left with biphasic and monophasic waveforms. I reviewed the results with the patient. I had a long discussion with the patient regarding her options, I offered an angiogram of the right lower extremity and patient would like to proceed. Patient is currently on Statin. She will call to schedule her follow up appointment.

We will see her in 3 months with ART's and Carotids.

I, Dr. Jesus Matos , personally performed the services described in this documentation, as scribed by Maira Tovar, M.A. in my presence, and reviewed by me.

Medical Decision Making (Maira Tovar MA; 1/20/2017 10:11 AM)
**Amount/ complexity of data to be reviewed:**
- Order and/or review of diagnostic test(s)



Signed by Jesus Matos, MD (1/24/2017 8:37 AM) 2

## C. Interpretive Worksheet Attached to Encounter

ENCOUNTER #: [redacted]
APPT DATE: 1/19/2017 8:00:00AM
APPT TYPE: LE Arterial Doppler
PROVIDER: SW LAB 2
PATIENT NUMBER: [redacted]
PATIENT NAME: [redacted]
DATE OF BIRTH: [redacted]
HOME TEL: [redacted]

APPT COMMENTS:
3 mo fu abi/cv

LAST DX: I65.23 Occlusion and stenosis of bilateral ca
Guarantor: [redacted]

SELF PAY BAL: $ 0.00

**Carotid**

Tech Init: [signature]

Diabetes? ☑ Yes ☐ No RT CEA Date: ________ LT CEA Date: ________

Stroke/TIA? ☐ Yes ☑ No Residual Defects from stroke? ☐ Yes ☐ No If yes, defect: ________

Coronary Artery Disease? ☑ Yes ☐ No If defect from stroke Pt is: ☐ RT handed ☐ LT Handed

Syncope? ☐ Yes ☐ No Bruit? ☐ RT ☐ LT ☐ BIL ☐ N/A

**RIGHT** Previous Date: 9/29/16 Circle one: Same (Progression) Improve

Native / CEA: ☐ None ☐ 1-39% ☐ (40-59%) ☐ 60-79% ☐ 80-99% ☐ Occluded

Stent: ☐ None ☐ 1-19% ☐ 20-49% ☐ 50-79% ☐ 80-99% ☐ Occluded

Vertebral (circle): (Antegrade) Retrograde To and Fro Absent Not Seen

Fill out below **ONLY** if greater than 39% stenosis for native or over 19% for stent:

CCA for ratio PSV: 84 Highest ICA PSV: 115 EDV: 20

Ratio (ICA/CCA): 1.36 Location highest ICA (circle) Prx (Mid) Dist

**LEFT** Previous Date: 9/29/16 Circle one: (Same) Progression Improve

Native / CEA: ☐ None ☐ 1-39% ☐ (40-59%) ☐ 60-79% ☐ 80-99% ☐ Occluded

Stent: ☐ None ☐ 1-19% ☐ 20-49% ☐ 50-79% ☐ 80-99% ☐ Occluded

Vertebral (circle): (Antegrade) Retrograde To and Fro Absent Not Seen

Fill out below **ONLY** if greater than 39% stenosis for native or over 19% for stent:

CCA for ratio PSV: 114 Highest ICA PSV: 124 EDV: 19

Ratio (ICA/CCA): 1.08 Location highest ICA (circle) Prx (Mid) Dist

| Percent | Systolic | Diastolic |
|---|---|---|
| 40-59% | 110-130 | <40 |
| 60-79% | 130-250 | 40-100 |
| 80-99% | >250 | >100 |

| Percent | Systolic | Ratio |
|---|---|---|
| ≥ 20% | ≥ 150 | ≥ 2.15 |
| ≥ 50% | ≥ 220 | ≥ 2.7 |
| ≥ 80% | ≥ 340 | 40-100 |

Notes: ________

Tech diff.

12/27/2016

## D. Electronic Claim Submission Log

| Claim# | Bill Media | Billing Prov | Local Use Text | Orig Voucher# | Orig Payor | Orig Bill Date | Orig Media |
|---|---|---|---|---|---|---|---|
| [redacted] | Electronic | MATOJES | | [redacted] | MEDICARE | 01/24/2017 (3) | Electronic |

| Dates of Service | Procedure | Mods | Description | Diag1 | Description | TOS | Units | Fee Amt | Pmts/Adjs | Amt Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 01/19/2017 | 93922 | | Single Level Arterial Dopplers Uppr/Lwr | I70.213 | Atherosclerosis of native arteries of extremities with inter | MEDICAL | 1.00 | $260.00 | $260.00 | $0.00 |

| Dates of Service | Procedure | Mods | Description | Diag1 | Description | TOS | Units | Fee Amt | Pmts/Adjs | Amt Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 01/19/2017 | 93926 | | Arterial Duplex Lwr Ext/Bpg Uni/Lmtd | I70.213 | Atherosclerosis of native arteries of extremities with inter | MEDICAL | 1.00 | $343.00 | $343.00 | $0.00 |

| Dates of Service | Procedure | Mods | Description | Diag1 | Description | TOS | Units | Fee Amt | Pmts/Adjs | Amt Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 01/19/2017 | 93880 | | Dup Scan Xtrc Art Compl Bi Std | I65.23 | Occlusion and stenosis of bilateral carotid arteries | MEDICAL | 1.00 | $508.00 | $508.00 | $0.00 |

## E. Medstreaming Audit Log

MedStreaming - Exam Viewer [Customer : PVA] [User bpuente] - [illegible] - Cerebrovascular Duplex Scan - 1/19/2017 8:45:00 AM

Exam List | Not Yet Ready | Ready for reading | QA | Indications | Personnel | Worksheet | Worksheet Macro | Report | Finalize | Reject | Rx | Labs | View

Audit trail

| Date/Time | Username | Event | Description |
|---|---|---|---|
| 1/19/2017 2:43:43 PM | Isaldana | Exam was opened | 4 am/Patient Details |
| 1/19/2017 2:44:34 PM | Isaldana | Changed exam status | Status changed to Scheduled |
| 1/19/2017 3:02:45 PM | Isaldana | Exam was opened | Edit Exam/Patient Details |
| 7/31/2017 3:04:08 PM | Isaldana | Preliminary report | Report_SCHEDULED_20170731150408.pdf : Preliminary Report PDF Snapshot uploaded |
| 7/31/2017 3:08:48 PM | Isaldana | Exam was opened | Edit Exam/Patient Details |
| 7/31/2017 3:09:51 PM | Isaldana | Exam was opened | Opened exam |
| 7/31/2017 3:12:16 PM | Isaldana | Preliminary report | Report_SCHEDULED_20170731151215.pdf : Preliminary Report PDF Snapshot uploaded |
| 7/31/2017 3:12:56 PM | Isaldana | User text | User chosed to accept optional OnReady rules validation failure and abort. |
| 7/31/2017 3:13:17 PM | Isaldana | Changed exam status | Status changed to Ready |
| 7/31/2017 3:13:18 PM | Isaldana | Preliminary report | Report_READY_20170731151316.pdf : Preliminary Report PDF Snapshot uploaded |
| 7/31/2017 3:13:39 PM | Isaldana | Changed exam status | 5 changed to QA |
| 7/31/2017 3:13:39 PM | Isaldana | Preliminary report | Report_QA_20170731151339.pdf : Preliminary Report PDF Snapshot uploaded |
| 7/31/2017 3:14:10 PM | medstreaming | User text | Exam is QA, can't send preliminary. |
| 8/2/2017 6:25:28 PM | jmatos | Changed exam status | 6 changed to Final |
| 8/2/2017 6:25:28 PM | jmatos | Final report | Report_FINAL_20170802172527.pdf : Final Report PDF Snapshot uploaded[Generate Report Utility Call] |
| 8/2/2017 6:26:15 PM | medstreaming | exam ONREADY ONFINAL | Exam OnFinal forwarding trigger submitted |
| 8/2/2017 6:26:27 PM | jmatos | Final report | Report_FINAL_20170802172527.pdf : Final Report PDF Snapshot uploaded[Generate Report Utility Call] |
| 6/16/2020 5:48:28 PM | bpuente | Exam was opened | Opened exam |

## F. Medstreaming "Final" Report

PVA
Peripheral Vascular Associates
DOCTORS OF ARTERIES & VEINS

94 Briggs Ave , Suite 600
San Antonio, TX 78224-1272
Phone: (210) 225-6508
Fax: (210) 225-1486

### Cerebrovascular Duplex Scan

**Patient** [illegible] **DOB:** [illegible] **Age:** 72y **Sex:** Female
**MRN** [illegible] **ICD9:** **CPT:** 93880 **Room:**
**Referring:** Hura, Claudia MD **Sonographer:** Saldana, Laura **DOS:** 01/19/2017
**Indications:** Follow up of carotid artery stenosis. Patient has coronary artery disease. Patient has diabetes.

**Impressions:**

**Right:** Mild stenosis, 40-59%, in the internal carotid artery. Antegrade flow in the vertebral artery. Progression of disease in comparison to study done 09/29/16.

**Left:** Mild stenosis, 40-59%, in the internal carotid artery. Antegrade flow in the vertebral artery. No significant change in comparison to study done 09/29/16.

Right: 40-59%

| | PSV | EDV | PLAQUE |
|---|---|---|---|
| D.ICA | 84 | 13 | |
| M.ICA | 115 | 20 | Heterogeneous |
| P. ICA | 102 | 15 | Heterogeneous |
| D. CCA | 102 | 10 | None |
| M. CCA | 85 | 13 | None |
| P.CCA | 99 | 12 | None |
| ECA | 124 | 1 | |

Velocity Criteria
1-39% = <110 systolic, <40 end diastolic
40-59% = ≥110 systolic, <40 end diastolic
60-79% = >130 systolic, ≥40 end diastolic
80-99% = >250 systolic, ≥100 end diastolic




Left: 40-59%

| | PSV | EDV | PLAQUE |
|---|---|---|---|
| | 89 | 14 | |
| | 124 | 19 | Heterogeneous |
| | 115 | 18 | Heterogeneous |
| | 111 | 14 | None |
| | 115 | 22 | None |
| | 176 | 21 | None |
| | 208 | 1 | Heterogeneous |

Ratio Criteria
0-49% = <2
50-69% = ≥2, <3.3
70-99% = ≥3.3

| Right | | | Left | |
|---|---|---|---|---|
| 64 | 11 | VERT | 74 | 11 |
| 1.4 | | ICA /CCA Ratio | 1.1 | |
| Antegrade | | Vertebral Flow | Antegrade | |

Reading/Performing: Matos, Jesus Electronically signed on 08/02/2017 17:25:27. 7

JUNE 23, 2020

## SAMPLE 5

### A. Technical Component Image




### B. Encounter Note

Assessment & Plan (William O. Kirk MD; 5/ 18/2016 1:22 PM)
Occlusion and stenosis of bilateral carotid arteries (I65.23)
Current Plans

- Schedule carotid ultrasound before next office visit.
- Follow up in six months or as needed.

Tobacco Use (Z72.0)
Current Plans

- Tobacco User / Cessation Counseling Provided (4004F)
- Aspirin or other antithrombotic therapy used (G8598)
- Pt Education - How to access health information online: discussed with patient and provided information.
- Current Medications Documented (G8427)
- Care Plan Documented (1123F)

Hypertension (I10)
Note: Carotid scan is stable with a mild right ICA stenosis and a moderate degree of stenosis in the left ICA. Will re-eval in 6 months.

History and Physical Note
**Chart Review Note** (Kirk, William O MD; 5/18/2016 1:22 PM)
I have reviewed the history and physical note and findings.

Completed and submitted for review by Ignasia Campos LVN (5/18/2016 1:21 PM)



Signed by William O Kirk, MD (5/ 18/2016 1:23 PM)

2

### C. Interpretive Worksheet Attached to Encounter

Not Provided

## D. Electronic Claim Submission Log

| Claim# | Bill Media | Billing Prov | Local Use Text | Orig Voucher# | Orig Payor | Orig Bill Date | Orig Media |
|---|---|---|---|---|---|---|---|
| [redacted] | Electronic | KIRKWIL | | [redacted] | MEDICARE | 05/19/2016 | 3 Electronic |

| Dates of Service | Procedure | Mods | Description | Diag1 | Description | TOS | Units | Fee Amt | Pmts/Adjs | Amt Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 05/18/2016 | 93880 | | Dup Scan Xtrc Art Compl Bi Std | I65.23 | Occlusion and stenosis of bilateral carotid arteries | MEDICAL | 1.00 | $508.00 | $508.00 | $0.00 |

## E. Medstreaming Audit Log

MedStreaming - Exam Viewer [Customer : PVA] [User bpuente] - [redacted] - Cerebrovascular Duplex Scan - 5/18/2016 12:26:08 PM

Exam List Not Yet Ready Ready for reading QA Indications Personnel Worksheet Worksheet Macro Report Finalize Reject Rx Labs View P

Audit trail

| Date/Time | Username | Event | Description |
|---|---|---|---|
| 5/18/2016 1:06:50 PM | kanaya | Exam was opened | 4 d exam |
| 5/18/2016 1:07:44 PM | kanaya | Preliminary report | Report_ACQUIRED_20160518130744.pdf : Preliminary Report PDF Snapshot uploaded |
| 5/18/2016 3:09:48 PM | kanaya | Exam was opened | Opened exam |
| 5/18/2016 3:11:51 PM | kanaya | Preliminary report | Report_ACQUIRED_20160518151150.pdf : Preliminary Report PDF Snapshot uploaded |
| 5/18/2016 3:12:26 PM | kanaya | Preliminary report | Report_ACQUIRED_20160518151226.pdf : Preliminary Report PDF Snapshot uploaded |
| 5/18/2016 3:13:11 PM | kanaya | Changed exam status | Status changed to Ready |
| 5/18/2016 3:13:11 PM | kanaya | Preliminary report | Report_READY_20160518151310.pdf : Preliminary Report PDF Snapshot uploaded |
| 5/18/2016 3:13:36 PM | kanaya | Changed exam status | 5 hanged to QA |
| 5/18/2016 3:13:36 PM | kanaya | Preliminary report | Report_QA_20160518151336.pdf : Preliminary Report PDF Snapshot uploaded |
| 5/18/2016 3:14:15 PM | medstreaming | User text | Exam is QA, can't send preliminary. |
| 5/19/2016 7:41:49 AM | WKIRK | Changed exam status | 6 hanged to Final |
| 5/19/2016 7:41:50 AM | WKIRK | Final report | Report_FINAL_20160519072937.pdf : Final Report PDF Snapshot uploaded[Generate Report Utility Call] |
| 5/19/2016 7:43:32 AM | medstreaming | exam ONREADY ONFINAL | Exam OnFinal forwarding trigger submitted |
| 11/16/2016 2:08:08 PM | aburnett | Changed exam status | Status changed to Ready |
| 11/16/2016 2:08:09 PM | aburnett | Preliminary report | Report_READY_20161116140804.pdf : Preliminary Report PDF Snapshot uploaded |
| 11/29/2016 2:49:21 PM | kanaya | Exam was opened | Opened exam |
| 11/29/2016 2:49:49 PM | kanaya | Preliminary report | Report_READY_20161129144942.pdf : Preliminary Report PDF Snapshot uploaded |
| 11/29/2016 2:50:55 PM | kanaya | Changed exam status | Status changed to QA |
| 11/29/2016 2:50:55 PM | kanaya | Preliminary report | Report_QA_20161129145051.pdf : Preliminary Report PDF Snapshot uploaded |
| 11/29/2016 2:51:38 PM | medstreaming | User text | Exam is QA, can't send preliminary. |
| 11/30/2016 7:37:48 AM | WKIRK | Changed exam status | Status changed to Final |
| 11/30/2016 7:37:48 AM | WKIRK | Final report | Report_FINAL_20161130073648.pdf : Final Report PDF Snapshot uploaded[Generate Report Utility Call] |
| 11/30/2016 7:38:28 AM | medstreaming | exam ONREADY ONFINAL | Exam OnFinal forwarding trigger submitted |
| 6/17/2020 11:53:15 AM | bpuente | Exam was opened | Opened exam |

**JUNE 23, 2020**

F. Medstreaming "Final" Report

Peripheral Vascular Associates
DOCTORS OF ARTERIES & VEINS

Northeast
8811 Village Drive, Suite 150
San Antonio, TX 78217
Phone: (210) 656-5098
Fax: (210) 656-5219

ACCREDITED FACILITY · IAC INTERSOCIETAL ACCREDITATION COMMISSION · VASCULAR TESTING

## Cerebrovascular Duplex Scan

| | | | |
|---|---|---|---|
| **Patient** | **DOB:** | **Age:** 66y | **Sex:** Male |
| **MRN** | **ICD9:** I65.23 | **CPT:** 93880 | **Room:** |
| **Referring:** Garza, Juan MD | | **Sonographer:** Anaya, Karima | **DOS:** 05/18/2016 |

**Indications:** Pt. follow up of known carotid stenosis. Pt. states no complaints at this time. HX: CVD

## Impressions:

**Right:** Mild stenosis, 40-59%, in the internal carotid artery. Antegrade flow in the vertebral artery. No significant change in comparison to study done 11/16/2015.

**Left:** Moderate stenosis, 60-79% in the internal carotid artery. Antegrade flow in the vertebral artery. No significant change in comparison to study done 11/16/2015.

**Recommendation:** Recommend repeat ultrasound in 6 months

**Right — 40-59%**

| | PSV | EDV | PLAQUE |
|---|---|---|---|
| D.ICA | 93 | 22 | |
| M.ICA | 116 | 31 | Heterogeneous |
| P. ICA | 89 | 23 | Heterogeneous |
| D. CCA | 50 | 14 | None |
| M. CCA | 46 | 13 | None |
| P.CCA | 43 | 9 | None |
| ECA | 63 | 10 | |

**Velocity Criteria**
1-39% = <110 systolic, <40 end diastolic
40-59% = ≥110 systolic, <40 end diastolic
60-79% = >130 systolic, ≥40 end diastolic
80-99% = >250 systolic, ≥100 end diastolic




**Left — 60-79%**

| | PSV | EDV | PLAQUE |
|---|---|---|---|
| D.ICA | 120 | 38 | |
| M.ICA | 203 | 52 | Heterogeneous |
| P. ICA | 212 | 56 | Heterogeneous |
| D. CCA | 66 | 13 | None |
| M. CCA | 90 | 20 | None |
| P.CCA | 75 | 15 | None |
| ECA | 360 | 49 | |

**Ratio Criteria**
0-49% = <2
50-69% = ≥2, <3.3
70-99% = ≥3.3

| Right | | | Left | |
|---|---|---|---|---|
| 33 | 10 | VERT | 53 | 11 |
| 116 | | ICA /CCA Ratio | 212 | |
| Antegrade | | Vertebral Flow | Antegrade | |

Reading/Performing: Kirk, William MD Electronically signed on 05/19/2016 07:29:37.

7