## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX. REL.; TIFFANY MONTCRIEFF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; AND ALICIA BURNETT, RELATOR, | § § § § § § | |
| *Plaintiffs* | § § | |
| v. | § § § | SA-17-CV-00317-XR |
| PERIPHERAL VASCULAR ASSOCIATES, P.A., | § § § | |
| *Defendant.* | § | |

## ORDER

On this date, the Court considered (1) Defendant's renewed motion for judgment as a matter of law (ECF No. 208), Relators' response (ECF No. 214), and Defendant's reply (ECF No. 217); and (2) Relators' motion for statutory penalties and entry of judgment (ECF No. 207), the responses filed by Defendant (ECF No. 215) and the United States (ECF No. 216), and Relators' replies thereto (ECF No. 218, 219).

## BACKGROUND

This False Claims Act case arises out of the alleged fraudulent billing practices of Defendant Peripheral Vascular Associates, P.A. ("PVA"), a healthcare provider. Relators filed this action in April 2017 under the authority granted by 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), on behalf of the United States Government. Relators allege that PVA falsely billed Medicare for services it had not performed. *See* ECF No. 8. After a five-day trial held in February 2022, the jury agreed, awarding $2,728,199 in damages. ECF No. 201. Relators now ask the Court to assess statutory penalties against PVA consistent with the jury's verdict. ECF No. 207. PVA asks the Court to set aside the jury verdict. ECF No. 208.

PVA is a full-service vascular surgery practice with multiple locations throughout San Antonio, Texas. ECF No. 123 at 2. Among other services, PVA performs vascular ultrasounds, which have two components relevant to this case: a technical component and a professional component. *Id.* In essence, the technical component is performing the ultrasound and the professional component is a physician analyzing the results. *Id.*

The technical and professional components of a vascular study can be billed to Medicare (or any other payor) separately or jointly. *Id.* Which provider bills a particular component of a vascular study depends on who performs which component. *Id.* at 3. PVA physicians read and interpret studies performed at PVA offices and at hospitals. *Id.* at 3–4. When a hospital performs the technical component of a study, the hospital bills for that component. *Id.* at 4. When a PVA physician or registered vascular technologist performs the technical component, PVA bills for that component. *Id.* PVA performs some vascular studies without a PVA physician seeing or treating the patient. *Id.* These "Testing Only" studies occur when PVA performs the technical component of a vascular study ordered by a different treating provider. *Id.*

A healthcare provider can bill Medicare for both the technical and professional components of a vascular study using a "global" Current Procedural Terminology ("CPT") Code. *Id.* The CPT Codes are a series of alphanumeric sequences—developed by the American Medical Association ("AMA") and adopted by the Department of Health and Human Services ("HHS")—that healthcare providers use to describe the procedures and services that they perform. ECF No. 123 at 2–3. When a provider bills for just one component of a study, it must use a two-character "modifier" that signifies that only one component has been performed. *Id.* As relevant here, a provider can append the "-TC" modifier when billing the technical component only, or the "-26" modifier to bill for the professional component only. *Id.*

PVA uses a program called Allscripts Clinical Module ("Allscripts CM") as its electronic medical records system and a program called Allscripts Practice Management ("APM") as its billing software. *Id.* ¶¶ 17, 22. A patient's medical record is contained in Allscripts CM. In 2014, PVA adopted an archiving and communications system called MedStreaming. *Id.* at 5. The purpose of this system was to help PVA physicians manage workflow and to create a reporting system that was easier for healthcare providers and patients to understand. *Id.* Every vascular study that PVA performs has a MedStreaming report. *Id.*

Relators filed their initial Complaint under seal in April 2017, ECF No. 1, followed by an Amended Complaint, filed under seal in December 2017, ECF No. 8. Relators brought this action under 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the FCA on behalf of the United States Government. Relators alleged, *inter alia*, that, in 2012, PVA implemented a scheme of too-quick billing designed to increase revenue. *Id.* ¶¶ 36–38. Specifically, PVA began billing Medicare for both the professional and technical component before the patient's status became "Final" in MedStreaming—before the PVA physician had reviewed and interpreted the study and signed the report. Relators alleged three tranches of claims, representing three separate theories of liability under the FCA.

(1)  **The "Testing Only" Tranche:** The Testing Only Tranche includes vascular studies that PVA performed based on referrals from non-PVA healthcare providers. When a patient is referred to PVA only for a vascular study, PVA does not perform Evaluation, Management, or Treatment Services ("E/M Services"). For these patients, there are no encounter notes in the patient's medical record in Allscripts CM. Accordingly, a PVA physician's interpretations appear only in the MedStreaming reports. Relators assert that PVA billed Medicare before the MedStreaming report was signed.

(2)  **The "Double Billing" Tranche**: The Double-Billing Tranche contemplates services PVA provided to its own patients. For these patients, PVA physicians would visit with a patient to provide E/M Services and then order a vascular study to be conducted on the same day. Relators argue that PVA

failed to generate a MedStreaming report to reflect the PVA physicians' interpretations of vascular studies. Although PVA argues that the physicians' interpretations are found in the Allscripts CM E/M Services patient note, Relators assert that the CPT definitions explicitly prohibit billing for both E/M Services and a vascular study without a separate, written report containing the physician's interpretations.

(3)   **The "Wrong Provider" Tranche**: Relators allege that PVA submitted bills to Medicare indicating the wrong "rendering" physician because PVA used a system that allowed any PVA physician to review and sign MedStreaming reports regardless of whether that physician performed the interpretation.

The Department of Justice investigated the Relators' allegations for roughly a year. Over the course of the investigation, PVA provided thousands of pages of medical and business records pursuant to a Government subpoena, including over 400 patient records covering a three-year period. On August 22, 2018, Katherine Britt, PVA's vice president of operations, met for an hour and a half with special agents from the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") to discuss PVA's Medicare billing practices and explain the documents provided in response to the subpoena. Three months later, the Government informed the Court of its decision to decline to intervene in Relators' case. ECF No. 20.

In August 2020, the parties filed cross-motions for summary judgment. ECF Nos. 94, 95. On December 14, 2020, the Court issued an order resolving the parties' cross-motions for summary judgment. *See United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 759–60 (W.D. Tex. 2020). As is relevant here, the Court granted Relators' motion with respect to the falsity and scienter elements of their claims, concluding that the issues of materiality and damages would be tried to the jury. *See id.* at 773.

A five-day trial was held in February 2022. After the close of Relators' case and then again before submission to the jury, PVA moved for judgment as a matter of law, arguing that that Relators had not satisfied their burden of proof as to materiality or damages, and had failed to

introduce any evidence relating to payments made by the Medicare Advantage and Tricare programs, which have their own rules for payment. *See* ECF Nos. 196, 197. The Court concluded that Relators had failed to present sufficient evidence that designation of the wrong provider on PVA's invoices was material to the Government and, accordingly, granted PVA's motions with respect to the Wrong Provider Tranche of Claims. Trial Tr. at 660:1–4. The Court also granted judgment as a matter of law as to the claims arising out of payments by the Medicare Advantage and Tricare programs. *Id.* at 672:3–8. The motions were denied in all other respects. ECF No. 199.

Pursuant to the Court's rulings narrowing the case, Relators asked the jury to find 2,780 false claims within the Testing Only Tranche and 4,650 within the Double Billing Tranche. Trial Tr. 772:10–8. On February 16, 2022, the jury returned a verdict in favor of Relators, but deducted 25 claims from each tranche.[1] ECF No. 201. In total, the jury found that PVA had submitted 7,380 false claims, causing $2,728,199 in damages to the Government. *Id.* Trebled, the damages awarded by the jury total $8,184,597. 31 U.S.C. § 3929(a)(1). Relators ask the Court to impose additional statutory penalties in the amount of $21,825,592—significantly less than the applicable statutory range of $64,144,311 to $128,288,622. ECF No. 207 at 1, 3. PVA objects that even this reduced penalty violates the Eighth Amendment's prohibition on excessive fines (ECF No. 215) and, pursuant to Federal Rule of Civil Procedure 50(b), renews those portions of its previous motions for judgment as a matter of law that were denied by the Court (ECF No. 208).

---

[1] This deduction was presumably based on Ms. Britt's testimony that one of the Relators may have caused roughly 50 MedStreaming reports to be misdated. *See* Trial Tr. at 646:12–647:2.

## DISCUSSION

### I.      Defendant's Renewed Motion for Judgment as a Matter of Law

#### A.      Legal Standard

Motions for judgment as a matter of law are governed by Federal Rule of Civil Procedure

50, which provides in relevant part:

> If a party has been fully heard on an issue during a jury trial and the court finds that
> a reasonable jury would not have a legally sufficient evidentiary basis to find for
> the party on that issue, the court may (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim . . .
> that can be maintained or defeated only with a favorable finding on that issue.

FED. R. CIV. P. 50(a)(1). If a party makes a motion for judgment as a matter of law during trial, but

the court does not grant the motion, the moving party may renew its motion no later than twenty-

eight days after the entry of judgment. FED. R. CIV. P. 50(b). A court considering a such a motion

may (1) allow judgment on the verdict; if the jury returned a verdict, (2) order a new trial; or (3)

direct the entry of judgment as a matter of law. FED. R. CIV. P. 50(b).

In considering a Rule 50(b) motion for judgment as a matter of law following a jury verdict,

the court must be "especially deferential" to the jury's findings. *SMI Owen Steel Co., Inc. v. Marsh

USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008). It should "consider all of the evidence, drawing all

reasonable inferences and resolving all credibility determinations in the light most favorable to the

non-moving party." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 498 (5th Cir. 2012); *Reeves

v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge."). A court must deny a motion for judgment as a matter of law

"unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that

reasonable jurors could not reach a contrary conclusion." *Id.* (quoting *Flowers v. S. Reg'l*

*Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001)). In deciding a Rule 50(b) motion, even

if the court would reach a different conclusion as the trier of fact, the court is "not free to reweigh

the evidence or to re-evaluate credibility of witnesses." *Brown v. Kinney Shoe Corp.*, 237 F.3d

556, 564 (5th Cir. 2001) (quoting *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995)). In short,

"[u]nless there was no credible evidence presented which might authorize the verdict, the jury's

findings must stand." *Urban Developers LLC v. City of Jackson, Miss.*, 468 F.3d 281, 297 (5th

Cir. 2006) (internal quotations omitted) (quoting *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d

454, 461 (5th Cir. 1995)).

"The court may, on motion, grant a new trial on all or some of the issues." FED. R. CIV. P.

59(a)(1). "A new trial may be granted, for example, if the district court finds the verdict is against

the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial

error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir.

1985). "While the court is to respect the jury's collective wisdom and must not simply substitute

its opinion for the jury's, '[i]f the trial judge is not satisfied with the verdict of a jury, he has the

right—and indeed the duty—to set the verdict aside and order a new trial.'" *Id.* (quoting C. Wright,

Federal Courts 634 (4th ed. 1983)). In ruling on a motion for new trial, the jury's verdict may not

be lightly set aside. *Ellis v. Weasler Eng'g, Inc.*, 258 F.3d 326, 343 (5th Cir. 2001).

**B.    Analysis**

The FCA prohibits false and fraudulent claims for reimbursement to the federal

government. To succeed on a claim for violation of the FCA, the Government or relator must

prove:

    1)    there was a false statement or fraudulent course of conduct;

    2)    made or carried out with the requisite scienter;

3)  that was material; and

4)  that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim).

*United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (citing 31 U.S.C. § 3729(a) (2015)). The FCA attaches liability "not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *Id.* (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

The Court notes that PVA's motion raises several arguments that are not properly before the Court. For example, the motion repeatedly addresses the elements of falsity and scienter, *see* ECF No. 208 at 16–18, even though neither of those issues were sent to the jury. PVA further asserts for the first time in its renewed motion that, as to the "double-billing" tranche, "Relators put forth no credible evidence demonstrating that PVA was paid twice for the professional component." ECF No. 208 at 12. PVA did not make this argument in either of its prior Motions for Judgment as a Matter of Law, and it is not properly before this Court as a "renewed" motion. *See Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006, 1010 (5th Cir. 1998); *Charbonnet v. Lee*, 951 F.2d 638, 642 n.20 (5th Cir. 1992). Similarly, PVA's briefing appears to challenge several of the Court's evidentiary rulings, including its decision to limit the scope of testimony concerning the 2018 OIG meeting, *see* ECF No. 208 at 10, and its decision to permit Relators to rely on Dr. Nye's statistical analysis in support of their claim for damages, *see id.* at 16.[2] The Court will not address these arguments further in this order.

---

[2] *See Montcrieff*, 507 F. Supp. at 771 (citing *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 609 (S.D. Tex. 2016) ("[C]ourts regularly find liability where—as here—relators provide circumstantial evidence that shows defendants engaged in a fraudulent scheme and submitted claims to Medicare seeking payment of such fraudulent claims."); *United States v. Vista Hospice Care, Inc.*, No. 3:07-CV-00604-M, 2016 WL 3449833, at *12, n.100 (N.D. Tex. June 20, 2016) ("Extrapolation has been used to establish damages in FCA cases."); *United States v. Krizek*, 192 F.3d 1024, 1030–31 (D.C. Cir. 1999); *see also United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 714 (7th Cir. 2014) ("there has to be some evidence—statistical or otherwise—from which the jury could determine (at least approximately) how many of [defendant's] documents contained false certifications.").

### 2. Materiality

For a false claim to violate the FCA, it must be material. *Universal Health Servs., Inc. v. United States ("Escobar")*, 579 U.S. 176, 191 (2016). The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In the Fifth Circuit, the FCA requires "proof only that the defendant's false statements *could have* influenced the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *United States ex rel. Harman v. Trinity Indus. Inc*., 872 F.3d 645, 661 (5th Cir. 2017) (emphasis added). "[T]he False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Escobar*, 579 U.S. at 196.

PVA devotes much of its briefing to the issue of materiality. *See* ECF No. 208 at 4–11; ECF No. 217 at 2–9; ECF No. 219 at 2–5. In support of its position that Relators failed to show that the false claims were material to the Government's payment decisions, PVA advances two primary arguments. First, PVA repeatedly asserts that the falsity of its claims amounted to a mere "timing issue" and was immaterial because "the issue was not whether PVA should be paid, but only when." ECF No. 208 at 4, 6, 8. Second, PVA asserts that, "[a]s a matter of law," the DOJ investigation and 2018 meeting with the OIG "clearly renders the purported false statements immaterial under the FCA." ECF No. 208 at 8; *see also id.* at 9 ("OIG's investigation, after notice of possible violations, negates the existence of materiality as a matter of law.").

The thrust of PVA's first materiality argument is that Relators—and the jury—have conflated falsity with materiality. In fact, PVA's theory of materiality suffers from the converse logical defect: conflating materiality with damages. PVA argues that the Government "would have" paid for its services at some point and that PVA simply reported those services at an

improper time.[3] Even if this were true, Congress has rejected this so-called "no harm, no foul" argument. *United States v. Mackby*, 339 F.3d 1013 (9th Cir. 2003) (citing S. Rep. No. 99–345, at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5275) ("A false claim for reimbursement under the Medicare, Medicaid or similar program is actionable under the act . . . even though the services are provided as claimed."); *see also United States v. Mackby*, 68 F. App'x 776, 777 (9th Cir. 2003) ("Mackby's conduct was not harmless. The government has an interest in preserving the integrity of the Medicare system and protecting against fraud. Fraudulent claims, even when the medical services were actually performed, hinder the effective administration of Medicare."). Both courts and Congress have recognized that a false claim may be material even when the damage it causes is minimal or—if the false claim has been denied—non-existent.

PVA next asserts that its pre-billing scheme does not satisfy the standard for materiality set out in the Supreme Court's decision in *Escobar*. Under *Escobar*, "a matter is material" if: (1) a reasonable person would attach importance to it in determining a "choice of action," or (2) "the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action," whether or not a reasonable person would do so. *Escobar*, 579 U.S. at 192 (quotation marks and citation omitted). *Escobar* identified several factors that are relevant to, but not dispositive of, the materiality inquiry: whether the government has designated "compliance with a particular . . . requirement as a condition of payment," *id.* at 194; whether the violation of that requirement goes to the "essence of the bargain," *id.* at 193 n.5 (internal quotation marks omitted); whether the violation is "minor or insubstantial," *id.* at 194; and whether the government has taken action when it had actual knowledge of similar violations, *id.* at 195. "[P]roof of materiality can include, but is not necessarily limited to, evidence

---

[3]This argument is addressed in greater detail in the Court's discussion of damages, *infra*.

that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the . . . requirement" at issue. *Id.* at 194–95.

Determining whether a violation is minor or insubstantial also appears to be a matter of common sense. In *Escobar*, the Supreme Court clarified that a defendant can have "actual knowledge" that a condition is material even when the Government does not expressly identify it as a condition of payment:

> If the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do not shoot, the defendant has "actual knowledge." *Id.* Likewise, because a *reasonable person* would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information" even if the Government did not spell this out.

*Id.* at 191. On the other hand, even an express condition may be immaterial. For example, "[i]f the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act."[4] *Id.* at 195. If the Government regularly pays the service provider's claims, even knowing that foreign-made staplers were used, that is "strong evidence" that the condition that the contractor must use American-made staplers is not material. *Id.* In other words, where "the government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* The Fifth Circuit has reasoned that, under *Escobar*, "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *Id.* at 663.

---

[4] At trial, PVA mischaracterized this hypothetical from *Escobar* as a requirement that a manufacturer supply American-made staplers. *See* Trial Tr. at 685:2–4. Regardless of the Government's payment behavior, there would appear to the Court to be a significant difference between a requirement that a health care service provider *use* American-made staplers and a requirement that a manufacturer *produce* staplers made in America.

Still, the Government's continued payments in light of its *actual* awareness of misconduct is not proof *per se* that the misconduct is immaterial under the FCA. Courts have long held that an FCA defendant is "not automatically exonerated by any overlapping knowledge by government officials." *United States ex rel. Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1156 (2d Cir. 1993). There are many good reasons, including important public health and safety considerations, why the Government might continue to pay claims in such circumstances. *See United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003) (government might have good reason to pay because the contract is "advantageous to the government" or is too far along to terminate). There are circumstances in which the Government may properly stop payments, but such decisions are necessarily tempered by the need to ensure adequate access to health care. The Government must ensure the delivery of health care to many millions of Americans enrolled in Medicaid, Medicare, and other health insurance programs. "The Government does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be wrongdoing." *United States v. Berkeley HeartLab, Inc.*, No. 14-cv-230, 2017 WL 4803911, at *7 (D.S.C. Oct. 23, 2017).

The materiality question in this case, as Relators put it, is simple: "If PVA had been truthful with Medicare when it submitted its bills, and said – 'We have not yet completed this vascular study, but intend to do so in the coming days, weeks, months, or years' – would Medicare have paid those claims?" ECF No. 214 at 4. The jury answered no. Despite PVA's assertions to the contrary, Relators presented ample evidence at trial to support the jury's materiality finding, including the testimony of Relators' Medicare billing experts, Dr. James Alexander and Robert Church, various Medicare publications, and PVA's own internal compliance policies.

Relators' first billing expert, Dr. James Alexander, served for eight years as a full-time Medical Director for Medicare Part B in Texas under Blue Cross/Blue Shield of Texas, including four years as the Chief Medical Director for the State of Texas. Trial Tr. at 178:13–180:14. During his tenure, on an almost daily basis, he participated in decisions whether or not to pay claims that were alleged to have been billed improperly. *Id.* at 181:2–7. Dr. Alexander testified that Medicare would not have paid the claims if it had known that the services were not yet complete, *id.* at 188:7–11; 204:16–22, because Medicare does not pay prospectively for services, *id.* 202:1–13. *See also id.* at 203:6–9 ("[I]f something has not been completed . . . it is considered an invalid claim to be billed to Medicare. And if Medicare had known about it, they would not have paid it."). Dr. Alexander also clarified that Medicare does not make partial payments for partially completed services. *Id.* at 205:5–17; 206:7–14. Relators' second billing expert, Robert Church, who has worked for and with multiple government payors, including Medicare, on billing and payment issues over the course of 30 years, agreed. *Id.* at 347:13-350:20. Like Dr. Alexander, he confirmed that "[i]f a doctor submits a bill to Medicare and says, 'Here's a bill and I have not completed the work, but I plan to do it soon, in a few days, a few weeks,'" Medicare would not pay that bill. *Id.* at 353:14–19; 354:5–22.

Relators' expert testimony was corroborated by several documents that emphasize the importance of only billing for services that have actually been performed. The Medicare Program Integrity Manual identifies examples of Medicare fraud, including: "Incorrect reporting of diagnoses or procedures to maximize payment," "Billing for services not furnished," "Unbundling or 'exploding charges,'" and "Misrepresenting dates and descriptions of services furnished or the identity of the beneficiary or the individual who furnishes the services." PEX 58 at 7–8. The Medicare Learning Network Booklet entitled "Medicare Fraud & Abuse: Prevent, Detect, Report,"

describes similar examples of Medicare fraud and abuse, including "Knowingly billing for services not furnished, supplies not provided, or both, including falsifying records to show delivery of such items." PEX 57 at 5.[5] The billing form submitted to Medicare itself—the CMS-1500 form—requires explicit certification by the billing physician that the services being billed for have been "furni<u>sed</u>." PEX 35 (emphasis added).

PVA's internal documents also demonstrate the importance of waiting to bill Medicare until services have been completed. For example, its "Compliance Pledge" includes the following billing guidelines:

- "Procedural codes . . . should only be selected which are supported in the chart."
- "[T]he patient's chart is the only defense against a claim of fraud or abuse. If it is not documented, it never happened and cannot be billed."
- "High Risk Areas" include: "1. Billing for items or services not actually rendered," and "4. Duplicated billing."
- "Claim development and submission policies and procedures should: 1. Provide for proper and timely documentation of all physician and other professional services prior to billing to ensure that only accurate and properly documented services are billed[.]"
- The "code used by the billing staff [should] accurately describe[] the service that was ordered by the physician and performed by [PVA]."
- "[A] claim should not be submitted by [PVA] if it is known that documentation does not exist and/or the service was not provided."

PEX 19. The Compliance Pledge was explicitly intended to set forth the broad outlines of a "specific Compliance Plan to address Medicare fraud and abuse laws." *Id.* at DEF000697.

In 2017, PVA "[t]ransitioned to billing after studies are read"—described internally as "Compliance billing"—in part to "[e]nsure no audit requests for incomplete medical records[.]" PEX 29 at DEF007697–98; *see also* DEF007691; Trial Tr. at 140:16:16–25. This "Compliance

---

[5] Dr. Alexander confirmed that both the Medicare Program Integrity Manual and the rules in the Medicare Learning Network Booklet would be considered by Medicare when determining whether to pay an allegedly improper claim. Trial Tr. 209:20–210:10, 215:23–216:11, 217:22–25.

Billing Project" represented "a SIGNIFICANT change to workflow in the vascular lab," and PVA acknowledged that it would "[t]ake[] significantly longer to bill exam[s]." PEX 29 at DEF007703. A "Vascular Lab Compliance Review" presentation given in 2018 by PVA's technical director, Barbara Burrow, confirmed that "Examples of improper claims include: . . . Billing for services not provided." PEX 20 at DEF0175801.

PVA urges the Court to disregard Relators' evidence of materiality and insists that the only relevant evidence is the Government's continued payment of claims after its investigation into PVA's billing practices. PVA's argument significantly overestimates the probative value of the 2018 meeting in multiple respects, and incorrectly assigns dispositive weight to *Escobar*'s government-action factor.

As a preliminary matter, the Court observes that the 2018 meeting was a part of the Government's *qui tam* investigation. A *qui tam* investigation focuses not on payment decisions, but on whether the DOJ and its agency clients should (1) commit their limited resources to intervening in the *qui tam* case, (2) decline intervention and allow relators to move forward with the case alone, or (3) decline intervention and exercise their discretion to dismiss the relators' case. Given the diverse—and ultimately opaque—factors bearing on the Government's intervention decision, courts routinely exclude it from the materiality analysis altogether:

> In *Escobar* itself, the government chose not to intervene, and the Supreme Court did not mention this as a relevant factor in its materiality analysis. On remand, the First Circuit held that the relators had sufficiently pleaded materiality, without reference to the government's declination of intervention. Furthermore, the False Claims Act is designed to allow relators to proceed with a *qui tam* action even after the United States has declined to intervene. If relators' ability to plead sufficiently the element of materiality were stymied by the government's choice not to intervene, this would undermine the purposes of the [FCA].

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 836 (6th Cir. 2018) (citations omitted). As Relators point out, under PVA's logic, any case in which the

Government declines to intervene—approximately 85% of *qui tam* cases—would presumptively fail the materiality test. ECF No. 214 at 15. The Court declines to adopt PVA's theory of intervention given its conspicuous absence from *Escobar* and its progeny.

Second, materiality should be decided at the time of the payment decision, not after-the-fact. The government-action factor turns on whether the government paid a specific claim notwithstanding its *contemporaneous and actual* knowledge that the claim was false. *Escobar* explains that governmental action is relevant only "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated," or "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position[.]" 579 U.S. at 195. Again, the Government was not making a payment decision at the 2018 meeting—it was reviewing claims that had already been paid for the purpose of determining whether to intervene in this lawsuit. Thus, the meeting in 2018 cannot establish that the Government knowingly paid false claims *before* the meeting.

Third, the Government's action or inaction is only probative after it acquires "actual knowledge" of the fraud. It is unclear, however, whether the Government understood the nature of PVA's pre-billing scheme from the limited information Ms. Britt provided at the 2018 meeting. Ms. Britt admitted that she detailed only one patient file at the meeting, and did not know whether it was a "testing only" patient or an "E&M" patient. Trial Tr. at 647:10–648:3. Nor could she recall whether the patient file in question demonstrated the falsity at issue. *Id.* at 648:4–8. She did not "provide the government with any statistics on the percentage of claims that PVA submits to Medicare before a MedStreaming report is finalized," *id.* at 648:14–17, and was not aware of the proportion or number of files produced to the Government included prematurely billed claims, *id.*

at 648:18–21. Based on this testimony, the jury easily could have concluded that the Government did not necessarily gain "actual knowledge" from the 2018 meeting.

Fourth, the Government's continued payment of PVA's claims is not evidence that Medicare knowingly paid false claims following the 2018 meeting because, by 2018, PVA had significantly changed its billing practices. The jury heard testimony from Relators' statistical expert, Dr. Zachary Nye, that, from 2014 to 2016, between 40% and 60% of PVA's claims on a monthly basis were false. Trial Tr. at 475:2–5. Following the 2017 Compliance Billing Project, the rates dropped to approximately 5%. Trial Tr. 475:5–8. Put differently, the Government cannot be said to have "actual knowledge" that the claims it paid in 2018 and beyond were false given that the vast majority of PVA's claims during that time period were *not* factually false.

Finally, even if PVA had established that the Government had actual knowledge of PVA's fraud at any point, the jury could have rationally concluded that the Government chose to pursue PVA's conduct through other means, including by allowing this lawsuit to run its course. Trial Tr. 301:1–19 (allowing FCA cases to proceed is one alternative that OIG has to addressing fraudulent billing). PVA points out that the Government could have stopped payments to PVA and canceled its contract, ECF No. 208 at 8, but, as previously noted, there are many reasons that the Government might continue payments in such circumstances, including the health and safety of Medicare beneficiaries. *See Kreindler*, 985 F.2d at 1156; *Harrison*, 352 F.3d at 917; *Berkeley HeartLab, Inc.*, 2017 WL 4803911, at *7.

Given the limited probative value of the 2018 meeting, PVA's reliance on the Fifth Circuit's decision in *Harman* is misplaced. In *Harman*, there was ample and uncontroverted evidence that the Government had actual knowledge of the purported fraud, *and* that the Government made an informed and intentional decision in response. On the eve of trial, the

17

Government agency issued a memo explicitly stating that despite the design change to the guardrails at issue, the guardrails remained eligible for payment at all times. 872 F.3d at 663. As the Fifth Circuit observed, the Government's reaction was exceptional in its "gravity and clarity," and thus left no doubt as to a lack of materiality. *Id.; see also id.* at 663–64 ("[T]his case is *not* about inferring governmental approval from continued payment. Here, the government has never retracted its explicit approval, instead stating that an 'unbroken chain of eligibility' has existed since 2005."). Here, there was no Government agency finding at all, let alone a decision with the clarity recognized in *Harman*.

The jury would have needed to make multiple inferences about both what the Government learned at the 2018 meeting and its conduct thereafter to impute any views on materiality to the Government. Its failure to do so is no reason to disturb the verdict—nothing in the law required the jury to reject all of Relators' credible evidence of materiality in favor of PVA's theory of the case. *Urban Developers*, 468 F.3d at 297. Indeed, *Escobar* confirms that no one factor is dispositive of the fact-intensive materiality inquiry. This holistic assessment of a false statement's ability to affect the Government's payment decisions is often a matter for the jury. *See United States v. Hodge*, 933 F.3d 468, 474 (5th Cir. 2019) (affirming denial of motion for judgment as a matter of law on materiality); *see also Prather*, 892 F.3d at 831 (explaining that the materiality inquiry is "holistic" in nature involving multiple, fact-intensive factors); *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906–07 (9th Cir. 2017) (same); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109–12 (1st Cir. 2016) ("*Escobar II*") (same); Restatement (Second) of Torts § 538 cmt. e (1977) (recognizing that the materiality of a misrepresentation often depends on the jury's assessment of what is reasonable).

The jury concluded that the PVA's false statements were material. Post-*Escobar*, the Fifth Circuit still requires "proof only that the defendant's false statements *could have influenced* the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *Harman*, 872 F.3d at 661 (emphasis added). The jury's finding was supported by the evidence at trial. It is also supported by the kind of common sense analysis contemplated under *Escobar*. Just as "a *reasonable person* would realize the imperative of a functioning firearm," a reasonable person would not pay for services that had not been rendered absent an agreement to prospective payment. *Escobar*, 579 U.S. at 191. The obvious risks of such an arrangement—that the service would be performed in an untimely manner, or not at all—are not purely hypothetical. Indeed, trial testimony confirmed that, in one instance, PVA took nearly two years to interpret a vascular study after the technical component was complete. *See* Trial Tr. 204:8–15; 586:16–18.

In asking the Court to reverse the jury's materiality finding, PVA invites the Court to engage in policymaking. To conclude, as a matter of law, that the falsity of the claim for a service not yet provided was "immaterial" because the service was performed shortly thereafter would be to concoct out of whole cloth a rule without any statutory or regulatory basis—and without any clearly discernable limits. How soon after a false claim is made must a service be performed to treat its falsity as "immaterial"? Days? Weeks? Months? Years? These are questions for Congress and for regulators; these are not questions for courts. As a practical matter, a judicially created rule permitting pre-billing so long as the services are performed within a reasonable amount of time would hamstring the Government in any future efforts to address such false claims, through enforcement actions or through run-of-the-mill claim-denials. PVA's preferred rule would burden the Government with asking, each time it receives a claim for payment, whether the billed service

had actually been performed. And any refusal to pay a claim for a service that had not been performed would likely be met with the (judicially endorsed) excuse that the claimant intended to provide the service "soon." The Court declines PVA's invitation to impose this state of uncertainty and opacity on the Medicare system.

For the foregoing reasons, PVA's motion for judgment as a matter of law on basis that Relators failed to establish materiality is **DENIED**.

### 3.    Damages

PVA insists that, as a matter of logic, "the government did not incur any damages" because "it is not an issue about whether PVA would be paid for those services, but simply when." ECF No. 208 at 12. The jury heard this argument at trial,[6] and rejected it. PVA's motion to set aside the jury's award of damages is difficult to assess in part because PVA failed to timely retain and designate a damages expert during the course of discovery in this case. Thus, PVA had no evidence to rebut the analyses conducted by Relators' damages expert, Dr. Zachary Nye. Nor did PVA attempt to cross-examine or impeach Dr. Nye on the points raised in its motion. In short, PVA failed to present any alternate damages models to the jury. Nonetheless, PVA now advances two alternative theories of damages—one based on the reimbursement rate for the professional component only and another based on the interest accrued between the billing date and the average time to completion of the professional component. As discussed more fully below, both of PVA's

---

[6] *See, e.g.*, the following excerpts from PVA's closing arguments:

> [T]hat's what relators' issue is. It's simply about timing. Importantly, it's not about whether PVA "would be" paid. Their focus is on "when" PVA was paid, not "whether" PVA would be paid. Trial Tr. at 766:21–25.

> If you look at [all of the claims at issue in this case], you're going to see that the government wasn't actually harmed here. The services were performed and PVA was paid for those services. Nobody on the stand contradicted that. In fact, everybody supported that. Even relators' primary expert, Dr. Alexander admitted that PVA would have received the money in these instances. In some cases, just later. *Id.* at 768:19–25.

damages models are flawed because they do not account for trial testimony about the practical administration of the Medicare system.

PVA suggests that the Court should sever the global bill into the technical component and professional component of the vascular studies and recalculate damages based on the professional component only. *Id.* at 13. The average reimbursement rate for the professional component, according to PVA, is $22 per vascular study. Trial testimony by witnesses from both parties, however, suggest that this methodology is inappropriate because it departs from Medicare's billing practices in multiple respects.

First, PVA's vice president of operations acknowledged that when a service provider is performing both the technical and professional component of a vascular study, Medicare guidelines state that the provider should use the global bill. Trial Tr. at 402:18–20 (testimony from Ms. Britt that the Medicare guidelines states establish that "if the provider is doing both services that you are to global bill."). Relators' Medicare billing expert, Dr. Alexander, explained that, although the technical component and professional component exist as separate CPT codes, they are billed separately only in limited circumstances, such as when hospital staff conduct the TC, and an outside physician completes the interpretation. *See* Trial Tr. at 229:6–25. When the same service provider is expected to perform both components, Dr. Alexander testified that Medicare does not reimburse for the technical portion without an interpretation because a study without an interpretation is "useless in patient care." *Id.* at 300:4–6; *see also id.* (Relator Tiffany Montcrieff testimony describing that without the physician's interpretation and diagnosis, the patient cannot be treated, and therefore her preliminary report as a technologist "is useless."). Indeed, as Ms. Burrow's compliance review presentation explained, "[n]on-invasive vascular studies done for screening purposes (i.e., without signs or symptoms of disease) are considered not reasonable and

21

necessary and are therefore non-covered by Medicare," PEX 20 at DEF0175817; *see also id.* at DEF0175802 ("Non-invasive vascular studies are considered not reasonable and necessary if the results are not needed for clinical decision making."). In sum, because PVA was performing both the technical and professional components, it was required to bill globally.

Second, as noted above, Medicare does not make partial payments for partially completed services. At trial, Dr. Alexander explained:

> [I]f a claim is invalid for payment, the whole claim is invalid for payment and not a portion of it that was completed. That's just, again, something that's driven through the whole system. . . . Medicare pays for things that are completed, not for things that are partially completed. And that makes it -- if it's not complete, it's invalid for being submitted, it would be denied when that's known and no part of it is then payable. . . . [P]eople can submit an appeal where they send in additional information and might explain some of the circumstances, but, you know, with just the fact that it was not completed, it would get denied if it was known.

Trial Tr. at 205:5–17; s*ee also id.* at 206:7–14 (testifying that if a claim for services that had not been performed had been submitted to him, he would have denied it); *id.* at 353:14–354:22 (corroborating testimony by Mr. Church). This bright-line rule makes sense given the practical requirements of managing the Medicare system. It is unsurprising that, in managing billions of dollars in Medicare claims each year, the Government does not scrutinize every claim, searching for a reason to pay it, in full or in part. Thus, a reasonable juror could conclude that, had the Government known that PVA had billed for an interpretation that had not been performed, it would have rejected PVA's claim for payment in its entirety.

Nonetheless, in considering damages, the Court cannot simply disregard the fact that the services for which PVA submitted claims were actually performed in every case. *See United States. v. Aerodex, Inc.,* 469 F.2d 1003, 1011 (5th Cir. 1972) (describing measure of FCA damages applied in other cases as the "difference between what the government paid and what it should have paid" absent the false statement); *United States. v. Sci. Applications Int'l Corp.,* 626 F.3d

1257, 1279 (D.C. Cir. 2010) ("[t]o establish damages, the government must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, but also that the performance the government received was worth less than what it believed it had purchased.").

Still, PVA's position that the Government did not suffer *any* damages because PVA would have been paid sooner or later is clearly unavailing. Our laws plainly recognize that payment today is not the same as payment tomorrow. *See In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935). This first principle of economics, known as the "time value of money," is certainly not unknown to PVA. Indeed, it appears that PVA's entire pre-billing structure was premised on the clear benefit of receiving payment "now" rather than "later." *See* ECF No. 308 at 12 (citing trial testimony that the change they considered during the spring of 2017 would not have led to any reduction or change the total money paid to PVA, but simply resulted in a "delay" in the timing of Medicare's payment).

The common measure of the difference between payment now and payment later is interest. *Gore, Inc. v. Glickman*, 137 F.3d 863, 868 (5th Cir. 1998) ("interest . . . compensate[s] one for the time value of money."). Interest alone, however, may not adequately account for the harm that fraudulent pre-billing schemes cause to the Government. Courts have recognized that "harm" under the FCA is unique, and often exceeds the direct monetary damage to the government. "Fraud harms the United States in ways untethered to the value of any ultimate payment." *Yates*, 21 F.4th 1288, 1316. As to Medicare, specifically: "Fraudulent claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system." *Id.* (quoting *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003)).

Assuming that interest is the best measure of damages in this case, the Court turns to the interest-based damages models presented in PVA's briefing, which yield estimated damages between $2,366.52 (based on a 3% interest rate) and $7,888.39 (based on a 10% interest rate). *See* ECF No. 208 at 15. PVA's calculations rely on a flawed assumption about how the Medicare reimbursement system operates. Specifically, PVA calculated the interest that would have accrued over a period of 10.5537 days, which purportedly represents the average time between the submission of a bill to Medicare and the signing of related MedStreaming report. *See id.* This ten-day period dramatically understates the Government's damages in this case.

PVA's own billing expert acknowledged that, when Medicare denies a claim, "[t]he provider [can] appeal the claim, provide additional documentation in support of the claim, and work towards a final determination." Trial Tr. at 565:9–11. When the Government identifies and rejects an improper claim that is later corrected, it benefits from the extended payment term between the due date of the original claim and the due date of the corrected claim. When the Government is unable to reject a false claim because it is unaware of a contractor's fraud, it has been harmed by, among other things, the loss of these extended payment terms. Thus, the proper measure of damages is the interest accrued in the time between the date the Government *paid* the false claim and the date that the claim is *determined to be false*—here, the jury verdict on February 16, 2022. For the purposes of illustration, using a median payment date of December 2, 2015,[7] and PVA's proposed alternative interest rates of 3% and 10%, the Government's estimated damages between the payment date and the date of the jury verdict would yield estimated damages between $559,030.07 and $2,349,846.50, and treble damages of $1,677,090.21 and $7,049,539.50.

---

[7] Dr. Nye calculated that approximately half of the false claims were submitted before, and half after, November 2, 2015. *See* ECF No. 207-1 at 2. Because a damages model premised on extended payment terms should be measured from the date of payment (rather than the date of billing), the Court assumes for the purposes of these calculations that PVA's claims were paid 30 days after they were submitted to Medicare.

Because the services for which PVA billed were eventually performed, the Court agrees with PVA that the jury's verdict on damages must be set aside for an interest-based model of damages. However, given PVA's failure to rebut Dr. Nye's testimony at trial or to present a workable interest model in its post-trial briefing, the Court has insufficient information from which to calculate damages at this time. The parties shall confer over the proper methodology for assessing damages consistent with this order, including the appropriate interest rate and the time period in which interest accrued, based on Dr. Nye's analysis. Within thirty (30) days of the filing of this order, the parties shall submit a joint advisory indicating their proposed models for evaluating damages, including any supporting evidence.

Accordingly, PVA's motion for judgment as a matter of law is **GRANTED IN PART** and **DENIED IN PART**.

## II.    Relators' Motion for Assessment of Statutory Penalties (ECF No. 207)

Violators of the False Claims Act are liable "for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). Violators are also responsible for the costs of a civil action. *Id.* § 3729(a)(3). Therefore, violators are liable for statutory penalties, treble damages, and costs.[8]

Relators ask the Court to impose statutory penalties against PVA in the amount of $21,825,592—approximately one-third of the statutory minimum for the 7,380 false claims

---

[8] Of this award, *qui tam* plaintiffs may be awarded a "reasonable" amount in "civil penalties and damages," including a portion of any statutory penalties as well as treble damage awards. 31 U.S.C. § 3730(d)(2). "The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." *Id.* Thus, Relators are entitled to 25–30% of the total statutory penalties, actual or treble damages owed to the Government, as well as attorney's fees and costs.

identified by the jury. ECF No. 207. PVA faces a maximum statutory penalty of $128,288,622.[9] Relators, however, seek only $21,825,592 in statutory penalties, plus treble damages, totaling approximately one-third of the statutory minimum. PVA objects that even this reduced penalty violates the Eighth Amendment's prohibition on excessive fines. ECF No. 215.

It is unsettled whether the Eighth Amendment's Excessive Fines Clause applies to monetary awards under the FCA. The Eighth Amendment states that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST., amend. VIII. To evaluate claims under the Excessive Fines Clause, courts must first determine whether the monetary forfeiture is a "fine" as set out in *United States v. Bajakajian*, 524 U.S. 321 (1998) and *Austin v. United States*, 509 U.S. 602 (1993). Then, courts must assess whether the fine is "grossly disproportional to the gravity of a defendant's offense." *Id*. at 337. If so, the fine is excessive.

The Eighth Amendment's prohibition on "excessive fines" addresses the government's power to extract payments as punishment. *See generally Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 268 (1989). In essence, the Excessive Fines Clause was intended to "limit only those fines directly imposed by, and payable to, the government." *Id*. at 268. The Excessive Fines Clause has rarely been interpreted and, consequently, its outer

---

[9] The statutory penalty is assessed per false claim. The per-claim amount is determined by Congress and violators are responsible for fines of "not less than $5,000 and not more than $10,000" per claim, as adjusted by the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, Pub. L 101-410. 31 U.S.C. § 3729(a)(1). The penalty has increased at several points in time. Thus, penalties are allotted based on the time period during which the false claim occurred. According to an analysis of PVA's 7,380 false claims performed by Dr. Nye, 3,643 claims occurred before November 2, 2015, and 3,737 claims occurred after November 2, 2015. ECF No. 207-1. Relators calculated the minimum and maximum available penalties associated with each period and concluded that PVA is subject to a statutory penalty ranging from $64,144,311 to $128,288,622. ECF No. 207. PVA suggests that Dr. Nye's methodology is flawed because "there is no way to determine what claims the jury counted towards their final tally of false claims," and, accordingly, when those false claims were made. ECF No. 215 at 9–10. As Relators point out, however, Dr. Nye's calculations are ultimately unnecessary for the Court to consider in light of the requested remittitur. ECF No. 218 at 11–12. Even assuming that all of the false claims were submitted before November 2015, the minimum statutory penalty would still be $40,590,000.

boundaries are not well-defined. Initially, the Supreme Court understood the Clause to limit only criminal forfeitures, although the Court has since held that it applies to both criminal and civil forfeitures. *Compare Browning-Ferris*, 492 U.S. at 262 (stating in dicta that the Excessive Fines Clause "appl[ies] to primarily, and perhaps exclusively to criminal prosecutions and punishment") with *Austin v. United States*, 509 U.S. 602, 610 (1993) (concluding that "thus, the question is not [] whether forfeiture [] is civil or criminal, but rather whether it is punishment").

While the Supreme Court has recognized that awards under the FCA are in part punitive in nature,[10] it has explicitly left open the question whether a private *qui tam* plaintiff's recovery of damages on behalf of the government implicates the Eighth Amendment.[11] *Browning-Ferris,* 492 U.S. at 275 n.21. Other circuits have concluded that non-intervened FCA qui tam actions are subject to the Eighth Amendment's prohibition on excessive fines. *See United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015); *United States v. Aleff*, 772 F.3d 508 (8th Cir. 2014); *Mackby*, 339 F.3d at 1013; *Yates*, 21 F.4th at 1288. Nonetheless, the Court need not reach the question here because, even assuming that the Excessive Fines Clause applies to private FCA actions, the reduced penalty in this case is not grossly disproportionate to the gravity of PVA's conduct.

A "punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. This inquiry does not turn, as

---

[10] *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000) ("[T]he current version of the FCA imposes damages that are essentially punitive in nature."); *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 130 (2003) (explaining that treble damages provision has "compensatory traits along with the punitive"); *Escobar*, 579 U.S. at 182 (citing *Stevens,* 529 U.S. at 784).

[11] There are reasons to doubt that FCA civil penalties are "fines" imposing punishment. First, the penalty provisions have a criminal counterpart, 18 U.S.C. § 287, indicating that Congress viewed the civil penalties as distinct from the criminal. Second, the statutory text explicitly describes the forfeiture as a "civil penalty" and is regulated by the Federal Civil Penalties Inflation Adjustment Act of 1990. Third, although the FCA imposes various scienter requirements—knowledge or intent, depending on the provision—the penalties are imposed at the culmination of civil proceedings and are not dependent on an underlying criminal conviction, contrary to the statute at issue in *Bajakajian*.

PVA suggests (ECF No. 215 at 7), on the ratio of damages to penalties—especially not in the context of the FCA, where Congress established minimum and maximum penalties for each false claim submitted by a defendant, in addition to treble damages for losses caused by the defendant's conduct.[12] *See* 31 U.S.C. § 3729(a)(1). Indeed, the FCA's penalty and damages provisions were enacted precisely because the submission of false claims harms the government in serious but difficult-to-quantify ways. *See* S. Rep. No. 99-345, at 3 (1986) ("The cost of fraud cannot always be measured in dollars and cents[.]"). The Excessive Fines Clause thus does not "confine[]" the "concept of harm . . . strictly to the economic realm" in the FCA context. *United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 409 (4th Cir. 2013). Moreover, "judgments about the appropriate punishment for an offense belong in the first instance to the legislature[,]" and "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise," a court should only deem a judgment unconstitutional if the amount of the judgment is "grossly disproportionate to the gravity of the defendant's offense[.]" *Bajakajian*, 524 U.S. at 336–37.

Courts may also consider where the imposed penalty lies on the range of penalties provided by the legislature. *See id.* n.14; *see also Yates*, 21 F.4th at 1314 (finding that when a judgment "fall[s] below the maximum statutory fine[] for a given offense, the judgment is entitled to a "strong presumption of constitutionality"); *accord United States v. Suarez*, 966 F.3d 376, 387 (5th Cir. 2020) ("If the value of the forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional." (internal quotation and

---

[12] Even so, the Court notes that the Eleventh Circuit in *Yates* ultimately upheld the trial court's assessment of $1,177,000 in penalties, representing a multiplier of over *155 times* single damages. *Id.* at 1297. By comparison, here, the proportion of requested penalties ($21,825,592) to the Court's estimated damages (between $559,030.07 and $2,349,846.50), is between 9 and 39. Courts have approved similar ratios in FCA cases, and even allowed significant penalties where there are no damages sought. *See, e.g., Bunk*, 741 F.3d at 409 (awarding $24 million in penalties where relator "sought no damages").

alteration marks omitted)). Here, Relators are not only willing to accept the statutory minimum, but a remittitur below the minimum. Accordingly, any award within the range provided by Congress is presumptively consistent with the Eighth Amendment. Logically then, a penalty *beneath* the statutory minimum also satisfies the Eighth Amendment.[13] Because Relators request a monetary damage significantly lower than the statutory minimum, it is presumptively constitutional.

Second, this Court finds that the requested amount is reasonable because PVA is in the class of defendants the FCA is designed to address. The False Claims Act targets the "growing pervasiveness of fraud" against the Government, enhances "the Government's ability to recover losses sustained as a result of" that fraud, and encourages "any individual knowing of Government fraud to bring that information forward." S. REP. 99-345, 17, 1986 U.S.C.C.A.N. 5266, 5282. PVA made over seven thousand false claims to receive reimbursements for services that had not been provided. Having knowledge of PVA's misconduct, Relators brought this suit. Thus, despite PVA's attempt to categorize its conduct as "mere reporting offense[s]" analogous to that in *Bajakajian*, this case is easily distinguishable.[14]

Third, although PVA attempts to argue its behavior "fall[s] short of being reprehensible," ECF No. 215 at 3–4, this Court disagrees for several reasons. At bottom, PVA caused significant

---

[13] This Court presumes that it has the discretion to impose monetary awards in an amount below the statutory minimum. *Compare Peterson v. Weinberger*, 508 F.2d 45, 55 (5th Cir. 1975) ("The Government tacitly admits that the court may exercise discretion where the imposition of forfeitures might prove excessive and out of proportion to the damages sustained by the Government.") *with* S. REP. 99-345, 17, 1986 U.S.C.C.A.N. 5266, 5282 ("The Committee reaffirms the apparent belief of the act's initial drafters that *defrauding the Government is serious enough to warrant an automatic forfeiture rather than leaving fine determinations with district courts*, possibly resulting in discretionary nominal payments.") (emphasis added).

[14] The defendant in *Bajakajian* was not a "money launderer, a drug trafficker, or a tax evader," three categories of people the statutes at issue addressed. In contrast, the jury found that PVA knowingly submitted false claims for government reimbursement—precisely the species of conduct prohibited by the FCA.

harm. Not only did PVA cause significant damage to the Government in the form of interest, but the consequences extend beyond monetary harm. False claims require the Government to expend additional resources—both financial and personnel—investigating and prosecuting fraud. False claims also undermine public confidence in the Government and, perhaps most importantly, compromise the administration of Government programs, like Medicare, that Americans depend upon to access quality health care. Contrary to PVA's objection that "this was not a scheme to defraud the public fisc," *id.* at 4, it is impossible to characterize the knowing perpetuation of fraud upon the United States and its programs as anything but a scheme to defraud the public. Finally, although PVA maintains that its conduct bears no relationship to criminal activity, on the contrary, false statements to the Government *can* be prosecuted as criminally. 18 U.S.C. § 287. The fact that the civil provisions impose a knowledge or intent requirement further indicates that Congress found this behavior serious and reprehensible.[15]

Additionally, PVA maintains that the penalties are unnecessary because merely "requiring PVA to forfeit the sums that Relators claim were prematurely billed for the professional component" would be more than sufficient to deter future misconduct. ECF No. 215 at 5–6. PVA is correct that FCA awards are designed, in part, to be punitive and to serve a deterrent effect. *United States v. Bornstein*, 423 U.S. 303, 309 n.5 (1976) (stating that the False Claims Act was adopted "for the purpose of punishing and preventing . . . frauds."). The damages awarded here are not punitive, however, but compensate the Government, in the form of interest, for its loss of access to funds wrongfully paid to PVA between the payment date and the date that the fraud was identified by the jury. *See Bajakajian*, 524 U.S. at 329 (characterizing forfeiture of currency that

---

[15] PVA also requests a lower penalty because its conduct harmed only the Government rather than Medicare beneficiaries. *See* ECF No. 215 at 3. It is unclear what this argument is intended to achieve, however, given that the FCA was designed to prevent harm to the Government. Moreover, PVA successfully sought via motion *in limine* to exclude evidence and argument regarding patient safety and medical necessity. *See* ECF No. 162.

"*does not* serve the remedial purpose of compensating the Government for a loss" as punitive because of its deterrent effect) (emphasis added).   Courts have recognized in the context of securities violations that, "[w]ithout civil penalties, the only financial risk to FCA violators is the forfeiture of their ill-gotten gains." *S.E.C. v. Thomas*, No. 3:13-CV-739-L, 2014 WL 840030, at *4 (N.D. Tex. Mar. 4, 2014) (citing *S.E.C. v. AmeriFirst Funding, Inc.*, No. 3:07–CV–1188–D, 2008 WL 1959843, at *2 (N.D. Tex. May 5, 2008)). The same holds true here. Because the entire purpose of PVA's pre-billing structure was to receive payments earlier, compensating the Government with interest on its early payments only serves to disgorge PVA's ill-gotten gains, not to discourage the underlying scheme. Finally, PVA asks that the award be reduced because it is unable to pay a hefty sum, though it fails to offer any evidence demonstrating its financial condition. ECF No. 215 at 7. "The familiar maxim ignorance of the law is no excuse" holds true here. *See Elonis v. United States*, 575 U.S. 723, 734–35 (2015). PVA should have considered the consequences of defrauding one of the Government's largest benefits programs before submitting its false claims. The Fifth Circuit has also rejected this argument. *United States v. Suarez*, 966 F.3d 376, 388 (5th Cir. 2020) (rejecting argument that defendant was "unable to pay the forfeiture judgment or any fine" as having no support in the Fifth Circuit).

In sum, the requested monetary sanction is not grossly disproportional to PVA's conduct. Relators request a monetary award significantly less than the minimum fines required by statute. In light of PVA's conduct, the Court cannot say that the award is disproportional. Statutory penalties of $21,825,592 do not violate the Eighth Amendment's Excessive Fines Clause, assuming that it applies here.

To the extent that Relators seek attorneys' fees and costs, as provided for in 31 U.S.C. § 3730(d)(2), Relators must submit a motion for attorneys' fees and a bill of costs to the Court within thirty (30) days of this order or seek an extension of time in which to do so.

## CONCLUSION

For the foregoing reasons, PVA's renewed motion for judgment as a matter of law (ECF No. 208) is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED IN PART** with respect to damages, which will need to be recalculated in a manner consistent with this order.

Within **fourteen (14) days of the filing of this order**, the parties are **DIRECTED** to confer over the proper methodology for assessing damages, including the appropriate interest rate and the time period in which interest accrued, based on Dr. Nye's analysis. Within **thirty (30) days of the filing of this order**, the parties shall submit a joint advisory indicating their proposed models for evaluating damages, including any supporting evidence.

To the extent that Relators seek attorneys' fees and costs, as provided for in 31 U.S.C. § 3730(d)(2), Relators must submit a motion for attorneys' fees and a bill of costs to the Court **within thirty (30) days of this order** or seek an extension of time in which to do so.

Relators' motion for statutory penalties (ECF No. 207) is **GRANTED**. The Court will postpone entering a judgment pursuant to Rule 58 until it has made a final determination concerning the proper measure of damages.

**SIGNED** this 9th day of January, 2023.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE