IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel., TIFFANY MONTCRIEFF, et al., | § | |
| Relators, Plaintiff, | § | |
| v. | § | Civil Action No. 5:17-CV-00317-XR |
| PERIPHERAL VASCULAR ASSOCIATES, P.A., | § | |
| Defendant. | § | |

**PERIPHERAL VASCULAR ASSOCIATES, P.A.'S MOTION FOR NEW TRIAL**

TO UNITED STATES DISTRICT JUDGE XAVIER RODRIGUEZ:

Defendant Peripheral Vascular Associates, P.A. ("PVA") respectfully moves that the Court grant a new trial pursuant to Federal Rule of Civil Procedure 59(a).

## INTRODUCTION

If not for the communities that PVA serves, there may be reasons to go the normal route of leaving the verdict alone and waiting for the Fifth Circuit to weigh in on the legal questions that this case presents. But irreversible harm and a reduction in access to needed medical care will be immediately felt in these communities unless something changes. PVA provides critical services in communities (many of them medically underserved) across South Texas—all the way to the border. PVA's offices are uniquely positioned to care for underserved populations in each of these communities. In some areas, PVA is the only specialty vascular service provider available.

The litigation is already taking a toll, reducing the availability of services in many of the South Texas counties that PVA serves. The strains will continue to mount. Many of PVA's physicians have received offers to move to large hospitals. The physicians may have other places to go, but many of PVA's patients do not.

When the weight of a judgment accelerates the attrition (depriving patients of local access to life- or limb-saving care), the collateral damage to these communities will be acute, immediate, and impossible to undo. These communities should not suffer the consequences of the shortcuts that Relators have taken in this case—shortcuts that, sooner or later, will require a new trial. From both a social and a practical perspective, the most efficient option is for this Court to grant a new trial now—before memories fade, more dollars are spilled, and countless South Texans lose local access to a longstanding medical practice that serves a vital need in their communities.

## ARGUMENT[1]

There are sound legal reasons to grant a new trial. This Court discussed the new trial standard in its January 9, 2023 Order in this case:

> "While the court is to respect the jury's collective wisdom and must not simply substitute its opinion for the jury's, **'[i]f the trial judge is not satisfied with the verdict of a jury,** he has the right—and indeed the duty—to set the verdict aside and order a new trial.'"

ECF No. 221 at 7 (quoting *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (quoting C. Wright, Federal Courts 634 (4th ed. 1983)) (emphasis added).

Here, a new trial is warranted to properly resolve at least three different issues:

- damages,
- scienter, and
- the number of false claims.

The first two issues have already been briefed. *See* ECF No. 208 at 11-16 (damages); ECF No. 234 (scienter). The third point concerns a series of decisions confirming PVA's position in its *Daubert* motion that Dr. Nye incorrectly tallied the number of false claims, requiring a new trial where the numbers can be accurately determined.

---

[1] This motion is subject to PVA's motion for a finding of fact regarding knowledge of materiality. ECF No. 232. If the Court finds that PVA did not act with knowledge of the materiality of their alleged misrepresentations, then Relators should take nothing—and there is no need for a retrial.

## I. There is no jury finding regarding a valid damages theory.

First, this Court has already expressed dissatisfaction with the damages verdict, which was based on a legally impermissible theory:

> Because the services for which PVA billed were eventually performed, the Court agrees with PVA that the jury's verdict on damages must be set aside for an interest-based model of damages.

ECF 221 at 25. Due to Relators' overreaching, they failed to obtain a supportable finding. *Id.*

The procedural rules give this Court the authority to make findings of fact, but only with respect to elements that were omitted from the charge. Fed. R. Civ. P. 49(a)(3) ("*Issues Not Submitted.*"). In contrast, when an issue is submitted to the jury, this Court has no authority to "substitute its opinion for the jury's." ECF No. 221 at 7 (quoting *Smith*, 773 F.2d at 613).[2] Any other rule would violate the Seventh Amendment. *Tull v. United States*, 481 U.S. 412, 418 (1987) ("After the adoption of the Seventh Amendment, federal courts followed this English common law in treating the civil penalty suit as a particular type of an action in debt, requiring a jury trial.").

Here, Relators bore the burden of proof, and it was their burden to submit evidence of a legally viable damages theory. They did not do so. This Court correctly rejected the jury's damages finding, and so Relators' best-case scenario is a new trial. *See* ECF No. 221 at 7 ("[I]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial.").

## II. Scienter was not conclusively established (especially prior to 2017).

Second, as set forth in PVA's motion to reconsider the partial summary judgment on scienter (ECF No. 234), the Relators impermissibly used evidence from 2017 to try to prove PVA's state of mind beforehand.

---

[2] A new trial on damages necessarily requires a new trial on materiality and the number of false claims. The jury found fewer false claims than Relators alleged, and so it is impossible to know exactly which claims the jury thought that the damages should be based on. The issues are "closely intertwined" and should be tried together. *See Worsham v. City of Pasadena*, 881 F.2d 1336, 1339 (5th Cir. 1989).

As this Court has already held with respect to the **government's** state of mind, such post hoc evidence is not conclusive as to a party's state of mind beforehand. The relevant analysis is set forth in this Court's January 9, 2023 analysis of materiality. ECF No. 221 at 9-20. If the government had knowingly paid false claims, this would indicate that the alleged falsity was not material. This Court explained that the government's state of mind in 2018 after the OIG audit meeting could not be retroactively imputed to its payment decisions beforehand:

> Again, the Government was not making a payment decision at the 2018 meeting—it was reviewing claims that had already been paid for the purpose of determining whether to intervene in this lawsuit. **Thus, the meeting in 2018 cannot establish that the Government knowingly paid false claims *before* the meeting.**

ECF No. 221 at 16 (emphasis added). The same logic should apply to PVA.

If 2018 evidence does not conclusively establish that the government "knowingly paid false claims" before 2018, then neither does 2017 evidence conclusively establish that PVA knowingly made false claims before 2017. And if retroactive knowledge cannot be conclusively imputed to the government, then it cannot be conclusively imputed to PVA either. Relators cannot have it both ways. This Court should grant PVA's motion to reconsider the partial summary judgment on scienter. Such a ruling would necessarily require a new trial.

## III. The Court should order a new trial so that the number of allegedly false claims can be accurately determined.

Finally, in the aggressive pursuit of penalties, Relators presented an unsupported and inflated calculation of the number of false claims. There are two distinct issues.

### A. As predicted by PVA's *Daubert* motion, Dr. Nye testified to a global number, without identifying the number of double-billing claims submitted to <u>Medicare Part B.</u>

Dr. Nye testified only to the **total** number of "double billing" false claims that were purportedly submitted—in the aggregate—to "Medicare Part B, Medicare Railroad, [and] the Advantage plans." Transcript (2/14/22) at 463:25-464:1. According to Dr. Nye, they calculated

"25,072 unique patient visits" for the "double billing category." Transcript (2/14/22) at 465:11-19. This was a global number, *id.*, and Dr. Nye never testified to how this aggregate number for double billing was allocated among Medicare Part B, Medicare Railroad, and the Advantage Plans.

This is the same concern that PVA raised in its motion to exclude: "**Dr. Nye acknowledges that he wasn't asked to isolate sources of payment** and that he lacks the background to testify about which payers are from a government source versus private insurance." ECF No. 86 at 7-8 (PVA's motion to exclude Dr. Nye's expert opinion) (emphasis added). This failure is fatal, for the Court later granted PVA's Rule 50(a) Motion for Judgment as a Matter of Law as to everything other than claims submitted to Medicare Part B. Transcript (2/15/22) at 672:3-10. But Dr. Nye's testimony regarding double billing did not offer a specific number for Medicare Part B. Thus, during closing argument, Relators' counsel pulled a number out of the air and simply asked the jury to find that there were "4,650 unique patient visits" in the double-billing category. Transcript (2/15/22) at 750:12-17. The jury found 4,625, but without any evidentiary support.

As PVA's motion to exclude explained, Dr. Nye's opinions are "based on irrelevant and inadmissible data beyond the FCA and **result in an overinclusive** representation that, even if accurate, would inflate the totals and prejudice PVA." ECF No. 86 at 8 (emphasis added). His opinions are unreliable and suffer from an impermissible "analytical gap." *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 552 U.S. 136, 146 (1997)).

This Court's directed verdict rulings prove the point. Because Dr. Nye did not actually testify to the real issue, Relators' counsel had no choice but to give the jury a number (*i.e.*, 4,650) that is nowhere in the trial record. By definition, the admission of Dr. Nye's inflated opinion about the number of double-billing claims requires a new trial. *See Echeverry v. Jazz Casino Co.*, 988 F.3d 221, 235 (5th Cir. 2021) ("For example, a party's substantial rights are affected if the erroneously admitted evidence was the only evidence admitted to prove an element.").

### B. The False Claims Act turns on the number of claim submissions to Medicare, not the number of unique patient visits batched into a single submission.

There is a second issue that also goes to the number of false claims that are at issue. The analysis proceeds in three steps: (1) the proper legal standard; (2) Relators' faulty theory; and (3) the need for a new trial.

#### 1. Count claims, not patient visits.

If a single claim submission to Medicare contains line items for a day's worth of patients, then for purposes of assessing penalties, does this count as one claim—or multiple claims? The answer is controlled by *United States v. Bornstein*, 423 U.S. 303 (1976), which decided the following question: How do you tally claims if a defendant sent **three shipments** containing **21 boxes** holding at least **397 falsely labeled products**? *Id.* at 307. The correct answer is "three." *Id.* at 313.

In a helpful opinion regarding Medicare fraud, the D.C. Circuit has summarized the holding of *Bornstein* as follows:

> In *United States v. Bornstein*, 423 U.S. 303, 307, 96 S.Ct. 523, 527, 46 L.Ed.2d 514 (1976), for instance, the Supreme Court considered the liability of a subcontractor who delivered **21 boxes** of falsely labeled electron tubes to the prime contractor in **three separate shipments**. The prime contractor, in turn, delivered **397 of these tubes** to the government and billed the government using **35 invoices**. The trial court awarded 35 statutory forfeitures against the subcontractor, one for each invoice. The Court of Appeals reversed, holding that there was only one forfeiture because there had been only one contract. **The Supreme Court disagreed with both positions and held that there had been three false claims by the subcontractor, one for each shipment of falsely labeled tubes**. *Id.* at 313, 96 S.Ct. at 529-30. The Court stated, "[T]he focus in each case [must] be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." *Id.* Because the subcontractor committed three separate causative acts—dispatching each shipment of the falsely marked tubes—it would be liable for three separate forfeitures.

*United States v. Krizek*, 111 F.3d 934, 939 (D.C. Cir. 1997) (emphasis added; footnote omitted). When multiple false statements are batched into a single submission, only one false claim occurs.

The same reasoning applies here. As the statutory definition of "claim" confirms, "[t]he question turns, not on how the government chooses to process the claim, but on how many times the defendants made a 'request or demand.'" *Id.*; *see* 31 U.S.C. § 3729(b)(2) ("the term 'claim' … means any request or demand … for money or property ….").

Two recent cases stand out, which echo the same reasoning. A single submission to Medicare (even if it contains multiple line items for different patients) is a single claim.

**a.** Start with *United States ex rel. Eastlick v. Reddy*: "[R]egarding penalties under the FCA, case law suggests that a penalty for each **act in violation is appropriate**." No. 3:19-CV-00245-E, 2023 WL 1110313, at *8 (N.D. Tex. Jan. 30, 2023) (emphasis added). Relators, however, focused on the number of "unique patient visits" that PVA performed. Of course, patient visits are not themselves violations of the FCA. The false submission (if any) to Medicare is what violates the FCA, and that is how the claims should be counted.

**b.** In *Lodge Construction, Inc. v. United States*, the Court of Federal Claims reached a similar conclusion: "In *Miller v. United States*, 213 Ct. Cl. 59, 72, 550 F.2d 17 (1977), the court rejected the United States' argument that 'each false item used in reaching a final figure' could be counted separately." 158 Fed. Cl. 23, 62 (2022). So it is here. When multiple patients are batched into a single submission to Medicare, only one claim has occurred.

**2. Even so, Relators counted patients—not claims.**

Relators relied on Dr. Nye to tally the supposedly false claims. But he did not actually count the number of submissions to Medicare. He based his opinion on the number of "unique patient visits" instead. Transcript (2/14/22) at 457:24, 464:17-22, 465:17-19, 466:6-9, 491:21-492:7. At trial, he freely admitted that he was not "asked to analyze how many vouchers were submitted to Medicare." Transcript (2/14/22) at 494:10-12. Nor was he "familiar with how information is actually submitted to Medicare." *Id.* at 494:20-22.

PVA's motion to exclude attached deposition excerpts where Dr. Nye made the same confessions. ECF No. 86-4. In his deposition, Dr. Nye explained: "I don't have experience in the health care industry or with the – you know, the reimbursement process with the government." ECF 86-4 (Dr. Nye Depo at 32:1-3). He has no idea how the claims are submitted to Medicare:

> Q. Do you have an understanding of how bills are submitted to Medicare?
> A. Not – no. Not with any specificity.
>
> Q. And same question. Do you have an understanding of how bills are submitted by a medical practice like PVA to any insurer?
> A. No. Not with any specificity.
>
> Q. So the number that you identify here as a false billing is a calculation done at the request of plaintiffs' counsel?
> ….
> A. Yes. I mean, plaintiffs asked us to perform calculations based on certain definitions, including what is considered a false billing.
>
> Q. And that definition of what is considered a false billing is a definition provided by plaintiffs' counsel?
> A. Correct.

ECF 86-4 (Dr. Nye Depo at 62:2-20).

As PVA argued in its motion to exclude, "Dr. Nye has not provided any reasoning or methodology, instead merely applying a simple formula provided by counsel for the Relators." ECF 86 at 5. He "has no experience in … the reimbursement process with the government." *Id.* at 6. His reports "are not reliable, as demonstrated by his admission during his deposition that [he] merely provides calculations and comparisons at the request of counsel without assigning significance to the results of the calculations and comparisons." *Id.* at 4; *see id.* at 8 (citing *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009). To establish "relevance," Relators had to show that Dr. Nye's "reasoning or methodology can be properly applied to the facts at issue," but they failed to do so. *Id.* at 4-5 (citing *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). His testimony should have been excluded.

### 3. The proper remedy is a new trial.

Because Dr. Nye's testimony was the only evidence offered of the number of purportedly false claims, the Court should grant a new trial. *See Echeverry*, 988 F.3d at 235 ("For example, a party's substantial rights are affected if the erroneously admitted evidence was the only evidence admitted to prove an element."). Crucially, it was not PVA's burden to craft the Relators' case or prove up the number of claim submissions. Rather, it was PVA's burden to move to exclude Dr. Nye's testimony—which PVA did. Because Relators pursued their unsupported theory anyway, a new trial is proper.

## PRAYER

PVA respectfully urges the Court to grant a new trial. If PVA were merely a branch of a large hospital, then it might make sense for the Fifth Circuit to wade through some of the novel legal issues first. But countless patients and their communities rely on PVA, and they are the ones who will suffer irreversible loss if the new trial waits until after an appeal.

PVA's patients include diabetics, those with cardiovascular disease, and the disabled—many of whom cannot easily afford the higher deductibles and additional co-payments, facility fees, and other costs associated with a hospital visit for the same services (if such services are even available in their local community). It is the Relators (not PVA's patients) who took shortcuts on damages, scienter, and the number of false claims. PVA's patients should not be deprived of cost-effective access to trained specialists when a new trial will be needed anyway. These South Texas communities should not be required to bear the consequences of Relators' litigation decisions.

Respectfully submitted,

*<u>/s/ David M. Prichard</u>*

David M. Prichard
State Bar No. 16317900
E-mail: dprichard@prichardyoungllp.com
David R. Montpas
State Bar No. 00794324
E-mail: dmontpas@prichardyoungllp.com
Glenn W. MacTaggart
State Bar No. 12787680
E-mail: gmactaggart@prichardyoungllp.com
PRICHARD YOUNG, LLP
Union Square, Suite 600
10101 Reunion Place
San Antonio, Texas 78216
(210) 477-7400 [Telephone]
(210) 477-7450 [Facsimile]

Sean McKenna
State Bar No. 24007652
smckenna@spencerfane.com
Mark A. Cole
*Admitted Pro Hac Vice*
mcole@spencerfane.com
Lauren M. Nelson
State Bar No. 24058016
lnelson@spencerfane.com
SPENCER FANE LLP
2200 Ross Avenue, Suite 4800 West
Dallas, Texas 75201
Telephone: 214-459-5890
Facsimile: 214-750-3612

Jeff Wurzburg
State Bar No. 24105140
jeff.wurzburg@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: 210-224-5575
Facsimile: 210-270-7205

***Counsel for Defendant Peripheral Vascular Associates, P.A.***

## CERTIFICATE OF SERVICE

I certify that on the **8th** day of **August 2023,** I submitted the foregoing document with the Clerk of Court for the U.S. District Court, Western District of Texas, using the electronic case files system of the Court. I hereby certify that I have served all counsel of record in the manner authorized by Federal Rule of Civil Procedure 5(b)(2):

*/s/ David Prichard*
David Prichard