**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. TIFFANY MONTCRIEFF, ROBERTA MARTINEZ, and ALICIA BURNETT,**<br><br>Plaintiffs,<br><br>vs.<br><br>**PERIPHERAL VASCULAR ASSOCIATES P.A.,**<br><br>Defendant. | Civil Action No. SA-17-CV-00317-XR |

**RELATORS' RESPONSE TO PVA'S MOTION FOR NEW TRIAL**

## I. INTRODUCTION

Relators hereby oppose Defendant Peripheral Vascular Associates, P.A.'s ("PVA's") Motion for New Trial (ECF No. 247).

PVA's Motion rehashes arguments that have been repeatedly rejected, and continues to assert purported facts and legal theories that were never before raised. Moreover, by indicating that it intends to recalculate damages, the Court has essentially already offered a remittitur in lieu of a new trial—PVA's Motion thus seeks relief for purported flaws in the Jury's Verdict that the Court has already remedied.[1]

As to the false claims counts requested of the Jury by Relators, they were incredibly conservative. Based on PVA's data, Relators could have requested three times as many false claims for each tranche. However, as detailed below, Relators backed out from Dr. Nye's calculations the subsequently-excluded federal payors in a manner that could not, and cannot, be logically assailed.

PVA's final argument, suggesting that unique patient visit counts are not equivalent to claims for purposes of determining false claims, is not only wrong on the facts, but estopped: Its counsel agreed at trial to a jury instruction that explicitly directed the Jury to use unique patient visits—not CPT codes—to count the number of false claims. Tr. 712:23-713:5.

PVA's ever-shifting positions should be rejected, and its Motion denied.

/ / /

/ / /

---

[1] PVA's over-the-top pleas that a Judgment will negatively impact underserved communities are both irrelevant and untrue. There are in fact dozens well-qualified vascular specialists in the San Antonio region who are willing and able to take on patients. Indeed, one such practice contacted Relators' counsel after seeing PVA's assertions in post-trial briefing to confirm that PVA is not "the only game in town." To the extent PVA wants to engage in a policy debate, that will ultimately not work in its favor. The False Claims Act is designed to ensure that taxpayer money is protected—in this case, taxpayer money designated to provide healthcare to Medicare recipients, not line the pockets of extremely well-compensated surgeons. If PVA seriously wants the Court to consider the equities, then it should disclose to the Court and the public the profits that its physician-owners made during the years that its overbilling occurred.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 59, a Motion for New Trial may be granted where: "(1) the verdict is against the great weight of the evidence; (2) the amount of damages awarded is excessive; or (3) the trial was unfair or marred by prejudicial error." *Johnston v. Char-Broil, LLC*, 622 F. Supp. 3d 317, 327 (N.D. Tex. 2022) (citing *Parra v. Interstate Express, Inc.*, 501 F. Supp. 3d 430, 434 (N.D. Tex. 2020) (Pittman, J.), aff'd, No. 20-11230, 2022 WL 421411 (5th Cir. Feb. 11, 2022)). "The Fifth Circuit has cautioned that 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.'" *Id.* (quoting *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980)) (citation omitted).

> We must affirm denial of a new trial unless the movant makes a "clear showing" of an "'absolute absence of evidence to support the jury's verdict,' thus indicating that the district court abused its discretion in refusing to find the jury's verdict 'contrary to the great weight of the evidence.'"

*Thomas v. Texas Dep't of Crim. Just.*, 297 F.3d 361, 368 (5th Cir. 2002) (quoting cases).

The Court has "the discretion to convert a motion for new trial into a remittitur," *id.,* when "the verdict is clearly excessive," *id.* (quoting *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir.1995)). If a "plaintiff declines the remitted award," then a "new trial on damages alone" may be ordered. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995) (citing cases).

## III. ARGUMENT

### A. The Jury's damages finding was valid and the Court has authority to offer a remittitur.

PVA should have been satisfied with the Court's invitation to submit additional briefing on an interest-based damages model. Instead, PVA twice deflected the Court's invitation in favor of attempting to reargue liability. PVA ultimately submitted three varying interest proposals, ranging from 10% to 1.08%. (ECF No. 208 at p. 15; ECF No. 222 at p. 8; ECF No. 230 at p.10.)

As previously briefed, the Jury's Verdict on both liability and damages was fully supported. (*See* ECF No. 214 at pp. 19-26.) Nonetheless, should the Court determine that reduction in that damages finding is necessary, it is well within its power to offer a remittitur in lieu of a new trial. *See Thomas v. Texas Dep't of Crim. Just.*, 297 F.3d 361, 368 (5th Cir. 2002). If it does so, for the reasons previously described, Relators respectfully request that the remittitur be based on the Medicare interest rate for overpayments and underpayments. (*See* ECF Nos. 222 & 235.) PVA provides no persuasive alternative.

**B. PVA failed to rebut ample evidence of scienter both pre- and post-2017.**

Completely ignoring evidence of its pre-2017 knowledge, PVA argues that scienter was established only based on its 2017 "compliance billing" project. To the contrary, as explained in response to PVA's Motion for Reconsideration, while certainly PVA's 2017 "compliance project" was a compelling focus, Relators submitted ample evidence that PVA knew its billing practices were improper well before, and after, 2017. For example, Relators described a <u>2013</u> e-mail string in which PVA's Barbara Burrow confirmed that she knew studies could not be billed until interpreted: "I looked at the studies that were scanned in. Most of them were not actually interpreted and cannot be billed until they are. I have spoken with Al, who will speak to the doctors." Relators' Motion for Summary Judgment (ECF No. 95) at 13-14; *see also id.* (citing a 2012 e-mail from Ms. Burrow to a PVA physician urging him to sign his reports, and that "One is being held for billing awaiting the complete report."). Similarly, Relators relied heavily on PVA's own compliance policy documents, which both pre- and post-dated the 2017 billing compliance project. *See, e.g., id.* at 15-18; Ex. 20 (2015 PVA "Medical Documentation & Coding Compliance Pledge"). The Court cited this, and other evidence, in its Order on Summary Judgment. (*See* ECF No. 123 at 50 n.2; *id.* at 53.)

In the face of this evidence, PVA submitted <u>nothing</u>. As the Court noted, PVA relied solely and exclusively on its flawed post hoc "reasonable interpretation" legal argument. (ECF No. 123 at 51-52.) PVA had ample opportunity to counter Relators' evidence, and it failed to

even attempt to do so—likely because it could not. PVA's personnel always knew that its practices were out of bounds, and there was therefore nothing to counter Relators' evidence with.

### C. The number of false claims found by the Jury was supported and conservative.

PVA argues that the number of false claims found by the Jury was unsupported for two reasons. Both are without merit.

#### 1. The double-billing false claim count is supported and conservative.

First, PVA argues that the number of Medicare Part B double-billing[2] false claims (i.e., unique patient visits) was not specifically identified by Dr. Nye. PVA's argument misses the logic of Relators' submission to the Jury, as explained in the following paragraphs:

Dr. Nye presented the number of claims—i.e., count of CPT codes submitted, even if for the same patient on the same day—for the double-billing tranche, in total *and* broken down by payor:

**Tranche 2: Double Billing**

| | Reimbursements | Claims |
|---|---|---|
| Medicare Part B: | $2,331,972 | 25,030 |
| Medicare Railroad Part B: | $15,245 | 163 |
| Medicare Advantage Plans: | $2,201,141 | 20,133 |
| Tri-Care / ChampVA: | $163,882 | 126 |
| **Total:** | **$4,712,240** | **45,452** |

Tr. 464:23-465:19 (Relators' Demonstrative 2 at p. 3).

[2] PVA's argument is limited to the double-billing tranche. It does not challenge the testing-only tranche on this ground. Therefore, even if a new trial were granted, it would only be as to the double-billing tranche. Judgment on the testing-only tranche would stand.

Dr. Nye also presented the corresponding total number of unique patient visits for the double-billing tranche for all federal payors: 25,072. Tr. at 465:11-19. In other words, the 45,452 total studies for federal payors were performed during 25,072 unique patient visits—an average of 1.8 studies per visit.

On the stand, however, Dr. Nye did not break down the 25,072 unique patient visit count for the double-billing tranche by each federal payor, because at the time all federal payors remained at issue. The Court subsequently granted Judgment for PVA as to federal payors other than Medicare Part B. Tr. at 672:3-10.

Rather than request to reopen the evidence to have Dr. Nye break down the 25,072 figure, Relators presented a logical, and highly conservative number of Medicare Part B unique patient visits to the Jury, as follows:

- Drawing the most favorable inference possible in PVA's favor, Relators assumed that every Railroad Part B, Medicare Advantage, and Tri-Care patient (the excluded claims) had only one ultrasound study per visit; i.e., that the 20,422 double-billing ultrasound studies performed on Railroad Part B, Medicare Advantage, and Tri-Care patients corresponded to 20,422 unique patient visits.
- Accordingly, Relators subtracted 20,422 unique patient visits from the 25,072 unique patient visit total presented by Dr. Nye, resulting in 4,650 claims—the figure submitted to the Jury. Tr. 750:15-17.[3] (The Jury then deducted 25 based on Ms. Britt's testimony, as discussed).

In other words, Relators requested *the very lowest* number of double-billing false claims possible for Medicare Part B. Had Relators instead used the simple average of ultrasound studies per visit—1.8—then the number of Medicare Part B false claims for the double-billing tranche would have been 13,905 (25,030 ultrasound studies).[4] A calculation based on this average would

[3] "And again, when we back out the other things we are not talking about here, conservatively, conservatively, 4,650 unique patient visits."
[4] Put differently, using the conservative approach, Relators assumed that the excluded visits had an average of only one false ultrasound study per false claim submission, while the Medicare

have been a perfectly reasonable basis for a jury verdict. Nonetheless, to be even more conservative, and ensure no attacks could be made on the number of false claims, Relators requested that the Jury with a far more conservative number. For the sake of consistency, Relators took the same conservative approach with the testing-only tranche, asking the Jury to find only 2,780 false claims, Tr. 747:5-9,[5] even though Dr. Nye had in fact testified to the precise Medicare Part B unique patient count—3,681—for the testing-only tranche, Tr. 491:24-492:7.[6]

PVA now looks this gift horse in the mouth, and asks for a new trial so that the number of false claims can be recalculated. Doing so would not turn out well for PVA, given that the actual number of double-billing false claims is three times higher than that requested by Relators.

**2. PVA admitted that unique patient visits are equivalent to claims.**

Second, PVA argues that Dr. Nye could not explain how "unique patient visits" equate to claims submitted to Medicare Part B. PVA's argument is blatantly disingenuous: PVA's counsel agreed to the Court's modified Jury Instruction that explicitly defined claims as equivalent to unique patient visits:

> THE COURT: What about this?
>
> "In determining the number of false claims, if any, **you should consider each unique patient visit** reflected on the Form 1500, or electronic equivalent, not the number of CPT codes on a claim."

---

Part B patients had an average of 5.4 false ultrasound studies per false claim submission. This was to PVA's huge advantage, and there was no more conservative an approach that could have been taken.

[5] "And that was on 2,780 unique patient visits. When we back out the TRICARE, we back out the Medicare Advantage, the ones we are not talking about, we are left with conservatively, 2,780 unique patient visits with these testing only patients."

[6] "Q. Okay. So I want to ask you for the testing only, how many unique patient visits were there?
A. We calculate 6,341.
Q. Okay. And so how many of those were for Medicare?
A. There is Medicare Part B, and there's Medicare Railroad, there's the Medicare Advantage plans, and then TRICARE, or military version of that.
Q. How many of those are for Medicare Part B?
A. 3,681."

**MS. NELSON: That is fine with us, Your Honor.**

MR. BERGER: Yes, Your Honor.

THE COURT: Okay. I'm going to make that change.

Tr. 712:23-713:5 (emphasis added).

PVA's trial counsel did not object to this instruction because it was accurate. Indeed, read closely, PVA's Motion is careful not to directly assert any error, but just attacks Dr. Nye for not being able to explain the nuances of Medicare claim submission. The attack is irrelevant. Dr. Nye used the correct metric for false claims, as PVA's counsel acknowledged in agreeing to the Jury Instruction described above.

## IV. CONCLUSION

For the foregoing reasons, Relators respectfully request that the Court deny Defendant's Motion for New Trial. In the alternative, Relators request that the Court convert the Motion into a remittitur, with the remittitur amount based on the Medicare interest rate for over- and underpayments.

Dated: September 1, 2023

By: */s/ Justin T. Berger*
Justin T. Berger (*pro hac vice*)
Sarvenaz J. Fahimi (*pro hac vice*)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jberger@cpmlegal.com
sfahimi@cpmlegal.com

Wallace M. Brylak, Jr. (Bar No. 03283360)
BRYLAK LAW
15900 La Cantera Parkway, Suite 19245
San Antonio, Texas 78256
Telephone: (210) 733-5533
Facsimile: (210) 558-4804
wbrylak@brylaklaw.com

*Counsel for Relators*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of September, 2023, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Wallace M. Brylak, Jr.
Brylak & Associates
15900 La Cantera Pkwy, Suite 19245
San Antonio, TX 78256
wbrylak@brylaklaw.com

Sean McKenna
Mark A. Cole
Spencer Fane LLP
2200 Ross Avenue
Suite 4800 West
Dallas, TX 75201
smckenna@spencerfane.com
mcole@spencerfane.com

Stephen J. Romero
Jeff Wurzburg
Norton Rose Fulbright US LLP
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, TX 78205
stephen.romero@nortonrosefulbright.com
jeff.wurzburg@nortonrosefulbright.com

John M. Deck
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
John.deck@usdoj.gov

David M. Prichard
David R. Montpas
Glen W. MacTaggart
Prichard Young, LLP
Union Square, Suite 600
10101 Reunion Place Blvd.
San Antonio, Texas 78216
dmontpas@prichardyoungllp.com
dprichard@prichard@prichardyoungllp.com
gmactaggart@prichardyoungllp.com

*/s/ Justin T. Berger*
Justin T. Berger