# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX. REL.; TIFFANY MONTCRIEFF, RELATOR; ROBERTA A. MARTINEZ, RELATOR; AND ALICIA BURNETT, RELATOR,<br><br>          *Plaintiffs* | § § § § § § § | |
| v. | § § | SA-17-CV-00317-XR |
| PERIPHERAL VASCULAR ASSOCIATES, P.A.,<br>          *Defendant.* | § § § § | |

## ORDER

On this date, the Court considered Defendant's (1) motion for finding of fact regarding an omitted element (ECF No. 232), (2) motion to reconsider partial summary judgment on scienter (ECF No. 234), and (3) motion for new trial (ECF No. 247), and the applicable responses (ECF Nos. 232, 242, 249), and replies (ECF Nos. 239, 243, 250) thereto.[1] After careful consideration, Defendant's motions are **DENIED**.

## BACKGROUND

This False Claims Act case arises out of the allegedly fraudulent billing practices of Defendant Peripheral Vascular Associates, P.A. ("PVA"), a healthcare provider. Relators filed this action in April 2017 under 31 U.S.C. § 3730(b), which authorizes private persons to sue for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), on behalf of the United States Government. Relators alleged that PVA falsely billed Medicare for services it had not

---

[1] In addition, the Court considered the Government's statement of interest regarding additional post-verdict motions (ECF No. 241) as well as Defendant's response regarding knowledge of materiality (ECF No. 244).

performed. *See* ECF No. 8.[2] After a five-day trial held in February 2022, the jury agreed, awarding $2,728,199 in damages. ECF No. 201.

PVA is a full-service vascular surgery practice with multiple locations throughout San Antonio, Texas. ECF No. 123 at 2. Among other services, PVA performs vascular ultrasounds, which have two components relevant to this case: a technical component and a professional component. *Id.* In essence, the technical component is performing the ultrasound and the professional component is a physician analyzing the results. *Id.*

A healthcare provider can bill Medicare for both the technical and professional components of a vascular study using a "global" Current Procedural Terminology ("CPT") Code. *Id.* at 4. When a provider bills for just one component of a study, it must use a two-character "modifier" that signifies that only one component has been performed. *Id.* As relevant here, a provider can append the "-TC" modifier when billing the technical component only, or the "-26" modifier to bill for the professional component only. *Id.*

PVA uses a program called Allscripts Clinical Module ("Allscripts CM") as its electronic medical records system and a program called Allscripts Practice Management ("APM") as its billing software. *Id.* at 5. A patient's medical record is contained in Allscripts CM. In 2014, PVA adopted an archiving and communications system called MedStreaming. *Id.* Every vascular study that PVA performs has a MedStreaming report. *Id.* In their pleadings, Relators alleged, *inter alia*, that, in 2012, PVA implemented a scheme of too-quick billing designed to increase revenue. *Id.* at 6. Specifically, PVA began billing Medicare for both the professional and technical component before the patient's status became "Final" in MedStreaming—before the PVA physician had reviewed and interpreted the study and signed the report. *Id.* Relators alleged three distinct tranches

---

[2] After investigating the Relators' allegations for roughly a year, the Department of Justice declined to intervene. *See* ECF No. 20.

of claims: (1) the "Testing Only" tranche,[3] (2) the "Double Billing" tranche,[4] and (3) the "Wrong Provider" tranche.[5] ECF No. 221 at 3–4.

In August 2020, the parties filed cross-motions for summary judgment. ECF Nos. 94, 95. On December 14, 2020, the Court issued an order resolving the parties' cross-motions for summary judgment. *See United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 759–60 (W.D. Tex. 2020). As is relevant here, the Court granted Relators' motion with respect to the falsity and scienter elements of their claims, concluding that the issues of materiality and damages would be tried to the jury. *See id.* at 773.

A five-day trial was held in February 2022. After the close of Relators' case and then again before submission to the jury, PVA moved for judgment as a matter of law, arguing that, among other things, Relators had not satisfied their burden of proof as to materiality or damages. *See* ECF Nos. 196, 197. The Court granted the motions in part, concluding that Relators had failed to offer evidence of materiality as to one subset of claims and had failed to present evidence of payments made by the Medicare Advantage and Tricare programs, which have their own rules for payment. Tr. at 660:1–4, 672:3–8.[6] The motions were denied in all other respects. ECF No. 199.

---

[3] The "Testing Only" tranche includes vascular studies that PVA performed based on referrals from non-PVA healthcare providers. When a patient is referred to PVA for a vascular study only, PVA does not perform Evaluation, Management, or Treatment Services ("E/M Services"). For these patients, there are no encounter notes in the patient's medical record in Allscripts CM. Accordingly, a PVA physician's interpretations appear only in the MedStreaming reports. Relators assert that PVA billed Medicare before the MedStreaming report was signed.

[4] The "Double Billing" tranche contemplates services PVA provided to its own patients. For these patients, PVA physicians would visit with a patient to provide E/M Services and then order a vascular study to be conducted on the same day. Relators argue that PVA failed to generate a MedStreaming report to reflect the PVA physicians' interpretations of vascular studies. Although PVA argues that the physicians' interpretations are found in the Allscripts CM E/M Services patient note, Relators assert that the CPT definitions explicitly prohibit billing for both E/M Services and a vascular study without a separate, written report containing the physician's interpretations.

[5] Relators allege that PVA submitted bills to Medicare signed by the wrong "rendering" physician because PVA's system permitted any PVA physician to review and sign MedStreaming reports, regardless of whether that physician performed the interpretation.

[6] The Court granted judgment as a matter of law on Relators' claims in the "Wrong Provider" tranche.

Based on the remaining claims, the jury found that PVA had submitted 7,380 false claims, causing $2,728,199 in damages to the Government. ECF No. 201. Following the verdict, PVA renewed those portions of its previous motions for judgment as a matter of law that were denied by the Court under Federal Rule of Civil Procedure 50(b). ECF No. 208. On January 9, 2023, the Court issued a 32-page order denying in part and granting in part PVA's renewed motion. *United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 649 F. Supp. 3d 404 (W.D. Tex. 2023).[7] In relevant part, the Court held that the jury's finding as to materiality was supported by ample evidence at trial. *Id.* at 414–20. With respect to damages, however, the Court concluded that proper measure of harm to the Government was not the full value of the claim as the jury found, but the interest accrued in the time between the date Government paid the false claims and the date that the claim was determined to be false. *Id.* at 420–23. At the Court's direction, *id.* at 428, the parties subsequently filed joint advisories with proposed models for evaluating damages. *See* ECF Nos. 222, 230.[8]

Thereafter, PVA filed three additional post-trial motions requesting (1) a finding of fact regarding an allegedly omitted element of Relators' claim—whether PVA's knew that its billing practices were material to the Government's payment decision, ECF No. 232; (2) reconsideration of the Court's order granting partial summary judgment on scienter—specifically whether the summary judgment record supports pre-2017 knowledge of PVA's scheme, ECF No. 234; and (3) a new trial to reassess alleged factual issues regarding damages, scienter, and the appropriate number of false claims, ECF No. 247. Relators oppose each motion. The Court addresses each motion in turn.

---

[7] In this order, the Court also granted Relators' motion for statutory penalties. *Id.*

[8] Notably, while Relators submitted a damages model based on the facts found by the jury, *see* ECF No. 222, PVA submitted a damages model based its own version of the facts, *see* ECF No. 230.

## DISCUSSION

I.      **The Supreme Court's decision in *SuperValu* has no bearing on this case.**

Because all three of PVA's motions draw on misinterpretations of the Supreme Court's recent decision in *United States ex rel. Schutte v. SuperValu Inc. ("SuperValu")*, 598 U.S. 739, 743 (2023), the Court will briefly address the scope and impact of that ruling on the FCA landscape at the outset.

FCA liability requires the Government or relators to establish (1) a false statement or fraudulent course of conduct by the defendant; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim). *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009).

The Supreme Court's decision in *SuperValu* focused on the scienter element—specifically, "[w]hether and when a defendant's contemporaneous subjective understanding or beliefs about the lawfulness of its conduct are relevant to whether it 'knowingly' violated the False Claims Act." *See* Petition for a Writ of Certiorari at 3, *SuperValu*, 143 S. Ct. 644 (No. 21-1326). The FCA's scienter requirement defines "knowing" and "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

The *SuperValu* Court addressed the Seventh Circuit's extension to FCA cases of the Supreme Court's decision in *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007)—a case interpreting the term "willfully" under the Fair Credit Reporting Act. *SuperValu*, 598 U.S. at 748. In relevant part, the Seventh Circuit read *Safeco* to require a two-step scienter inquiry in FCA

cases. *Id.* Under step one of this framework, a court would "ask whether a defendant's acts were consistent with any objectively reasonable interpretation of the relevant law that had not been ruled out by definitive legal authority or guidance." Step one, however, ignored whether the defendant believed that interpretation at the time of its claims. *Id.* If a defendant's act was not consistent with any objectively reasonable interpretation, then a court would proceed to step two. *Id.* Only under step two would a court then consider a defendant's subjective thoughts. *Id.* Put simply, the Seventh Circuit's framework required that a defendant's acts be objectively unreasonable before moving to any consideration of whether the defendant knowingly submitted a false claim. *Id.*

*SuperValu* rejected the Seventh Circuit's two-step framework. To begin, the Seventh Circuit's approach allowed *post-hoc* reasonable interpretations of the applicable law to provide a safe harbor for defendants who submitted claims with knowledge of their falsity. *Id.* This framework incorrectly shifted the focus of the scienter inquiry in FCA cases—what matters is "what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it." *Id.* at 752 (emphasis in original). In rejecting the Seventh Circuit's approach, *SuperValu* expounded a common-sense rule—what matters is a defendant's knowledge and subjective beliefs when it submits the claim, not what an objectively reasonable person thought upon submitting a claim or what a defendant may have thought in retrospect. *Id.* at 750.

But *SuperValu* did not hold that a defendant could consciously disregard facts and circumstances available at the time of claim submission to avoid FCA liability. *See id.* at 749–58. Tellingly, the Supreme Court clarified that FCA liability is not cabined to those with "actual knowledge" that their claims are false. *Id.* at 751. It also covers those "who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity," as well as those who are "conscious of a substantial and unjustifiable

risk that their claims are false, but submit the claims anyway." *Id.* Moreover, the Supreme Court

expressly did not foreclose the application of an objective form of recklessness in FCA cases. *Id.*

at 751 n.5. That is, "[i]n some civil contexts, a defendant may be called 'reckless' for acting in the

face of an unjustifiably high risk of illegality that was so obvious that it should have been known,

even if the defendant was not actually conscious of that risk." *Id.*[9]

## II.   Motion for Finding of Fact Regarding Omitted Element (ECF No. 232)

### a.  Legal Standard

Under Federal Rule of Civil Procedure 49, a court may make a finding of fact on any issue

of fact that was not submitted to the jury. FED. R. CIV. P. 49(a)(3); *see also Graphic Prod. Distribs.,*

*Inc. v. ITEK Corp.*, 717 F.2d 1560, 1569 (11th Cir. 1983). "If the court makes no finding, it is

considered to have made a finding consistent with its judgment on the special verdict." *Id.*

### b.  Analysis

PVA argues that the Court should make a finding of fact under Rule 49(a)(3) regarding an

allegedly omitted element of Relators' FCA claim: whether PVA knew that its submissions were

material to the Government's payment decision. The Fifth Circuit does not require an FCA

claimant to show "knowledge of materiality." *See Longhi*, 575 F.3d at 467. Nonetheless, PVA asks

the Court to recognize "knowledge of materiality" as a new element based on the Supreme Court's

decisions in *Universal Health Servs., Inc. v. United States ex rel. Escobar ("Escobar")*, 579 U.S.

176 (2016) and *SuperValu*, 598 U.S. 739, for the reasons stated below, the Court declines to do so.

The FCA defines "material" as "having a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). For materiality,

---

[9] Notably, PVA advanced the same approach rejected by *SuperValu* in its response to Relators' motion for summary judgment. ECF No. 112 at 15. There, the Court declined PVA's invitation, noting that "[f]or an interpretation to be reasonable, it must actually be held." ECF No. 123 at 51–52.

the FCA requires "proof only that the defendant's false statements could have influenced the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *United States ex rel. Harman v. Trinity Indus. Inc*., 872 F.3d 645, 661 (5th Cir. 2017).

Under the Supreme Court's decision in *Escobar*, "a matter is material" if: (1) a reasonable person would attach importance to it in determining a "choice of action," or (2) "the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action," whether or not a reasonable person would do so. *See Escobar*, 579 U.S. at 192 (internal quotation marks and citation omitted). *Escobar* identified several factors that are relevant to, but not automatically dispositive of, the materiality inquiry: whether the government has designated "compliance with a particular . . . requirement as a condition of payment," *id.* at 194; whether the violation of that requirement goes to the "essence of the bargain," *id*. at 193 n.5 (internal quotation marks omitted); whether the violation is "minor or insubstantial," *id*. at 194; and whether the government has taken action when it had actual knowledge of similar violations, *id*. at 195. "[P]roof of materiality can include, *but is not necessarily limited to*, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the . . . requirement" at issue. *Id*. at 194–95 (emphasis added).

Determining whether a violation is minor or insubstantial also appears to be a matter of common sense. In *Escobar*, the Supreme Court clarified that a condition can be material even where the Government does not expressly identify it as a condition of payment. *Id.* at 191 (noting that, even "if the Government failed to specify that the guns it orders must actually shoot . . . a reasonable person would understand the imperative of a functioning firearm"). On the other hand,

even an express condition may be immaterial. For example, "[i]f the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act." *Id.* at 195. If the Government regularly pays the service provider's claims, even knowing that foreign-made staplers were used, that is "strong evidence" that the condition that the contractor must use American-made staplers is not material. *Id.*

While PVA makes much of the Supreme Court's analysis in *SuperValu*, as discussed above, that case addressed the proper standard of knowledge under the scienter element, not the FCA's materiality element. 598 U.S. at 743. *SuperValu* acknowledges that materiality and scienter are two separate requirements; it does not add a new element—knowledge of materiality—to claims under the FCA. *See Longhi*, 575 F.3d at 467. Post-*Escobar*, the Fifth Circuit still requires "proof only that the defendant's false statements *could have influenced* the government's pay decision or had the potential to influence the government's decision, not that the false statements actually did so." *Harman*, 872 F.3d at 661 (emphasis added). *SuperValu* did nothing to disturb that standard.

As this Court has previously explained, a defendant's subjective knowledge of materiality may be sufficient, but is *not* necessary, to establish materiality under the FCA. *See United States ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*, 664 F. Supp. 3d 722, 747 (W.D. Tex. 2023). A defendant's actual, subjective understanding of materiality is only *necessary* when the Government attaches unreasonable importance to a misrepresentation that a reasonable person would consider immaterial. *See Escobar*, 579 U.S. at 192. Otherwise, a matter may be "material" if a reasonable person would attach importance to it in determining a choice of action, regardless of the defendant's subjective beliefs about matter. *Id.*

9

The FCA does not *require* that defendants have *knowledge* that their misrepresentations to the Government are material. To the extent that a scienter requirement applies to materiality—and not just falsity—it is built into the materiality analysis through the "reasonable person" standard. Indeed, *Escobar* itself forecloses PVA's argument in its discussion of implied conditions of payment:

> [B]ecause a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to "deliberate ignorance" or 'reckless disregard' of the 'truth or falsity of the information' even if the Government did not spell this out.

*Id.* at 191. *Escobar* counsels that the materiality inquiry is holistic and largely objective in nature. *Id.* at 192–94; *see also United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019) ("No one factor is dispositive, and our inquiry is holistic.").

Here, the jury concluded that the PVA's false statements were material. The jury's finding was supported by the evidence at trial. It is also supported by the kind of common-sense analysis contemplated under *Escobar*. Just as "a *reasonable person* would realize the imperative of a functioning firearm," a reasonable person would not pay for services that had not been rendered absent an agreement to prospective payment. *Escobar*, 579 U.S. at 191.[10]

Accordingly, the Court declines to recognize a new fifth element for liability under the FCA and thus will not make a finding of fact regarding an allegedly omitted element.

## III.     Motion for Reconsideration of Partial Summary Judgment (ECF No. 234)

### a.  Legal Standard

"[T]he Federal Rules of Civil Procedure do not provide for a motion for reconsideration." *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004). Nonetheless, the Fifth Circuit

---

[10] In addition, to the extent that PVA suggests that reliance is also a requisite element for FCA liability, Fifth Circuit case law counsels otherwise. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009) ("The False Claims Act, in contrast, lacks the elements of reliance and damages.").

has considered motions to reconsider final judgments under Rule 59(e) and 60(b). FED. R. CIV. P. 59(e) (allowing a court "to prevent a manifest injustice" by altering or amending a judgment upon a timely motion); FED. R. CIV. P. 60(b) (allowing a court to "relieve a party or its legal representative from a final judgment, order, or proceeding" for "any . . . reason that justifies relief"); *see Doe v. Bridge City Indep. Sch. Dist.*, No. 20-40596, 2021 WL 4900296 at *1 (5th Cir. 2021) (Where appellants did not identify the rule by which they sought reconsideration, the court had discretion to analyze the motion under Rule 59(e) as a motion to alter or amend the judgment or under Rule 60(b) as a motion for relief from a judgment or order). Application of Rules 59(e) and 60(b) requires entry of a final judgment, however, and the Court has yet to issue a final judgment in this case, given the parties' numerous post-trial motions.

A court can revisit an interlocutory order, including an order on partial summary judgment, pursuant to Rule 54(b). *See* FED. R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990) ("[B]ecause the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law."), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994). Indeed, the Court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981).

"Although the precise standard for evaluating a motion to reconsider under Rule 54(b) is unclear, whether to grant such a motion rests within the discretion of the court." *Dos Santos v. Bell Helicopter Textron, Inc. Dist.*, 651 F. Supp. 2d 550, 553 (N.D. Tex. 2009). The standard would appear to be less exacting than that used in evaluating motions under Rule 59(e) or Rule 60(b). *See James v. Sadler*, 909 F.2d 834, 836 (5th Cir.1990) ("The policy interests underlying Rules 59 and 60, securing the finality of judgments, were not implicated in this case because the action was still proceeding against other defendants in the district court."). Still, the standards under Rule 59 and Rule 60 will inform the Court's analysis. *Vladmir Ltd. v. Pac. Parts Supply Co.*, No. CIV.A.SA-08-CV-819XR, 2009 WL 4110288, at *2 (W.D. Tex. Nov. 20, 2009). In particular, the Court considers whether the movant is simply pursuing its old arguments or improperly raising new arguments that should have been made earlier without any justification. *Id.*; *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (a Rule 59(e) motion "cannot be used to raise arguments which could, and should, have been made before the judgment issues"); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (Rule 59(e) cannot be used to "relitigate old matters" that have already been resolved).

### b. *Analysis*

In its motion, PVA contends Relators' claims fail under *SuperValu* because they did not submit conclusive evidence with their motion for summary judgment, or at trial, that PVA had any conscious awareness of the risk that it was submitting false claims before 2017. ECF No. 234 at 1–6. In response, Relators assert that PVA's arguments rely on a misunderstanding of *SuperValu*, which did not change the law applied by this Court in its summary judgment order. ECF No. 242 at 2–3. Relators further assert that they submitted ample evidence that PVA was aware that its pre-2017 billing practices were improper, while PVA submitted no evidence to the contrary. *Id.* at 4.

With respect to the scienter element, the FCA applies to those who "knowingly assist[] in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975). A person acts "knowingly" with respect to information if the person "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b); *see also SuperValu*, 598 U.S. at 749.

The Supreme Court's recent decision in *SuperValu* addressed the evidentiary standard for proving the scienter element, holding that scienter refers to the defendant's *subjective* knowledge and beliefs, not what a hypothetical objectively reasonable person might have known or believed. *SuperValu*, 598 U.S. at 750. In doing so, *SuperValu* rejected the existence of an "objectively reasonable" safe harbor for defendants. *Id.* Further, as the United States points out, "the [*SuperValu*] court did not limit the type of evidence that the government could use to prove intent, including evidence *after* claims are presented." ECF No. 241 at 8 (emphasis added).

While PVA implies that *SuperValu*'s description of the three different mental states listed under 31 U.S.C. § 3729 is somehow groundbreaking, this framework is nothing new. Of course, what matters is the knowledge and subjective beliefs at the time of the claim, as *SuperValu* makes clear. 598 U.S. at 750. The subjective nature of the inquiry, however, does not cabin FCA liability only to those who have *actual* knowledge that their claims are false, despite PVA's apparent argument to the contrary. *See id.* at 752 ("What typically matters at common law is whether the defendant made the false statement 'without belief in its truth or recklessly, careless of whether it is true or false.'" (quoting Restatement (Second) of Torts § 526, Comment e)). Even more, the Court in *SuperValu* explicitly declined foreclose the application of an objective form of

recklessness to FCA liability. *Id.* at 751 n.5.[11] Read faithfully, nothing in *SuperValu* suggests that a defendant can bury its head in the sand and avoid FCA liability in the face of overwhelming evidence that its submissions to the Government contained false statements. *United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*, 950 F.3d 277, 282-83 (5th Cir. 2020); *see also United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008). Simply put, *SuperValu* does not alter the Court's summary judgment analysis.

Next, PVA challenges the evidentiary support for the Court's summary judgment ruling on scienter. According to PVA, there is "no conclusive evidence in the record as to PVA's state of mind prior to the 2017 compliance billing email and notes," and "no evidence at all that before 2017, PVA knew that signed stand-alone reports were somehow required." ECF No. 234 at 4.

PVA's arguments are largely beside the point because they disregard much of the evidence considered. The Court did not rely exclusively on the 2017 compliance billing email and notes in reaching its conclusion on scienter; instead, it considered evidence spanning from 2012 through 2017 along with "widespread industry publications" that were "strong evidence that PVA recklessly disregarded industry practice." ECF No. 123 at 48–53 & n.2. The question here is not whether PVA *knew* that a stand-alone report was required prior to the submission of a claim to Medicare. Rather, the question is whether PVA knew when it submitted the claims in the "Double Billing" tranche that the claims falsely represented to the Government that both components of a study had been performed, or

---

[11] In relevant part, the Supreme Court noted:

> In some civil contexts, a defendant may be called "reckless" for acting in the face of an unjustifiably high risk of illegality that was so obvious that it should have been known, even if the defendant was not actually conscious of that risk. We need not consider how (or whether) that objective form of "recklessness" relates to the FCA today because, as noted above, it is enough to say that the FCA's standards can be satisfied by a defendant's subjective awareness of the claim's falsity or an unjustifiable risk of such falsity.

*Id.* at 751 n.5 (citations omitted).

acted in "deliberate ignorance" or "reckless disregard" as to the falsity of that representation. *See SuperValu*, 598 U.S. at 750; ECF No. 123 at 36–43; 51–52.

In short, *SuperValu* does not alter this Court's analysis, and the Court declines to accept PVA's invitation to reconsider its order granting partial summary judgment.

### IV.     Motion for a New Trial

#### a.  *Legal Standard*

The Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). A court may not "substitute its opinion for the jury's," but "[i]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citations omitted).

#### b.  *Analysis*

According to PVA, a new trial is warranted to reassess three separate issues: (1) scienter, (2) the number of false claims, and (3) damages. ECF No. 247 at 2. First, PVA reasserts the scienter arguments made in its motion for reconsideration and now rejected by the Court. *Id.* at 3–4. Second, PVA argues that the Court must grant a new trial to accurately determine the number of false claims because Relators improperly measured the number of false claims and relied only on an expert opinion that should have been excluded. *Id.* at 4–9. Third, PVA contends that Relators cannot support any damages finding at this stage because the Court lacks the authority to adopt an interest-based model of damages. *Id.* at 3. For the reasons addressed below, Relators argue, and the Court agrees, no new trial is needed to reassess any of these issues. ECF No. 249 at 3–7.

i.  Sciener

The Court declines to entertain PVA's scienter arguments for a third time. The Court finds no reason to disturb its order granting summary judgment as to scienter (ECF No. 123) and will not order a new trial on that basis.

ii.  Number of Claims

Next, PVA argues that this Court should order a new trial to properly assess the number of false claims submitted by PVA. First, PVA takes issue with the number of claims found by the jury for the "Double Billing" tranche to the extent that the verdict was based on Dr. Nye's testimony. ECF No. 247 at 4–5. According to PVA, Dr. Zachary Nye testified only to the total number of "Double Billing" false claims in the aggregate for the Medicare Part B, Medicare Railroad, and Advantage Plans, without any breaking down the claims by payor. *Id.* PVA further asserts the Dr. Nye's opinions were "based on irrelevant and inadmissible data beyond the FCA and result in an overinclusive representation that, even if accurate, would inflate the totals and prejudice PVA." *Id.* at 5 (quoting ECF No. 86 at 8). In turn, PVA contends that these flaws in Dr. Nye's testimony ultimately led to Realtors' counsel suggesting there were 4,650 unique patient visits as a measure of the total number of false claims during closing arguments without adequate support. *Id.* Second, PVA argues that the Court should have excluded Dr. Nye's testimony altogether, as he failed to properly calculate PVA's by counting unique patient visits rather than batched Form 1500 submissions to Medicare. *Id.* at 5–9.

In response, Realtors contend that neither argument warrants a new trial. First, Relators point out that, while Dr. Nye did not break down the unique patient visit count after the Court granted judgment for PVA as to federal payors other than Medicare Part B, the Relators presented a conservative figure of 4,650 false claims during closing argument. ECF No. 249 at 5–7. Second,

Relators contend that PVA ultimately agreed to the Court's modified jury instruction that defined claims as equivalent to unique patient visits. *Id.* at 7–8 (citing Tr. 712:23–713:5).

PVA simply has not demonstrated the need for a new trial to reassess the precise number of "Double Billing" false claims. Here, PVA primarily contends that "Dr. Nye incorrectly tallied the number of false claims, requiring a new trial where the numbers can be accurately determined," and that the Court should in effect reconsider its ruling on PVA's motion to exclude Dr. Nye's allegedly "unreliable" and "inadmissible" testimony. ECF No. 247 at 2, 4–5; ECF No. 250 at 5–8.

In its motion to exclude Dr. Nye's testimony, PVA contended that his analysis was irrelevant and unreliable because it relied on data that allegedly did not distinguish between the technical and professional component of a global claim and may have included claims submitted to private payors, resulting in an artificially inflated number of claims. ECF No. 86 at 6–8. The Court denied the motion, noting that PVA's "argument [went] to the weight of Dr. Nye's opinion, and [was] not grounds for exclusion. . . . PVA's concerns [were] properly addressed on cross-examination or the presentation of refuting evidence." ECF No. 123 at 27–28. However, now, PVA asserts two different arguments that are at best only tangentially related to those made in its admissibility challenge—that Dr. Nye (1) failed to present a specific number of "Double Billing" false claims submitted to Medicare Part B, and (2) applied the wrong measure when assessing the number of false claims submitted by PVA. To the extent that PVA seeks to have the Court revisit its admission of Dr. Nye's testimony on a basis not furthered in its motion to exclude Dr. Nye's testimony, the Court declines to do so.

Even so, to the extent that PVA seeks a new trial on the basis that the precise number of Medicare Part B false claims was not directly presented to the jury, the Court declines this request. At this stage, PVA's "burden is . . . to show that there is no evidence to support the jury's verdict."

*Sierra v. Dorel Juv. Grp.*, 663 F. App'x 307, 310 (5th Cir. 2016) (citing *Whitehead*, 163 F.3d at 269). Indeed, upon this Court's review of the record, there is evidence to support the jury verdict. Here, Dr. Nye testified to the total number of false claims submitted for the "Double Billing" tranche, and Relators put before the jury the data upon which that opinion was based. Tr. at 467:2–19; Pls.' Exs. 88, 116. While the Court later granted a directed verdict as to a portion of the "Double Billing" false claims, the jury was entitled to rely upon Dr. Nye's testimony and the accompanying data in arriving at the ultimate number of "Double Billing" false claims submitted.[12]

Second, PVA's next argument—that Dr. Nye improperly measured the number of claims using unique patient visits rather than counting batched Form 1500 submissions—fairs the same. To begin, as Relators point out, PVA's trial counsel agreed to the Court's modified jury instruction allowing unique patient visits as a measurement of claims. *See* ECF No. 249 at 7–8.[13] Notably, this was done at the request of PVA after it objected to the original proposed jury charge. Tr. at 711:16–713:4. Though PVA did later object to the Court's charge, PVA only offered a formulaic objection lacking any specificity and taking issue with the new charge only to the extent that it differed with PVA's originally requested jury charge. Tr. at 715:20–716:12. Thus, this specific issue had been resolved upon submission to the jury. *See id.* It is simply too late for PVA to change its position. *See Health All. Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 127 (S.D.N.Y. 2007), *aff'd*, 294 F. App'x 680 (2d Cir. 2008).

In addition, PVA's own case law contradicts PVA's position that the proper measure of claims is the number of batched Form 1500 submissions, rather than unique patient visits or the

---

[12] In addition, it is not clear whether PVA intends to advance this argument as an independent basis for a new trial or simply as a part of a last-ditch effort to challenge the admissibility of Dr. Nye's testimony. *See* ECF No. 247.

[13] After receiving input from both parties, the Court and the parties ultimately settled on the following language to present to the jury: "In determining the number of false claims, if any, you should consider each unique patient visit reflected on the Form 1500, or electronic equivalent, not the number of CPT codes on a claim." Tr. at 712:24–713:4.

associated individual Form 1500 submissions. *See* ECF No. 247 at 6–7. Though PVA cites to *United States v. Krizek* to flesh out its view of the Supreme Court's *Bornstein* decision, the D.C. Circuit in *Krizek* addressed nearly the same question PVA now presses before this Court—what is the proper measure of claims in Medicare FCA cases? 111 F.3d 934, 940 (D.C. Cir. 1997). In answering this question, Court in *Krizek* held that "the 'claim' in this context is the HCFA 1500 form." *Id.* at 943. Indeed, because Form 1500 is patient-specific, *see* Pls.' Ex. 35, the number of unique patient visits appears to be a sufficient proxy to allow a jury to measure the number of claims here with a reasonable certainty—a point that PVA conceded at trial. *See* Tr. at 712:24– 713:4, *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 610 (S.D. Tex. 2016) ("Relators have presented sufficient evidence for a jury to determine how many false claims were actually presented with reasonable certainty."). Accordingly, the Court will not order a new trial to reassess the number of claims issue.

### iii.   Interest-Based Damages

PVA further contends that the Court lacks authority to impose a new measure of damages at this late stage or enter a remittitur and must instead order a new trial. ECF No. 247 at 3; ECF No. 250 at 3–4. According to PVA, Relators failed to submit evidence of a legally viable damages theory, and the Court's rejection of Relators' damages calculation requires that it order a new trial to properly reassess the issue. *Id.* The Court disagrees.

### 1.   New Trial or Remittitur?

Although a court cannot "substitute its own opinion for the jury's," a court may remit the damages award as a matter of law where the precise determination of damages depends on the application of legal rules and there are no fact issues left for the jury to decide. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 261 F. Supp. 3d 14, 19 (D.D.C. 2017); *see also United States ex*

*rel. Feldman v. van Gorp*, 697 F.3d 78, 92 (2d Cir. 2012) ("We conclude, however, that here, where the question is not the benefit of the bargain between the plaintiff and the defendants, and the amount of each payment for which liability has been assessed is not in dispute, no further finding of fact as to the amount of the damages was necessary."). This proposition logically flows from the general rule that the proper measure of damages is a question of law, not a question of fact. *See TODCO Americas, Inc. v. El Paso oLeo E Gas Do Brasil, Ltda.*, No. CV H-08-1832, 2009 WL 10697535, at *4 (S.D. Tex. July 17, 2009); *Ronaldo Designer Jewelry, Inc. v. Cox*, No. 1:17-CV-2-DMB-DAS, 2020 WL 1124599, at *5 (N.D. Miss. Mar. 6, 2020). For example, a court can reduce damages where "it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there." CHARLES A. WRIGHT & ARTHUR R. MILLER, 11 FED. PRAC. & PROC. CIV. § 2815 (3d ed.); *see also Akey v. Placer Cnty.*, No. 2:14-CV-02402-KJM-DB, 2019 WL 5102241, at *4 (E.D. Cal. Oct. 11, 2019). The Court is faced with such a situation here.

As the Court explained in its order on PVA's renewed motion for judgment as a matter of law, it cannot ignore "the fact that the services for which PVA submitted claims were actually performed in every case." ECF No. 221 at 22. Thus, the Court held as a matter of law that the Government was entitled to an interest-based measure of damages. *Id.* at 24–25. The Court directed the parties to submit additional briefing on the question of damages because, "given PVA's failure to rebut Dr. Nye's testimony at trial or to present a workable interest model in its post-trial briefing," the Court had insufficient information from which to calculate damages at the time. ECF No. 221 at 25.

Outside of its calculation of final damages, the jury's remaining findings were left intact. *See id.*; ECF No. 201. PVA insists, however, that in order to revisit the proper calculation of the Government's damages, the Court must set aside the jury's findings and hold a new trial. ECF No.

250 at 3. PVA simply ignores the status of this case: there are no fact issues left for a jury to resolve.

Other courts have faced similar post-trial quandaries where the calculation of damages was straightforward given the jury's resolution of the fact issues and rooted in the same evidence relied on at trial. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 261 F. Supp. 3d 14, 17 (D.D.C. 2017). For example, in *Lorazepam*, after multiple plaintiffs were dismissed on appeal, the trial court relied on post-trial expert calculations in entering a remittitur to calculate damages for the remaining plaintiffs, even though the damages had been presented "in the aggregate" at trial. *Id.* at 18–19. The defendants sought to reopen discovery and hold a new trial on damages. *Id.* The court, however, noted that the jury had resolved all fact issues in rendering its verdict and the defendants had failed to identify any flaws in the expert's post-trial calculation's methodology. *Id.* at 19. Thus, there were simply "no facts in dispute or evidence to be weighed." *Id.* at 18–19.

Similarly here, PVA purportedly seeks a new trial on damages. *See* ECF No. 201; ECF No. 222 at 6–9; ECF No. 247 at 3; *see generally* ECF No. 230. PVA's briefing, however, amounts to yet another attempt to relitigate its liability and merely confirms that the reassessment of damages does not present a question for the jury. Tellingly, PVA spends the entirety of its post-trial damages briefing attacking the number of claims found by the jury rather than attacking the Relators' updated damages calculation based on the jury's findings. *See* ECF No. 222 at 6–9; ECF No. 230. And in response to the Court's requests for briefing on the proper calculation of damages, PVA has repeatedly recycled arguments that have already been rejected by the Court, premised not on the jury's findings but on the facts it *wishes* the jury had found. *See* ECF No. 222 at 6–9; *see generally* ECF No. 230. Much like the defendants in *Lorazepam*, PVA fails to challenge the methodology of Dr. Nye's post-trial calculations in either its post-trial damages briefing or its

motion for a new trial, taking issue instead with the number of claims found by the jury. *See* ECF Nos. 222, 230.

Thus, the parties' briefing confirms that the jury's findings are sufficient to allow the Court to accurately remit damages based on an interest-based theory of damages. In addition, although Relators did not cite specific trial evidence in support of Dr. Nye's calculations, the Court is satisfied that it can rely on them in entering a remittitur because his figures were produced using "PVA's datasets on which all of his prior work was based." ECF No. 222 at 5. Because the resolution of the damages issues is simply a matter of law and the updated calculation will be rooted in the same data that was presented at trial, the Court concludes that it can properly enter a remittitur as a matter of law in lieu of granting a new trial.

### 2. Applicable Interest Rate

Before entering remittitur, the Court must resolve one remaining question of law: the appropriate interest rate. Relators propose that the Court use the interest rate for overpayments and underpayments to Medicare providers published by the Secretary of Treasury and Centers for Medicare and Medicaid Services ("CMS interest rate"), which was, as of the date of the jury's verdict, 9.125%. ECF No. 222. PVA urges the Court to apply the federal post-judgment interest rate in effect on the date of the jury's verdict, 1.08%. *See* ECF No. 230. [14]

According to Relators, the CMS interest rate adequately measures the time-value of money to the Medicare program. ECF No. 222 at 4. It is commonly used in administrative proceedings related to Medicare overpayments and underpayments as well as in district court proceedings to recover Medicare overpayments. *Id.* at 2–4 (first citing *United States v. GentleTouch Healthcare,*

---

[14] Notably, PVA has continually moved the mark on this point, submitting varying interest rate proposals to the Court in its briefs. *See* ECF No. 208 at 15 (proposing "the typical Medicare interest rate on overpayments"); ECF No. 222 at 8 (proposing "a U.S. Treasury rate on average of between 1.92%–3.67% since the verdict"); ECF No. 230 at 10 (proposing the federal postjudgment interest rate of 1.08% in effect on the date of the jury's verdict).

*Inc.*, No. A-21- CV-725-RP, 2022 WL 3449496, at *3 (W.D. Tex. June 14, 2022); and then *United States v. Eshcol Health Care Servs. Inc.*, No. 3:21-CV-2280-S-BH, 2022 WL 4227533, at *1 (N.D. Tex. Aug. 22, 2022), *report and recommendation adopted*, No. 3:21- CV-2280-S, 2022 WL 4227521 (N.D. Tex. Sept. 13, 2022)). PVA objects that the CMS interest rate is inapplicable because the Government did not make any overpayments—PVA contends that it performed the services at the center of the disputed claims. *See* ECF No. 230 at 10.

The Court finds Relators' rationale far more persuasive—the CM intertest rate is the interest rate that properly measures the value of money to the Medicare program. Further, PVA's argument that there were no overpayments yet again misses the point. While the services for which it billed Medicare were ultimately performed, those services were performed *after* PVA submitted its requests for payment. And as the Court already recognized: "payment today is not the same as payment tomorrow." ECF No. 221 at 23 (citing *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935)). Accounting for the time-value of money, the government *did* overpay for PVA's services. Thus, the Court concludes that it can properly adjust damages here as a matter of law by applying the published CMS interest rate in effect on the date of the jury's verdict.

Accordingly, the Court will not order a new trial to reassess damages. Instead, the Court will enter a remittitur based on the Relators' proposed measure of interest-based damages and will enter final judgment with damages in the amount of $220,252 for the "Testing Only" tranche and $1,235,127 for the "Double Billing" tranche—resulting in a damages figure of $1,455,379. *See* ECF No. 222. Trebled, the damages award here amounts to $4,366,137. 31 U.S.C. § 3729(a)(1).

## CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** that:

PVA's motion for finding of fact regarding an omitted element (ECF No. 232) is **DENIED**.

PVA's motion to reconsider partial summary judgment on scienter (ECF No. 234) is **DENIED**.

PVA's motion for new trial (ECF No. 247) is **DENIED**.

Consistent with an interest-based model of damages, this Court will enter a remittitur as a matter of law for both the "Testing Only" tranche and the "Double Billing" tranche. A final judgment will issue separately pursuant to Rule 58.

It is so **ORDERED**.

**SIGNED** this 30th day of January, 2024.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE